EXHIBIT 11

Office of
# Inspector General
## Chicago Board of Education
Nicholas Schuler, Inspector General



# A n n u a l   R e p o r t

# F Y   2 0 1 7




January 1, 2018

Office of

# Inspector General

## Chicago Board of Education

Nicholas Schuler, Inspector General

---

January 1, 2018

To the citizens of Chicago and Illinois, the Illinois General Assembly and the Chicago Board of Education:

The following Annual Report of the Office of Inspector General for the Chicago Board of Education includes a summary of investigations and other matters reported to the Board of Education by the Office of Inspector General in Fiscal Year 2017 (July 1, 2016, to June 30, 2017), and is filed pursuant to 105 ILCS 5/34-13.1(e).

The OIG's investigative work in 2017 included a series of theft cases in which CPS employees used gift cards, paid for with school funds, to make personal purchases. In addition to the serious theft risks posed by the use of gift cards in CPS schools and departments, the OIG discovered other systemic problems associated with the use of gift cards. Notably, the OIG found that schools used gift cards to circumvent spending controls, such as the prohibition on the use of petty cash. The OIG also found that using gift cards in that manner was wasteful because CPS pays expensive fees charged by the vendors who sell the gift cards.

Other investigations detailed in this year's report include:

o   Residency violations by high-level Central Office employees in leadership positions;

o   Procurement violations, including contract "stringing" designed to circumvent competitive purchasing requirements and an attempt to evade the district's M/WBE contract requirements by using a minority-owned business as a "pass-through," instead of as a substantive provider of services;

o   Ethical violations, improper spending, thefts and other financial improprieties;

o   The theft of CPS-purchased CTA transit passes, and associated interference from CPS's Internal Audit and Compliance Department;[1] and

---

[1] The OIG publicly reported on that matter via a September 16, 2016, Significant Activity Report.

567 West Lake Street   ◆   Suite 1120   ◆   Chicago, Illinois   ◆   60661-1405
Phone: (773) 534-9400   ◆   Fax: (773) 534-9401   ◆   inspectorgeneral@cpsoig.org

o An investigation of various improper practices at the school located in the Cook County Jail.[2]

Additionally, the OIG formed a new Performance Analysis Section in Fiscal Year 2017, which is tasked with identifying and addressing policy deficiencies and systemic problems through independent and objective evaluations and reviews. This new section will serve as a deeply needed complement to the Office's Investigative Section. Although the Performance Analysis Section was not formed until the second half of the fiscal year — and was not fully staffed until Fiscal Year 2018 — it provided significant assistance on an important matter reported in 2017, the OIG's review of former CPS employees with Do Not Hire (DNH) designations working at charter schools.[3] Additional work by the Performance Analysis Section will be reported in the upcoming year.

As always, it is a privilege to serve the students and families of CPS. Know that this office remains dedicated to independent investigation and analysis to further its mission of rooting out waste and corruption within our school district. Please feel free to contact us with any concerns.

Sincerely,

Nicholas Schuler
Inspector General

---

[2] The OIG publicly reported on that matter via a Significant Activity Report that was released on September 12, 2017.

[3] The OIG publicly reported on that matter via a Significant Activity Report that was released on October 24, 2017.

# Table of Contents

**Section 1 — Office Overview** ........................................................................**1**
  A.  Mission and Budget..................................................................................1
  B.  Criminal Case Information and Updates................................................1
  C.  Ethics Violation by the General Counsel and Subsequent Cover-Up ...4
  D.  Training and Investigation Standards ....................................................5
  E.  Complaints Received in 2017..................................................................6

**Section 2 — Theft at CPS Involving Gift Cards Used as Petty Cash** .............**8**
  A.  Theft at Options School with Vulnerable Student Body .......................9
  B.  $10,500 Lost Through Principal's Theft and Mismanagement............10
  C.  Theft at Three Other Schools Involving Gift Cards .............................11

**Section 3 — Other Thefts and Financial Improprieties** ...............................**12**
  A.  Principal Used School Checks to Steal Over $22,000...........................13
  B.  Theft, Improper Spending and Nepotism by a Principal .....................14
  C.  Vendor Misappropriated $12,000 from CPS .......................................15

**Section 4 — "Stringing" and Other Procurement Violations** ......................**17**
  A.  Stringing Scheme Involving Three CPS Vendors .................................17
  B.  Textbook Publisher Attempted M/WBE Pass-Through.........................18
  C.  Principal's Misuse of the CPOR Procurement Process ........................19

**Section 5 — Residency Fraud, Tuition Fraud and SES Application Fraud** ...**20**
  A.  Residency Violations By High-Level Central Office Employees............21
  B.  Other Residency Violations Not Involving Tuition Fraud ....................22
  C.  Tuition-Fraud Cases Not Involving Selective-Enrollment Applications............25
  D.  Application and Admissions Fraud at Selective-Enrollment Schools...............27

**Section 6 — Payroll Fraud and Abuse of Sick Time** ....................................**31**

**Section 7 — Ethics Violations, Conduct Unbecoming and Other Matters** ...**33**
  A.  Violations Involving Farming and Horse-Breeding Programs.............33
  B.  Teacher Accepted Improper Gratuities from Private School................36
  C.  Conduct Unbecoming ...........................................................................36
  D.  Other Violations....................................................................................38

**Section 8 — Cases Involving Arrests or Criminal-Background Issues** ..........**39**
  A.  Matters Involving Allegations or Charges of Sexual Misconduct ........39
  B.  Driving Under the Influence and Other Driving-Related Offenses......41
  C.  Vendor Fraud, Battery, Harassment and Theft ...................................43

**Section 9 — Previously Reported Matters** .................................................**46**
  A.  Theft of CTA Passes and Internal Audit Interference .........................46
  B.  Improper Practices at School Serving Detainees in Jail.......................47
  C.  Employees with DNHs Working at Charters and Contracts.................47

**Appendices**

Office of

**Inspector General**

Chicago Board of Education

Nicholas Schuler, Inspector General

---

# FY 2017 ANNUAL REPORT

### SECTION 1 — OFFICE OVERVIEW

#### A. MISSION AND BUDGET

The mission of the Office of the Inspector General is to ensure integrity in the operations of Chicago Public Schools by conducting meaningful, accurate and thorough investigations into allegations of waste, fraud, financial mismanagement and employee misconduct. The OIG also reviews CPS systems, practices and procedures to determine their effectiveness in preventing waste, fraud and financial mismanagement.

In Fiscal Year 2017, the OIG's budget was approximately $2.05 million, which included 18 full-time positions.

#### B. CRIMINAL CASE INFORMATION AND UPDATES

##### 1. *Barbara Byrd-Bennett and The SUPES Academy*

In its Fiscal Year 2015 Annual Report, the OIG first reported on its joint investigation with federal authorities that led to the indictments of former CPS CEO Barbara Byrd-Bennett, Gary Solomon, Thomas Vranas, and two companies that were owned by Solomon and Vranas: The SUPES Academy and Synesi Associates. As that indictment detailed, Byrd-Bennett steered CPS contracts that were worth more than $23 million to her former employers, The SUPES Academy and Synesi Associates, with the expectation of hundreds of thousands of dollars in kickback payments. The indictment also alleged that the companies had provided Byrd-Bennett with improper benefits, such as expensive meals, an airplane ticket and seats at sporting events. In all, Byrd-Bennett was charged with 5 counts of wire fraud and 15 counts of mail fraud. On October 13, 2015, she pleaded guilty to one count of wire fraud pursuant to a plea agreement.

Since the OIG's 2015 Annual Report, Solomon and Vranas also pleaded guilty. They, along with Byrd-Bennett, also were sentenced and began serving prison time. The details of each individual's dispositions are as follows:

Office of Inspector General
Chicago Board of Education
2017 Annual Report

- o As noted above, Byrd-Bennett pleaded guilty to one count of wire fraud on October 13, 2015. On April 28, 2017, the U.S. District Court for the Northern District of Illinois sentenced her to four-and-a-half years in prison. Byrd-Bennett began serving her sentence on August 28, 2017.

- o On October 18, 2016, Solomon pleaded guilty to one count of wire fraud as part of a plea agreement. On March 24, 2017, the district court sentenced him to seven years in prison. Solomon began serving his sentence on October 10, 2017.

- o On April 12, 2016, and also as part of a plea agreement, Vranas pleaded guilty to one count of conspiring to commit federal program bribery. On April 28, 2017, the district court sentenced him to one-and-a-half years in prison. Vranas began serving his sentence on August 1, 2017.

In addition to Byrd-Bennett's, Solomon's and Vranas's criminal penalties, on March 10, 2016, CPS filed a civil lawsuit against the three individuals, The SUPES Academy and Synesi Associates, in the Circuit Court of Cook County. In its suit, CPS asked the court to award it $65 million dollars in restitution and penalties for the damage caused by the conspiracy to defraud the school district. The case is pending as of the date of this report.

The OIG continues to look at related administrative issues pertaining to The SUPES Academy.

The names of these subjects are included here because they already were identified in press releases from the U.S. Attorney's Office.

2. *OIG Assistance in Federal Tax Violation Case Against Bus Company Owner*

On September 22, 2016, the U.S. Attorney's Office for the Northern District of Illinois indicted Jewel Lockhart — the owner of Jewels Bus Co., which transported CPS students from 2008 to 2013 — on one count of having impeded the Internal Revenue Service and six counts of willfully filing false tax returns. From 2009 to 2011, Lockhart allegedly reported to the IRS that Jewels Bus's corporate income was more than $30.8 million when she, in fact, knew that the corporation's income substantially exceeded that amount. Also according to the indictment, Lockhart concealed that unreported corporate income, approximately $600,000 of which she used to purchase and renovate a half-a-million dollar home. Lockhart then allegedly deducted the funds in U.S. tax filings illegally. When later asked by an IRS officer about Jewels Bus's apparent failure to pay all of its owed taxes, Lockhart apparently lied by (1) stating that CPS was the company's only client; and (2) failing to acknowledge its numerous other customers.

Office of Inspector General
Chicago Board of Education
2017 Annual Report

The OIG assisted the federal authorities in their investigation, and the OIG joined then-U.S. Attorney Zachary Fardon and other federal authorities when announcing the indictment. The case is currently pending before the U.S. District Court for the Northern District of Illinois.

The names of these subjects are included here because they already were identified in press releases from the U.S. Attorney's Office.

### 3. Update on OIG Assistance in $33 Million Federal Fraud Case

In its Annual Report for the 2014 Fiscal Year, the OIG first reported on its assistance in an investigation with federal authorities that led to the indictments of "supplemental educational services" companies Brilliance Academy, Inc., and Babbage New School, Inc., and their executives — father and son Jowhar Soultanali and Kabir Kassam — for defrauding more than 200 school districts in 19 states, including Illinois, of more than $33 million. Specifically, Soultanali, Kassam and the two companies were charged with mail fraud and federal program bribery as part of a prolonged scheme, through which they (1) misrepresented the nature and quality of the educational services that Brilliance Academy and Babbage New School had provided; (2) submitted inflated invoices to the school districts; and (3) falsified student progress reports. Soultanali and Kassam also bribed school officials and teachers in other districts to make sure their fraud went undetected, including a Caribbean cruise for an assistant principal in Texas and an outing to a gentleman's club for a state education official in New Mexico. In addition, they bribed several other school officials with the expectation that the officials would help in procuring federal funds for the companies.

On August 23, 2016, Soultanali and Kassam each pleaded guilty to one count of mail fraud, pursuant to plea agreements. The U.S. District Court for the Northern District of Illinois sentenced both men on October 23, 2017. The court sentenced Soultanali to six years in prison, and Kassam to five years and ten months in prison.

The names of these subjects are included here because they already were identified in press releases from the U.S. Attorney's Office.

### 4. Update to Shakedown and Kickback Scheme (14-00928)

In its Fiscal Year 2015 Annual Report, the OIG reported that an investigation had determined that a high school engineer attempted to enlist a vendor in a kickback scheme, by which the engineer would prepare fraudulent purchase orders that inflated the actual cost of the vendor's work, creating a surplus of money that the two men could share. After the vendor reported the engineer's overtures to CPS, the

Office of Inspector General
Chicago Board of Education
2017 Annual Report

OIG worked in conjunction with the Office of the Cook County State's Attorney on a joint investigation.

After a joint operation with the State's Attorney's Office, the engineer was arrested. A Grand Jury of the Circuit Court of Cook County indicted the engineer on two counts of bribery (a Class 2 felony); two counts of official misconduct (a Class 3 felony); and one count of attempted theft of governmental property exceeding $500 in value and not exceeding $10,000 in value (a Class 2 felony).

In the wake of his arrest, the engineer's employment was terminated, and a Do Not Hire designation was placed in his personnel file.

The vendor was not charged. The OIG did not make any recommendations against him because he was the complainant and fully cooperated with the investigation.

The OIG now reports that on April 26, 2016, the engineer pleaded guilty in the Circuit Court of Cook County to one count of bribery, a Class 2 felony. He was sentenced to 18 months conditional discharge, 100 hours of community service, DNA indexing and $100 restitution to the vendor who cooperated in the case.

### C. ETHICS VIOLATION BY THE GENERAL COUNSEL AND SUBSEQUENT COVER-UP

On December 5, 2017, the OIG issued its final report to the Board of Education regarding an investigation into whether (1) then-General Counsel Ronald Marmer violated the Code of Ethics by improperly exercising "contract management authority" over legal work performed by Jenner & Block for the school funding litigation while Marmer had an existing "business relationship" with that firm; and (2) CEO Forrest Claypool and Marmer acted improperly with regard to the opinions of several in-house and outside attorneys who had concluded that Marmer either was already violating the Code of Ethics because he was exercising "contract management authority," or could not exercise such authority over work performed by Jenner & Block without violating the Code of Ethics.

The OIG concluded that Marmer violated the Code of Ethics. The OIG further concluded that Claypool improperly attempted to paper over the negative opinions of six attorneys with a cherry-picked but materially deficient opinion authored by a seventh attorney. In addition, after the OIG investigation was publicly known, Claypool took improper steps to alter relevant records with the intent of obscuring the work that an outside attorney had done on the matter. Claypool then greatly increased the severity of his misconduct by lying to the OIG in two separate interviews.

Office of Inspector General
Chicago Board of Education
2017 Annual Report

Based on the evidence, the OIG recommended the termination of Claypool's employment. The OIG also recommended that the Board discipline Marmer in an appropriate manner, up to and including termination of employment.

In the immediate wake of the OIG's report to the Board, Forrest Claypool and Ronald Marmer announced their resignations. On December 8, 2017, Forrest Claypool resigned, effective December 31, 2017. On December 12, Ronald Marmer resigned, effective December 22, 2017.

The OIG further recommended that the role and function of the Ethics Committee needs to be strengthened and defined. To date, the OIG has not heard back from the Board about that recommendation.

Consistent with its normal reporting practice, this investigation will be more fully detailed in the next year's Annual Report, as it was officially reported to the Board by the OIG in Fiscal Year 2018. The OIG, however, has included this brief summary in this year's report because the investigation was a significant concern for the OIG — and a matter of public attention — throughout Fiscal Year 2017. In particular, on December 7, 2016, the inspector general publicly addressed the Board to describe how the investigation was being improperly impeded at that time by improper assertions of the attorney-client privilege. In the wake of a subsequent interim report that the OIG issued to the Board in June 2017, the attorney-client privilege assertions stopped, and the OIG was able to complete its investigation.

Based on the significant public interest in this case, the Board publicly released the OIG's final reports to the Board, which were issued on December 5, 2017. Thus, further details regarding the OIG's investigation are already public, and the OIG has posted its Executive Memo and Final Summary Report for this investigation on its website: www.cpsoig.org.

### D. TRAINING AND INVESTIGATION STANDARDS

Many employees of the OIG are members of the Association of Inspectors General, a national organization of state, local and federal inspectors general and their staffs. The AIG offers training seminars and certification institutes for members as well as networking opportunities.

Currently, nine OIG employees hold the designation of Certified Inspector General or Certified Inspector General Investigator.

Participation in the AIG also offers employees continuing training in best practices related to the performance of the inspector general mission. Locally, the OIG

Office of Inspector General
Chicago Board of Education
2017 Annual Report

collaborates with IG offices from other state and local agencies to train all staff in a variety of areas related to investigations and audits.

The OIG conducts its investigations in accordance with the AIG's Principles and Standards for Offices of Inspector General, generally accepted principles, quality standards and best practices applicable to federal, state and local offices of inspectors general. In addition, the OIG, at all times, exercises due professional care and independent, impartial judgment in conducting its investigations and issuing its reports and recommendations.

### E. COMPLAINTS RECEIVED IN 2017

In Fiscal Year 2017, the OIG received 1,457 complaints alleging misconduct, waste, fraud and financial mismanagement at Chicago Public Schools, including allegations of misconduct by CPS employees or vendors and allegations of students residing outside the City of Chicago and attending CPS.

Of the 1,457 total complaints received, the OIG opened investigations into a total of 276 cases (18.9%). Several factors restrict the number of cases the OIG can open and investigate, including (1) a continuing focus on significant and often complex issues; (2) a particularly small staff size in relation to the OIG's total oversight responsibility (CPS has over 30,000 employees and an annual budget of $5.46 billion); and (3) time consumed by post-investigation activities (e.g., preparation and testimony for hearings, trials and labor arbitrations).

As previously reported by this office, the inability to investigate more complaints creates a substantial risk that instances of fraud and employee misconduct go undetected.

The OIG received 388 anonymous complaints, 26.6% of the total complaints received during the reporting year. Although the OIG responds to anonymous complaints, it is far more challenging to begin an investigation without the ability to question the complainant and evaluate the credibility of the information received.

Office of Inspector General
Chicago Board of Education
2017 Annual Report

The table below reflects the types of complaints received by the OIG in Fiscal Year 2017.

**Type of Complaint Received FY 2017**

| | | |
|---|---|---|
| Residency | 168 | 11.53% |
| Mismanagement | 274 | 18.81% |
| Inattention to Duty | 34 | 2.33% |
| Misappropriation of Funds | 30 | 2.06% |
| Criminal Background | 7 | 0.48% |
| Conduct Unbecoming | 27 | 1.85% |
| Falsification of Attendance Records | 42 | 2.88% |
| Falsification of Employment Records | 1 | 0.07% |
| Falsification of School Records | 31 | 2.13% |
| Test Cheating | 9 | 0.62% |
| Tuition Fraud | 65 | 4.46% |
| Grade Changing | 2 | 0.14% |
| Violation of Acceptable Use Policy (computer/email) | 3 | 0.21% |
| Violation of Magnet and Selective-Enrollment Policy | 13 | 0.89% |
| Sexual Harassment | 3 | 0.21% |
| Contractor Violations | 38 | 2.61% |
| Ethics | 39 | 2.68% |
| Discourteous Treatment | 139 | 9.54% |
| Losing One's Professional License | 8 | 0.55% |
| Preferential Treatment | 32 | 2.20% |
| Fraudulent Leave of Absence | 12 | 0.82% |
| Retaliation | 33 | 2.26% |

Office of Inspector General
Chicago Board of Education
2017 Annual Report

| Type of Complaint Received FY 2017 | | |
|---|---|---|
| Unauthorized Use of Board Property | 4 | 0.27% |
| Off-Duty Criminal Conduct | 30 | 2.06% |
| On-Duty Criminal Conduct | 32 | 2.20% |
| Discrimination | 15 | 1.03% |
| Miscellaneous | 366 | 25.12% |
| | **1,457** | **100.00%** |

## SECTION 2 — THEFT AT CPS INVOLVING GIFT CARDS USED AS PETTY CASH

Three OIG investigations (15-00387, 15-00982 and 15-01115) uncovered a wide-spread practice of CPS schools and departments using Board funds to purchase gift cards. Specifically, from January 1, 2013, to December 21, 2016, 80 CPS schools, Network offices, and Central Office departments have spent $250,691.90 to purchase 7,462 gift cards from three CPS vendors ("Vendor A," "Vendor B" and "Vendor C"). Of those gift cards, 6,576 were store- or business-specific gift cards (such as ones to be used at Target or for iTunes purchases), which were ostensibly intended to be used as student or family incentives. The remaining gift cards were large dollar amount Visa, MasterCard or American Express cards. As detailed further below, in each investigation, CPS personnel stole or misappropriated a portion of these gift cards. As such, the OIG has not only recommended administrative discipline, but also referred these cases to the Cook County State's Attorney's Office for additional investigation and possible criminal prosecution.

The OIG further identified several systemic issues surrounding the practice of purchasing and using gift cards. First, gift-card purchases are wasteful. Vendors that sell gift cards to CPS are essentially selling cash but they charge significant processing and service fees on top of the value of the gift cards. Those fees have been, on average, 18% markups on the gift cards purchased since January 1, 2013. But just as problematic, schools were purchasing large dollar amount Visa, MasterCard or American Express gift cards to circumvent the district's prohibition on the use of petty cash and to use in place of the discontinued procurement cards (or "P-Cards") — standard credit cards that were issued to schools or Network offices to purchase school-related items from businesses that were not CPS vendors.

Office of Inspector General
Chicago Board of Education
2017 Annual Report

As the OIG was concluding the three investigations, the OIG was made aware that the Board is considering reinstituting P-Cards to mitigate the problems with gift cards.

In each investigation, the OIG made the same overarching policy recommendations and observations. First, the OIG recommended that the Board enact a policy that precisely details (1) the circumstances under which schools may use gift cards as student or family incentives or rewards; and (2) the processes by which the gift cards will be tracked so that they can be sufficiently audited. The OIG also recommended that the policy limit gift-card purchases to one strategically sourced vendor that, after the requisite competitive procurement bidding process, would contract with CPS to provide gift cards while charging the lowest processing and service fees possible.

In addition, the OIG recommended that the Board enact a separate policy that prohibits the use of Visa, MasterCard or American Express gift cards as methods of payment for school-related expenditures as an improper circumvention on the prohibition on petty-cash accounts. The OIG requested that it be actively involved in the development of these policies.

Finally, the OIG agreed that the reinstitution of P-Cards could mitigate some of the issues surrounding gift cards by creating increased spending oversight through transparent auditing trails, and thus hold schools and network offices more accountable for their day-to-day expenditures. However, the OIG cautioned, P-Cards would be effective only so long as their reinstatement would not result in the improper spending that led to their prohibition in the first place.

It is the OIG's understanding that the Board is considering the OIG's policy recommendations. To date, however, the Board has not advised the OIG whether it will be implementing those recommendations. The three gift-card investigations are each summarized below.

### A. THEFT AT OPTIONS SCHOOL WITH VULNERABLE STUDENT BODY (15-00982)

In this investigation the OIG found theft involving gift cards and donated items at an Options high school serving a highly vulnerable student population with specialized needs. The principal of that high school and the school clerk told the OIG that, throughout the 2013–14 school year, the school had spent $3,466.60 to purchase eight gift cards from Vendor A (that together were valued at $3,200) to use in place of the discontinued P-Cards when making school-related purchases. However, the transaction records for the gift cards show that school personnel — including the principal and clerk, themselves — spent $3,193.63 of the $3,200 in gift cards on items or services that, at best, were only somewhat related to educational purposes

Office of Inspector General
Chicago Board of Education
2017 Annual Report

or, at worst, were clearly for personal reasons, such as the purchase of wedding favors for guests at the clerk's wedding, several purchases at a casino in Iowa and repeated expenditures at restaurants.

The OIG also uncovered numerous incidents of school personnel stealing items that were donated to the school's students, as well as outright theft of school funds. First, and most disturbingly, the principal stole presents and at least $500 in gift cards that were donated to the students and were intended to help address their specialized needs. The principal, school clerk and a computer technician at the school, together, misappropriated five iPad Airs that also had been donated to the school. In addition, the principal misappropriated approximately 30 new backpacks filled with school supplies that had been donated to the school. The principal gave the backpacks to a personal acquaintance, supposedly as part of a charitable trip the acquaintance organized.

The OIG also discovered that funds were stolen directly from the school. The clerk stole $654.97 in school funds by submitting fraudulent reimbursement requests. And the clerk, at the principal's direction, issued a $500 school check to a CPS employee who used to work at the school so that she could pay her rent.

Even more, the principal, computer technician and school clerk interfered with the OIG's investigation. Specifically, they attempted to intimidate a teacher at the school into lying to the OIG, and instructed her to falsely state that their former co-worker who was given $500 was only being reimbursed for purchasing books for the teacher. The teacher told the OIG about the attempt to intimidate her and signed a statement further confirming that the principal instructed her to tell the OIG a false story about borrowing money from the former employee to pay for books.

The OIG recommended that the Board terminate the employment of the principal, the school clerk, the computer technician and the employee who had moved to a different school. The OIG further recommended that the Board place Do Not Hire (DNH) designations in each of their personnel files. After the OIG issued its report, the principal and clerk resigned from their positions, and the Board subsequently advised the OIG that it placed DNH designations in their files. The Board also advised that it terminated the employment of the computer technician and the other employee and placed DNH designations in their files.

### B. $10,500 Lost Through Principal's Theft and Mismanagement (15-00387)

In this investigation the OIG discovered theft and mismanagement involving the use of gift cards at another school. A principal at a high school purchased 16 MasterCard gift cards, valued at $3,100, supposedly to pay for expenses related to school-

Office of Inspector General
Chicago Board of Education
2017 Annual Report

sponsored college tours. The principal, however, used the gift cards to make $1,502.67 worth of personal purchases, including, among other things, telephone bill payments for his personal account. He also stole an additional $404.99 directly from the school. In all, he stole a total of $1,907.66 from the school.

Apart from his theft, over the course of three school years, the principal mismanaged school funds when using school checks, issuing reimbursements, or tracking items that were purchased with school funds. Because of his mismanagement, $8,590.54 in school funds remain missing, including eight more gift cards worth $4,000 that the school had purchased from Vendor B.

The OIG asked Vendor B to provide documents related to the school's purchase of the eight, still-missing gift cards, but the company replied that it had no documents regarding the sale, demonstrating its inability to track its own gift-card sales, as discussed further with respect to the investigation below. Similarly, the school's financial records contain no documents that reflect that the principal or any other school employee took possession of the gift cards. Between the principal's thefts and his fiscal mismanagement, the school lost $10,498.20.

The principal resigned while under investigation by the OIG in this matter, and, before the OIG issued its report in this case, the Board placed a DNH designation in his personnel file for unrelated misconduct. Accordingly, the OIG did not recommend any discipline for the principal when it reported on this matter because he already had a DNH classification in his file.

The OIG's recommendations with respect to Vendor B are discussed below in the next gift-card investigation.

## C. THEFT AT THREE OTHER SCHOOLS INVOLVING GIFT CARDS (15-01115)

In this investigation, the OIG uncovered separate incidents at three other schools where CPS personnel ("Employee 1," "Employee 2," "Employee 3," "Employee 4" and "Employee 5") misappropriated or stole school-purchased gift cards to make a total of $5,515.87 worth of personal purchases. Among other improper purchases, the gift cards were used to pay for car detailing and service at a local BMW dealership and dinner at Mastro's Steakhouse (Employee 1), to make layaway payments at K-Mart (Employees 2 and 3), to pay for a social lunch at The Cheesecake Factory (Employee 4), and as "reimbursement" for a non-existent school-related expense (Employee 5).

The Board already had terminated Employee 1's employment and placed a DNH designation in his personnel file for other misconduct. Employee 2 and Employee 3, in turn, were listed as hourly employees whom CPS had not employed for months. Thus, to the extent that they remained CPS employees, the OIG recommended that

Office of Inspector General
Chicago Board of Education
2017 Annual Report

the Board terminate each of their employment and place DNH designations in their respective personnel files. Employee 4 resigned from CPS during this investigation. The OIG recommended that the Board place a DNH designation in her personnel file. As to Employee 5, the OIG recommended that the Board terminate her employment and place a DNH designation in her personnel file. The Board subsequently advised the OIG that it terminated the employment of Employees 2, 3 and 5 and placed DNH designations in their personnel files, as well as Employee 4's file.

As part of this investigation the OIG also discovered serious problems with Vendor B. Transaction records provided by Vendor B led the OIG to suspect that one of the company's employees had been defrauding the district by failing to deliver all of the gift cards for which CPS had paid. The employee, however, told the OIG that she did not steal gift cards from CPS, but instead stole them directly from Vendor B. Because Vendor B kept such poor records of its gift-card sales to CPS — a problem which was also found in the related investigation discussed above (15-00387) — the OIG could not determine whether the employee had stolen from CPS or Vendor B. But, in any event, the employee admitted she used Vendor B's business relationship with CPS to steal gift cards, which she and her husband used to make $4,043.62 worth of personal purchases, including a trip to Cancun. In addition, Vendor B's owner acknowledged the possibility that it had inflated its prices with regard to sales to one school in response to a purported billing dispute.

The OIG recommended that the Board permanently debar Vendor B and its owner for their (1) deficient inventory controls and records, (2) gross negligence in maintaining paperwork regarding business dealings with CPS, and (3) intentionally false pricing and invoicing with respect to one school. The OIG also recommended that the Board permanently debar Vendor B's employee who stole gift cards.

The Board has advised the OIG that the Board provided Vendor B, its owner and its employee with notice of their debarment and that the Board was engaged in settlement negotiations with the company. To date, those negotiations are still ongoing.


### SECTION 3 — OTHER THEFTS AND FINANCIAL IMPROPRIETIES

In addition to the gift-card cases discussed above in Section 2, the OIG investigated other notable cases involving theft and financial mismanagement. Discussed below are two cases involving principals who stole school funds, and one case involving a vendor who misappropriated CPS funds by depositing checks CPS sent the vendor by mistake.

Office of Inspector General
Chicago Board of Education
2017 Annual Report

### A. PRINCIPAL USED SCHOOL CHECKS TO STEAL OVER $22,000 (15-00490)

An OIG investigation determined that, over a four-year period, an elementary school principal stole at least $22,461.16 of school funds to purchase goods from Costco Wholesale Clubs and Apple Stores located throughout metropolitan Chicago for his and his family's personal use. The principal's wife, who was not a CPS employee, actively participated in the on-going thefts, in that she continuously accepted goods the principal had purchased with stolen school funds. Neither the principal — who had resigned by the time the OIG sought his interview — nor his wife, would speak with the OIG.

Between June 2011 and October 2014, the principal used 22 school checks to buy at least $10,698.40 worth of goods from Costco that, obviously, were not intended to be used at the school. Those purchases included, among hundreds of other items: very large amounts of liquor, beer and wine; large quantities of high-end food items, such as steaks, salmon filets and rib roasts; small household appliances; flatware; toiletries; and over-the-counter medicines. Some circumstantial evidence in the case suggests that many of these purchases were made for use in his wife's failing catering business. The OIG, however, could not confirm this because he and his wife refused to speak with the OIG.

From August 2010 to December 2014, the principal used six school checks to purchase at least $11,796.50 worth of electronic devices, software, warranties, memory upgrades, speakers and other accessories from Apple Stores. None of the devices that the principal had purchased with school checks were accounted for at the school, and eight devices purchased with school checks — including iPads, an iMac, a MacBook Pro, a MacBook Air and an iPhone — were directly traceable to either the principal or his wife. In addition, a former member of the school's Local School Council told the OIG that the principal had given her an iPad that he had purchased with school funds. Two other iPads purchased by the principal with school funds were registered to individuals who were not CPS employees, one of whom is the late mother of the principal's wife.

The school clerk acknowledged that she provided the principal with blank checks when instructed by him and that she suspected he was using them to make personal purchases. However, she stated that he intimidated her into always following his directives and that he did not allow her to attend any CPS trainings regarding accounting practices.

The OIG did not recommend administrative discipline for the principal because he left CPS shortly after the OIG opened this investigation, and a Do Not Hire (DNH) designation was placed in his personnel file at that time. With respect to the school

Office of Inspector General
Chicago Board of Education
2017 Annual Report

clerk, the OIG concluded that her involvement in this case did not warrant discipline. Her employment, however, was terminated for unrelated misconduct.

The OIG referred this matter to the Cook County State's Attorney's Office. In addition, the Board advised that it will initiate a legal action to recover the $22,461.16 in school funds that the principal and his wife stole.

## B.  THEFT, IMPROPER SPENDING AND NEPOTISM BY A PRINCIPAL (14-01007)

An OIG investigation determined that a principal of an elementary school stole $100 in CPS funds, signed her assistant principal's name on school checks, made expenditures that violated spending guidelines and violated CPS's nepotism policy. During a seven-month period, the principal signed her former assistant principal's name on 53 school checks, which totaled $11,427.90. School checks require two signatures and, at this school, the principal and the assistant principal were the signatories on the checking account. However, the principal told the OIG that, after her assistant principal left the school, she failed to get a new signatory on the account and resorted to signing the assistant principal's name on school checks improperly. Her actions were inherently deceptive and also violated CPS guidelines requiring that school checks be signed by two authorized individuals. Although, in most cases, the checks were for legitimate school expenditures, some of the checks were used for improper purposes.

In one instance, the principal signed the assistant principal's name on a reimbursement check she issued to herself to steal $100 from the school's internal accounts. More specifically, she issued herself a $160 check as reimbursement for a purchase that was only $60. During her tenure as principal, she issued herself 10 reimbursement checks totaling $2,541.75. She improperly signed the assistant principal's name on two of those checks. To ensure effective controls over internal account spending and sufficient levels of segregation of duties, the principal should not have been a signatory on any of the checks issued to her. By signing one signature line on eight of the checks, she defeated one level of review imposed by the two-signatory system, and by signing both lines on two of the checks, she completely circumvented the controls the system is supposed to provide.

The principal also violated spending guidelines by improperly using school funds for the direct benefit of staff, through a teachers' lunch club she managed. As part of the lunch club, expensive gourmet food was prepared for the teachers, and at least some of the food purchases violated spending guidelines because, although the teachers contributed some of their own money towards the club, the principal also spent funds from the school's accounts. For example, on one occasion, the principal spent $420 in school funds so the teachers could have lobster, shrimp, steaks and other

items for their lunch club meals. On another occasion, she spent $525 in school funds on lobster, crab, shrimp, salmon and steak, much of which, but not all, was given to the teachers.

In addition to the violations discussed above, the principal violated the prohibition on nepotism in the CPS Code of Ethics by requesting that her nephew come work at her school, where he then worked under her supervision. She also gave preferential treatment to her sister by repeatedly using her as a school vendor to provide services, which included, among other things, massages for teachers. Notably, the principal signed the assistant principal's name on one of the school checks she issued to her sister.

During the principal's two interviews with the OIG, she repeatedly misrepresented facts regarding material issues in this case, including signatures on school checks, payments for caterings services at the school, and her relatives who worked at the school. However, after the OIG showed her documentation that conflicted with her statements, she admitted to the violations discussed above.

Due to the principal's numerous violations, including theft, falsifying signatures and improper purchasing, the OIG recommended that the Board terminate her employment and place a permanent DNH designation in her personnel file. The Board advised the OIG that the principal resigned in the wake of the OIG's investigation, and that the Board subsequently placed a DNH in her file.

The OIG also found lesser violations with respect to the school's former lunchroom manager whom the principal asked to cater events for the school. The OIG found that the school's former lunchroom manager failed to receive Board approval to work secondary employment through his catering service and that he used his catering service to conduct work for the school in violation of the Code of Ethics because the principal paid him for a few of the after-school events that he catered. Notably, he did not charge any fee for most of the events he catered for the school.

The OIG recommended appropriate discipline for the lunchroom manager, but informed the Board that it should consider discipline at the lower end of the spectrum of possible action given that (1) he was fully forthcoming with the OIG, and (2) the principal specifically asked him to cater school events and specifically asked to pay him for his services. The Board advised the OIG that he is being given a written reprimand.

### C. VENDOR MISAPPROPRIATED $12,000 FROM CPS (16-01122)

An OIG investigation determined that a CPS vendor misappropriated $12,037.39 when she deposited two checks that CPS sent her inadvertently. CPS's Accounting

Department intended to send the checks to a different vendor but issued them to her instead due to a clerical error stemming from the fact that her name was similar to the other vendor's name. After she received the checks, she sent an email to the Accounting Department's general email account stating that she did not know why she had received the checks and asking for direction as to how to handle them. The Accounting Department failed to respond to her email and never voided the checks. Two weeks later, she deposited the checks in her bank account.

As part of the investigation, the OIG determined that the confusion between the names of the two vendors was an ongoing problem prior to the events that gave rise to this case. From 2011 to 2015, various CPS staff members created 28 purchase orders in which the vendor at issue in this case was listed mistakenly. In at least one prior instance, CPS also inadvertently released payment to her. However, that mistake was caught, and the check was voided before it was deposited. Thus, the OIG found that the vendor only accepted and deposited the two checks in the amount of $12,037.39 mentioned above.

The OIG concluded that the vendor did not take enough action in light of the obvious error and ultimately misappropriated the money. However, the OIG also concluded that CPS shared a portion of the blame in this matter because CPS failed to correct the mistake and void the checks, after the vendor notified CPS about the payment. CPS even sent income tax documentation to the vendor confirming that CPS paid her the money.

The OIG recommended that the vendor be permanently debarred. The OIG also recommended that, if financially practicable, the Board should pursue recovery of the $12,037.39 in funds that essentially were stolen by the vendor. The OIG did not refer this matter to the Cook County State's Attorney's Office, given the shared blame on the part of CPS, and the higher burden of proof in criminal cases.

The OIG further recommended that the Board ensure that the Accounting Department will be prevented from releasing any future payments to the vendor, even in the event of a clerical error. The OIG also recommended that the Accounting Department review its records for other recurring clerical errors and adopt controls to prevent the inadvertent payments that can result from these types of errors. Additionally, the OIG recommended that the Accounting Department take steps to ensure that its general email accounts are managed effectively and that all emails are reviewed in a timely fashion.

The Board advised that the vendor was permanently debarred and that the Board is still considering whether to pursue recovery of the misappropriated funds. The

Office of Inspector General
Chicago Board of Education
2017 Annual Report

Board has not advised whether any of the recommendations with respect to the Accounting Department will be implemented.

## SECTION 4 — "STRINGING" AND OTHER PROCUREMENT VIOLATIONS

In Fiscal Year 2017, the OIG continued to investigate "stringing" violations. Board Rule 7-12 prohibits "stringing," which is defined as dividing or planning any procurement program, activity, transaction, invoice, purchase order or agreement involving the Board or any of its operational elements (including offices, departments, bureaus, programs, units and schools) to avoid: (a) the competitive procurement processes set forth in Board Rule 7-2; or (b) the limitations on delegated authority set forth in Board Rule 7-15 or 105 ILCS 5/34-8.1.

The OIG also reported on an important procurement matter involving a vendor that improperly attempted to evade the Board's remedial program intended to mitigate the effects of race- and gender-based discrimination that minority- and women-owned business enterprises ("M/WBE") face when providing goods and services to CPS. *See* CPS Policy Manual § 401.18(I)(1.1)–(1.3) (Board Report 16-1207-PO2). That investigation is discussed below.

### A. STRINGING SCHEME INVOLVING THREE CPS VENDORS (14-00590)

An OIG investigation determined that, during the 2014, 2015 and 2016 Fiscal Years, a CPS vendor ("Vendor A") engaged in a three-part, interrelated stringing operation when selling office supply-related goods and services to dozens of schools and CPS departments, so as to circumvent the Department of Procurement's competitive bidding processes that are required when sales of biddable goods and non-biddable services exceed $10,000 and $25,000, respectively. Vendor A utilized two other CPS vendors ("Vendor B" and "Vendor C") as part of its three-armed scheme. In the stringing operation's first arm, Vendor B acted as a shell "alter-ego" corporation, to which Vendor A would direct schools' purchases when those schools were close to exceeding the procurement limits with it. In the second arm, Vendor A used Vendor C as a pass-through vendor when schools would be close to exceeding their spending limits with Vendor A. With the stringing operation's third arm, Vendor A simply combined the scheme's first two arms to simultaneously utilize its sham "alter ego" in Vendor B and its pass-through vendor in Vendor C to spread purchases across the three companies.

For the 2014, 2015 and 2016 Fiscal Years, Vendor A's sales to schools or departments totaled $1,143,981.44 when it alone sold goods or services — that is, when neither Vendor B nor Vendor C did business with those same schools or

departments. But when Vendor A did do business with schools to which Vendors B and C also sold goods or services — that is, when the stringing sales occurred — Vendor A sold an additional $641,493.63 worth of goods or services. Vendor A's total sales to schools over 2014, 2015 and 2016 equaled $1,785,475.07. Thus, one-third of those total sales were made through Vendor A's prolonged stringing operation.

The OIG recommended that the Board permanently debar Vendors A, B and C, as well as two of Vendor A's sales representatives and the owner of Vendor C, each of whom were involved in the stringing operation. In addition, because of the extent of the stringing that had occurred, the OIG recommended that the Board direct the Department of Procurement to review its training for district employees on stringing and other procurement-related matters to ensure that it is adequate. As part of that review, the OIG advised that Procurement should consider whether it should mandate such training on an annual or other cyclical basis.

The Board advised the OIG that it provided notice of debarments to each of the three vendors, to Vendor A's sales representatives, and to Vendor C's owner. In December 2017, the Board and Vendor A were engaged in settlement negotiations concerning Vendor A's debarment, and those negotiations are still ongoing, to date. The issue of the companies' and individuals' debarments will be presented to the Board in March 2018. It is the OIG's understanding that the Board is considering the OIG's recommendation regarding training.

### B. Textbook Publisher Attempted M/WBE Pass-Through (16-00817)

An OIG investigation determined that a textbook publisher — to which CPS had awarded a competitively bid contract worth up to $24 million of textbooks and professional development instruction — violated CPS's Remedial Program for M/WBE Participation in Goods and Services. Specifically, the vendor violated CPS's M/WBE policy in two ways.

First, when bidding on the proposed contract, the publisher informed CPS that it would give a percentage of a contract award to a certified minority-owned business entity ("MBE") subcontractor — as the contract required — when it actually never intended to do so. The proposed contract instructed bidding companies to specify, among other details, how they would direct at least 15% of contract-related work to MBEs. Initially, the publisher did not provide that information when submitting its bid. Instead, it argued in conversations and meetings with CPS's Departments of Business Diversity and Procurement that the M/WBE requirements should not apply because textbooks were finished goods, and thus the company had little need or opportunity to retain subcontractors that would satisfy the requirements. After Business Diversity rejected the publisher's position, the publisher submitted

Office of Inspector General
Chicago Board of Education
2017 Annual Report

materials that showed that it had entered into partnerships with subcontractors that satisfied the contract's 15% MBE requirement, including one in which it would give one MBE subcontractor 12% of the publisher's contract award to provide sales, marketing and professional-development services. The publisher's chief financial officer, though, repeatedly told the OIG the contrary: that the publisher and the MBE subcontractor never reached an agreement under which the publisher would give it 12% of the contract award.

In addition, email communications and evidence provided by the MBE subcontractor and the publisher's long-term sales agent revealed that the publisher — initially, at the MBE subcontractor's suggestion — had attempted to enter into a partnership arrangement, whereby it would give the MBE subcontractor a certain percentage of the contract award, and then instruct the MBE subcontractor to "pass-through" the majority of that award to the publisher's sales agent (who is white) and his company (which is not an M/WBE). In so doing, the publisher would pay its sales agent and his company for services with the funds that were earmarked for MBE subcontractors, while simultaneously misrepresenting that it was in compliance with CPS's M/WBE requirements. After reconsidering the propriety of that proposition, the MBE subcontractor rejected the proposal and later reported the publisher to CPS's Office of Business Diversity.

The OIG recommended that the Board debar the publisher, its CEO and its CFO for an appropriate length of time, including up to a permanent debarment. And the OIG also recommended that CPS's Department of Procurement should decline to execute the contract that it had awarded to the publisher, and should prohibit the publisher from providing any goods or services pursuant to that contract. In addition, the OIG recommended that the publisher's sales agent and his company be debarred for an appropriate length of time, while taking into account his truthful cooperation in the OIG's investigation.

The Board has advised the OIG that the publisher and its executives voluntarily agreed to cease all business with CPS until August 2019. The publisher's sales agent similarly agreed to a 30-day voluntary halt of CPS business, which the Board will address at its meeting in March 2018. On the OIG's recommendation, the Board did not discipline the MBE subcontractor or her company because, although she had suggested the improper pass-through arrangement, she ultimately rejected the publisher's proposed partnership and reported it to CPS.

## C. Principal's Misuse of the CPOR Procurement Process (16-00139)

An OIG investigation concluded that, on two separate occasions, a high school principal failed to follow the competitive-bidding process when submitting a Chief

Office of Inspector General
Chicago Board of Education
2017 Annual Report

Purchasing Officer Request (CPOR) to purchase services from a technology consulting group. Under the Board Rules, a school may purchase goods or services priced between $25,001 and $75,000 only upon submission of a CPOR application, and only after "at least three" companies have provided pricing bids for the goods or services sought. But in 2013, the principal purchased $52,822 worth of equipment and services from the consulting group without first obtaining the requisite three bids or submitting the required CPOR application. And in 2015, she improperly used the CPOR process to obtain approval retroactively for $74,444 worth of work that the consulting group had completed months earlier.

The principal resigned her position while under investigation. Because that investigation was sustained, the OIG recommended that the Board place a permanent Do Not Hire (DNH) classification in her personnel file. The Board subsequently advised the OIG that it placed a DNH designation in her personnel file.

### SECTION 5 — RESIDENCY FRAUD, TUITION FRAUD AND SES APPLICATION FRAUD

The cases in this section involve instances of (1) employee violations of the Board's residency policy (residency fraud), (2) parents who owe CPS non-resident tuition because their children did not live in the City of Chicago but nonetheless improperly attended CPS schools by using a false City address (tuition fraud), and (3) fraud with respect to applications for admission to selective-enrollment schools.

Significantly, in 2017 the OIG reported on four residency-fraud cases in which high-level Central Office employees in leadership positions were living in the suburbs. Those cases are discussed first, in subsection A. Subsection B includes a discussion of the other residency-fraud cases that did not also involve tuition fraud or falsified selective-enrollment applications. In residency fraud cases, the OIG recommends immediate termination of employment when employees who have violated the residency policy also lie about their address. This is because, per the Board's residency policy (Board Report 08-0227-PO1), an employee who lies about his or her address in conjunction with a residency violation is subject to immediate dismissal.

Non-selective–enrollment tuition fraud cases are discussed in subsection C. In those cases, the OIG found that suburban students were improperly attending CPS schools and that the families of those students were responsible for paying non-resident tuition for the years the students attended CPS. In Fiscal Year 2017, the statutory non-resident annual tuition rate was $12,878 per student.

Office of Inspector General
Chicago Board of Education
2017 Annual Report

The selective-enrollment cases are discussed in subsection D. As further explained below, those matters include suburban-residency fraud cases and "tier fraud" cases.

## A. Residency Violations By High-Level Central Office Employees

In 2017, the OIG found that several high-level Central Office employees in leadership positions violated the residency policy by living in the suburbs. The OIG previously has expressed its concern that CPS may not be setting the proper tone at the top with respect to the residency policy. The violations by high-level Central Office employees are particularly concerning given that CPS regularly terminates the employment of low-level employees for such violations. To ensure that there is not a double standard regarding the residency policy, the OIG investigates residency violations by employees at all levels.

o *Central Office Deputy Resided in Evergreen Park (16-00965)*

An OIG investigation concluded that a Central Office deputy violated the district's employee residency policy by claiming to live in the City of Chicago, when he actually resided in suburban Evergreen Park. The deputy misrepresented his suburban residency with the intent to avoid the residency policy's requirements and subsequently lied about where he lived.

In a report issued to the Board in December 2016, the OIG recommended that the Board immediately terminate his employment and place a permanent Do Not Hire (DNH) classification in his personnel file, as the residency policy mandates. Shortly thereafter, the Board informed the OIG that it would not immediately terminate his employment. Instead, the Board decided to continue his employment for a couple of months until a replacement could be located. The Board, however, ultimately allowed him to stay through the end of June 2017, when he resigned. The Board subsequently placed a DNH designation in his personnel file.

o *Head of a Central Office Department Resided in La Grange Park (16-00632)*

An OIG investigation determined that the head of a department in Central Office violated the residency policy by residing in La Grange Park and submitting a false Chicago address to CPS. He resigned shortly after the OIG interviewed him as part of this investigation. Had he not resigned, he would have been subject to immediate dismissal for violating the residency policy and lying about his actual residence. The OIG recommended that a permanent DNH designation be placed in his personnel file, and the Board advised the DNH designation was placed in his file.

Office of Inspector General
Chicago Board of Education
2017 Annual Report

  ○ *Another Head of a Central Office Department Resided in a Suburb (17-00167)*

An OIG investigation concluded that a second individual heading a department in Central Office violated CPS's residency policy. This department head resided in Broadview, Illinois, and failed to notify CPS that he was living there. Because he violated the residency policy and lied about his actual residence, he was subject to immediate dismissal. The OIG also learned during the course of the investigation that he was planning to resign from CPS to take a position with City Colleges of Chicago. The OIG recommended that the Board terminate his employment and place a permanent DNH designation in his personnel file. He subsequently resigned from CPS and obtained the position with CCC. The Board advised that it placed a DNH designation in his file. The OIG referred this matter to the CCC OIG for review and to take whatever action it deems appropriate.

  ○ *Director of Unit in Central Office and Wife Resided in Calumet City (15-01176)*

An OIG investigation determined that the director of a Central Office unit, and his wife, who worked in the district's Talent Office, violated the residency policy by residing in Calumet City, Illinois. They each misrepresented their residency with the intent to avoid the district's policy and lied about where they lived. Indeed, when the OIG confronted the director with substantial evidence showing that he and his wife were residing in Calumet City, he continued to insist — falsely — that they resided in Chicago.

The OIG recommended that the Board immediately terminate the director's employment, both for his residency violation and for his refusal to cooperate with the OIG's investigation by ignoring his obligation under Board Rule 4-4(m) not to provide "any false, deliberately inaccurate, or deliberately incomplete statements" to the OIG. The OIG also recommended that the Board place a permanent DNH classification in his personnel file. His wife resigned from CPS during the investigation, and the OIG recommended that the Board place a permanent DNH classification in her personnel file, as well. The Board subsequently advised the OIG that it terminated the director's employment and placed DNH designations in his and his wife's personnel files.

### B. Other Residency Violations Not Involving Tuition Fraud

This subsection includes residency violations investigated by the OIG that did not involve high-level CPS officers. Additional residency-fraud cases are addressed separately in the next two subsections because those cases also involved tuition fraud.

Office of Inspector General
Chicago Board of Education
2017 Annual Report

○ *Two Teachers, Husband and Wife, Resided in Palos Heights (16-01363)*

An OIG investigation determined that two married teachers working at the same elementary school violated the CPS residency policy by living in Palos Heights, in a home they have owned since 2002. They both lied about their residency when they listed a Chicago address with CPS and failed to report their true address. They also both refused to cooperate with the OIG by failing to answer questions about their residency.

They were each subject to immediate termination for violating the residency policy, and they also were subject to immediate termination for failing to cooperate with the OIG. Accordingly, the OIG recommended that the Board immediately terminate their employment and place DNH designations in their personnel files. The Board subsequently advised the OIG that the two teachers resigned following the OIG's investigation and that the Board placed DNH designations in their files.

○ *Principal and His Wife, Another CPS Employee, Resided in Suburbs (16-00926)*

An OIG investigation determined that a principal of an elementary school and his wife, a social worker employed by CPS, violated the CPS residency policy by living in Country Club Hills. They both lied about their residence by listing a Chicago address with CPS and failing to report their true address. Because they failed to comply with the residency policy and lied about it, their employment was subject to immediate termination.

The principal resigned shortly after he was interviewed by the OIG as part of this investigation. Therefore, the OIG recommended that the Board place a DNH designation in his personnel file. The OIG recommended that his wife's employment be terminated and that the Board also place a DNH designation in her personnel file. The Board advised the OIG that the Board placed a DNH designation in the husband's file and that dismissal proceedings are pending against the wife. To date, those proceedings are still pending.

○ *Selective-Enrollment High School Teacher Resided in Evanston (16-00907)*

An OIG investigation determined that a teacher at a selective-enrollment high school violated the residency policy by representing to the district that he resided in Chicago, when he actually resided in Evanston. The teacher admitted to the OIG that, two years after CPS hired him, he moved to Evanston. He insisted, though, that he was exempt from the residency policy because he was eligible to receive a special-needs residency waiver. But the teacher acknowledged that he did not actually have a residency waiver and had not even applied for one. Furthermore, the residency policy clearly states that it shall not "be interpreted to permit an employee who was

Office of Inspector General
Chicago Board of Education
2017 Annual Report

a City resident at the time of hire to be eligible to apply for a waiver for the purpose of changing his or her residency."

The OIG recommended that the Board immediately terminate the teacher's employment and place a DNH designation in his personnel file. The Board advised that the teacher resigned from CPS after the OIG issued its findings, at which time a DNH designation was placed in his personnel file.

> o   *Elementary School Teacher Resided in Crete (15-00607)*

An OIG investigation concluded that an elementary school teacher violated the residency policy by intentionally misrepresenting that she lived in Chicago when she actually resided in Crete, Illinois. In addition, the teacher provided the OIG with numerous pieces of false information throughout its investigation.

The OIG recommended that the Board immediately terminate the teacher's employment, both for her residency violation and for her refusal to cooperate with the OIG's investigation by ignoring her obligation under Board Rule 4-4(m) not to provide "any false, deliberately inaccurate, or deliberately incomplete statements" to the OIG. The OIG also recommended that the Board place a permanent DNH classification in her personnel file. The Board advised that it has initiated dismissal proceedings against her. To date, those proceedings are still pending.

> o   *Elementary School Teacher Resided in Bolingbrook (15-00414)*

An OIG investigation determined that an elementary school teacher violated the district's residency policy by residing in Bolingbrook, Illinois, and by misrepresenting to CPS that she lived in Chicago with the intent of avoiding the policy. The teacher resigned while under investigation by the OIG. If not for her resignation, the OIG would have recommended that the Board immediately terminate her employment. Because she resigned, the OIG recommended that the Board place a DNH designation in her personnel file. The Board subsequently advised the OIG that it placed a DNH in her file.

> o   *School Business Manager Resided in Lockport (15-00625)*

An OIG investigation concluded that a high school business manager violated the residency policy by residing in Lockport, Illinois, instead of Chicago, and that she misrepresented her residency with the intent to avoid the policy. The OIG, though, delayed reporting its findings to the Board because of her central involvement in a separate investigation discussed above (14-00590), which was ongoing when the OIG concluded that she had violated the residency policy. While the OIG was investigating that other matter, the district laid off the business manager. The OIG

Office of Inspector General
Chicago Board of Education
2017 Annual Report

ultimately reported on this residency matter when it reported on the other investigation. Given that the business manager was no longer employed by CPS, the OIG recommended that the Board place a permanent DNH classification in her personnel file. The Board subsequently advised that it placed a DNH in her file.

> o *School Counselor Resided in Wheeling (15-00706)*

An OIG investigation concluded that a school counselor violated the residency policy by residing in Wheeling, Illinois, and misrepresented her residency with the intent to avoid the district's policy. The OIG recommended that the Board immediately terminate her employment and place a DNH designation in her personnel file. The Board advised that, while dismissal proceedings were pending, she submitted her resignation, effective January 2, 2018. The Board then placed a DNH in her file.

> o *School Culture Coordinator Resided in University Park (17-00011)*

An OIG investigation concluded that a school culture coordinator at an elementary school violated the residency policy by residing in University Park, Illinois, instead of Chicago. After being interviewed by the OIG, he submitted his resignation and told his principal that he was resigning because he was living in a suburb and the OIG had enough evidence to prove he was violating the residency policy. Because he already had resigned when the OIG reported on this matter, the OIG recommended that the Board place a DNH designation in his personnel file. The Board advised that it placed a DNH in his file.

### C. TUITION-FRAUD CASES NOT INVOLVING SELECTIVE-ENROLLMENT APPLICATIONS

This subsection includes cases in which suburban families used false addresses to send their children to CPS schools and, consequently, owe CPS non-resident tuition. The statutory non-resident annual tuition rate was $12,878 per student in Fiscal Year 2017. In most of these cases, one or both of the parents were CPS employees, who also were in violation of the employee-residency policy by living in the suburbs. One case involving tuition fraud and residency fraud is discussed in the next subsection because it also involved selective-enrollment application fraud.

> o *Teacher and Three Children-Students Lived in Harvey (16-01219)*

An OIG investigation concluded that an elementary school teacher violated the CPS residency policy by living in Harvey, Illinois, and intentionally misrepresenting her residency with the intent to avoid the policy. In addition, she and her husband lived in Harvey with their three daughters, who all attended CPS schools despite living in the suburbs. Specifically, CPS records revealed that the oldest daughter attended CPS schools from 2006 to 2012, the middle daughter attended CPS schools from 2006 to

Office of Inspector General
Chicago Board of Education
2017 Annual Report

2014, and the youngest daughter attended CPS schools from 2006 to 2017, when she graduated. Their mother, however, told the OIG that the CPS records were incomplete and that her daughters all actually attended CPS schools from first grade through their high school graduations, and all while they were living in Harvey.

The OIG recommended that the Board immediately terminate the teacher's employment and place a permanent DNH classification in her personnel file. In addition, the OIG recommended that, if financially practicable, the Board take steps to recover the non-resident tuition that the teacher owed to the district based on the amount of time that her daughters attended CPS schools while they resided outside of Chicago. However, the OIG left it to the Board's discretion as to whether to seek the amount supported by CPS records ($264,964.78) or the amount based on the teacher's admission that her daughters each resided in Harvey while attending CPS schools from first grade through graduation ($345,615.37).

The Board advised the OIG that the teacher resigned in the wake of the OIG's investigation and that the Board placed a DNH designation in her personnel file. None of the students were disenrolled from their schools because they already had graduated when the OIG reported on this matter. The administration also advised that it is planning to pursue the recovery of non-resident tuition from the parents.

> o *Security Guard and Children-Students Resided in Calumet City (16-00759)*

An OIG investigation determined that an elementary school security guard violated the residency policy by residing in Calumet City, Illinois, instead of Chicago, and by misrepresenting his residency with the intent to avoid the policy. In addition, his three children improperly attended CPS schools while living with him in Calumet City. Specifically, his daughter attended CPS schools during the 2013–14 school year and a short part of the 2014–15 school year, while living in Calumet City. And his two sons attended a CPS school during the 2016–17 school year, while living in Calumet City. The OIG found that the security guard and his wife owed CPS non-resident tuition in the amount of $38,632.68 for the three years that the children attended CPS schools, plus pro rata tuition for the segment of the 2014–15 school year in which the daughter attended CPS.

Shortly after the OIG interviewed the security guard in this matter, he resigned from CPS. But for his resignation, the OIG would have recommended that his employment be terminated immediately. In light of his resignation, however, the OIG recommended that the Board place a permanent DNH classification in his personnel file. The OIG also recommended that his two sons, who were still attending CPS, be disenrolled from their school. In addition, the OIG recommended that, if financially

Office of Inspector General
Chicago Board of Education
2017 Annual Report

practicable, the Board take steps to recover the non-resident tuition owed by the security guard and his wife.

The Board subsequently advised the OIG that it placed a DNH in the security guard's personnel file and disenrolled his two sons. The Board also advised that it is pursuing the recovery of the $38,632.68 in non-resident tuition that they owed.

> o   *Elementary Student Resided in Calumet City (17-00245)*

An OIG investigation determined that, in the middle of the 2016–17 school year, a student attending a CPS elementary school moved to Calumet City with his mother from their previous address in Chicago. The OIG determined that there was no violation in this case because CPS students who leave Chicago and move to the suburbs during the middle of the year are allowed to remain in their school until the end of the year. As such, the student's mother was not responsible for any non-resident tuition. Nevertheless, the OIG recommended that the student be disenrolled from the school at the end of the year. The Board subsequently advised that the student was disenrolled at the end of the year.

### D.   APPLICATION AND ADMISSIONS FRAUD AT SELECTIVE-ENROLLMENT SCHOOLS

Over the past few years, the OIG has identified numerous instances of application and admissions fraud at CPS's selective-enrollment schools. Those cases can include suburban-residency fraud, "tier fraud" or both. Enrollment in CPS's selective-enrollment schools is limited to Chicago residents. Thus, the suburban-residency fraud cases are simply those cases in which suburban families lied about their residency so that their children could attend selective-enrollment schools.[4] Tier fraud occurs when families lie on their selective-enrollment applications by falsely claiming that they live in a lower socio-economic area, or "tier," than they actually do to cheat the system and improperly gain admission to a selective-enrollment school.[5]

---

[4] Suburban residents, of course, are generally not eligible to attend any CPS school, let alone the fiercely competitive selective-enrollment schools and programs. As discussed above, not only are suburban students subject to disenrollment, their families also owe CPS tuition for the years the students attended CPS schools as non-residents.

[5] The selective-enrollment admissions process considers socio-economic factors that relate to the census tract in which an applicant resides at the time of application. The policy is intended to increase selective-enrollment opportunities for students from lower socio-economic areas. The census tracts are broken down into four tiers. Under the current policy, a total of 30% of the available seats are filled in rank order using only testing/academic criteria. The remaining available seats (subject to very limited exceptions) are filled from four rank-order lists that further categorize students by their respective socio-economic tiers (i.e., census tracts), with each tier contributing 25% of the students to the remaining available seats. Students from the higher tiers usually must have better scores than those in the lower tiers. Thus, lying about a

Office of Inspector General
Chicago Board of Education
2017 Annual Report

Thus, tier fraud cases often involve families that actually live in Chicago, but in higher socio-economic areas of the City than were represented on the selective-enrollment applications. Students who have engaged in tier or suburban-residency fraud are disenrolled from any selective-enrollment school or program to which they were admitted and permanently banned from attending any selective-enrollment school or program in the future.

In the first three cases discussed below, the families engaged in suburban-residency fraud. In the last two cases, the families committed tier fraud.

> o  *Custodians and Children-Students Resided in Burbank (16-00204)*

An OIG investigation determined that a husband and wife, who were both employed by CPS as custodians, violated the residency policy by residing in Burbank, Illinois, and misrepresenting their residency with the intent to avoid the residency policy. They also violated the student-residency policy by enrolling their children in CPS schools even though they were living in Burbank. Specifically, their daughter attended a CPS elementary school as a non-resident from the 2011–12 school year through the 2014–15 school year, and then attended a selective-enrollment high school, Lindblom Math and Science Academy, as a non-resident from the 2015–16 school year through the 2016–17 school year. Their son attended a CPS elementary school as a non-resident from the 2011–12 school year through the 2016–17 school year. Additionally, the parents falsified the daughter's selective-enrollment high school application by listing a false Chicago address, instead of the Burbank address where she actually lived.

The OIG recommended that the Board immediately terminate the husband's and wife's employment and place permanent DNH classifications in their personnel files. Because the daughter's selective-enrollment application was falsified, the OIG recommended that she be disenrolled from Lindblom and permanently banned from all CPS selective-enrollment schools and programs. Although the son was not attending a selective-enrollment school, he was still improperly enrolled in CPS as a non-resident. Thus, the OIG also recommended that he be disenrolled from his school. In addition, the OIG recommended that, if financially practicable, the Board recover the non-resident tuition that the parents owed CPS for the years that their children fraudulently attended CPS schools, which amounted to $120,988.64 for all the years up to the end of the 2015–16 school year, plus the additional tuition owed

---

student's address is one way to cheat the system and obtain a seat at a selective-enrollment school.

Office of Inspector General
Chicago Board of Education
2017 Annual Report

for the period of time during the 2016–17 school year that they ultimately attended their CPS schools.

The Board advised the OIG that it terminated the husband's and wife's employment and placed DNH classifications in their files. The daughter was disenrolled from Lindblom at the end of the school year and permanently banned from CPS selective-enrollment schools and programs. The son was disenrolled from his elementary school at the end of the year, as well. However, the Board advised that the family subsequently established that they moved into the City of Chicago and, as such, for the 2017–18 school year, the son was allowed to re-enroll in his CPS elementary school, and the daughter was allowed to enroll in a CPS neighborhood high school. Finally, the Board advised that it is pursuing the recovery of non-resident tuition from the parents in the amount of $146,743.76. That figure includes the amount owed for prior years of tuition ($120,988.64), plus the tuition cost for the children attending CPS for the full year in 2016–17 ($25,755.12).

- o *CTE Coordinator and Two Children-Students Lived in Berwyn (14-00800)*

An OIG investigation determined that a high school CTE coordinator committed multiple violations of CPS policy with respect to her residency and the residency of her two children. The CTE Coordinator falsified her son's selective-enrollment high school application to reflect that he was living in Chicago when he was actually living in Berwyn. Despite the falsified application, her son was not selected for admission to any selective-enrollment school. He and his sister, however, enrolled in and attended a CPS magnet high school while they were both residing in Berwyn. Because the daughter attended the CPS high school as a non-resident for the 2015–16 and 2016–17 school years, and the son attended the school as a non-resident for the 2016–17 school year, the OIG found that their mother owed CPS non-resident tuition in the amount of $38,632.68. Furthermore, their mother, a CPS employee, also violated the district's employee-residency policy by living in Berwyn and falsely representing that she was living in Chicago.

The OIG recommended that the Board terminate the mother's employment, place a DNH classification in her personnel file and pursue the recovery of non-resident tuition from her in the amount of $38,632.68, if financially practicable. In addition, the OIG recommended that her son be disenrolled from his CPS school and that he be permanently banned from CPS selective-enrollment schools because his selective-enrollment application was falsified. With respect to the daughter, the OIG acknowledged that she was nearing the conclusion of her senior year and, in keeping with the Board's practices in such instances, she would be allowed to finish her semester and her graduation would moot the disenrollment issue.

Office of Inspector General
Chicago Board of Education
2017 Annual Report

The Board advised that it pursued dismissal proceedings against the mother. To date, those proceedings are still pending. The Board also initiated proceedings to recover $38,632.68 in non-resident tuition from the mother and father. The Board further advised that the daughter graduated and the son was disenrolled from the magnet high school he attended. The Board did not permanently ban the son from CPS selective-enrollment schools, despite his falsified application, because he had not been selected for admission to any of those schools. In addition, the Board notified the OIG that the son subsequently established residency in Chicago and enrolled in a CPS neighborhood high school.

> o *Suburban Family Enrolled Daughter in Regional Gifted Center (16-01157)*

An OIG investigation determined that a family living in Matteson, Illinois, fraudulently enrolled their daughter in Lenart Elementary Regional Gifted Center (a selective-enrollment school), for the 2014–15, 2015–16 and 2016–17 school years. During those three years, the daughter attended Lenart while residing in Matteson in violation of the CPS student residency requirement.

In accordance with CPS policy and the rules of the Office of Access and Enrollment, the OIG recommended that she be disenrolled from Lenart and that she be permanently banned from CPS's selective-enrollment schools and programs. In addition, the OIG found that her parents owe CPS $12,877.56 for each year that she attended Lenart. Therefore, the OIG recommended that CPS pursue non-resident tuition from them in the amount of $38,632.68, if financially practicable.

The Board advised the OIG that the student was disenrolled from Lenart and permanently banned from attending any selective-enrollment school or program. The Board also advised that it is pursuing the recovery of $32,193.90 in non-resident tuition from the parents.

> o *North Center Family Falsely Claimed to Live in North Lawndale (17-00340)*

An OIG investigation determined that an eighth grader was improperly admitted to Payton College Prep for the 2017–18 school year after his parents committed tier fraud by listing a false Tier 1 address in the North Lawndale neighborhood on his selective-enrollment high school application. Had they listed the Tier 4 address where the family actually resided in the North Center neighborhood of Chicago, he would not have qualified for admission to Payton. By submitting false information on their son's application, the parents violated the Board policy and the OAE rule prohibiting such fraudulent representations in the application process.

Consistent with Board policy and OAE rules, the OIG recommended that the student be disenrolled from Payton, and that he be permanently banned from enrolling at

any other CPS selective-enrollment school or program. The Board subsequently advised the OIG that the student was disenrolled from Payton and permanently banned from all selective-enrollment schools and programs.

> o *Beverly Family Falsely Claimed to Live in Little Village (17-00493)*

An OIG investigation found that a CPS high school teacher and his wife falsified their son's selective-enrollment high school application to reflect that he resided at a Tier 1 address in the Little Village neighborhood instead of the family's actual address in the Beverly neighborhood, which was classified as Tier 4. Thus, the OIG found that the family committed tier fraud. As a result of the misrepresented Tier 1 address listed in the son's application, he gained an improper advantage during the selection process and was admitted to Jones College Prep, where he otherwise would not have been admitted.

The OIG recommended that the student be disenrolled from Jones and, consistent with the rules set forth by OAE, be made permanently ineligible for further enrollment in any CPS selective-enrollment school or program. The OIG further noted that the father's participation in the family's fraud was grounds for the termination of his employment under CPS's policy that governs selective-enrollment admissions. As such, the OIG recommended that the Board terminate his employment and place a DNH designation in his personnel file.

The Board advised the OIG that the student was disenrolled from Jones and permanently banned from attending any selective-enrollment school or program. His father was placed on suspension during the pendency of his disciplinary proceedings and, to date, that process is still pending.

## SECTION 6 — PAYROLL FRAUD AND ABUSE OF SICK TIME

> o *School Counselor Falsified Manual Time-Entry Forms (16-00815)*

An OIG investigation determined that a school counselor at a high school submitted false time-entry forms that misrepresented the hours he worked. Specifically, he asserted that he had worked three full days when, in fact, two of those days he worked half days and the third day he was completely absent. The counselor resigned his position with CPS while under investigation. The OIG recommended that the Board place a permanent Do Not Hire (DNH) designation in his personnel file, and the Board subsequently advised the OIG that a DNH was placed in his file.

Office of Inspector General
Chicago Board of Education
2017 Annual Report

    o   *Teacher Used Sick Time to Take Three Vacations (15-01072)*

An OIG investigation concluded that, during the 2015–16 school year, a teacher at an elementary school violated the CPS policy regarding paid time off by using nine sick days to take three vacations. Specifically, the OIG found that she used two sick days to go on a Caribbean cruise, used one sick day to go to New York and used six sick days to travel to Europe. She admitted that she was not sick when she used those sick days.

The OIG recommended appropriate discipline for the teacher. The Board advised the OIG that it filed dismissal charges against her and that she has been suspended without pay during the pendency of those proceedings. To date, those proceedings are still pending.

    o   *Teacher Used Sick Time for Wedding-Related Events (16-00879)*

An OIG investigation concluded that an elementary school teacher improperly used sick time to attend events related to her wedding. The teacher admitted that, because of her misunderstanding of the rules surrounding the proper use of benefit time, she used sick time to take time off from work on six days to focus on her wedding, and not because she was, in fact, sick.

The OIG recommended appropriate discipline for the teacher. The Board advised the OIG that it terminated the teacher's employment and placed a DNH in her personnel file.

    o   *Teacher Used Sick Time To Vacation in Mexico (15-00941)*

An OIG investigation determined that an elementary school teacher improperly used sick time for a vacation in Mexico. The teacher told the OIG that no one had explained to him the difference between the proper use of sick time and personal-business time, and related that, at the school where he taught, no one differentiated between sick time and personal-business time. The OIG recommended that the Board impose appropriate discipline. In August 2017, the teacher was suspended without pay, and the Board advised the OIG that it was still reviewing the matter. To date, her disciplinary proceedings are still pending.

    o   *SECA Used Sick Time to Vacation in Las Vegas (17-00492)*

An OIG investigation determined that a special education classroom assistant at an elementary school violated the CPS policy regarding paid time off by using two sick days to take a vacation in Las Vegas. The OIG recommended that the SECA be given

Office of Inspector General
Chicago Board of Education
2017 Annual Report

appropriate discipline. The Board advised the OIG that the Board terminated her employment and placed a DNH designation in her personnel file.

> o  *Teacher Refused To Cooperate with OIG Investigation (16-01341)*

An OIG investigation concluded that an elementary school teacher refused to cooperate with an OIG investigation, in violation of Board Rule 4-4(m). When investigating whether the teacher had improperly obtained secondary employment while on a prolonged period of leave under the Family and Medical Leave Act of 1993, the OIG asked to interview the teacher. The teacher, though, repeatedly failed to make herself available to be interviewed, even after the OIG informed her that failing to do so could result in a finding that she did not cooperate with the OIG.

The OIG recommended that the Board terminate the teacher's employment and place a DNH designation in her personnel file. The Board subsequently advised the OIG that the teacher resigned in the wake of the investigation, and that the Board placed a DNH classification in her personnel file.

## SECTION 7 — ETHICS VIOLATIONS, CONDUCT UNBECOMING AND OTHER MATTERS

### A.  VIOLATIONS INVOLVING FARMING AND HORSE-BREEDING PROGRAMS (15-00822)

An OIG investigation found multiple violations involving agricultural activities at a high school. The OIG's findings included (1) a school employee violated the CPS Code of Ethics by conducting business with the school through the school's farming and racehorse-breeding programs, (2) the principal failed to obtain CPS approval for the school to receive donated horses and failed to properly register the horses, and (3) the principal and a second employee mismanaged $400 in cash obtained from the sale of school equipment.

A school employee violated the Code of Ethics by having an economic interest in business with the school. Specifically, he used his meat processing company to sell the school $800 in frozen turkeys. He also used his company to buy eggs produced at the school and sell them for a profit of approximately $130. He bought and sold some of the school's lettuce as well, but it is unclear whether he profited from those sales. Although the documented transactions between the employee and the school were relatively low in value, they nevertheless violated the Code of Ethics. Furthermore, because the employee had direct access to the school's agricultural products and clearly bought and sold some of those products, there is a danger that his dealings with the school could be more extensive.

Office of Inspector General
Chicago Board of Education
2017 Annual Report

The OIG also found that the same employee violated the Code of Ethics by doing business with the school through the school's racehorse-breeding program. Before the employee was hired, he donated two mares to the school for the breeding program but maintained an interest in those horses, as well as a third mare donated to the school, in that the ownership of the mares would revert to him when the breeding program ended. The principal subsequently hired the employee and paid him $25 an hour to manage the program. Additionally, the employee had an interest in two of the horses foaled at the school because he was the registered breeder and, as such, could receive breeder's awards in the event those horses won races. Although the employee did not receive direct payment for the horses, the arrangement he negotiated with the principal was significant because the employee (1) shifted the costs of the expensive horse-breeding enterprise to the school, (2) received $25 an hour from the school to manage the program, and (3) had the potential to receive large sums in breeder's awards if the foals in which he had an interest became successful racehorses. Furthermore, because he maintained an interest in some of the horses, and the school paid for the expenses associated with those horses — including boarding, feed and veterinary care — he essentially was engaged in improper business dealings with the school. He also had a conflict of interest because, as the manager of the horse-breeding program, he regularly made and influenced decisions involving large school expenditures for the very horses in which he had a financial interest.

CPS policy and guidelines require that schools report donations to the CPS Chief Financial Officer and receive approval before accepting them. In this case, however, the principal never reported the horses donated to the school and never received approval to accept them.

The principal also failed to properly register the school's horses with the United States Trotting Association, the organization whose records are used by race tracks to identify the recipients of purse money. Under Illinois horse-racing law, *see* 230 ILCS 5/31(g)(5), the school is the rightful breeder of several horses foaled through the school's breeding program. As such, the school is entitled to receive the breeder's awards associated with any races those horses win. However, not all of those horses were registered to the school as they should have been. The employee who managed the school's breeding program was registered improperly as the breeder for one of the foals that was bred by the school, and the principal was registered improperly as the breeder for two of the foals that were bred by the school. The principal also was registered improperly as the owner of two of the mares that were owned by the school.

Office of Inspector General
Chicago Board of Education
2017 Annual Report

The OIG did not find that the principal or the employee actually received any benefit as a result of the incorrect information submitted to the USTA. At the time the OIG submitted its report, the school had only foaled one horse that had won races. One of those races resulted in a breeder's award, which the racetrack properly issued to the school. That horse also won a race at a county fair, but it is unclear whether that race qualified for breeder's awards. If so, the OIG advised the Board that the school might be entitled to collect an outstanding breeder's award in the amount of $250.

In addition, the OIG found that the principal and a second employee mismanaged $400 in cash that the principal received after selling farm equipment that was CPS property. The $400 was not submitted to the school treasurer promptly as required by CPS guidelines. It was not until four months later, after the OIG inquired about the money, that the second employee submitted the $400 to the treasurer. That employee explained the delay by stating that he forgot about the cash after placing it in the safe in his office. It was not clear why that employee handled the money at all, considering that the principal delivered the equipment to the buyer and received the $400 in cash. Regardless, the delay violated CPS guidelines. The failure to submit the funds promptly was particularly concerning given that (1) the payment was in cash and (2) the equipment sold was not on the asset register and, thus, was not otherwise being tracked. Therefore, at the very least, this incident constituted financial mismanagement.

The OIG recommended that the principal and both employees discussed above be given appropriate discipline. The Board subsequently advised that all three of them were issued written reprimands. The OIG recommended that the meat processing company owned by one of the employees be permanently debarred, and the Board advised that the company was given a permanent debarment.

Additionally, the OIG recommended that the employee managing the horse-breeding program be prohibited from making further decisions regarding the horses in which he maintains an interest, so as to eliminate the conflict of interest. The OIG recommended that the school work with the USTA to correct the records for the horses owned and bred by the school. The OIG further advised that the school should monitor the USTA records for the racehorses it bred to ensure that, when those horses win races, the school promptly receives its breeder's awards. The OIG also advised that, in the future, perhaps agreements involving very expensive and potentially lucrative ventures, like the horse-breeding agreement in this case, should be vetted by the Law Department before they are finalized and implemented. It is the OIG's understanding that the Board is considering these additional recommendations. To date, however, the Board has not advised the OIG whether it will be following those recommendations.

Office of Inspector General
Chicago Board of Education
2017 Annual Report

### B. TEACHER ACCEPTED IMPROPER GRATUITIES FROM PRIVATE SCHOOL (16-01398)

An OIG investigation determined that a high school teacher/athletic director violated CPS's Code of Ethics by accepting cash gratuities from a private school for her work in opening and overseeing the CPS high school's football field and facilities, which the private school would use for its freshman football team. Each year from 2011 to 2015, she accepted gratuities from the private school in amounts between $500 and $750. In total, the private school gave her $3,150 as "token[s] of [its] appreciation."

Under the Code of Ethics, no Board employee "shall accept anything of value, including, but not limited to, a Gift . . . based upon any explicit or implicit mutual understanding that official actions will be influenced." Moreover, if the gift from any one source "exceed[s] a cumulative value of $100 during any calendar year," the recipient Board employee must notify the district's Chief Financial Officer, who will then "determine whether to return the Gift to the giver or accept the Gift on behalf of the Board." Based on the OIG's investigation, there was no dispute that (1) for each year over the five-year period, the teacher/athletic director kept five checks that the private school issued to her in amounts over $100; (2) the payments influenced her actions in allowing the private school to use the CPS school's football field; and (3) the teacher did not report any of the payments that she had received.

Because of the large amount in gratuities that she accepted from the private school over five years, the OIG recommended that the Board terminate her employment and place a Do Not Hire (DNH) designation in her personnel file. The Board subsequently advised the OIG that, in lieu of termination, the teacher resigned her position, and that the Board placed a DNH designation in her personnel file.

### C. CONDUCT UNBECOMING

○ *Network Chief Pressured Son's Teachers About Grades (13-00660)*

An OIG investigation determined that, during the 2012–13 school year, a Network Chief engaged in conduct unbecoming by abusing her position of influence over three of her son's teachers — who taught at a school that was not directly under her supervision — to pressure them to give him higher grades. In all, from August 2012 to September 2013, the Network Chief sent a total of 48 such emails from her cps.edu account. She sent 22 of those emails between the hours of 8:00 a.m. and 3:30 p.m. — that is, regular school hours — and the signature line of six emails reflected that she sent them in her capacity as Network Chief. Another Network Chief (the one who oversaw the son's school) told the OIG that the emails likely intimidated the teachers who had received them. In addition, the emails routinely

Office of Inspector General
Chicago Board of Education
2017 Annual Report

included the teachers' immediate supervisors and Network personnel, and were obviously written from the perspective of an education administrator within CPS as opposed to a lay person.

Circumstantial evidence further showed that the Network Chief's constant pressure about her son's grades led school and Network administrators to pressure her son's teachers — either directly or indirectly — to award him higher grades that he had not earned. One teacher told the OIG that she was asked to change or reconsider one of his grades, and stated that the Network Chief's emails were "in the back of her mind" when grading her son. Similarly, another teacher told the OIG that, at the Network Chief's behest, the assistant principal forced him to raise the son's letter grade for one grading period, after the fact.

When interviewed by the OIG, the Network Chief recognized in hindsight that her emails were intimidating, and apologized for their tone and volume. She stated that she realized that her emails were worded very strongly, but explained that she was only demanding that her son receive a better education. Nevertheless, she could see how her emails could have intimidated the teachers and administrators.

The OIG recommended that the Board impose appropriate discipline on the Network Chief. The Board advised the OIG that it issued her a Memorandum of Understanding with Directives for Improvement.

o   *Principal Unduly Pressured Grocery Store to Donate to School (15-01106)*

An OIG investigation determined that the principal of an elementary school coerced a neighborhood grocery store into donating goods for a school fundraising event. More specifically, when the store declined the school's initial request for a donation, the principal sent the store an email, threatening that the school and the people associated with it would stop making purchases from the store if the store failed to donate for the school's event. The store then relented and donated goods to the school.

The OIG found that the principal's conduct was unbecoming of a CPS principal and, because he used CPS email to threaten the store, he violated CPS's policy regarding acceptable use of the CPS network. Additionally, the OIG found that the principal violated CPS policy and guidelines regarding receiving donations because he accepted the donated goods from the store without first reporting the donation to the CPS Chief Financial Officer and receiving approval.

The OIG recommended appropriate discipline for the principal, and the Board advised that he was issued a written reprimand.

Office of Inspector General
Chicago Board of Education
2017 Annual Report

### D. OTHER VIOLATIONS

> o *Selling School Merchandise in Violation of Fundraising Guidelines (16-01243)*

An OIG investigation determined that a teacher's assistant at an elementary school sold school merchandise at the school in violation of CPS's fundraising guidelines. Specifically, he violated the guidelines by (1) failing to receive approval before selling school merchandise; (2) failing to submit the funds he collected to the school treasurer so they could be deposited in the school's internal accounts; and (3) failing to submit an accounting report detailing his inventory, sales and collections. He admitted that he used a room at the school to make, store and sell school athletic apparel. He stated that, initially, he purchased equipment and materials with his own funds to make apparel with the school logo to give to the basketball team free of charge. Eventually, however, he began selling apparel to offset the cost of the materials he was donating to the students. He admitted that he did not receive approval from the principal or LSC before he began selling apparel at the school. He also admitted that he never submitted the funds he collected to the school and he never submitted any reports documenting his inventory and sales. The OIG did not discover any evidence that he used the funds he collected for personal gain or that he otherwise stole CPS funds. Nevertheless, his conduct violated CPS fundraising guidelines.

The OIG recommended appropriate discipline for the teacher's assistant. The Board advised that his employment was terminated, and that a DNH designation was placed in his personnel file.

> o *Assistant Principal Violated OAE Protocol (16-00981)*

An OIG investigation determined that an assistant principal violated the Office of Access and Enrollment's process for administering the waitlist of students who applied to an elementary school from outside the school's attendance boundaries. The assistant principal admitted that she offered seats to seven siblings from the same family without exhausting the waitlist as to each student. She said she worked down the waitlist to reach some of the siblings and then offered seats to the remaining siblings as a form of sibling preference. However, CPS's sibling-preference policy only applies when a sibling was previously enrolled at the school. In this case, none of the siblings had been enrolled at the school. They all applied at once. Therefore, the assistant principal improperly used the sibling-preference policy to offer seats at the school to those students.

Office of Inspector General
Chicago Board of Education
2017 Annual Report

The OIG recommended appropriate discipline for the assistant principal, but noted that this was a relatively minor violation that did not warrant serious discipline. The Board advised the OIG that she was issued school-based discipline.

> o *Employee Charged with Municipal Licensing Violations (17-00058)*

A CPS Network-level employee was charged with multiple violations of the Chicago Municipal Code that occurred during a social event he hosted. Specifically, the City of Chicago Department of Business Affairs and Consumer Protection charged the CPS employee with (1) operating without a public place of amusement license; (2) operating without a liquor license; and (3) false advertising. The BACP also brought similar charges against the venue the employee rented for the event. The employee and the BACP subsequently entered into a settlement agreement, in which the employee agreed to pay the City of Chicago $5,000 and the BACP agreed not to pursue license revocation proceedings.

The OIG reviewed the matter, and the employee informed the OIG that he rented a venue to host a party for friends and family. The venue provided liquor for the party, and he assumed that the venue was properly licensed. He claimed that the BACP misconstrued the facts and the nature of the function. The event was not held during the employee's work hours. The OIG did not make any recommendations to the Board in this matter, and the Board advised the OIG that it did not take any disciplinary action with respect to the employee.

## Section 8 — Cases Involving Arrests or Criminal-Background Issues

The OIG has the responsibility of monitoring the outcome of cases in which Board employees or vendors were arrested and charged with criminal offenses. The OIG reports on these matters so that the Board can make determinations regarding administrative discipline or other action, based on the resolution of the criminal cases.

### A. Matters Involving Allegations or Charges of Sexual Misconduct

> o *Charter School Teacher's Sexual Conduct with Minor (15-00144)*

An OIG investigation concluded that a charter school teacher was arrested after having engaged in sexual acts with a minor student at a different charter school, where the teacher previously was employed. The teacher was subsequently charged with multiple felony counts stemming from the conduct. But ultimately he pleaded guilty to one count of child pornography, *see* 720 ILCS 5/11-20.1(a)(4), and one count of criminal sexual assault of a victim between 13 and 17, *see* 720 ILCS 5/11-

Office of Inspector General
Chicago Board of Education
2017 Annual Report

1.20(a)(4), both of which are Class 1 felonies. He was sentenced to seven years in prison for the child pornography count and five years in prison for the criminal sexual assault count, with the sentences running consecutively.

The OIG learned that, in the wake of the teacher's arrest, the charter school terminated his employment.

o  *Teacher Arrested for Sexual Abuse of Minor (16-00069)*

A teacher at a CPS high school was arrested for criminal sexual abuse of a teenage student who attended a different school. Following the arrest, the Board immediately removed the teacher from the school and placed him on leave. The teacher resigned from CPS while his case was pending in Court, and the Board subsequently placed a Do Not Hire (DNH) designation in his personnel file.

The Cook County State's Attorney's Office charged the teacher with numerous counts of the Class 2 felony of aggravated criminal sexual abuse involving a victim who is at least 13 years of age but under 17 years of age and is at least five years younger than the offender, *see* 720 ILCS 5/11-1.60(d). The State's Attorney's Office also charged the teacher with one count of indecent solicitation of a child with the intent of committing aggravated criminal sexual assault, a Class 3 felony, *see* 720 ILCS 5/11-6(a); one count of indecent solicitation of a child by means of the Internet, a Class 4 felony, *see* 720 ILCS 5/11-6(a-5); and one count of grooming (using the Internet to solicit children to commit a sex offense), a Class 4 felony, *see* 720 ILCS 5/11-25.

Ultimately, the teacher pleaded guilty to, and was found guilty of, one count of indecent solicitation of a child with the intent of committing aggravated criminal sexual assault, a Class 3 felony, *see* 720 ILCS 5/11-6(a). The Cook County Circuit Court sentenced him to two years of probation.

o  *Teacher Arrested for Molestation of High School Student (15-00820)*

An OIG investigation concluded that a high school special education teacher was arrested in Florida for felony lewd or lascivious molestation of a CPS high school student during a non-CPS athletics trip. The charge was subsequently downgraded to misdemeanor battery, of which the Circuit Court of Orange County, Florida, found him guilty. He was sentenced to 10 days in jail, 25 hours of community service, 355 days of probation, and ordered to pay $613.17 in fines and costs.

The CPS Law Department investigated the incident itself, and the Board has advised the OIG that, based on that investigation, it has issued the teacher a Warning Resolution.

Office of Inspector General
Chicago Board of Education
2017 Annual Report

> o *Teacher Arrested for Sexually Abusing CPS Student (15-01144)*

An OIG investigation determined that a high school special education teacher was arrested for aggravated sexual abuse of a CPS student after he offered a teenage student at the school money and then rubbed the student's chest with his hands. The charge was subsequently downgraded to simple misdemeanor battery, *see* 720 ILCS 5/12-3(a)(2), of which the teacher was found guilty. He was sentenced to six months of supervision and ordered to pay $265 in fines, court fees and costs.

The Board advised the OIG that it terminated the special education teacher's employment and placed a DNH designation in his personnel file.

> o *SECA Sent Nude Photos of Himself to Female Student (16-00343)*

An OIG investigation determined that a high school special education classroom assistant was arrested and charged with distribution of explicit material to a minor, *see* 720 ILCS 5/11-21(b)(1)(A), which is a Class A misdemeanor. Specifically, the SECA was arrested after police determined that he had sent a female student, whom he had befriended, Snapchat photos of his naked torso and erect penis. The SECA pleaded guilty to the charge, and was sentenced to six months of court supervision and 40 hours of community service.

The Board advised the OIG that, after the CPS Law Department conducted its own investigation into the matter, it initiated dismissal proceedings against the SECA. He then resigned, and the Board placed a DNH classification in his personnel file.

**B. DRIVING UNDER THE INFLUENCE AND OTHER DRIVING-RELATED OFFENSES**

> o *Teacher Arrested for DUI and Fleeing Scene of Accident (16-00241)*

A teacher was arrested for (1) driving a motor vehicle while under the influence of alcohol, specifically, while having a blood alcohol content of 0.148; (2) striking two girls (a fourteen-year-old and a seven-year-old) in a crosswalk while he was under the influence; and (3) fleeing the scene of the accident. The girls suffered minor injuries. Significantly, when the OIG interviewed the teacher about the incident, he said the morning of the accident he was on his way to work at the school where he taught. Thus, if he had not been arrested, he would have reported to work under the influence of alcohol.

The Cook County State's Attorney's Office charged the teacher with misdemeanor DUI and other traffic offenses, including leaving the scene of an accident. At the time the OIG reported this matter to the Board, the teacher's case was still pending in the Circuit Court of Cook County. However, the OIG determined that the teacher's actions

Office of Inspector General
Chicago Board of Education
2017 Annual Report

constituted violations of Board policy proscribing conduct prohibited by the Municipal Code of the City of Chicago and the Illinois Compiled Statutes.

The OIG recommended that the Board impose appropriate discipline, up to and including termination. The Board subsequently advised the OIG that the Board terminated the teacher's employment and placed a DNH designation in his personnel file.

o   *School Engineer Convicted of Aggravated DUI (16-00607)*

An OIG investigation determined that a school engineer had pleaded guilty to the Class 4 felony of aggravated DUI, *see* 625 ILCS 5/11-501(a), and the Class 4 felony of having multiple convictions (between four and nine) for driving on a license that was suspended or revoked, *see* 625 ILCS 5/6-303(a). He was sentenced to serve 180 days in the Cook County Jail and two years of probation, and he was fined $794.

The Board has advised the OIG that it suspended the engineer for 30 days without pay. The engineer also entered into a "last-chance agreement," in which he agreed that he would be terminated immediately if he were involved in any alcohol- or drug-related misconduct on- or off-duty, and that he would be prohibited from driving CPS-owned vehicles.

o   *Lunchroom Manager Arrested for DUI (15-00349)*

A lunchroom manager at a high school was arrested for driving under the influence. She was charged with the Class A misdemeanor of DUI with a blood or breath alcohol content of 0.08 or greater, *see* 625 ILCS 5/11-501(a)(1). The Circuit Court of Cook County fined her $500 and gave her 18 months of supervision. When the OIG interviewed her, she admitted that she was drinking the night she was arrested and that she failed the Breathalyzer test. The OIG also uncovered time records reflecting that the lunchroom manager improperly used two sick days to appear in court for her DUI case.

The OIG provided the above information to the Board so that it could consider whether it should take disciplinary action against the lunchroom manager. The Board advised the OIG that dismissal charges have been filed against her. To date, her proceedings are still pending.

o   *Engineer Arrested for DUI (15-00469)*

A district-wide engineer was arrested for driving under the influence. He was charged with the Class A misdemeanor of DUI with a blood or breath alcohol content of 0.08 or greater, *see* 625 ILCS 5/11-501(a)(1). The Circuit Court of Cook County

Office of Inspector General
Chicago Board of Education
2017 Annual Report

fined him $500 and gave him one year of supervision. When the OIG interviewed the engineer, he admitted that he was drinking the night he was arrested and that he failed a field sobriety test. The OIG also uncovered time records reflecting that the engineer improperly used one sick day to appear in court for his DUI case.

The OIG provided the above information to the Board so that it could consider whether it should take disciplinary action against the engineer. The Board advised the OIG that disciplinary action is pending.

> o *Teacher Arrested for DUI (16-00341)*

A teacher was arrested for driving under the influence. She was charged with the Class A misdemeanor of DUI with a blood or breath alcohol content of 0.08 or greater, *see* 625 ILCS 5/11-501(a)(1). The Circuit Court of Cook County fined her $500 and gave her 18 months of supervision. The teacher admitted to the OIG that she was drinking the night she was arrested and that she failed the Breathalyzer test. In addition, school records showed that she improperly used a sick day to attend a court appearance in her DUI case.

The OIG referred this matter to the Board so that it could consider whether administrative discipline was appropriate. The Board advised the OIG that dismissal charges have been filed against her.

> o *Engineer Convicted of Driving with a Suspended License (17-00342)*

An OIG investigation concluded that a district-wide engineer was convicted, in the Circuit Court of Effingham County, of driving while his driver's license was revoked for the third or subsequent time, *see* 625 ILCS 5/6303(a)(d-2). At the time of his arrest, the engineer also was charged with driving 85 mph in a 70 mph zone and possessing less than 2.5 grams of cannabis (which, the engineer acknowledged stemmed from a residual amount of marijuana that police found in his backpack). The engineer pleaded guilty to driving with a suspended license, and the court dismissed the speeding and possession-of-cannabis charges. The court then sentenced the engineer to one to two years' probation and 300 hours of community service, and imposed a $100 fine, court fees and costs.

The Board advised the OIG that the engineer will be issued a written reprimand.

### C. VENDOR FRAUD, BATTERY, HARASSMENT AND THEFT

> o *School Cook Convicted of Vendor Fraud (16-00893)*

An OIG investigation determined that a school cook was convicted, in the Circuit Court of Cook County, of Medicaid vendor fraud and giving false statements, *see* 305

Office of Inspector General
Chicago Board of Education
2017 Annual Report

ILCS 5/8A-3(a), which is a Class 2 felony. Specifically, the cook submitted false Medicaid timesheets for her son, a Medicaid personal assistance provider, after he had been arrested on an unrelated matter and, therefore, was no longer providing care to the patient specified on the timesheets. As a result of the cook's actions, her son was paid up to approximately $10,000 for services that he did not provide. After the cook pleaded guilty to the crime, she was sentenced to 18 months of probation, ordered to pay $4,000 in restitution and ordered to pay $749 in fines, court fees and costs.

The Board has advised the OIG that it disciplined the cook by giving her a written reprimand.

- o *Custodian Arrested For Committing Aggravated Battery (16-00329)*

An OIG investigation found that a city-wide custodial worker had been arrested on charges of having committed aggravated battery with the intent to inflict great bodily harm. The custodian's arrest stemmed from an incident during which the custodian supposedly began a verbal altercation with the victim and reporting complainant, and ultimately punched the complainant. For his part, the custodian told the OIG that the complainant — and not he — was the aggressor in the altercation, and that he had actually attempted to de-escalate the confrontation. The custodian punched the complainant only after he threatened to shoot the custodian and reached into his waistband for, what the custodian believed to be, a handgun. The custodian told the OIG that he planned to assert the defense of not guilty by reason of self-defense at his criminal trial.

Because the custodian cooperated with the OIG's investigation and because the OIG could not determine who the aggressor in the altercation was, the OIG did not recommend that the Board impose any discipline at the time. The OIG subsequently learned that the custodian was found not guilty at trial, and the Board advised that it returned the custodian to work without imposing any discipline.

- o *Military Instructor Convicted of Misdemeanor Battery (15-00825)*

An OIG investigation found that a military instructor at a high school was convicted in Kane County, Illinois, of misdemeanor battery, *see* 720 ILCS 5/12-3(a)(2), after engaging in a physical altercation with a group of teenage boys whom, he believed, were a negative influence on his daughter. The instructor was sentenced to 12 months of court supervision and 100 hours of community service, and was fined $500.

The Board has advised the OIG that it shared the OIG's report with the instructor's commanding officer, and the matter is still being reviewed.

Office of Inspector General
Chicago Board of Education
2017 Annual Report

o   *Substitute Teacher Convicted of Misdemeanor Battery (16-00498)*

An OIG investigation concluded that a day-to-day substitute teacher pleaded guilty in the Circuit Court of Cook County to simple misdemeanor battery, *see* 720 ILCS 5/12-3(a)(1), after she bit her roommate during an altercation. The OIG learned of the conviction after the principal discovered that the substitute teacher was using school computers to access the following website: www.erasemugshots.com. The court sentenced the substitute teacher to one year of supervision and ordered her to pay $250 in fines, court fees and costs. The court also entered an order of protection against the substitute teacher.

The Board has advised the OIG that it placed the substitute teacher on a Level One Performance-Improvement Plan.

o   *Teacher Arrested for Harassing Phone Messages and Texts (17-00487)*

An OIG investigation found that a physical education teacher at an elementary school was arrested on one count of harassment through electronic communications, *see* 720 ILCS 5/25.5-3(a)(1); 720 ILCS 5/25.5(5)(a), and one count of harassment by telephone, *see* 720 ILCS 5/25.5-2(a)(2), for leaving harassing phone messages and sending harassing text messages to the wife of the supervisor who had fired him from his previous job. Both crimes are Class B misdemeanors. The OIG also uncovered time records reflecting that the teacher improperly used over three hours of sick time to appear in court for his case.

While his criminal case was pending in Will County, his employment was terminated because his position was non-renewed by the principal. The OIG recommended that the Board place a DNH designation in his personnel file, and the Board subsequently advised that a DNH was placed in his file.

o   *Bus Aide Arrested for Retail Theft and Resisting Arrest (16-01453)*

A substitute bus aide was twice arrested for retail theft and later arrested a third time on an outstanding warrant following a traffic stop. The first arrest occurred at a retail store after she stole a $16 watch. As she was being placed under arrest, she became combative with the officers and kicked one of them. She was charged, in the Circuit Court of Cook County, with misdemeanor theft, misdemeanor battery and misdemeanor resisting a peace officer.

A few months later, she was arrested in another retail store for stealing 12 items of clothing worth a total of $184. For that, she pleaded guilty to misdemeanor retail theft in the Circuit Court of Cook County, and she was sentenced to six months of conditional discharge and fined $274.

Office of Inspector General
Chicago Board of Education
2017 Annual Report

The Court subsequently issued a warrant for her arrest after she failed to appear for a hearing on the charges filed against her after the first arrest mentioned above. The warrant was later executed when a police officer pulled her over for driving with an obstructed driver's view and discovered that there was an outstanding warrant for her arrest. She then pleaded guilty to the charges related to the first retail theft — misdemeanor theft, misdemeanor battery and misdemeanor resisting a peace officer. She was sentenced to two days in the Cook County Department of Corrections.

The Board advised the OIG that the Board decided not to terminate her employment. Instead, she was issued a final warning.

○ *Teacher Arrested for Trespass and Theft (16-00633)*

An OIG investigation concluded that a high school teacher was arrested and charged, in the Circuit Court of Cook County, with counts of criminal trespass, *see* 720 ILCS 5/21-5(a), and misdemeanor theft, *see* 720 ILCS 5/16-1(a)(1)(A), for entering his school after hours and removing sections of old chalkboards that had been replaced by whiteboards. The teacher returned all of the chalkboard sections shortly after his arrest, and explained to the police that he had thought nobody would mind if he took them. He further said that he did not think he was doing anything wrong at the time, but realized that he should have obtained permission first. Ultimately, the charges against the teacher were dropped.

The Board advised the OIG that it filed dismissal charges against the teacher. To date, the proceedings against the teacher are still pending.

## Section 9 — Previously Reported Matters

The OIG previously issued Significant Activity Reports regarding three investigations that were completed in Fiscal Year 2017. Those investigations are briefly discussed in this section, along with any significant updates or outstanding concerns. Additionally, the three Significant Activity Reports are attached as appendices to this report.

### A. Theft of CTA Passes and Internal Audit Interference (15-01032)

In a September 16, 2016, Significant Activity Report, the OIG detailed the OIG's investigation of the theft of more than $72,000 worth of limited-use CTA transit passes by a former programs coordinator in CPS's Department of Transportation, who would then conspire to sell the passes on the black market.

Office of Inspector General
Chicago Board of Education
2017 Annual Report

The OIG detailed a separate concern in the Significant Activity Report: that the Department of Internal Audit and Compliance disregarded repeated requests from the OIG to refrain from separately investigating the matter by independently interviewing witnesses. As a result, CPS personnel prematurely alerted the program coordinator to the fact that he was under investigation, and caused one of his managers to be so confused about who she should be talking to that she was afraid to cooperate with the OIG. Even more, CPS's Chief Internal Auditor contacted the Cook County State's Attorney's Office in an attempt to interject Internal Audit into the OIG's independent investigation and discussions with the prosecutor.

The full Significant Activity Report is included below as **Appendix A**.

### B. Improper Practices at School Serving Detainees in Jail (16-00276)

On September 12, 2017, the OIG issued a Significant Activity Report regarding its investigation of the CPS high school serving detainees at the Cook County Jail. The OIG had previously reported to the Board on that matter in June 2017. As stated in the Significant Activity Report, the OIG found various improper practices at the school, including: inflated enrollment and attendance data; course credits awarded when they were not earned; term lengths that were too short to ensure that students received enough classroom instruction; a questionable classroom structure where teachers did not always know which subjects the students were supposed to be learning; and the underreporting of dangerous incidents occurring at the school. The OIG's full Significant Activity Report is included below as **Appendix B**.

Following the release of the OIG's Significant Activity Report, the principal was removed from the school. Two months later, however, CPS reinstated the principal and released a memorandum from the Law Department criticizing the OIG's report on the matter.

As the OIG has stated, it stands by its report. Unfortunately, Law misunderstood and mischaracterized several aspects of the OIG's investigation. Contrary to Law's assertions, the OIG's report does not contain significant errors. Because the OIG stands by its investigation and findings, the OIG will be addressing this matter with the new administration in the upcoming year.

### C. Employees with DNHs Working at Charters and Contracts (16-01121)

On October 24, 2017, the OIG issued a Significant Activity Report detailing its findings following a review of former CPS employees with Do Not Hire (DNH) designations who were, nevertheless, working at CPS charter and contract schools. The OIG found that, as of December 2016, there were 163 employees of CPS charter and contract schools who were not eligible for rehire by CPS because they had been

Office of Inspector General
Chicago Board of Education
2017 Annual Report

given DNHs for various reasons following previous periods of employment with the district. Many of those employees had been given DNH designations for serious infractions. For example, numerous administrators and managers at CPS charter or contract schools had received DNHs for either theft, misappropriation of funds, or falsifying or forging CPS documents. Three employees had received DNHs for sexual abuse.

The OIG recommended that the Board develop a policy or program through which CPS charter and contract schools could learn (1) whether their current employees or prospective hires have received DNH designations from CPS, and (2) the reasons for those designations. The OIG also recommended that, in DNH cases raising legitimate concerns about child safety and welfare, CPS should notify the charter and contract schools when it becomes aware that those employees are working at those schools. The Board advised the OIG that it took action with respect to the situations the OIG had identified as presenting the most critical danger to students. For example, CPS contacted the charter schools that were employing the three individuals found by CPS to be sex abusers, and CPS reported to the OIG that those employees are no longer working at those schools. The Board also advised that it was working to establish a broader method by which charter and contract schools will be able to receive DNH information from CPS.

After the OIG released its Significant Activity Report on this matter, CPS released a statement that the charter schools that were not using CPS to conduct background checks would have until November 17, 2017, to agree to do so, and that if they refused, CPS would identify them publicly. On November 22, 2017, CPS announced that all but five charter operators had agreed to use CPS for conducting background checks during the hiring process, and CPS publicly identified the five operators that refused. CPS plans to share DNH information with the charter operators who use CPS for background checks, but CPS stated that it faces legal restrictions in sharing DNH information with charters that have not agreed to use CPS for those services. To address that remaining problem with the five operators who refused to participate, CPS stated that it will work with state legislators to require all operators to use CPS to conduct background checks.

The full Significant Activity Report is attached below as **Appendix C**.

Office of Inspector General
Chicago Board of Education
2017 Annual Report

# **Appendices**

A.  September 16, 2016, Significant Activity Report:
$75,000 Theft of CPS-Purchased CTA Transit Passes and Significant Interference from CPS's Internal Audit and Compliance Department

B.  September 12, 2017, Significant Activity Report:
Extensive Improper Practices at School Serving Detainees in the Cook County Jail

C.  October 24, 2017, Significant Activity Report:
Former CPS Employees Not Eligible for Rehire Working at Charters and Contracts

**Appendix A**

Office of
**Inspector General**
Chicago Board of Education
Nicholas Schuler, Inspector General

---

### SIGNIFICANT ACTIVITY REPORT

---

**FRIDAY, SEPTEMBER 16, 2016**

**OIG INVESTIGATIVE REPORT DETAILS $75,000 THEFT OF CPS-PURCHASED CTA TRANSIT PASSES, SIGNIFICANT INTERFERENCE FROM CPS'S INTERNAL AUDIT AND COMPLIANCE DEPARTMENT**

An OIG investigation concluded that a CPS employee in the district's Central Office (the "Employee") stole at least $72,705.60 worth of CTA transit passes, for which he was responsible for distributing to schools. Specifically, the evidence uncovered by the OIG showed that the Employee had participated in a criminal conspiracy that involved two conspirators ("Conspirator A" and "Conspirator B"), whereby the Employee would steal limited-use CTA transit passes from Central Office, and then deliver them to his conspirators so that they could sell them on the black market.

During the course of the OIG's investigation, however, the Department of Internal Audit and Compliance disregarded repeated requests from the OIG to refrain from separately investigating the matter. Over warnings from the OIG that a separate and parallel investigation could jeopardize the chances for a criminal prosecution in the matter, Internal Audit pressed ahead with interviews of CPS personnel, thereby hindering the OIG's investigation. For instance, Internal Audit's interviews caused one of the Employee's managers to be so confused about who she should be talking to that she was afraid to cooperate with the OIG. Additionally, a string of interviews conducted by Internal Audit personnel — on top of those being conducted as part of the OIG investigation — needlessly and prematurely telegraphed to the Employee that he was the *subject* of the investigation, as opposed to merely being someone from whom background information was being sought. Worse still, Internal Audit contacted the Cook County State's Attorney's Office in a clear attempt to interject the department into the OIG's independent investigation and discussions with the prosecutor.

On September 8, 2016, the OIG issued a summary report to the Chicago Board of Education that detailed its investigation of the Employee's theft of the CTA transit passes. In that report, the OIG also voiced its concerns about Internal Audit's

---

**Appendix A**

insistence on conducting a separate and parallel investigation into the matter, despite the OIG's repeated requests to stop. The key details from the report are as follows:

**The OIG's Investigation of the Transit-Pass Theft:** In October of 2015, the Chicago Police Department arrested Conspirator A for being in possession of CTA transit passes that were stolen property and actually belonged to CPS. Conspirator A had been selling them out of a convenience store on Chicago's Southside. Each pass cost CPS $2.04. Thus, the 300 transit passes represented $612 of CPS property.

Conspirator A provided the first name of the individual from whom, he said, he had obtained the transit passes, and further provided that individual's telephone number. The CTA subsequently determined that the passes had originated from a bulk order that the Employee had placed on behalf of CPS. The OIG, in turn, (1) used the telephone number that Conspirator A had provided to the police to determine that his identified supplier was Conspirator B; (2) found that the Employee was connected to Conspirator B on a social-media platform; and (3) uncovered that Conspirator B's telephone number was used to call the Employee's department at Central Office on three separate occasions.

The Employee, for his part, joined CPS after working at CTA for 14 years. In his role at CPS, the Employee was responsible for, among other things, ordering, receiving and securing transit passes, as well as distributing them to schools that requested them. In doing so, the OIG determined, he distributed at least 35,640 passes — worth $72,705.60 — to four individuals who are not, and apparently have never been, employees at CPS, and are in all likelihood actually fictitious.

Two of those fictitious individuals — "Fictitious Recipient A" and "Fictitious Recipient B" — received transit passes within days of Conspirator A's arrest. Specifically, one week before Conspirator A's arrest, the Employee received an order of 6,000 transit passes that were sent to his Central Office department from CTA's third-party provider of passes, Cubic Transportation Systems. According to Cubic, the 300 transit passes seized during the arrest originated from the batch of passes that the Employee had received, and CTA records show that the Employee did not place another order for passes until after Conspirator A's arrest. The Employee's business records further reflect that, in the time period between the date on which he had received the 6,000 transit passes from Cubic and the date of Conspirator A's arrest, the Employee distributed a total of 4,600 transit passes to "Fictitious Recipient A" and "Fictitious Recipient B".

Consequently, the totality of the evidence supported the OIG's conclusion that the Employee participated in a criminal conspiracy involving Conspirators A and B, whereby the Employee would steal transit passes from Central Office, and then deliver them to either Conspirators A or B so that they could sell them on the black

**Appendix A**

market. As a result of the conspiracy, the Employee likely stole at least $72,705.60 worth of transit passes from CPS over a seven-and-a-half month period.

Indeed, the OIG could not exclude the possibility that the total loss to CPS might actually be greater. The Employee was able to steal such large quantities of transit passes because his department had instituted insufficient inventory controls. Most notably, the Employee was the sole individual in his department who had responsibility for ordering, receiving, securing, and distributing the passes. And his ultimate and immediate supervisors acknowledged that there was little to no oversight of his handling of transit passes. Those deficiencies allowed the Employee the opportunity to steal.

Based on a recommendation from Internal Audit and Compliance following a separate parallel investigation that it had conducted — despite repeated requests by the OIG to refrain from investigating (the details of which are discussed below) — the Board terminated the Employee's employment on November 8, 2015, and placed a Do Not Hire (DNH) designation in his personnel file. Nevertheless, in its report to the Board, the OIG recommended that it take legal action to recover $72,705.60 from the Employee for the transit passes that he had stolen, if the Board deemed that such legal efforts would be financially practicable.

As to the control deficiencies that allowed the Employee the opportunity to steal such large quantities of transit passes, the OIG considered whether discipline for his supervisors was appropriate. Both the Employee's ultimate and immediate supervisors acknowledged that there was little to no oversight of his handling of the passes and recounted their respective attempts to prompt the Employee to institute stronger inventory controls, but also realized that, in hindsight, they could have done more to ensure that he was appropriately supervised. Thus, although it is clear their attempts at remedial actions were insufficient in this instance, they were at least attempting to correct problems so as to address apparent control issues. So the OIG stopped short of recommending that the Board impose discipline on either individual.

But the OIG did inform the Board that it was clear the Employee was able to steal such large quantities of transit passes because his department had insufficient inventory controls in place, in that he was the sole employee who had the responsibility for ordering, receiving, securing, and distributing transit passes. Even though the Employee's department had strengthened its controls in the wake of this investigation, it did not separate the key inventory functions among two or more individuals. Thus, the OIG recommended that the department divide those duties among several employees to eliminate the classic fraud opportunities associated with a one-person arrangement.

**Appendix A**

**INTERNAL AUDIT'S SIGNIFICANT INTERFERENCE WITH THE OIG INVESTIGATION:** The OIG further detailed for the Board the Department of Internal Audit and Compliance's improper separate and parallel investigation into the theft of the transit passes. Specifically, during the course of the OIG's investigation, Internal Audit disregarded repeated requests from the OIG to refrain from simultaneously and separately investigating the matter. Even though the OIG warned that a separate and parallel investigation could jeopardize the chances of criminal charges being brought, Internal Audit pressed ahead.

The OIG explained that Internal Audit's actions created several substantial dangers to the OIG's investigation. Internal Audit sowed confusion among high-ranking CPS personnel as to whether it or the OIG was conducting the investigation. Two such individuals — one a CPS Executive, and the other the director of the Employee's department — instructed the Employee's immediate supervisor to contact Internal Audit about the investigation. Indeed, the department director informed the Employee's supervisor that he had met with Internal Audit regarding the stolen transit passes, and that Internal Audit was undertaking its own investigation. The Employee's supervisor credibly stated that the department director even went so far as to direct her to communicate with Internal Audit personnel — *and not the OIG*. Not surprisingly, the supervisor told the OIG that she was so confused about who she should be talking to that she was actually afraid to cooperate with the OIG. That result is manifestly unacceptable.

Similarly, Internal Audit's separate interviews of personnel, and the manner in which those interviews were conducted, prematurely alerted the Employee to the fact that he was a subject, and not a mere witness, with regard to the transit passes' disappearances. Of course, it requires very little imagination (or knowledge of investigations) to see how being tipped off to the fact that he was at the center of the investigation could have led the Employee to cover his tracks and tell any conspirators that they needed to tread with caution and "clam up" if approached. Worse yet, by conducting its own investigation, Internal Audit deprived the OIG of its full arsenal of investigative strategies and tactics. In short, Internal Audit compromised an investigation that implicated clearly criminal activity by sowing fear and confusion in the minds of key witnesses and prematurely alerting the investigation's main subject.

In addition, the OIG stated, Internal Audit's under-the-table outreach to the State's Attorney's Office showed extreme disregard for the OIG's statutory mandate to investigate fraud. Moreover, Internal Audit's actions amounted to little more than a slipshod attempt to interject the department into the OIG's investigation and the OIG's work with the prosecutor.

**Appendix A**

The OIG also recounted to the Board that it had raised its concerns about Internal Audit's outright lack of cooperation with the OIG in this investigation to the Board President, which resulted in assurances from Internal Audit's department head that he will not contact prosecutors in the future. Nonetheless, very troubling issues remain regarding Internal Audit's other employee-misconduct investigations — which, the OIG has learned, Internal Audit has been conducting. In particular, early this year, Internal Audit's department head informed the OIG that the department will not, as a simple and routine matter of course, refrain from conducting parallel investigations when the OIG asks him to do so. But needless to say, and as this investigation demonstrated, simultaneous parallel action can be much more damaging than helpful. Among the worst possible outcomes of such action would be that the OIG is not able to fully identify just how high in the chain-of-command responsibility lies because low-level employees are promptly fired and no longer have an obligation to cooperate in OIG investigations, or because higher-level employees start covering their tracks once the investigation becomes known.

Just as troubling is the fact that Internal Audit's department head will not agree to define the types of matters that his office would normally investigate in the first instance, and which types of matters would normally be referred to the OIG. The combination of refusing to stand aside, as a matter of course, when the OIG is investigating, and refusing to define Internal Audit's normal investigative area, creates numerous problems. The primacy of the OIG as the Board's statutorily identified investigative body is necessary so that the OIG can *independently and uniformly* investigate all significant matters. It eliminates wasteful duplication of efforts. And perhaps most importantly, it heads off any chance of the Board or administration being accused of "cherry picking" issues or matters to investigate in order to keep something from the eyes of the OIG — or that they are asking their own people to handle certain situations in a limited way.

The optics about ethics matter, particularly so in this investigation, which involved the theft of CTA fare cards purchased by CPS. The subject of the OIG's investigation — the Employee — was employed at CTA for over a decade before joining CPS. On top of that is the fact that the CPS CEO and two high-ranking members of his staff — Senior Vice President of Finance Ronald DeNard, and Internal Audit's department head himself — had very recently come from high-level CTA executive positions shortly before Conspirator A's arrest. Thus, so as to avoid the mere appearance of any impropriety or undue influence on any investigation into the theft of CTA transit passes purchased by CPS, Internal Audit clearly should have stepped aside and let the OIG — the statutorily independent investigative body — undertake its own investigation. In addition, and as the OIG noted in its report, the OIG has a long history of investigating and reporting on the inventory-control issues surrounding the limited-use transit passes that were at issue in this investigation. So there was

**Appendix A**

every reason for the OIG, which already had a significant body of relevant subject-matter expertise, to continue its investigation here.

The OIG concluded its summary report by informing the Board and the CEO that it had detailed Internal Audit's improper actions with the hope that they would address the matter to the OIG's satisfaction.

**Appendix B**

Office of
**Inspector General**
Chicago Board of Education
Nicholas Schuler, Inspector General

---

### SIGNIFICANT ACTIVITY REPORT

---

TUESDAY, SEPTEMBER 12, 2017

**AN OIG INVESTIGATION REVEALED EXTENSIVE IMPROPER PRACTICES
AT SCHOOL SERVING DETAINEES IN THE COOK COUNTY JAIL**

The Office of Inspector General determined that a CPS high school serving detainees at the Cook County Jail falsely inflated its enrollment and attendance data and awarded course credits that were not earned. Through these practices, the school artificially inflated its School Quality Rating Policy scores. On June 30, 2017, the OIG issued a summary report (OIG 16-00276) to the Chicago Board of Education detailing its findings and recommendations in this matter. This marks the fifth consecutive year the OIG has reported on the falsification of student records in CPS schools.

Some key takeaways from this investigation are as follows:

o   From the 2012–13 school year through the 2015–16 school year, 342 students were kept on the rolls improperly after their release from jail a total of 352 times. On average, those students were listed falsely as being enrolled at the school for 42 days following their release from jail. In 54 instances those students were kept on the rolls for more than 100 days after their release.

o   The school also falsified attendance. During the 2015–16 school year alone, 45 students were reported falsely as being present for the full school day a total of 351 times after they were already released from the jail. The attendance of students still in the jail was inflated as well.

o   The school frequently awarded students credits when the students had not received enough classroom instruction to qualify for them. One teacher told the OIG the school was a "credit mill."

---

567 West Lake Street  ◆  Suite 1120  ◆  Chicago, Illinois  ◆  60661-1405
Phone (773) 534-9400  ◆  Fax (773) 534-9401  ◆  inspectorgeneral@cpsoig.org

**Appendix B**

o One student was shot to death a week following his release from jail, and on the day he was killed the school was still reporting him on the rolls and present for classes even though the school knew he had been released. After he died, he was given a full course credit (for a semester's worth of a class) even though the principal had learned of his death and knew that he only had attended classes for a brief period of time prior to his release. The principal then pressured two of the student's teachers to issue him more credits, but the teachers refused because the student had not received enough classroom instruction. Indeed, the student's records show that he did not receive enough classroom instruction to receive a credit for any course, and according to reports from his teachers his instruction time was even less than what was eventually reported officially. Notably, although he had attended three classes for a short period of time, he never attended the course for which he was given credit.

o The school also employed a questionable blended-class structure whereby teachers were expected to teach multiple courses simultaneously to classrooms comprised of a collection of students enrolled in different courses. For example, students enrolled in chemistry had to share the teacher's time with students enrolled in biology and earth science. Particularly troubling was that teachers reported they often were unaware which subject each individual student was supposed to be learning.

o The school's 2016–17 SQRP scores show that its attendance rate was 92.5% and its credit-attainment rate was 85.4%, both of which were the second highest of any CPS school in its category. However, the OIG found that those scores were inflated due to falsified data.

**BACKGROUND**

The school at issue is an alternative high school located within the Cook County Jail. It is designed to afford an opportunity for the school-aged detainees in the jail to continue their high school education while they are detained. When the current principal took the helm at the school, she implemented changes to maximize the number of credits that students could potentially earn. One of the changes she implemented was a block-scheduling system with three, 100-minute class periods in a day. The long class periods allowed students to finish courses within condensed terms that were only seven weeks long. Under this system, the principal was able to fit six terms into a school year. Students could take up to three courses in a term and complete up to 18 courses in a year.

Within this unique setting, the school, under the principal's leadership, engaged in several improper practices discussed below that undermined its academic integrity.

**Appendix B**

**IMPROPER POST-RELEASE ENROLLMENTS**

The OIG discovered that a former student, who was killed one week after his release from the Cook County Jail, was still on the school's rolls and marked as attending class on the days following his release, including the date of his death. Given that he had left the school upon his release, he should not have been kept on the rolls and certainly should not have been marked as attending class. To make matters worse, after he died, the school issued him a credit for a course he was falsely recorded as taking after his release from the jail. Although he spent minimal amounts of time in three classes prior to his release, his records show that he did not receive enough classroom instruction to qualify for any credits. Moreover, the credit he was given was for a course he never attended. Worse still, the principal subsequently pressured two of the student's teachers to issue him more credits, but the teachers refused.

After learning about that incident, the OIG conducted a broad review of the school's data and discovered that the student discussed above was not an isolated case. To the contrary, the school consistently kept students enrolled, reported them as present for class and awarded them credits after they left the jail and could no longer be in attendance. From the 2012–13 school year through the 2015–16 school year, the OIG identified 352 enrollments involving 342 students that continued improperly past the date those students were released from the jail. Those post-release enrollments resulted in those 342 students being maintained on the rolls for a total of 14,664 days longer than they should have been. On average, the post-release enrollments lasted 42 days. In 54 instances they lasted longer than 100 days. Furthermore, the school issued credits to those students during those false enrollments 126 times.

The school also falsified attendance on a wide scale during those improper continuing enrollments. In the 2015–16 school year — the only year in question for which the OIG was able to obtain the full attendance data set — 45 students were recorded as present at school for the day 351 times after they had already been released from the jail. Because those daily-attendance entries reflect that the students were present for all their classes those days and the students can take up to three classes in a day, those 45 students were falsely reported as present for as many as 1,053 classes that year. Thus, on average, each of those students was falsely reported as being present for as many as 23 classes after leaving the school. Significantly, in terms of reporting students as earning their credit requirements, the impact of the falsification was twice as large because the school's class periods were 100 minutes long — twice the length of a typical CPS class. And given the short terms at the school, these periods of falsified attendance were the equivalent of students being marked present, on average, for 20% of a term after they already left school.

**Appendix B**

**OTHER EXAMPLES OF IMPROPER ENROLLMENT, ATTENDANCE AND CREDIT PRACTICES**

As stated above, the principal designed the school year to include six short terms to maximize the number of credits students could receive. As a result, the terms were so short — often 36 to 38 days — that they provided little margin of error for students to miss class or enroll late and still receive sufficient minutes of classroom instruction. The principal scheduled cutoff dates approximately seven days into a term that were supposed to serve as the last day in which students could enroll and still receive credit for the course. However, the principal did not always enforce the cutoff dates, and students regularly received credits without spending enough time in class. Even if the cutoff dates were followed, they would not ensure that students received 3,600 minutes of classroom instruction, as required to earn a credit according to CPS policy (Board Report 04-0128-PO1, § I(A)), because the classes were 100 minutes long and the terms shortened at the cutoff dates were fewer than 36 days.

Within these curtailed terms, where perfect attendance was critical, students nevertheless frequently missed class. At times, those students were reported by the school as present when their teachers had marked them absent. One student received a credit for a course, even though his teacher only marked him present for class seven times during the course of a seven-week term. Another student received a credit for a course after his teacher only marked him present 17 times in a seven-week term. According to teacher reports, many students received credits without having received enough classroom instruction due to 10-day stays in solitary confinement. One teacher reported that a student received a course credit simply for watching *Cosmos: A Spacetime Odyssey*, a science-documentary series presented by Neil deGrasse Tyson.

Teachers at the school stated that the principal pressured them to issue credits over their objections when students had not spent sufficient time in the classroom. The principal denied pressuring teachers in such circumstances, but the evidence shows that, at the very least, she encouraged them to issue credits in those instances. Based on the totality of the evidence, the principal clearly established an environment at the school where teachers were expected to overcome their concerns about short enrollments and missed classroom instruction and find a way to distribute credits to students.

The OIG also found that the school enrolled numerous students beyond their 22nd birthdays in violation of CPS guidelines requiring that students be disenrolled before turning 22. Some of those students who were 22 years of age or older also received credits. Notably, a few students were as old as 27, 28 and 29 at the time they were enrolled. While those students did not receive credits, they were still enrolled in violation of CPS guidelines.

**Appendix B**

Additionally, the school often misreported student attendance, in part, because it relied on information from the Department of Corrections, rather than the teachers' record of observed attendance in the classroom. Based on the system in place at the school, each morning the DOC was supposed to inform the principal's administration if any of the students refused to attend class that day. If they did not refuse, the school clerk reported them as present for the entire day. Nevertheless, students sometimes skipped classes despite initially indicating that they would attend. In fact, the principal admitted that the school did not always report attendance accurately because students were reported as present for courses they missed later in the day so long as they appeared for their first class of the day.

### QUESTIONABLE BLENDED-CLASS STRUCTURE

The school also employed a deficient and dishonest course structure in which students sitting within the same classroom took multiple different courses categorized within a general discipline. For example, science teachers taught chemistry, biology and earth science to the same class at the same time, and social studies teachers taught American history, economics, African-American studies and world studies to the same class at the same time. Moreover, teachers often did not know the courses the students were enrolled in until they issued the credits the students were supposed to receive at the end of the term. Thus, science teachers did not know which of their students were supposed to be learning chemistry and which ones were supposed to be learning biology. At times, students received credits for a subject that they were not taught at all. For example, some students received credits for learning Spanish after taking a class where the teacher taught only French.

This system is dishonest and sets a horrible example for students. It also harms students by depriving them of the opportunity to learn the courses in which they enrolled. Although they were given credits, they were not provided with the education that those credits were meant to represent.

### INFLATED SQRP SCORES

As a result of the improper and dishonest practices discussed above, the principal artificially inflated the school's SQRP scores. As the principal told the OIG, she is evaluated, in part, based on those scores. The SQRP data reflects that the school is performing very well in comparison to the 47 other high schools that CPS classifies as "option schools" (the category for schools primarily serving students who re-enrolled after dropping out). The school's 2016–17 SQRP scores, which are based on 2015–16 data, show that its attendance rate was 92.5% and the credit-attainment rate was 85.4%. Both rates were the second highest of any option school. Its one-year graduation rate was 97.8%, which was one of the highest rates of any option school. Accordingly, CPS's accountability status for the school reflects that it is in good standing. Based on the practices discussed above, however, the OIG concluded that the school artificially inflated its scores by falsifying data.

**Appendix B**

The evidence suggests that, despite the favorable graduation, credit-attainment and attendance rates reported, actual student learning has been minimal. STAR assessments (standardized tests used by CPS in option schools) show that students at this school scored worse than any other option-school students in reading and math growth. The principal acknowledged her students' poor STAR scores, but blamed teachers for the low scores. Given that under the principal's policies, the students (1) are able to receive credit for classes they only attended for a couple weeks, and (2) attend blended classes where teachers cover multiple different courses at once without knowing which courses the students are supposed to be learning, the OIG concluded that the setting and framework likely prevented students from receiving an adequate education.

**UNDERREPORTING OF DANGEROUS INCIDENTS**

Additionally, many teachers complained that the principal discouraged them from reporting dangerous incidents at the school. According to the teachers, the concerning incidents at the school include: assaults; chronic classroom masturbation; students inebriated during class after drinking "hooch" that they made in their toilets; flooding and water damage caused by students clogging toilets with mattresses; and threatening conduct by an organized faction of students who committed sexual assaults in the jail. Although the teachers complained to the OIG about these ongoing problems, the principal never officially reported more than 10 incidents involving misconduct, injuries or safety concerns to CPS in a year. Most CPS high schools report far more such incidents in a year. Given the teacher complaints and the low level of official reporting, the OIG found that the school almost certainly underreported the number of dangerous incidents and safety concerns. CPS should be apprised of every incident that risks the safety of CPS students and teachers, and it also should be aware of disruptive classroom misconduct that makes educating exceedingly difficult.

**OIG RECOMMENDATIONS**

Based on the findings discussed above, the OIG recommended that the Board terminate the principal's employment. The OIG stresses that it appreciates that this school has a unique mission and unique challenges. That being said, the school cannot falsify data and award credits that were not earned. It appears that the school's improper and fraudulent practices are a means of distributing as many credits as possible, with a heavy cost to academic integrity. To help remedy these problems and prevent such improper practices in the future, the OIG recommended that the Board implement the following policy changes:

The official attendance reported by the school should be based on teachers' records reflecting the students whom teachers actually observed attending their classes. To adopt this more accurate system of reporting attendance, the school will need to begin reporting *period*-attendance codes in addition to *daily*-attendance codes. The

**Appendix B**

school should also begin utilizing the half-day daily-attendance codes to report attendance accurately. For example, when students are present for only two of the three periods in the day, they should be reported as absent for half the day. (*See* CPS Guidelines for Attendance Improvement and Truancy Reduction, p. 154.)

The length of the school's terms should be extended beyond 40 days to ensure that students receive enough classroom instruction in the event they miss a few days of class. To accommodate longer terms, the school will probably need to decrease the total number of terms in a year to four or five.

The school should abandon its course structure of simultaneously teaching multiple different subjects within the same general discipline. Instead, it should adopt the traditional course structure employed in other CPS schools.

Finally, the school's administration should begin encouraging staff to report dangerous incidents and safety concerns, and all such incidents should be officially reported to CPS.

**Appendix C**

Office of
**Inspector General**
Chicago Board of Education
Nicholas Schuler, Inspector General

---

### SIGNIFICANT ACTIVITY REPORT

---

**TUESDAY, OCTOBER 24, 2017**

**FORMER CPS EMPLOYEES NOT ELIGIBLE FOR REHIRE WORKING AT CHARTERS AND CONTRACTS**

A review conducted by the Office of Inspector General for the Chicago Public Schools discovered that 163 former CPS employees with permanent "Do Not Hire" (DNH) designations in their CPS files were working at CPS charter and contract schools. The review looked at all employees of CPS charter and contract schools working as of December 2016. Key points include:

o   The 163 former CPS employees with DNH designations equals 2% of the total number of workers employed by CPS charter and contract schools.

o   98 of the 163 (60%) employees barred from returning to CPS were working in charter or contract schools as teachers.

o   34 of the 163 (21%) were employed at charter or contract schools as administrators or managers. Ten of those were given DNH designations by CPS for falsifying or forging CPS documents. Seven of the administrators and managers identified were classified as DNHs for theft, misappropriation of funds, fiscal mismanagement or waste of funds.

o   Three employees found working at charter or contract schools during the 2016–17 school year were designated as DNHs by CPS for sexual abuse. Those employees are no longer working at those schools.

o   22 former CPS employees who were designated as DNHs due to improper corporal punishment or physical abuse of students were working in charter or contract schools during the 2016–17 school year. Based on their job titles, two of those former employees apparently were holding positions at those schools with increased disciplinary responsibilities.

o   Former CPS employees with DNHs were found working for 33 different charter or contract operators. Four of those operators employed 11 to 27

---

**Appendix C**

individuals with DNHs, 11 of the operators employed 4 to 8 of those individuals, and 18 employed 1 to 3.

o Five percent of all CPS employees who received DNH designations in the last five years were found to be working in charter or contract schools.

o The charter and contract schools apparently did not know that they were hiring employees who had been given DNH designations by CPS, because there was no system in place by which charter or contract schools could learn whether their employees or prospective employees had received those designations.

o On June 30, 2017, the OIG issued a summary report (OIG 16-01121) to the Chicago Board of Education that detailed its findings and recommendations. The OIG recommended that the Board develop and implement a policy or program through which charter schools could learn (1) whether their current employees or prospective hires have received DNH designations from CPS, and (2) the reasons for those designations. Additionally, in DNH cases that raise legitimate concerns about child safety and welfare, the OIG recommended that CPS should notify charter and contract schools when it becomes aware that those employees are working at those schools.

o The Board recently advised the OIG that it took action with respect to the situations the OIG had identified as presenting the most critical danger to students. Specifically, CPS contacted the charter schools that employed individuals found by CPS to have been sexual abusers, and those individuals are no longer working at those schools. The Board also advised the OIG it is working to establish a broader method by which charter and contract schools will be able to receive DNH information from CPS.

**PREVIOUS OIG INVESTIGATIONS SPURRED THIS REVIEW**

In June 2016, the OIG reported to the Board that it had discovered that two former CPS employees, who had been given DNH designations, obtained positions at CPS charter or contract schools after resigning from CPS in the wake of OIG investigations. The OIG subsequently initiated this review to determine how many former CPS employees with DNH designations were working at CPS charter and contract schools.

**Appendix C**

**THE REVIEW**

### A. METHODOLOGY

To identify former CPS employees with "Do Not Hire" (DNH) designations who were working at charter or contract schools, the OIG asked all CPS charter and contract school organizations for a list of their employees as of December 20, 2016. After receiving that information, the OIG compared the employee list against former CPS personnel with DNH designations in their electronic personnel records.

As stated above, the OIG found that 163 former Chicago Public Schools employees with permanent DNH designations in their CPS files were working at CPS charter and contract schools. The OIG then asked CPS to provide the reasons for why it placed DNH designations in those employee files. After CPS provided that information, the OIG requested additional file materials on a selection of former employees who were designated as DNHs for serious offenses. The OIG also interviewed CPS personnel to better understand the district's policies and practices with respect to this issue.

The OIG's new Performance-Analysis Unit contributed significantly to the work on this project. The OIG's review began in the fall of 2016, before the Performance-Analysis Unit was established in January 2017, but after it was formed the unit contributed extensively to the work on this review.

### B. TYPES OF MISCONDUCT

The table below shows the reasons why the 163 former employees identified by the OIG were given DNH designations.

| | Misconduct Types Associated with DNHs | Instances |
|---|---|---|
| 1. | Incompetence/Unsatisfactory performance | 43 |
| 2. | Violating school rules | 33 |
| 3. | Corporal punishment/Physical abuse | 22 |
| 4. | Forging or falsifying official school or Board documents | 17 |
| 5. | Repeated acts of misconduct | 16 |
| 6. | Employee attendance | 16 |
| 7. | Residency | 16 |
| 8. | An assault, threat or abuse resulting in physical contact | 13 |
| 9. | Falsifying employee attendance or employment records | 10 |
| 10. | Job application fraud | 9 |
| 11. | Negligence/Incompetence — Students | 7 |
| 12. | Theft/Misappropriation of funds | 7 |

**Appendix C**

| | Misconduct Types Associated with DNHs | Instances |
|---|---|---|
| 13. | Insubordination | 6 |
| 14. | Irremediable conduct | 6 |
| 15. | Policy non-compliance | 6 |
| 16. | Verbal abuse | 5 |
| 17. | Serious ethics violation | 5 |
| 18. | Other | 4 |
| 19. | Drug/Alcohol Violation | 4 |
| 20. | Fiscal mismanagement or waste of funds | 4 |
| 21. | Making false statements | 4 |
| 22. | Negligence/Incompetence — Other Duties | 4 |
| 23. | Sexual abuse | 3 |
| 24. | Sexual harassment | 3 |
| 25. | Conduct causing psychological or physical harm or injury to a student | 2 |
| 26. | Inattention to duty, sleeping on duty | 2 |
| 27. | Using cellphones, etc., while supervising students | 2 |
| 28. | Using work locations or materials to conduct a secondary business | 2 |
| 29. | 105 ILCS 5/24A-5 Unsatisfactory evaluation | 1 |
| 30. | Conviction for an enumerated crime as defined in the Illinois School Code | 1 |
| 31. | Discourteous treatment | 1 |
| 32. | Failure to perform duties | 1 |
| 33. | Test cheating | 1 |

\* Total number of instances equals 276 because some employees with DNH designations committed more than one offense.

\*\* Some similar misconduct types were grouped into a single category for this analysis.

C. OIG INTERVIEWS WITH CPS PERSONNEL

After discussing this matter with CPS personnel, the OIG learned that, in the past, CPS did not routinely share its DNH designations with its charter or contract schools. The OIG also learned that CPS officials have been discussing ways to address the situation since the OIG first raised this issue with the Board in June 2016. However, no plan of action had been implemented by the time the OIG issued its report in June 2017. Several CPS officials voiced concerns about the information they could or should share with charter and contract schools. For example, a CPS official suggested that CPS might not have the authority to tell charter schools who they could not hire.

Despite those reservations, the OIG learned that there were internal CPS discussions during the 2016–17 school year about implementing a first-step plan to conduct

**Appendix C**

DNH checks on pending hires at the 129 charter or contract campuses that currently use CPS to do their pre-hiring background checks (approximately half the charter and contract schools). CPS then would alert those schools if it detected any DNHs during the background checks. If the charter then asked CPS about the basis for the DNH, CPS might consider sharing that information on a case-by-case basis. One official told the OIG that the proposed screening of prospective employees at charter and contract schools might not apply to positions in network offices because they do not have contact with students.

Additionally, one official speculated that CPS probably could address this matter in future contracts with charter or contract schools. According to that official, CPS probably could include terms in those contracts regarding job-candidate waivers that would allow for the disclosure of DNH information to charters so that those schools could make informed decisions.

### OIG RECOMMENDATIONS IN JUNE REPORT

Despite the Board's concerns and the lack of clear precedent in this area, the OIG concluded that the Board should find a way to ensure that its chosen charter- and contract-school operators — who teach the district's own public school students with money the district provides — know when their employees or prospective hires have received DNH designations from CPS for serious offenses. The OIG recommended that, at the very least, the Board should disclose DNH information when it involves proven sexual and physical abusers in the CPS system. The OIG further recommended that the Board also should disclose DNH information with respect to employees who have committed financial crimes, fraud and other serious misconduct so as to prevent those employees from committing similar acts at CPS charter and contract schools. Accordingly, the OIG recommended that the Board develop a policy or program that:

1. Alerts all contract and charter schools to the possibility that their existing employee rosters may contain former CPS employees who have DNH designations in their files;

2. Provides a means by which charter and contract schools can then seek from CPS, and be given, relevant information, at least in certain serious cases;

3. Provides a means by which charter and contract schools can have all potential hires screened for CPS DNH designations and be given relevant DNH information, at least in certain serious cases; and

4. Requires that in DNH cases that raise legitimate concerns about child safety and welfare, CPS immediately notify charter and contract schools when CPS

**Appendix C**

> becomes aware that employees with DNH designations are working at such schools.

The OIG acknowledged that the Board reasonably may conclude that disclosure of a former employee's DNH status may not be warranted in some cases. For example, many of the DNHs the OIG found resulted from poor teaching performance by probationary teachers. With additional training, a new principal or a different setting, a rookie teacher might be ready to excel. Residency violations also may not warrant disclosure to charter or contract schools. Those schools do not have a residency requirement and may not feel the need to exclude prospective employees whom CPS designated as DNHs for failing to live in Chicago.

The OIG further advised that CPS's then-tentative plan to address DNHs of prospective employees was a good start, but that the plan should extend to existing charter and contract school employees, including those who might have received DNH designations from CPS after they had already obtained positions with charters. Furthermore, the OIG recommended that the screenings should cover all employees, including those in administrative roles at network or main offices. The OIG advised that the potential plan to amend contracts with charter and contract schools to require prospective employees to allow CPS to disclose DNH information appeared to be a promising approach. The OIG encouraged the Board to explore whether such a provision might be extended to existing employees of charter and contract schools.

**RESPONSE FROM THE BOARD**

The Board recently responded to the OIG's report, informing the OIG that CPS addressed the four most serious cases discussed in the OIG's report — the three former employees given DNHs for sexual abuse and the one former employee given a DNH for an enumerated offense. The OIG also learned that CPS is continuing to develop a plan to address this problem more broadly. The four pressing cases and CPS's broad plan are discussed in more detail below.

A. Four Cases Addressed by CPS

In its June 2017 report to the Board, the OIG stressed that the conduct associated with some of the identified employees was serious enough to warrant immediate attention. The most pressing were three charter or contract employees who had been designated as DNHs for sexual abuse.

One of those employees was a former CPS elementary school teacher who was fired and classified as a DNH for sexually abusing two of his students at his home and inappropriately touching a third student during class. The OIG discovered that he was working at a charter school as a teacher in Chicago during the 2016–17 school year. According to the Board's response, after CPS fired the employee, it notified the

**Appendix C**

Illinois State Board of Education that the teacher was terminated for "child abuse," but the Board was not certain whether ISBE ever began the process to revoke his teaching certificate. The Board further informed the OIG that CPS has contacted the charter school about the teacher, and he has since been released by the school and is no longer working there.

The second employee who was classified as a DNH for sexual abuse was fired by CPS after it was discovered that he had a sexual relationship with a 17-year-old student. During the 2016–17 school year, that former CPS employee was working in a charter school as a teacher. The Board advised the OIG in its response that CPS contacted the charter school about this former employee, and the charter initially refused to take any action with respect to him. Apparently, the charter already was aware that the employee had been arrested for criminal sexual assault because that was discovered during the criminal background check conducted when he was hired. Despite the arrest, the charter hired him after he presented expungement paperwork showing that his criminal record was clear. In August 2017, however, CPS learned that the Illinois Department of Children and Family Services "indicated" a finding against the employee for a more recent act of misconduct against a minor. After the Board shared that new information with the charter, the school removed the employee from its worksite pending the outcome of its investigation of the matter.

The third employee with a DNH designation because of sexual abuse resigned from CPS following allegations that he hugged a student and made explicit sexual advances towards the student. During the 2016–17 school year, that former employee was working in a classroom setting at a charter school. In the Board's response, it advised the OIG that CPS contacted the charter and learned that the employee had been released by the school in 2016.

In addition to the DNH designations resulting from sexual abuse, the OIG also raised immediate concerns about a former CPS employee who was fired and classified as a DNH after CPS discovered she had been convicted of an "enumerated offense," a classification that bars someone from working in an Illinois public school (see 105 ILCS 5/34-18.5(c)). In this case, records indicated that the employee was convicted of a felony involving the delivery or manufacture of cocaine. The OIG discovered that this employee was working at a charter school during the 2016–17 school year. According to the Board's response, CPS looked into this matter and learned that, although the charter hired that employee when she still had a conviction for an enumerated offense on her record, that conviction has since been expunged *and*, as a result of a recent statutory amendment, the conviction is no longer an enumerated offense barring her from working in Illinois schools, given the number of years that have elapsed. As such, CPS believes she is still employed by the charter school where she was working last year.

**Appendix C**

B.  THE BOARD'S PLAN TO RESOLVE THE BROADER PROBLEM

The Board said it is developing a protocol for notifying charter and contract schools when their candidates for hire have CPS DNH designations, and also apprising those schools of the basis for those DNHs so that the schools can make an informed decision about whether to hire those candidates. The Board is working with charter and contract schools to amend their existing contracts to allow DNH information to be shared during the screening of prospective employees. This process is already underway at a few charter schools. The Board hopes to have a framework in place with certain charter and contract schools by the end of the calendar year.

Some charter schools have already agreed to include consent language in their employment applications stating that the Board is allowed to provide those schools with job candidates' DNH information, including the basis for the DNHs. The Board has completed the process changes necessary to provide DNH information to those schools that have added that consent language. Accordingly, when job candidates at those schools complete applications giving their consent, and those schools provide the Board with that documentation, the Board will inform those schools of any DNH information pertaining to the candidates, if it exists.

The Board stated that it believes there are two primary categories of concerns. First, employees who have been convicted of enumerated offenses should not be able to work at charter or contract schools. While there may be some instances when convictions are expunged or the impact of the enumerated offense changes with the passage of time, employees who continue to have an enumerated offense on their record cannot work at CPS, a charter school or a contract school. Second, some employees who have not been convicted of an enumerated offense may still have engaged in misconduct so serious that they present an unacceptable risk to students or others.

The Board intends to provide prompt notice to charter and contract schools when the Board learns that prospective employees at those schools have been convicted of sexual crimes or have indicated DCFS findings on their record. Illinois statutes, however, only prohibit schools from employing individuals who have been convicted of enumerated offenses. Beyond that prohibition, charter schools have been given considerable latitude, by statute, with respect to their hiring decisions. The Board exercises its discretion to decline hiring a broad range of persons who have not been convicted of enumerated offenses but, in the Board's judgment, still present a risk to the safety of students, staff and others. Although the Board decides not to hire those individuals, it does not have a statutory basis to require charter schools to defer to the Board's conclusions about the risks presented by those individuals.

In addition, the Board said it would prefer to expand the assistance it provides to charter and contract schools with respect to criminal background checks. The Board

**Appendix C**

already conducts background checks for prospective employees at some charter schools. However, under the current system, the Board transmits the results to the charters and those schools have the responsibility of reviewing those documents and determining whether they show convictions for enumerated offenses or other information calling a candidate's fitness into question. The Board would prefer to handle the screening process at charter schools the same way it handles the process with respect to CPS candidates. If the Board were more involved, it could identify when charter candidates were convicted of enumerated offenses and then inform those schools that they cannot hire those candidates. Furthermore, the Board could share DCFS reports and refreshed criminal background reports on current employees of the charter and contract schools, if those employees consented. The Board said it is hopeful that it can persuade charters to increase its involvement in this manner.

The Board said that, while it is prioritizing sharing information with respect to *prospective* charter and contract school employees and already has begun working with charter schools to allow for that, it fully intends to extend that process to cover *current* employees as well. Sharing information about current employees will require further amendments to contracts and an effective legal means to take employment actions where needed.

Overall, the OIG is encouraged that this issue has received substantial attention from the highest levels at CPS, and that the Board is working on a remedy to solve this problem. The OIG will continue to monitor this important issue.