EXHIBIT 14

Office of
# Inspector General
## Chicago Board of Education

Nicholas Schuler, Inspector General



January 1, 2019

Office of

# Inspector General

## Chicago Board of Education

Nicholas Schuler, Inspector General

January 1, 2019

To the citizens of Chicago and Illinois, the Chicago Board of Education, the Mayor of Chicago, the Illinois General Assembly and other elected officials:

The following Annual Report of the Office of Inspector General for the Chicago Board of Education includes a summary of investigations and other matters reported to the Board of Education by the Office of Inspector General in Fiscal Year 2018 (July 1, 2017, to June 30, 2018), and is filed pursuant to 105 ILCS 5/34-13.1(e).

In Fiscal Year 2018, the OIG reported on numerous significant matters, including the following investigations involving high-level CPS officials:[1]

- o An ethics violation by then-General Counsel Ronald Marmer and a subsequent cover-up by then-CEO Forrest Claypool;

- o An alternative-school operator that used SUPES Academy owners Gary Solomon and Thomas Vranas as undisclosed lobbyists to gain improper access to then-CEO Barbara Byrd-Bennett, manipulate CPS procurement processes and win contracts to operate CPS schools;

- o An education-technology company that improperly influenced the procurement process by wining and dining Byrd-Bennett, who steered a large CPS contract to the company; and

- o A former Board Member who violated the prohibition on conflicts of interest in the CPS Code of Ethics by advocating for CPS schools to purchase the products of at least four companies in which she was an investor.

The OIG also reported on two performance reviews conducted by the OIG's Performance Analysis Unit. The first review detailed a widespread pattern of improper and inconsistent K–8 admissions practices at CPS schools. The second review found that families living in CPS's most affluent attendance area were given a

---

[1] The OIG publicly reported on the first matter on December 7, 2017, by posting a copy of the OIG's report to the Board on the OIG's website after the Board released the OIG's report to the public. The OIG publicly reported on the other matters via Significant Activity Reports released on May 29, 2018, and July 31, 2018.

567 West Lake Street ◆ Suite 1120 ◆ Chicago, Illinois ◆ 60661-1405
Phone: (773) 534-9400 ◆ Fax: (773) 534-9401 ◆ inspectorgeneral@cpsoig.org

unique perk: special priority access to two years of free, full-day Montessori pre-kindergarten, worth $30,000 on average in the private market.[2]

Other investigations detailed in this year's report include:

- o Financial mismanagement matters, including the investigation of a director of a school music club who mismanaged over $13,000 in funds raised by the club by depositing the funds in his personal bank account and ignoring directives from the school principal to turn the funds over to the school and provide an accounting;

- o Cases involving the falsification of student attendance data by misclassifying absent students as merely tardy or as having transferred out of the district;

- o Admissions fraud at elite selective-enrollment schools; and

- o Procurement violations, abuse of paid leaves of absence and employee residency violations.

I am honored to have been reappointed to serve a second term as the inspector general. As always, it is a privilege to serve the students and families of CPS. Know that this office remains dedicated to independent investigation and analysis to further its mission of rooting out waste and corruption within our school district. Please feel free to contact us with any concerns.


Sincerely,

Nicholas Schuler
Inspector General

---

[2] The OIG publicly reported on those reviews via Significant Activity Reports released on February 21, 2018, and May 23, 2018.

# Table of Contents

**Section 1 — Office Overview** ...................................................................**1**
   A.  Mission and Budget.............................................................1
   B.  Training and Investigation Standards .................................1
   C.  Complaints Received in 2018................................................2

**Section 2 — Noteworthy Investigations and Performance Reviews**............**4**
   A.  CEO Claypool and General Counsel Marmer Investigation............4
   B.  Irregularities in Elementary School Admissions ....................6
   C.  Free Pre-K Perk in CPS's Wealthiest Attendance Area................8
   D.  Contract Steering and Conflicts of Interest.........................10
   E.  Contract-School Operator's Secret Access to Byrd-Bennett ........12

**Section 3 — Thefts and Financial Mismanagement** ..................................**15**

**Section 4 — Improper Hiring, Nepotism and Other Violations**...................**19**
   A.  Hiring of Unlicensed Teacher and Course Devoid of Content .......19
   B.  Nepotism and Other Matters...........................................21

**Section 5 — Vendor "Stringing" and Debarment**....................................**22**

**Section 6 — Falsified Student Attendance** ..........................................**25**
   A.  Misuse of Tardy Classification for Absent Students.................25
   B.  Misuse of Transfer Codes for Absent Students ......................27

**Section 7 — Abuse of Paid Leave, Sick Time and Secondary Employment**..................**29**
   A.  Abuse of Paid Leaves of Absence.....................................29
   B.  Other Secondary Employment Cases...................................30
   C.  Other Sick Day Abuse Cases..........................................30

**Section 8 — SES Application Fraud and Other Suburban Residency Fraud** .................**31**
   A.  Suburban-Residency Fraud at Selective-Enrollment Schools ........32
   B.  Tier Fraud..........................................................35
   C.  Other Suburban Residency Fraud Matter ............................37

**Section 9 — Employee Residency Fraud**...............................................**37**

**Section 10 — Cases Involving Arrests or Criminal-Background Issues** .......................**44**

**Section 11 — Updates to Cases Reported in Previous Annual Reports**........................**48**

**Appendices**

Office of

**Inspector General**

Chicago Board of Education

Nicholas Schuler, Inspector General

# FY 2018 ANNUAL REPORT

## SECTION 1 — OFFICE OVERVIEW

### A. MISSION AND BUDGET

The mission of the Office of Inspector General is to ensure integrity in the operations of Chicago Public Schools by conducting meaningful, accurate and thorough investigations into allegations of waste, fraud, financial mismanagement and employee misconduct. The OIG also reviews CPS systems, practices and procedures to determine their effectiveness in preventing waste, fraud and financial mismanagement.

In Fiscal Year 2018, the OIG's budget was approximately $2.08 million, which included 19 full-time positions.

### B. TRAINING AND INVESTIGATION STANDARDS

Many employees of the OIG are members of the Association of Inspectors General, a national organization of state, local and federal inspectors general and their staffs. The AIG offers training seminars and certification institutes for members as well as networking opportunities.

Many OIG employees hold the designation of Certified Inspector General or Certified Inspector General Investigator.

Participation in the AIG also offers employees continuing training in best practices related to the performance of the Inspector General mission. Locally, the OIG collaborates with IG offices from other state and local agencies to train all staff in a variety of areas related to investigations and audits.

The OIG conducts its investigations in accordance with the AIG's Principles and Standards for Offices of Inspector General, generally accepted principles, quality standards and best practices applicable to federal, state and local offices of inspectors general. In addition, the OIG, at all times, exercises due professional care

Office of Inspector General
Chicago Board of Education
2018 Annual Report

and independent, impartial judgment in conducting its investigations and issuing its reports and recommendations.

### C. Complaints Received in 2018

In Fiscal Year 2018, the OIG received 1,520 complaints alleging misconduct, waste, fraud and financial mismanagement at Chicago Public Schools, including allegations of misconduct by CPS employees or vendors and allegations of students residing outside the City of Chicago and attending CPS.

Of the 1,520 total complaints received, the OIG opened investigations into a total of 270 cases (17.8%). Several factors restrict the number of cases the OIG can open and investigate, including (1) a continuing focus on significant and often complex issues; (2) a particularly small staff size in relation to the OIG's total oversight responsibility (in Fiscal Year 2018 CPS had approximately 35,000 employees and a budget of $5.75 billion); and (3) time consumed by post-investigation activities (e.g., preparation and testimony for hearings, trials and labor arbitrations).

As previously reported by this office, the inability to investigate more complaints creates a substantial risk that instances of fraud and employee misconduct go undetected.

The OIG received 340 anonymous complaints, 22.4 percent of the total complaints received during the reporting year. Although the OIG responds to anonymous complaints, it is far more challenging to begin an investigation without the ability to speak with the complainant.

The table below reflects the types of complaints received by the OIG in Fiscal Year 2018.

[Table begins on next page.]

Office of Inspector General
Chicago Board of Education
2018 Annual Report

## Type of Complaint Received FY 2018

| | | |
|---|---|---|
| Residency | 180 | 11.84% |
| Mismanagement | 210 | 13.82% |
| Inattention to Duty | 41 | 2.70% |
| Misappropriation of Funds | 16 | 1.05% |
| Criminal Background | 11 | 0.72% |
| Conduct Unbecoming | 42 | 2.76% |
| Falsification of Attendance Records | 24 | 1.58% |
| Falsification of Employment Records | 11 | 0.72% |
| Falsification of School Records | 19 | 1.25% |
| Test Cheating | 13 | 0.86% |
| Tuition Fraud | 67 | 4.41% |
| Grade Changing | 2 | 0.13% |
| Violation of Acceptable Use Policy (computer/email) | 1 | 0.07% |
| Violation of Magnet and Selective-Enrollment Policy | 7 | 0.46% |
| Sexual Harassment | 11 | 0.72% |
| Contractor Violations | 23 | 1.51% |
| Ethics | 25 | 1.64% |
| Discourteous Treatment | 106 | 6.97% |
| Losing One's Professional License | 1 | 0.07% |
| Preferential Treatment | 24 | 1.58% |
| Fraudulent Leave of Absence | 13 | 0.86% |
| Retaliation | 39 | 2.57% |
| Unauthorized Use of Board Property | 6 | 0.39% |
| Theft of Board Property | 9 | 0.59% |

Office of Inspector General
Chicago Board of Education
2018 Annual Report

### Type of Complaint Received FY 2018

| | | |
|---|---|---|
| Off-Duty Criminal Conduct | 15 | 0.99% |
| On-Duty Criminal Conduct | 15 | 0.99% |
| Discrimination | 32 | 2.11% |
| Violation of Board Policy | 40 | 2.63% |
| Violation of the Student Code of Conduct | 11 | 0.72% |
| Miscellaneous | 506 | 33.29% |
| | **1,520** | **100.00%** |

## SECTION 2 — NOTEWORTHY INVESTIGATIONS AND PERFORMANCE REVIEWS

This section includes three investigations and two performance reviews that the OIG reported to the Board in Fiscal Year 2018 and also reported publicly, given their importance.

### A. CEO CLAYPOOL AND GENERAL COUNSEL MARMER INVESTIGATION (16-00924)

On December 7, 2017, the OIG publicly reported on its investigation of an ethics violation by then-General Counsel Ronald Marmer and the subsequent cover-up by then-CEO Forrest Claypool. Following the Board's release of the Executive Memo and Summary Report that the OIG had sent to the Board on this matter, the OIG made those documents available to the public by posting them on its website: cpsoig.org.

The OIG's findings and recommendations and the Board's response are summarized here. The OIG's Executive Memo, which discusses the evidence in more detail and contains the OIG's full findings and recommendations, is attached below as **Appendix A**.

In this case, the OIG found that Marmer violated the CPS Code of Ethics by exercising "contract management authority" over work performed by Jenner & Block — the law firm hired to bring a lawsuit on behalf of the district challenging the legality of the State of Illinois's school-funding formula and its discriminatory impact on CPS — because Marmer had an existing "business relationship" with that firm.

The OIG further found that Marmer and Claypool failed to take proper corrective action after learning that CPS's three-member Ethics Committee and a fourth high-

Office of Inspector General
Chicago Board of Education
2018 Annual Report

level CPS Law Department attorney considered this issue and all agreed that it was a violation of the Code of Ethics for Marmer to exercise "contract management authority" over the firm. Instead, Marmer and Claypool obtained two outside legal opinions on the matter, and when neither of those attorneys provided opinions approving of Marmer's involvement in the contracted legal work, Marmer and Claypool consulted a seventh attorney, whom Claypool had known since college. That seventh attorney concluded that Marmer's conduct did not violate the Code of Ethics. That attorney's opinion, however, was incorrect and materially deficient because he failed to address the central problem relating to the definition of a "business relationship." Although Claypool knew that the attorney did not address that issue, Claypool nevertheless relied on the opinion and released it to the press in the wake of public questions about Marmer's involvement in the work of Jenner & Block. Significantly, Claypool never told the Board or the public about the previous six attorneys who concluded that Marmer's relationship with the firm violated the Code of Ethics. Thus, the OIG found that Claypool used the seventh attorney's opinion to paper over the negative opinions of the six attorneys who had already addressed the issue.

Furthermore, after the OIG's investigation was publicly known, Claypool took improper steps to alter relevant records with the intent of obscuring the work of one of the outside attorneys who had concluded that Marmer was violating the Code of Ethics. Specifically, Claypool asked that attorney to change entries on his bill referencing "CPS's Code of Ethics" and "ethics issues." The attorney complied, and only the revised bill, with that language omitted, was placed on CPS's billing system.

Claypool then greatly compounded the severity of his misconduct when he repeatedly lied to the OIG by unequivocally denying that he had asked the outside attorney to make changes to his bill. Claypool further lied to the OIG when he said that, initially, he was not aware that the outside attorney had written an opinion on the matter.

Based on the extensive evidence in this case, which is discussed in more detail in the attached Executive Memo, the OIG recommended that the Board terminate Claypool's employment and discipline Marmer in an appropriate manner, up to and including the termination of his employment. However, in the immediate wake of the OIG's report, they both resigned from CPS. Claypool resigned on December 8, 2017, effective December 31, 2017, and Marmer resigned on December 12, 2017, effective December 22, 2017.

In addition, the OIG made recommendations to address Marmer's questionable changes to the Ethics Committee. As stated above, the three members of the Ethics

Office of Inspector General
Chicago Board of Education
2018 Annual Report

Committee all concluded that Marmer was violating the Code of Ethics. The OIG later discovered that, during the OIG's investigation, Marmer removed one of those members and added two new people who had each followed Claypool to CPS from the CTA: the Chief Internal Auditor and an attorney in the Law Department. The timing of the changes was concerning because it happened while the OIG was investigating Marmer's and Claypool's disagreement with the Ethics Committee. Moreover, the changes apparently occurred right after Claypool learned in a Board briefing that the opinion of the Ethics Committee was central to the OIG's investigation. Given the timing and overall circumstances, the OIG could not eliminate the possibility that the real motive for the personnel changes was to create an Ethics Committee more deferential to Claypool and Marmer.

Accordingly, the OIG recommended that the role and function of the Ethics Committee needed to be strengthened and defined, and that appointments to the Ethics Committee should be publicly approved at Board meetings. The OIG also recommended that the Board should appoint a group to propose new rules for the committee after researching best practices for operating an Ethics Committee.

In response to the OIG's report, the Ethics Committee was expanded to seven members and now includes an individual from the Board Office, as well as individuals from CPS education departments. The current members of the committee are as follows: the Ethics Advisor, the General Counsel, the Deputy General Counsel for School Law, a Senior Assistant General Counsel, the Chief of Staff to the Board, the Executive Director of Enrollment and Access, and the Deputy Chief of Network Support.

The Board advised the OIG that the Ethics Committee continues to function as intended when it was originally created: as an informal advisory group to assist the Ethics Advisor with the interpretation of the Code of Ethics. However, the Board advised that the Ethics Advisor has convened a group of ethics officials from sister agencies that meets quarterly and discusses best practices. The Board also advised that it joined the Council on Governmental Ethics Laws and that CPS's Ethics Advisor attended COGEL's annual conference, which included professional development for ethics officials.

### B. Irregularities in Elementary School Admissions (17-00650)

In a February 21, 2018, Significant Activity Report, the OIG's Performance Analysis Unit detailed a widespread pattern of improper and inconsistent K–8 admissions practices, particularly at neighborhood schools.

Office of Inspector General
Chicago Board of Education
2018 Annual Report

This review followed an Office of Access and Enrollment audit, conducted at the OIG's request, of every K–8 student admitted in 2016–17 to a traditional CPS school that was not their neighborhood school. All such out-of-boundary admissions should have gone through OAE's "Options for Knowledge" admissions process (since rebranded as "GoCPS"). This means that at neighborhood and lottery magnet schools, non-neighborhood applicants should have been admitted via an OAE lottery or a post-lottery application to OAE.

Instead, the OIG found that hundreds of schools were bypassing OAE by using a variety of side-door practices to admit kids. This included vetting prospective students for grades and attendance, giving preference to the children of staff members and improperly promoting out-of-boundary pre-K students who did not win OAE lotteries to kindergarten — even at those schools with some of the longest lottery waitlists.

Of more than 18,200 admissions audited, nearly 6,900 — nearly two out of five — failed the audit, usually because an admission improperly bypassed OAE. Of 421 schools audited, 93 percent held at least one audit failure, and almost two-thirds had at least 10 audit failures. Neighborhood schools by far had the most audit failures. More than 50 percent of students who enrolled in neighborhood schools outside their own neighborhoods improperly bypassed OAE and generally were admitted through some kind of side-door practice. Several principals told the OIG that they were never trained on admissions or indicated that they were given incorrect training by their predecessor principals.

The OIG's recommendations included, among other things, intensive training, particularly for principals of neighborhood schools; clearer, more concise and more accessible rules for principals; a requirement that principals certify that they have read the rules; and the creation of additional auditable data on admissions, especially during the period after OAE waitlists are exhausted.

The OIG's full Significant Activity Report, which discusses the OIG's findings and recommendations in more detail, is included below as **Appendix B.**

Since the OIG reported on this performance review, the Board has advised that OAE sent a memo to principals on enrollment policies and procedures that specifically warned against automatically promoting out-of-boundary pre-K students to kindergarten, alerted principals not to admit students out of waitlist order and required the maintenance of a waitlist log.

In addition, the Board advised that principals were trained on the admissions rules in the summer of 2018 and the training included an admonition that vetting of

Office of Inspector General
Chicago Board of Education
2018 Annual Report

prospective students after waitlists are exhausted is prohibited. The Board also advised that the summer 2019 training sessions will include some kind of signature requirement for principals, thus creating a record of which principals were properly trained.

Furthermore, OAE will be bringing admissions-policy amendments that address OIG concerns to the June 2019 Board meeting and plans to review its draft amendments with the OIG before the Board vote. Also, in the spring of 2019, OAE will feature information on how to report admissions violations on its GoCPS website.

With respect to audit improvements, OAE advised that it developed enhancements that should allow Internal Audit and the OIG to easily audit when and how offers were made and accepted, when waitlists were exhausted and when post-lottery application forms were submitted and approved.

### C. Free Pre-K Perk in CPS's Wealthiest Attendance Area (17-00326)

In a May 23, 2018, Significant Activity Report, the OIG's Performance Analysis Unit reported that families in the Oscar Mayer Magnet attendance area — the most affluent in CPS — were the only ones in the entire system to receive special priority access to two years of free, full-day Montessori pre-kindergarten. This perk is worth more than $30,000 on average in the private market and is costing taxpayers just over $700,000 a year in salaries and benefits, the OIG found.

After receiving free, full-day, Montessori pre-K at taxpayer expense, nearly one-third of the three-year-olds who joined Mayer's pre-K in 2014–15 had left CPS by first grade, the OIG determined. Some went on to pricey private schools, area Catholic schools or suburban schools.

All this followed CPS's 2008 decision, spurred by feedback from vocal area residents, to allow Mayer to keep its attendance boundary when Mayer converted to a magnet school with new Montessori and International Baccalaureate programming. The conversion occurred after CPS won a federal magnet grant by indicating that Mayer would be a citywide magnet school.

At a 2008 Board meeting on the matter, then-Board President Rufus Williams voiced concern that Mayer's proposed conversion to a magnet school with a boundary would eventually fill Mayer with students from its largely white neighborhood, shortchanging African-American students who had a long tradition of attending Mayer from outside the neighborhood. In response, CPS wrote into the Board report approving the conversion a requirement that CPS file a demographic report on Mayer with the Board annually so the Board could determine if Mayer should keep

or lose its boundaries. In the 10 years since, such a report was never filed, the OIG determined.

During those 10 years, Mayer's African-American student body fell from 52 percent to 8 percent, while its white student body rose from 16 percent to 71 percent. Economically, in the 2017–18 school year, 98 percent of Mayer three-year-olds were from the most affluent "tier" in CPS — up from 74 percent in 2011–12, the first school year CPS used tiers. The neighborhood demand for Mayer's Montessori pre-K has been so high that in the last five school years only four three-year-olds from outside Mayer's boundaries with no siblings at the school have won lottery seats. For the 2017–18 school year, not one of 686 out-of-boundary applicants was accepted.

The OIG recommended that CPS stop targeting a special free pre-K perk to the most affluent attendance area in CPS, consider other options with the Mayer community and work with the Board Secretary on a tracking system for reports requested by the Board. The OIG's full Significant Activity Report is included below as **Appendix C**.

In response, CPS conducted a 10-year demographic analysis of Mayer and held the first of three community meetings on December 3, 2018, to present the OIG's findings and to discuss future options. A CPS PowerPoint presentation from that meeting summarized the OIG's findings and expanded further on one of them by documenting the Mayer post-pre-K bailout rate since 2008. According to that presentation, the number of Mayer three- and four-year-olds who leave the school after free pre-K is "sizeable and growing."

The presentation also summarized the OIG's recommendations and outlined some "proposed community options for discussion," such as providing a tuition-based Montessori pre-K at Mayer and offering grades K–8 as either neighborhood seats or citywide magnet seats. The meeting then broke into working groups for further discussion.

One CPS official advised the OIG that the district is open to other ideas. A Mayer "working group" is meeting monthly to develop recommendations to address the OIG's report, with CPS representatives assisting as needed.

Additional community meetings are planned for January 24 and February 27 of 2019, and CPS will be releasing FAQs to address community and working group questions. CPS anticipates submitting a recommendation about Mayer to the Board at the April 2019 Board of Education meeting.

CPS is still working on a formalized tracking system to ensure that reports requested by the Board, such as the annual demographic reports requested in this case, are completed.

### D. CONTRACT STEERING AND CONFLICTS OF INTEREST (15-00005)

In a May 29, 2018, Significant Activity Report, the OIG detailed its investigation of two overlapping matters: (1) then-CPS CEO Barbara Byrd-Bennett's improper dealings with an education-technology company ("Vendor A"), which involved Vendor A's wining and dining of Byrd-Bennett and a large CPS contract steered to Vendor A; and (2) a former Board Member's conflicts of interest involving Vendor A and other companies in which she was an investor. The OIG's full Significant Activity Report is included below as **Appendix D**.

Since reporting on this investigation, the Board has responded with additional remedial measures. The OIG's recommendations and the Board's response are summarized here.

#### 1. *Recommendations Given Vendor A's Improper Dealings with Byrd-Bennett*

Because the OIG found that Vendor A violated CPS's ethical standards and undermined CPS's procurement processes by using expensive dinners to influence Byrd-Bennett and obtain CPS business, the OIG would have normally recommended that the company be debarred. However, in this case, Vendor A was subsequently acquired by another education-technology company, and, while that company continued to do business with CPS, the contract at issue had expired. Therefore, the OIG recommended that CPS conduct a review to determine the effectiveness of the product at issue in the OIG's investigation and whether CPS should continue purchasing that product from the successor company. If that review revealed that the company's ongoing business with CPS is a legacy of an improper contracting process, and the successor company is not adding value for CPS students, the OIG recommended that the company be debarred. However, if the Board decided to do business with the company, the OIG recommended that the Board appoint an independent monitor — chosen by the Board, but paid for by the company — to review the company's sales activities for unethical conduct. The OIG also recommended that the Board should require the company to annually certify that it has complied with CPS's ethics policies. In the meantime, the OIG recommended that CPS suspend all purchases of the product at issue.

In response to the OIG's recommendations, the Board advised that, for the summer of 2018 and the 2018–19 school year, it suspended any purchases of the product at

Office of Inspector General
Chicago Board of Education
2018 Annual Report

issue in the OIG's investigation. The Board further advised that the district has no plan to use the product in the future.

The OIG also recommended that the Board personally debar the primary Vendor A employee involved in the improper dealings with Byrd-Bennett. That employee (the "Sales Executive") had since left Vendor A and gone to work as the CEO for a different CPS vendor.

In response, the Board advised that it has initiated debarment proceedings against the Sales Executive.

In addition, the OIG recommended that Section XII of CPS's Code of Ethics be amended to explicitly state that vendors or prospective vendors seeking Board work are prohibited from giving gifts, payments or gratuities to Board officials or employees.

The Board advised that the CPS Ethics Advisor has convened a group to recommend multiple amendments to the Code of Ethics and that the OIG's recommendation for Section XII will be one of the group's recommended amendments. That process is still pending.

### 2. Policy Recommendations Given Former Board Member's Conflicts of Interest

Although the OIG found that, among other things, the former Board Member violated the prohibition on conflicts of interest in the Code of Ethics by using her position to advocate for CPS to purchase products of at least four companies in which she was an investor, she had already left the Board at the time the OIG reported on this matter. Therefore, the OIG advised that the appropriate remedy for the violations in this case was to make the Code of Ethics more robust and to provide better training to Board members so that similar violations do not occur in the future.

Accordingly, and as discussed in more detail in the OIG's Significant Activity Report, the OIG recommended that the Board amend Section VII of the Code of Ethics so that it comports with Illinois law and protects the integrity of the Board by making it clear that Board members can have no significant personal financial stake in the business of CPS at any level. Furthermore, because Board members vote to renew charter schools, the OIG recommended that they also should be prohibited from having an interest in companies doing business with CPS charters. The OIG also recommended that the Board should (1) place an affirmative duty on Board members to inquire whether any entities in which they have an economic interest are doing business or seeking to do business at any level with CPS, or CPS charter schools; and (2) require that Board members annually certify that they conducted

Office of Inspector General
Chicago Board of Education
2018 Annual Report

such an inquiry and that none of the companies in which they have an economic interest are doing business with CPS or CPS charters.

In response to these recommendations, the Board advised that the CPS Law Department and outside counsel are considering the OIG's recommended policy changes and have discussed this matter with the ISBE General Counsel. That legal review is still pending.

### 3. Recommendations for Vendor that Failed to Cooperate in Investigation

During this investigation, an education-technology company and CPS vendor that the former Board Member was invested in and advocated for ("Vendor B") failed to cooperate with the OIG. Accordingly, the OIG recommended that Vendor B and its then-CEO, who refused to provide information requested by the OIG, be debarred as CPS vendors.

The Board subsequently initiated debarment proceedings against Vendor B and its former CEO. The former CEO was later permanently debarred from doing any business with the Board. Vendor B, however, reached a settlement agreement with the Board, pursuant to which, the Board agreed to dismiss the debarment proceedings against Vendor B, and Vendor B agreed to: (1) comply with the OIG's previous document request by producing the requested information; (2) submit to independent monitoring for a period of 24 months, by a monitor selected by the Board and at Vendor B's expense; (3) pay the Board $50,000 in restitution; and (4) refrain from engaging in business with the Board for a period of 60 days. In accordance with that agreement, Vendor B subsequently provided the OIG with the previously requested information, submitted to the independent monitor, paid the $50,000 and completed a 60-day period without engaging in CPS business.

### E. Contract-School Operator's Secret Access to Byrd-Bennett (13-00930)

On July 31, 2018, the OIG issued a Significant Activity Report regarding the investigation of an alternative-school operator that used SUPES Academy owners Gary Solomon and Thomas Vranas as undisclosed lobbyists to help the company gain improper access to then-CPS CEO Barbara Byrd-Bennett, manipulate CPS procurement processes and win contracts to operate CPS schools. The OIG's full Significant Activity Report, detailing the OIG's findings in this matter, is included below as **Appendix E**.

Since reporting on this investigation, the Board has responded with additional remedial measures. The OIG's recommendations and the Board's response are summarized here.

Office of Inspector General
Chicago Board of Education
2018 Annual Report

### 1. Disciplinary Recommendations and the Board's Response

Based on the evidence in this case, the OIG recommended that the Board debar the alternative-school operator and the two executives at that company who oversaw the company's misconduct ("Executive A" and "Executive B").

The OIG recognized, however, that the Board may decide that the company's debarment may be too disruptive for CPS, given that it operated several schools. Therefore, the OIG recommended that, should the Board decide that it is not feasible to debar the company, the Board should: (1) require that the company pay the Board a penalty in the amount of $6.7 million, which was 10 percent of the amount that CPS had paid the company at the time the OIG reported this matter to the Board; (2) allow the current contracts with the company to lapse and place them back out to bid; (3) direct the company to enhance its internal policies and training related to doing business with CPS and to certify annually that it has complied with CPS's Code of Ethics and procurement policies; and (4) appoint an independent monitor — selected by the Board and the OIG, but paid for by the company — for a three-year period to assess and report on the company's corporate ethics and compliance culture.

In response, the Board subsequently advised that it is finalizing a settlement with the company and Executives A and B, in which they agreed that: (1) the company will pay to the Board and directly invest in its CPS schools a total of $1 million; (2) the company will submit to an independent monitor for three years, based on the terms recommended by the OIG, and including training of the company's executives on the CPS Code of Ethics; (3) Executive A and Executive B will also submit to the independent monitor for the three-year period, so long as they continue to work for the company during that time; and (4) Executive A and Executive B will be precluded from participating in any Board business for three years, regardless of their place of employment.

The Board further advised that the $1 million will be comprised of a total of $700,000 in cash payments to the Board over a five-year period and a total of $300,000 of in-kind investments in the company's CPS schools over the same five-year period. Among other things, the in-kind investments may include vocational or skills training programs, new technologies, educational or support staff and capital improvements — all beyond what is already existing in the CPS schools operated by the company. Furthermore, to count towards the $300,000, the company's in-kind investments must be approved by the Office of Innovation and Incubation.

In addition, and as discussed in more detail in the Significant Activity Report, the OIG recommended that the Board place a Do Not Hire (DNH) designation in the

Office of Inspector General
Chicago Board of Education
2018 Annual Report

personnel file of a former CPS Network Chief who had resigned under a previous investigation and went on to work for the alternative-school operator as part of an improper "wink-wink" agreement with the company that Solomon brokered on Byrd-Bennett's behalf.

The Board subsequently placed a DNH in the personnel file of that former Network Chief.

2. *Recommendations Regarding Lobbyist Disclosures and the Board's Response*

An important aspect of this case was that the company failed to disclose to the district that it retained Solomon and Vranas as lobbyists to represent its interests to CPS officials. Prospective CPS vendors are supposed to complete and submit CPS's Contractor's Disclosure Forms, which require the vendors to disclose their lobbyists retained to influence the contract award. However, the OIG determined that CPS lacked sufficient processes to ensure that it receives those forms and that those forms are made readily available to the public. Therefore, consistent with the Code of Ethics' disclosure requirements for contracts valued at $25,000 or more, the OIG recommended that the Department of Procurement take steps to ensure that it receives those lobbyist disclosures and, once received, to ensure they are maintained in a form that is easily accessible by the public. To that end, the OIG recommended that the Department of Procurement place electronic copies of those forms on a publicly accessible website on the cps.edu domain.

In addition, the OIG recommended that the Code of Ethics be amended to place an explicit affirmative burden on the lobbyists themselves (as opposed to simply on the vendors who retain them) to register with the Board and disclose their involvement in Board contracts. To facilitate this process, the OIG recommended that the Board create and maintain a lobbyist registry that is publicly accessible, maintained in an electronic format on the cps.edu domain, and modeled on the City of Chicago's lobbyist filing system that is publicly accessible on the City's website.

In response, the Board advised that the Department of Procurement is developing an online portal where the vendors' disclosure forms will be maintained in a form accessible by the general public. With respect to the OIG's recommendation for a lobbyist registry, the Board advised that the CPS Law Department is researching practices in other jurisdictions, including other City agencies, to ensure that the Board has an effective process for tracking lobbyist activity associated with CPS contracts. That work by the Law Department is still pending.

Office of Inspector General
Chicago Board of Education
2018 Annual Report

## SECTION 3 — THEFTS AND FINANCIAL MISMANAGEMENT

In Fiscal Year 2018, the OIG reported on several investigations involving theft or financial mismanagement. Those cases are discussed below.

> o  *Music-Group Director Mismanaged Over $13,000 in Funds (17-00551)*

An investigation determined that a music teacher at a high school mismanaged at least $13,099 in funds raised by the school choir club he directed by depositing those funds in his personal checking account, withholding portions of that money from the school and spending the majority of it without maintaining a proper accounting of how it was spent.

In 2016, the club received substantial acclaim after a successful run performing on a television show. To appear on that show, the club made several trips to Los Angeles, and it was during that time that the club's director started a GoFundMe campaign to raise money for the group. When they returned to Chicago, the group booked numerous local shows, which were often paid gigs or involved donations to the group. The OIG found that the director mismanaged $8,074 raised through the GoFundMe campaign, as well as $5,025 in funds the group received for performing local shows.

The director started the GoFundMe campaign without CPS approval and improperly connected it to his checking account. After the school principal discovered the account and instructed him to fill out a fundraising proposal in accordance with CPS policy, he ignored the principal's directives and began spending the donated funds during the club's trips to Los Angeles. It was not until six months later — after the director had already spent $7,568 of the GoFundMe money, and after the principal and school operations manager had repeatedly demanded an accounting — that he began communicating to the school the amount he had spent and the nature of his expenses, which he claimed were all for the group. The director, however, had not maintained an accounting of his spending during the group's trips, and he had commingled the donated funds by depositing them in his checking account, which he shared with his parents. Thus, by the time he attempted to report his spending to the school months later, he struggled to recall exactly how he had spent the money, the majority of which he said he distributed to the students in cash. Furthermore, the GoFundMe account subsequently accrued $506 in additional donated funds, but the director did not turn that money over to the school until after he was interviewed by the OIG. Accordingly, the OIG found that he willfully violated CPS fundraising guidelines.

Office of Inspector General
Chicago Board of Education
2018 Annual Report

Perhaps more seriously, the director mismanaged at least $5,025 in checks that were given to the group for shows the group performed or were otherwise given to the group as donations. He deposited those checks in his bank account and admitted to the OIG that he withheld some of those funds from the school. Following his interview with the OIG, he turned over $3,500 to the school for three checks he had deposited in his account 6 to 10 months earlier. However, he apparently never submitted to the school the other $1,525 in checks he put in his account.

The director claimed that the funds he deposited in his bank account were for the music group and that he never used any of that money for his personal expenses. While the OIG did not find that he stole money from the group for his own personal use, the OIG could not exclude that possibility given his poor accounting and the fact that he purposely withheld money from the school, despite the principal's repeated demands that he document all funds received and submit those funds to the school.

The director resigned from CPS two months after he was interviewed by the OIG and while the OIG was still investigating this matter. He subsequently established the music group as an LLC that operated independently from CPS. Given his misconduct, the OIG recommended that the Board place a Do Not Hire (DNH) designation in his personnel file. The OIG also recommended that the Board could consider seeking to recover the remaining $1,525 in funds that he deposited in his account and never turned over to the school. The OIG advised, however, that those funds were intended for the music group, which was no longer a CPS club and was being run privately by the director.

The Board subsequently placed a DNH in his personnel file. The Board also advised that, at this time, it is not pursuing recovery of the remaining funds he failed to turn over to the school.

> o   *Theft of Over $500 in Fees Collected from Students (18-00543)*

An investigation determined that a contract custodian working at an elementary school stole $510 in cash from a school safe that was unlocked. The cash had been collected from students for yearbook fees, graduation fees and a trip to Springfield, Illinois. The custodian was identified in video surveillance footage by the school principal and school clerk, and he admitted to the OIG that he stole the cash.

The OIG recommended that the Board debar the custodian from working at the school and contact the company that employed him to notify it of the custodian's actions, should it wish to take any further action against him. The Board advised that it is initiating debarment proceedings against the custodian and that it notified his employer of this matter and directed the employer to ensure that he not be assigned

Office of Inspector General
Chicago Board of Education
2018 Annual Report

to work on any CPS property. The Board is also seeking recovery of the stolen money from the custodian.

o   *Improper Credit Card Account and Numerous Errors by Clerk (18-00425)*

An investigation determined that an elementary school principal violated CPS's prohibition on procurement cards (or "P-Cards") by obtaining a Costco-sponsored credit card in the school's name. The school maintained the credit card account for four years, until its Network Chief confiscated the cards in 2018. Notably, from June 2014 to June 2016, the school was charged finance fees and interest at an annual rate of nearly 30 percent.

The principal told the OIG she did not know that she could not open and maintain credit card accounts in the school's name. She further stated that the financial specialists from the CPS School Support Center who assist the school with its finances never identified this issue, and it was never covered by CPS trainings. The OIG found no evidence that she intentionally circumvented the prohibition on procurement cards.

The OIG recommended that the Board direct the school to close its credit card account. The OIG declined to recommend discipline against the principal in this instance for maintaining the improper credit card account. The Board subsequently advised that the school was directed to close the account.

Also, because the OIG discovered an apparently common belief held by school administrators that they are permitted to open credit cards in their school's names, the OIG recommended that the Board advise all CPS school administrators that maintaining school credit card accounts is not allowed under the district's prohibition on procurement cards. The Board subsequently informed the OIG that the Office of Internal Audit advised all schools that the use of school credit cards is prohibited.

In addition, while investigating this matter, the OIG uncovered evidence showing that, since August 2015, the school clerk kept incomplete and sloppy records with regard to both the school's credit cards and the general administration of the school's internal accounts, including: incomplete record keeping for school expenditures; failure to receipt money deposited into the school's accounts; failure to obtain authorization for school expenditures; improper payment of school employees from the school's internal accounts; and unauthorized reimbursements to herself. Her large number of mistakes, coupled with the prolonged period of time over which she repeatedly made them, showed a disregard for the school's finances and the district's accounting procedures for schools.

Office of Inspector General
Chicago Board of Education
2018 Annual Report

The school clerk was also the subject of a separate residency investigation (18-00070) that the OIG reported to the Board concurrently with this matter. The OIG determined that the clerk violated the CPS residency policy by living in Elk Grove Village, Illinois, and by misrepresenting to the district that she was living in Chicago.

The OIG recommended that the Board terminate the clerk's employment and place a DNH designation in her personnel file. She resigned from CPS in the wake of the OIG's reports, and the Board subsequently placed a DNH in her personnel file.

- *Improper School Credit Card Accounts at a High School (16-00971)*

This investigation was reported to the Board concurrently with OIG 18-00425, discussed above, because, as in that case, the OIG found that a school was using credit cards in violation of CPS's prohibition on procurement cards. Here, the OIG found that a high school was maintaining credit card accounts with Home Depot and Jewel-Osco for school-related purchases. In addition, the school clerk mismanaged the school's Home Depot credit card account by failing to pay the school's invoices for five months, resulting in finance fees and late fees charged to the school. Although the fee amounts were small, they nevertheless constituted an additional 18 percent of the cost of the school's purchases.

The OIG recommended that the Board direct the school to close its credit card accounts with Home Depot and Jewel-Osco. The OIG declined to recommend discipline against the school clerk for mismanaging the Home Depot credit card account because of the minor dollar amounts that resulted from her mismanagement. The Board subsequently advised that the school was directed to close its credit card accounts.

Additionally, as in OIG 18-00425, the OIG recommended that the Board advise all CPS school administrators that, under the district's prohibition on procurement cards, schools are prohibited from maintaining credit card accounts. As stated above, the Office of Internal Audit advised all schools of the prohibition.

- *Two Misappropriated CPS Checks (18-00254)*

An investigation determined that, in unrelated incidents, two CPS employees each had one of their paychecks misappropriated by another individual.

In the first case, CPS mailed a paycheck in the amount of $99.64 to a new substitute teacher. However, due to a clerical error, the check was incorrectly mailed to the address of a non-employee with a similar name. The check was subsequently cashed by the non-employee who received it.

In the second case, CPS mailed a paycheck in the amount of $137.18 to a new lunchroom employee. Although the check was addressed to the employee at the correct street address she provided CPS, it did not list her apartment number because the she had not provided CPS with that information. The check was subsequently cashed, and the employee claimed she never received it. The OIG determined that the check was likely cashed by another individual in the employee's building, who forged the employee's signature when endorsing the check.

The OIG reported these matters to the Board so it could consider whether it should issue a replacement check to one or both of the employees, and so that it could consider whether it was financially practicable to pursue recovery of the misappropriated funds.

The Board subsequently advised that it issued replacement checks to both employees. The Board also advised that, given the low dollar amounts and the difficulty of locating the individuals who misappropriated the checks, it would not pursue recovery of the funds.

### SECTION 4 — IMPROPER HIRING, NEPOTISM AND OTHER VIOLATIONS

#### A. HIRING OF UNLICENSED TEACHER AND COURSE DEVOID OF CONTENT (17-02079)

An investigation determined that, in the 2015–16 and 2016–17 school years, a high school hired an unlicensed teacher who taught dance classes at the school in violation of Illinois law prohibiting someone from teaching in traditional public schools without a teacher's license, 105 ILCS 5/21B-15(d).

Rather than have the dance teacher complete CPS's onboarding process through the Talent Office, as the principal should have, she instead obtained the dance teacher's services by retaining a CPS vendor that sent the teacher to the school. Because the principal hired the teacher in that manner, he never underwent a background check. Consequently, he taught at the school for two years in violation of 105 ILCS 5/34-18.5, which requires that school employees and contracted workers who have daily contact with students undergo a background check.

When the OIG asked the vendor that provided the dance teacher to produce basic information about him, his employment with the company and the work he performed at the CPS high school, it refused. Accordingly, the OIG found that the vendor failed to cooperate in the OIG's investigation.

Additionally, the OIG found that, after the vendor's teacher stopped working at the school, the principal continued to offer dance courses, and actually expanded the

Office of Inspector General
Chicago Board of Education
2018 Annual Report

program by adding more classes, even though the school was not using the vendor anymore and had no one to teach the classes. During the fall semester of the 2017–18 school year, 147 students were enrolled in and received semester grades — mostly A's — for dance classes that lacked any curriculum. The principal told the OIG that, even though she did not have a dance teacher to teach the classes, she kept and expanded them because the school had offered them before and a high number of students were signing up for them. Without a dance teacher, the classes were covered by a series of rotating substitute teachers. The substitutes took attendance, and the students were subsequently assigned grades based on their attendance. However, the principal told the OIG that the students in the dance classes did "nothing." She said the course was about being present for class and the students were supposed to be doing self-generated work. Those students all received course credit at the end of the semester, despite the fact that they were given no instruction and were not assessed or evaluated to determine whether they learned any course content. As such, the dance classes violated the CPS High School Promotion Policy, which sets forth basic requirements for CPS courses.

The OIG found that the principal was primarily responsible for the hiring and onboarding violations in this case, as well as for allowing students to enroll in and earn credit for courses where nothing was taught. In addition, the OIG found that the assistant principal also bore some responsibility for these violations because she assisted the principal in the hiring of the dance teacher through the vendor and was aware that, the semester after the dance teacher left, the school continued to offer the course and assign grades for it, even though the course had no teacher and no instruction whatsoever.

The OIG recommended appropriate discipline for both the principal and the assistant principal and recommended that the vendor be debarred for failing to cooperate with the OIG's investigation.

The Board has advised the OIG that the Board suspended the principal without pay and initiated dismissal proceedings against her, which are still pending. The Board also advised that the assistant principal was given a five-day suspension without pay and that the Board has initiated debarment proceedings against the dance company.

The Board further advised that, because the students who were enrolled in the dance classes in the fall semester of the 2017–18 school year improperly received course credit for a class that lacked a teacher and any real content, those students were not allowed to keep the credit or the grades they were given for the class. However, students who wanted to make that credit up, particularly seniors who needed the credit to graduate in the spring, were given opportunities to earn the

Office of Inspector General
Chicago Board of Education
2018 Annual Report

credit by taking an online course offered by CPS or by completing an independent study project closely overseen by the CPS Arts Department. Those students were assigned new grades based on an assessment of their work in the online course or independent study project they completed.

### B. Nepotism and Other Matters

o *Principal Hired and Supervised Relative (18-00196)*

An investigation determined that an elementary school principal hired a special education classroom assistant who is the mother of the principal's brother's children. Although the SECA and the principal's brother are not married, the principal and SECA are nevertheless considered relatives under the CPS Code of Ethics. The OIG found that the principal had the final say when deciding to hire the SECA and that the SECA reported directly to the principal. Furthermore, the Code of Ethics presumes that principals supervise all the staff in their schools by virtue of their position. Accordingly, the OIG found that the principal violated the prohibition on nepotism in the Code of Ethics because she hired and supervised a relative.

The OIG recommended appropriate discipline for the principal and also recommended that the Board consider an appropriate remedy to cure the nepotism violation, including transferring either the principal or the SECA to another school.

The Board advised that it determined that no discipline against the principal was warranted. However, the SECA was transferred to another school to cure the nepotism violation.

o *Former Employee Ineligible for Rehire Working as Referee (18-00207)*

An investigation determined that a former coach at a high school, who had been given a Do Not Hire (DNH) designation, continued to officiate CPS sporting events as a vendor after receiving the DNH. He had been given the DNH for engaging in a verbal and physical altercation with another CPS employee in front of students. That altercation included an exchange of punches and the repeated usage of profanity. After CPS designated him as a DNH, the district paid him nearly $40,000 over the next five years for his work as a referee.

Because the Board had previously determined that his behavior was so inappropriate that he should not be eligible for any future position with CPS, and because in his role as a vendor he worked closely with CPS students officiating games, the OIG recommended that he be permanently debarred from his role as a referee and any future role as a vendor that entails close contact with CPS students.

Office of Inspector General
Chicago Board of Education
2018 Annual Report

The Board subsequently advised that it initiated debarment proceedings against the referee, and those proceedings are still pending. In the meantime, the referee is prohibited from performing any CPS work.

> o *Nutritional Supplements for Students without Parental Permission (17-00877)*

An investigation determined that a teacher and high school basketball coach gave whey protein drinks and Centrum vitamins to the students he coached, without prior written permission from their parents. The OIG investigated the matter after receiving a complaint from a parent. When the OIG interviewed the coach, he acknowledged that he gave his players protein shakes and vitamins on multiple occasions, and that he did so without written permission from their parents. He explained that he provided the supplements to help the students with their athletic training and out of a general concern for their overall nutritional health.

The OIG declined recommending discipline against the coach because no CPS policy specifically prohibits coaches or any CPS employees from providing students with nutritional supplements. However, the OIG advised that CPS's policy governing the administration of medication requires that parents must provide written authorization before school personnel can give medication to their children. Although this policy does not specifically address nutritional supplements, it specifically extends to over-the-counter medication, and, therefore, could be reasonably interpreted to extend to nutritional supplements, as well.

The OIG reported on this matter so that the Board could consider whether, in light of the fact that no policy clearly prohibits CPS personnel from giving students nutritional supplements absent parental consent, the policy governing the administration of medication should be amended to cover nutritional supplements, such as vitamins, protein drinks and other herbal or athletic supplements.

The Board has advised the OIG that it is working on revising the policy, but that process is still pending.

### SECTION 5 — VENDOR "STRINGING" AND DEBARMENT

In Fiscal Year 2018, the OIG continued to investigate "stringing" violations. Board Rule 7-12 prohibits "stringing," which is defined as dividing or planning any procurement program, activity, transaction, invoice, purchase order or agreement involving the Board or any of its operational elements (including offices, departments, bureaus, programs, units and schools) to avoid: (a) the competitive

Office of Inspector General
Chicago Board of Education
2018 Annual Report

procurement processes set forth in Board Rule 7-2; or (b) the limitations on delegated authority set forth in Board Rule 7-15 or 105 ILCS 5/34-8.1.

The first case discussed below was a series of stringing violations over several years in which a husband and wife split CPS construction work between two companies to avoid CPS's competitive procurement processes. Significantly, personnel in the Department of Facilities who were involved with procuring that construction work were aware that the services were being split to avoid the competitive process.

The OIG also reported on a matter involving an MBE subcontractor that had been permanently debarred from doing business with the City of Chicago following a plea agreement in a criminal case against that company.

   o *Two Construction Companies Strung over $1.1 Million in Services (16-01294)*

An investigation determined that, over several years, a husband and wife ("Person A" and "Person B") used their two construction companies ("Company A" and "Company B") to string over $1.1 million worth of biddable contracting services to CPS schools and departments. Board Rules provide that each school and department is prohibited from purchasing more than $10,000 of biddable items or services from a vendor in a single year, without first submitting the purchases through the competitive bidding process. Here, the OIG found that Person A and Person B improperly circumvented that competitive procurement process by dividing the CPS work up between their two companies.

The OIG also concluded that three employees in CPS's Department of Facilities — two managers ("Manager A" and "Manager B") and an engineer (the "Engineer") — knew that Person A and Person B were stringing biddable contracts between their two companies, but did business with them anyway. Significantly, Manager A told the OIG that stringing sales to avoid the $10,000 spending limit "was common practice" within the Department of Facilities.

The OIG recommended that the Board permanently debar Person A, Person B, Company A and Company B. The OIG also recommended discipline for the CPS employees involved. For the Engineer, the OIG recommended appropriate discipline, including up to the termination of his employment, and recommended that the Board place a Do Not Hire (DNH) designation in his personnel file, if it terminates his employment. Manager A, however, had already retired from CPS at the time of the OIG investigation, and Manager B resigned not long after he was interviewed by the OIG in this case. Given that they had retired and resigned, respectively, the OIG recommended that the Board place DNH designations in their personnel files.

Office of Inspector General
Chicago Board of Education
2018 Annual Report

The OIG also recommended that all employees in the Department of Facilities who serve in a procurement capacity undergo training concerning stringing and other procurement-related issues. In addition, the OIG recommended similar training for four principals who dealt with Company A and Company B and either (1) missed or ignored obvious warning signs that stringing was occurring or (2) were unfamiliar with stringing altogether.

In response to the OIG's report, the Board debarred Person A, Person B, Company A and Company B. The Board also placed DNH designations in the personnel files of Manager A and Manager B. The Engineer retired after the OIG issued its report, and the Board decided not to place a DNH in his file. The Board also advised that Facilities personnel underwent training on stringing and other procurement-related issues. As for the four principals who the OIG recommended should also receive such training, the Board advised that one of those principals has since left the district and that the other three all received the training.

> o *MBE Subcontractor Debarred by Court Order (17-00594)*

An investigation determined that a minority-owned business enterprise (the "MBE"), serving as a subcontractor on a CPS contract, and its owner were permanently barred from doing business with the City of Chicago, pursuant to a sentencing order entered by the Cook County Circuit Court in a criminal case involving business dealings with the City and the MBE's alleged role in a pass-through scheme. The court's order, entered pursuant to a plea agreement between the MBE's owner and the Illinois Attorney General's Office, barred the MBE and its owner from doing business with the City under section 1-23-020 of the Chicago Municipal Code, which provides, among other things, that individuals or entities are ineligible to do business with the City if they have been convicted of any criminal offense involving a theft or fraud against the City.

The OIG did not find any wrongdoing by the MBE with respect to its subcontracting work on the CPS contract. However, CPS's debarment policy provides that a subcontractor to a CPS contract may be debarred for improper conduct, including conduct resulting in a debarment imposed by another governmental entity or agency, and given the fact that the MBE and its owner are now permanently ineligible from doing business with the City, the OIG recommended that the Board debar them and remove them as subcontractors on the CPS contract. The OIG also recommended that CPS's Office of Business Diversity should assist the vendor on the CPS contract in locating a different MBE subcontractor so that it will be able to meet its agreed-to MBE goal, should it require such assistance.

Office of Inspector General
Chicago Board of Education
2018 Annual Report

The Board subsequently debarred the MBE and its owner from doing any business with the Board. As such, they are also ineligible to act as a subcontractor or supplier on any existing or future Board contracts. The Board also advised that the vendor on the CPS contract was informed that CPS could offer assistance in locating a new MBE subcontractor, if needed.

### Section 6 — Falsified Student Attendance

For the past several years, the OIG has been investigating and reporting on cases that involve the fraudulent reporting of student data, including attendance, enrollment and transfer data. This year the OIG reported on two such cases: one where an elementary school improperly recorded students merely as tardy who had arrived so late to school that they were required to be recorded as absent for a half or full day; and a second case where an elementary school improperly used transfer codes to disenroll and then re-enroll students who were absent for lengthy periods and should have been recorded as absent. Those two cases are discussed below.

#### A. Misuse of Tardy Classification for Absent Students (17-00393)

An investigation determined that, from the 2014–15 school year to the 2017–18 school year, the principal and assistant principal at an elementary school improperly instructed the school's attendance clerks to mark students who arrived late to school tardy, regardless of how late they arrived to school. Consequently, students who should have been counted as absent for either half the day or the full day were frequently counted as present because students recorded as tardy are counted as present for purposes of calculating attendance.

CPS attendance guidelines require that students receive at least 300 minutes of instruction in a school day to be marked present for that day. Students who receive less than 300 minutes, but more than 150 minutes, should be marked as absent for half the day. Students who receive less than 150 minutes should be marked as absent for the full day, even if they came to school for part of the day. By contrast, students are supposed to be marked tardy when they arrive late to school but nevertheless receive at least 300 minutes of instructional time.

The principal told the OIG that she did not draw a distinction between marking a student tardy or absent for half the day. The assistant principal told the OIG that a student who arrived to school as late as 2:00 p.m. would be classified as tardy, even though the school day ends at 2:30 p.m. Such students, therefore, would be counted as present for the whole day, when they should be counted as absent for the whole day.

Office of Inspector General
Chicago Board of Education
2018 Annual Report

Accordingly, the school's misuse of the tardy attendance code likely impacted the school's reported attendance rate. Not surprisingly, the school's use of the tardy code far outpaced districtwide averages, as well as the averages for the school's Network. In the last four years the school used the tardy code more than twice its Network average, and in the last four semesters it used the tardy code more than four times the district average. Given the size of these discrepancies, it is clear that the impact on the school's attendance rate was not *de minimis*, and almost certainly was substantial.

However, the OIG was unable to quantify with certainty how much the school's attendance was impacted because the informal method by which the school misclassified students as tardy obfuscated the effect on the school's attendance numbers. Specifically, decisions to change a student's absent classification to tardy were made by the principal or assistant principal during the day and communicated to the clerks before they entered the school's daily attendance in the database that tracks attendance. Because the attendance data was not changed in the database after the fact, no audit trail exists that would accurately reflect the number of instances when students were improperly classified as tardy and, thus, improperly counted as present.

In addition, the OIG found that the principal and assistant principal violated the CPS policy on transporting students by instructing several school employees to transport students to and from school in their personal vehicles without first (1) obtaining parents' written consent to allow school personnel to transport their children; (2) verifying that the employees had valid driver's licenses and appropriate automobile insurance; or (3) placing the employees' driver's license information and proof of insurance on file. These violations occurred after the principal and assistant principal instituted an initiative to try to ensure that truant students attended school. While their initiative may have been well-intentioned, CPS policy provides that the use of private vehicles for student transportation is strongly discouraged, and it is only permitted when the school obtains the parents' written consent, verifies the driver's license and insurance information of the employees driving students, and places that information on file. That was not done here.

Notably, the principal's and assistant principal's misconduct — both the improper use of the tardy classification and the improper transporting of students — was done without the knowledge of Network officials.

The OIG recommended that the principal and assistant principal be given appropriate discipline. The OIG also recommended appropriate discipline for the

primary clerk who improperly entered tardy codes and who also frequently drove students to and from school in violation of CPS policy.

In response to the OIG's report, the Board terminated the principal's employment and placed a Do Not Hire (DNH) designation in her personnel file. The Board advised that it is issuing the assistant principal a Level Two Performance-Improvement Plan and issuing a written reprimand to the clerk.

### B. MISUSE OF TRANSFER CODES FOR ABSENT STUDENTS (18-00134)

An investigation determined that, since 2015, administrators and staff at an elementary school falsified attendance records through the improper use of out-of-district (Code 33) and homeschool (Code 40) transfer codes. Students with extended absences for various reasons, including family vacations or visa issues, were unenrolled and coded as transferring to schools outside the district or as transferring to be homeschooled. The students were then re-enrolled at the school when they returned. Had they not been unenrolled, they would have been marked as having unexcused absences for the days they were gone. This scheme was overseen by the principal, who admitted he violated CPS policy and knew that this practice was prohibited.

During the 2015–16, 2016–17 and 2017–18 school years, the OIG found 75 instances where students were temporarily unenrolled and deemed Code 33 or Code 40 transfers, before being re-enrolled within the same school year. The OIG found that, in 17 of these instances (involving 14 students), students were marked as a Code 33 or Code 40 "transfer," even though the school's administration and staff clearly knew the students were not actually transferring to another school, but rather, were taking an extended absence for other reasons. Additionally, within these 75 instances, the OIG identified at least 27 other instances of suspect "transfers," given that they were relatively short in nature (typically four to six weeks) and either preceded, followed or overlapped with the school's winter or summer vacations. The OIG did not find any transfer files or homeschool forms associated with these transfers.

Beyond the school's improper reliance on Code 33 and Code 40, the school regularly failed to obtain the proper documentation for such "transfers" or otherwise kept incomplete transfer files. Of the 75 instances identified, the OIG was able to find student transfer forms and cards for only seven transfers in the 2016–17 school year. Of the seven documented transfers, three were not even actual transfers, but rather, were extended absences for other reasons. Furthermore, none of the seven transfer files contained sufficient documentation showing that the school subsequently verified the transfers by obtaining written documentation from the

Office of Inspector General
Chicago Board of Education
2018 Annual Report

receiving school that the student enrolled there. Thus, at most, the OIG was able to find evidence of four semi-documented valid transfers to out-of-district schools.

Because of the school's incomplete record keeping, the OIG was unable to determine what effect the misuse of transfer codes had on the school's overall attendance rates. However, the OIG believes that the school perpetuated this unenrollment and transfer practice to manipulate its attendance numbers and protect its school rating. For example, in an email to a parent, suggesting that the parent unenroll his child because of an extended family vacation, the principal expressed concern that absences might affect the school's rating.

The OIG recommended that CPS terminate the principal's employment because, in the case of at least four students, he clearly condoned or encouraged parents to unenroll students to avoid unexcused absences, including after he received express direction from other CPS administrators not to engage in that practice. The principal acknowledged that he knew the practice was prohibited, and when confronted with emails showing that he condoned the practice, he admitted that he violated CPS policy.

With respect to the assistant principal, the OIG recommended weighty discipline, up to and including termination, because the OIG found that, in the case of at least two students, she advised their parent to unenroll them because of an extended absence due to a family trip outside the country, and that she did that after receiving specific guidance from CPS administrators that students in those situations should be recorded as having unexcused absences. She also was copied on several emails at the school involving suspect "transfers." The OIG stopped short of simply recommending termination for her because the OIG found fewer instances of attendance fraud involving her, as compared to the principal.

The OIG also recommended appropriate discipline for two clerk assistants at the school, who entered Code 33 and Code 40 transfers despite knowing that the students were not actually transferring to another school or to be homeschooled.

Given that the school's administration and staff demonstrated a lack of familiarity with the district's policies regarding extended absences, use of transfer codes, homeschooling and proper record keeping for these things, the OIG recommended that all clerks and administrators at the school undergo training on all those topics.

The Board subsequently advised that it has initiated dismissal proceedings against the principal and is considering disciplinary action against the assistant principal. As for the two clerk assistants, the Board issued each of them a Level One Performance-Improvement Plan. The Board also advised that several employees at the school

Office of Inspector General
Chicago Board of Education
2018 Annual Report

were given training on attendance management and procedures for enrolling and withdrawing students.

### SECTION 7 — ABUSE OF PAID LEAVE, SICK TIME AND SECONDARY EMPLOYMENT

#### A. ABUSE OF PAID LEAVES OF ABSENCE

- *Teacher Abused Paid Leave of Absence (17-00191)*

An investigation determined that a teacher violated CPS policy by working a second job while she was on a short-term disability paid leave of absence from CPS for three months in 2017. During her paid leave, and despite her claimed disability, she worked as a yoga instructor and health coach and even hosted a retreat at a beach resort in a tropical country.

She also violated the CPS Code of Ethics by failing to request and receive approval to work secondary employment.

The teacher resigned from CPS during the course of the OIG's investigation. The OIG recommended that the Board place a Do Not Hire (DNH) designation in her personnel file, which the Board subsequently did.

- *Teacher Worked Secondary Employment During Paid Leaves (17-02082)*

An investigation determined that a teacher improperly abused at least one paid medical leave of absence, and possibly as many as three paid leaves, by working a second job. She also violated the Code of Ethics by failing to request and receive approval to work secondary employment.

The teacher retired from CPS while the OIG was investigating this matter, and the OIG subsequently recommended that the Board place a DNH designation in her personnel file, which the Board did.

- *SECA Abused Paid Leave of Absence (17-02137)*

An investigation determined that a special education classroom assistant abused a paid medical leave of absence to work as a counseling intern. She told staff at the elementary school where she worked as a SECA, as well as staff at the school where she was interning, that she was using a student teaching leave of absence (which is unpaid) to complete her internship. However, she actually took a paid leave of absence based on a claimed disability. The OIG found that she abused her paid leave by using it to complete her internship, rather than to recover from a claimed medical condition.

Office of Inspector General
Chicago Board of Education
2018 Annual Report

The OIG recommended that the SECA be given appropriate discipline. In response to the OIG's report, the Board initiated dismissal proceedings against her. She subsequently resigned, and the Board placed a DNH designation in her personnel file.

### B. OTHER SECONDARY EMPLOYMENT CASES

○ *Private Business Work on CPS Time and Abuse of Sick Days (17-00232)*

An investigation determined that a central office employee violated CPS's Code of Ethics by conducting work for his private business during his CPS workday. Over a period of approximately one year, he sent 194 emails relating to his business using his CPS email account, and 182 of those emails were sent while he was at work at CPS. He further violated the Code of Ethics by failing to obtain CPS approval to work secondary employment. Moreover, by using his CPS email account to conduct his non-CPS business, he also violated CPS's network- and computer-use policy.

In addition, the OIG found that the employee violated the CPS policy on paid time off by using two sick days for a vacation.

The OIG recommended that the employee be given appropriate discipline. The Board subsequently terminated his employment and placed a DNH in his personnel file.

○ *Real Estate Work on CPS Time (17-00597)*

An investigation determined that a teacher violated the Code of Ethics by using Board property, including CPS computers and printers and her CPS email account, to conduct business related to her secondary job as a real estate agent. She also sometimes used her personal cell phone to communicate with real estate clients during school hours. She also violated the Code of Ethics by failing to obtain approval from her principal to work secondary employment.

Because the teacher's use of Board property for her real estate work was minimal, the OIG did not recommend that the Board terminate her employment. Rather, the OIG recommended appropriate discipline. The Board subsequently advised that it issued the teacher a Level One Performance-Improvement Plan.

### C. OTHER SICK DAY ABUSE CASES

○ *Teacher Used 22 Sick Days for Vacations (17-00923)*

An investigation determined that a teacher at an elementary school violated the CPS policy on paid time off by using 22 sick days to take various domestic and international vacations over a five-year period from 2011 to 2016, including trips to

Paris, Hong Kong and Alaska. Notably, she used 11 of those sick days for vacations over a period of just one year and three months in 2015 and 2016. The OIG recommended appropriate discipline for the teacher, and the Board subsequently advised that it has initiated dismissal proceedings against her.

- o *Sick Days for Annual Trips to Las Vegas to Watch March Madness (18-00430)*

An investigation determined that a teacher at a high school improperly used sick days for annual trips to Las Vegas to watch the NCAA Men's Basketball Tournament. The teacher admitted that he takes annual trips to Las Vegas to watch the tournament, that he has done so for approximately the past 14 years and that he usually uses sick days for those trips. Specifically, the OIG found that, since 2008, he used 13 and a half sick days for his trips to Las Vegas.

The teacher told the OIG that no one has ever told him sick-day use was limited to times when he had a personal illness. He said he did not pretend to be sick or tell the school that he was sick when he went on those trips and that he only used sick days because teachers are not given vacation days. Although teachers receive personal business days, he said his school does not like employees using those benefit days on Fridays and Mondays, which is when he would travel to and from Las Vegas.

Nevertheless, because the teacher violated CPS's clear policy on paid time off, the OIG recommended that he be given appropriate discipline. The Board subsequently advised that he was issued a warning resolution.


## SECTION 8 — SES APPLICATION FRAUD AND OTHER SUBURBAN RESIDENCY FRAUD

Over the past several years, the OIG has identified numerous instances of application and admissions fraud at CPS's selective-enrollment schools. Those cases can include suburban-residency fraud, "tier fraud" or both. Enrollment in CPS's selective-enrollment schools is limited to Chicago residents. Thus, the suburban-residency fraud cases are simply those cases in which suburban families lied about their residency so that their children could attend selective-enrollment schools.[3] In the 2017–18 school year, the statutory non-resident tuition rate was $13,468 per student. Accordingly, the OIG recommends that CPS recover non-resident tuition when appropriate.

---

[3] Suburban residents, of course, are generally not eligible to attend any CPS school, let alone the fiercely competitive selective-enrollment schools and programs. Not only are suburban students subject to disenrollment, their families also owe CPS tuition for the years the students attended CPS schools as non-residents.

Office of Inspector General
Chicago Board of Education
2018 Annual Report

Tier fraud occurs when families lie on their selective-enrollment applications by falsely claiming that they live in a lower socio-economic area, or "tier," than they actually do to cheat the system and improperly gain admission to a selective-enrollment school.[4] Thus, tier fraud cases often involve families that actually live in Chicago, but in higher socio-economic areas of the City than were represented on the selective-enrollment applications. Students who have engaged in tier or suburban-residency fraud are disenrolled from any selective-enrollment school or program to which they were admitted and permanently banned from attending any selective-enrollment school or program in the future.

The first five cases discussed below involve suburban students at CPS selective-enrollment schools. One of those cases also involves tier fraud. The next two cases involve Chicago families who committed tier fraud. The last case is a suburban-residency fraud matter at a neighborhood school.

### A. SUBURBAN-RESIDENCY FRAUD AT SELECTIVE-ENROLLMENT SCHOOLS

o *Lincolnwood Resident at Northside College Prep (16-00738)*

An OIG investigation determined that a sophomore at Northside College Prep was living in Lincolnwood while attending Northside during the 2016–17 and 2017–18 school years. As such, she violated the student residency policy. In addition, the student's mother, a CPS special education teacher, violated CPS's policy governing selective-enrollment admissions by participating in her daughter's residency fraud.

The OIG recommended that the student be disenrolled from Northside and permanently banned from any CPS selective-enrollment school or program. If financially practicable, the OIG recommended that the Board pursue recovery of non-resident tuition from the family. The OIG also recommended that the Board terminate the mother's employment and place a Do Not Hire (DNH) designation in her personnel file.

---

[4] The selective-enrollment admissions process considers socio-economic factors that relate to the census tract in which an applicant resides at the time of application. The policy is intended to increase selective-enrollment opportunities for students from lower socio-economic areas. The census tracts are broken down into four tiers. Under the current policy, a total of 30 percent of the available seats are filled in rank order using only testing/academic criteria. The remaining available seats (subject to very limited exceptions) are filled from four rank-order lists that further categorize students by their respective socio-economic tiers (i.e., census tracts), with each tier filling 25 percent of the remaining available seats. Students from the higher tiers usually must have better scores than those in the lower tiers. Thus, lying about a student's address is one way to cheat the system and obtain a seat at a selective-enrollment school.

Office of Inspector General
Chicago Board of Education
2018 Annual Report

The Board advised that it has initiated dismissal proceedings against the mother and that those proceedings are still pending. The student was disenrolled from Northside and permanently banned from attending any selective-enrollment school or program. The Board also advised that, with respect to the non-resident tuition owed, CPS is finalizing a repayment plan with the family and, if that is unsuccessful, it will refer the matter to a collections firm to pursue the debt.

  o  *Melrose Park Resident at Lane Tech Academic Center (16-01289)*

An OIG investigation determined that a family living in Melrose Park, Illinois, fraudulently enrolled two children in CPS schools. One child was an eighth grader at Lane Tech Academic Center, a selective-enrollment program, and the other child was a sophomore at a CPS neighborhood school. Both attended those schools during the 2017–18 school year, even though they were living in Melrose Park, where their younger sibling was attending public school.

The OIG recommended that both students be disenrolled from their CPS schools and that the eighth grader at Lane be permanently banned from attending any CPS selective-enrollment school or program. The OIG also recommended that, if financially practicable, CPS should pursue recovery of the non-resident tuition owed for the two students attending CPS for the 2017–18 school year.

Following the OIG's report, the Board disenrolled both students at the end of the school year and permanently banned the eighth grader from selective-enrollment schools or programs. In addition, the Board advised that it has referred the unpaid non-resident tuition to a collections firm.

  o  *Cicero Resident at Lane Tech High School (17-00258)*

An OIG investigation determined that a Cicero family fraudulently enrolled two sons in CPS schools for the 2017–18 school year. One son attended Lane Tech High School and the other son attended a CPS charter school, even though they were both living in Cicero.

The OIG recommended that both students be disenrolled from CPS schools and that the Lane student be permanently banned from attending any CPS selective-enrollment school or program. The OIG also recommended that, if financially practicable, CPS should pursue recovery of non-resident tuition from the family for the 2017–18 school year.

Following an administrative hearing on this matter, the hearing officer found that the son who attended Lane was living in Cicero in violation of the student residency policy. Accordingly, he was disenrolled from Lane and permanently banned from

Office of Inspector General
Chicago Board of Education
2018 Annual Report

attending any selective-enrollment school or program. Furthermore, the family owes non-resident tuition for the year he attended Lane, and the Board advised that it referred the matter to a collections firm to recover that tuition. However, the hearing officer found that the brother who attended a CPS charter school did not move to the suburbs until October 2017, and, therefore, he could finish that school year without the family owing tuition. The Board advised the OIG that it informed the charter school that the student was no longer living in Chicago and could finish that school year, but could not enroll for the 2018–19 school year.

  o *Oak Lawn Resident at Jones College Prep (17-00600)*

An OIG investigation determined that a CPS provisional substitute teacher, living in Oak Lawn, Illinois, with her son, falsified her son's selective-enrollment application by stating that he lived at a Tier 2 address in Chicago's Brainerd neighborhood, when he was actually living at a Tier 4 address in Oak Lawn, Illinois. He was subsequently admitted to Jones College Prep and attended the school for the 2016–17 and 2017–18 school years, while he continued to live in the suburbs. Had he applied using his correct, Tier 4 address he would not have qualified for admission to Jones.

Accordingly, the OIG found that the student not only committed suburban residency fraud by living in the suburbs while attending CPS schools, but also committed tier fraud by using a false address in a lower tier to gain admission to a selective-enrollment school. Additionally, the OIG found that, during the 2015–16 school year, prior to attending Jones, the student attended a CPS charter school while he was living in Oak Lawn, in violation of the student residency requirement.

The OIG recommended that the student be disenrolled from Jones and permanently banned from attending any CPS selective-enrollment school or program. The OIG recommended that, if financially practicable, CPS should pursue recovery of non-resident tuition for the two years he attended Jones. The OIG also recommended that CPS should inform the charter school he attended of the OIG's findings so that the charter can seek recovery of the non-resident tuition it is owed for the 2015–16 school year.

With respect to the student's mother, the provisional substitute teacher with CPS, the OIG recommended that the Board terminate her employment and place a DNH designation in her personnel file. Although the employee residency policy does not require provisional substitute teachers to reside in Chicago, she violated the CPS policy governing selective-enrollment admissions by falsifying her son's application.

Office of Inspector General
Chicago Board of Education
2018 Annual Report

Following the OIG's investigation, the mother resigned from CPS, and a DNH designation was placed in her personnel file. The Board disenrolled her son from Jones and permanently banned him from any selective-enrollment school or program. The Board also has advised the OIG that it has referred this matter to a collections firm to pursue the non-resident tuition owed for the years the son attended Jones. Additionally, the Board advised the OIG that it notified the charter school he attended prior to Jones of this matter.

> ○ *Cicero Residents at South Loop Elementary and Lane Tech (17-02228)*

An OIG investigation determined that two siblings living in Cicero attended South Loop Elementary Regional Gifted Center, a selective-enrollment program, for two years, and the older sibling subsequently attended Lane Tech for his freshman year. However, the students did not submit any false information on their selective-enrollment applications and apparently made no attempt to deceive the schools. They applied using their true Cicero address and never represented that they were living in Chicago. The OIG found that they were permitted to attend CPS schools due to the negligence of a CPS clerk who enrolled the students and ignored a system safeguard put in place to prevent non-residents from attending CPS schools.

The OIG recommended that clerk be given appropriate discipline. Because the OIG did not conclude that the family engaged in fraud, the OIG did not recommend that the students be permanently banned from attending selective-enrollment schools. However, the OIG recommended that the students be prohibited from re-enrolling at CPS schools for the 2018–19 school year, unless they provided proof that they reside in Chicago.

The Board advised the OIG that, before the 2018–19 school year, the family provided the district with proof that they established residency in Chicago, and they subsequently re-enrolled their children at Lane Tech and South Loop Elementary. The Board is still considering what level of discipline to impose on the clerk.

**B. TIER FRAUD**

> ○ *Tier Fraud at Whitney Young Academic Center (17-00574)*

An OIG investigation determined that a CPS analyst and his wife, a former CPS employee, committed tier fraud by submitting their daughter's selective-enrollment application using a false Tier 1 address in the Washington Park neighborhood, instead of the Tier 4 address in the Dunning neighborhood where the family actually was living. As a result, their daughter was admitted to the Whitney Young Academic Center and attended the school for the 2017–18 school year. Had they used their real

Office of Inspector General
Chicago Board of Education
2018 Annual Report

address in the application, their daughter would not have qualified for admission to Whitney Young.

By submitting a fraudulent selective-enrollment application, the parents violated the district's policy governing selective-enrollment admissions. The OIG also found that the mother's cousin, a CPS school counselor, was living at the false Washington Park address used in the application and tacitly assisted in the fraud by turning a blind eye to their use of her address.

The OIG recommended that the daughter be disenrolled from the Whitney Young Academic Center and that she be permanently banned from attending any CPS selective-enrollment school or program. The OIG recommended that the Board terminate the father's employment with the district and place a DNH designation in his personnel file. The OIG also recommended appropriate discipline for the school counselor (the mother's cousin) whose address they used.

Following the OIG's investigation, the father resigned from CPS, and a DNH was placed in his personnel file. The Board also advised that the daughter was disenrolled from Young and permanently banned from attending any selective-enrollment school or program. The Board is still considering what level of discipline to impose on the school counselor.

> o   *Tier Fraud at Payton College Prep (18-00040)*

An OIG investigation determined that a CPS school counselor committed tier fraud by submitting her son's selective-enrollment application using a false Tier 1 address in the Little Village neighborhood, instead of the Tier 3 address in Logan Square where the family actually was living. As a result, her son was admitted to Payton and attended the school for the 2017–18 school year. Had she used their real Logan Square address in the application, her son would not have qualified for admission to Payton. Additionally, by submitting a fraudulent selective-enrollment application, the mother, a CPS employee, violated the district's policy governing selective-enrollment admissions.

The OIG recommended that the student be disenrolled from Payton and that he be permanently banned from attending CPS selective-enrollment schools or programs. The OIG recommended that the Board terminate the mother's employment and place a DNH designation in her personnel file.

The Board subsequently advised that the student was disenrolled from Payton and permanently banned from attending any selective-enrollment school or program. The Board also advised that it has initiated dismissal proceedings against the mother, which are still pending.

Office of Inspector General
Chicago Board of Education
2018 Annual Report

### C. OTHER SUBURBAN RESIDENCY FRAUD MATTER

- *Hammond Resident at CPS Neighborhood School (17-00308)*

An OIG investigation determined that a sixth grader at a CPS neighborhood school was living in Hammond, Indiana, and had been for several years while attending the CPS school. The OIG reported this matter to the Board after the 2017–18 school year had already concluded. Accordingly, rather than recommending disenrollment, the OIG recommended that the student be prohibited from re-enrolling at the school, or any other CPS school, unless the student becomes a Chicago resident. The OIG also recommended that CPS pursue recovery of non-resident tuition, if financially practicable.

The Board subsequently advised that the student was prohibited from enrolling in any CPS school for the 2018–19 school year and that the matter was referred to collections to pursue the non-resident tuition owed.

### SECTION 9 — EMPLOYEE RESIDENCY FRAUD

The cases in this section involve employee violations of the Board's residency policy (residency fraud). The OIG recommends "immediate termination" when employee residency violators also lie about their addresses. This is because, per the Board's residency policy, an employee who lies about his or her address in conjunction with a residency violation is subject to immediate dismissal. *See* Board Report 18-0627-PO4.

- *Teacher Resided in Country Club Hills (15-00528)*

An investigation determined that a teacher was residing in Country Club Hills, Illinois, in violation of the CPS residency policy. Despite living in the suburbs, the teacher maintained a false address-of-record with CPS and then, during the OIG's investigation, submitted another false address to the district.

The OIG recommended that the Board immediately terminate the teacher's employment and place a Do Not Hire (DNH) designation in her personnel file. After the Board initiated dismissal proceedings against her, she resigned, and the Board placed a DNH in her file.

- *Teacher Resided in University Park (16-00386)*

An investigation determined that a teacher represented to CPS that she was living in Chicago, even though she was actually residing in University Park, Illinois, in violation of the district's residency policy. She resigned from CPS the day after she

was interviewed by the OIG in this investigation. At the recommendation of the OIG, the Board placed a DNH designation in her personnel file.

- *Teacher Resided in Algonquin (16-00594)*

An investigation determined that a teacher was living in Algonquin, Illinois, in violation of CPS's residency policy. Additionally, the OIG found that he not only misrepresented to the district that he was living in Chicago, but that he willfully and repeatedly disregarded the residency requirement after he was given a second chance to comply with the policy, following a previous OIG investigation in 2004 in which the OIG found that he was living in Bloomingdale, Illinois (04-3502). Despite signing a sworn residency statement, undergoing a prior investigation and being formally warned that he needed to be living in Chicago, the OIG found that he lived in the suburbs for at least 13 of his 16 years with CPS.

In addition to the teacher's residency violation, the OIG found that he violated the CPS policy on paid time off by using two sick days for a vacation in Florida.

Because he violated the residency policy and lied about it, the OIG recommended that the Board immediately terminate his employment and place a DNH designation in his personnel file. After the Board initiated dismissal proceedings against him, he resigned, and the Board placed a DNH in his file.

- *Teacher Resided in Round Lake (17-00126)*

An investigation determined that a teacher was living in Round Lake, Illinois, in violation of the residency policy, and that she misrepresented her residency to CPS to avoid the requirement that she live in Chicago. The OIG recommended that the Board immediately terminate her employment and place a DNH in her personnel file.

After the Board initiated dismissal proceedings against her, she resigned, and the Board placed a DNH in her file.

- *Principal Resided in Skokie (17-00239)*

An investigation determined that a principal violated the CPS residency policy by living in Skokie, Illinois, and by misrepresenting her address. The OIG also found that she violated the CPS policy regarding paid time off by using two sick days for a vacation and one sick day to prepare for a home move.

The principal resigned from CPS during the OIG's investigation. Had she not resigned, she would have been subject to immediate dismissal for violating the residency policy and lying about her actual residence. However, because she had

Office of Inspector General
Chicago Board of Education
2018 Annual Report

already resigned, the OIG recommended that the Board place a DNH designation in her personnel file. The Board subsequently placed a DNH in her file.

> o   *Manager in a Central Office Department Resided in South Holland (17-00323)*

An investigation determined that a manager in a department in Central Office violated the CPS residency policy by residing in South Holland, Illinois, and by misrepresenting her address to the Board.

She also annually misrepresented her residency status on her Statement of Business and Financial Interest. Each year, she submitted her SBFI, including her sworn statement that she was grandfathered into an exemption from the residency policy because she began working for CPS prior to November 20, 1996. In fact, however, she was hired in 1999 and, therefore, the exemption did not apply to her. The OIG learned that her misstatements on her SBFIs had not been discovered by CPS because the district does not have sufficient resources to verify employees' claims on their SBFIs.

The OIG recommended that the Board immediately terminate her employment and place a DNH designation in her personnel file. The OIG also recommended that the Board take appropriate steps to ensure that sufficient resources are allocated so that SBFIs are reviewed to verify employees' claims of residency exemptions.

Following the OIG's report to the Board, she resigned from her position with CPS, and a DNH was subsequently placed in her file.

The Board also advised that the Ethics Advisor and the Talent Office began a protocol of identifying individuals who claimed residency exemptions in their SBFIs and verifying whether they were entitled to the claimed exemptions.

> o   *Director in a Central Office Department Resided in Homewood (17-00523)*

An investigation determined that a director in a department in Central Office violated the CPS residency policy by residing in Homewood, Illinois, and by misrepresenting his address.

The OIG recommended that the Board immediately terminate his employment and place a DNH designation in his personnel file. Following the OIG's report to the Board, the director resigned, and the Board subsequently placed a DNH in his file.

> o   *High School Teacher Resided in Glenview (17-00581)*

An investigation determined that a high school teacher violated the CPS residency policy by residing in Glenview, Illinois, and by misrepresenting to the district that she was living in Chicago. Additionally, her husband, who is also a CPS teacher, knew

that she was living in Glenview in violation of the residency policy. Notably, the husband was permitted by CPS to reside in Glenview pursuant to a special needs waiver he had obtained years earlier. His wife, however, had not obtained a waiver and, thus, was not permitted to live in the suburbs.

The OIG recommended that the Board immediately terminate the wife's employment and place a DNH designation in her personnel file. The OIG recommended appropriate discipline for the husband because he was aware that his wife was violating the residency policy.

Following the OIG's report to the Board, the wife resigned, and the Board placed a DNH in her file. The Board is still considering what level of discipline to impose on the husband.

> o *School Social Worker Resided in Evergreen Park (17-00728)*

An investigation determined that a school social worker violated the CPS residency policy by living in Evergreen Park, Illinois, and by misrepresenting that she was living in Chicago. The OIG recommended that the Board immediately terminate her employment and place a DNH in her personnel file.

The Board subsequently advised that it initiated dismissal proceedings against her, which are still pending.

> o *School Counselor Resided in Lincolnwood (17-00848)*

An investigation determined that a school counselor violated the CPS residency policy by living in Lincolnwood, Illinois, and by misrepresenting to CPS that she was living in Chicago.

Additionally, her boyfriend, a CPS school clerk, was living with her in Lincolnwood. The OIG did not find a residency violation with respect to the boyfriend because he was grandfathered into an exemption from the residency requirement. However, despite being permitted to live in the suburbs, the boyfriend falsified his address-of-record to reflect that he was living in Chicago at the same address as his girlfriend to help hide the fact that she was violating the residency policy by living with him in Lincolnwood.

The OIG recommended that the Board terminate the employment of the school counselor and the school clerk and place DNH designations in both of their personnel files.

The Board advised that it initiated dismissal proceedings against both employees. The school counselor subsequently resigned, and the Board placed a DNH in her

Office of Inspector General
Chicago Board of Education
2018 Annual Report

personnel file. The Board later terminated the employment of the school clerk and placed a DNH in his personnel file.

In this case the OIG also found that the school counselor's daughter, who was primarily living with the school counselor in Lincolnwood, submitted a selective-enrollment high school application using her father's address in Chicago and was admitted to Northside College Prep for the 2018–19 school year. Although the daughter should have listed the Lincolnwood address on her application, the OIG found that she did not gain an unfair advantage in the admissions process because her father lives at a Tier 4 address. Thus, this case did not constitute tier fraud. Furthermore, this case did not constitute suburban-residency fraud because selective-enrollment applicants are permitted to live outside Chicago during the application process, so long as they move to Chicago before they are enrolled. At the time the OIG reported on this matter, in the spring of 2018, the daughter was not yet required to have established residency in Chicago.

Accordingly, the OIG concluded that the daughter could enroll at Northside if she moved to Chicago. The OIG recommended that, before she was allowed to enroll, CPS should ensure that the family presented verified proof that the daughter actually resides in Chicago.

The Board subsequently advised that the daughter was allowed to enroll at Northside after her parent provided verified proof that the daughter now resides in Chicago.

> o  *Talent Office Employee Resided in Cicero (17-02046)*

An investigation determined that a Talent Office employee violated the CPS residency policy by living in Cicero, Illinois, and by misrepresenting to the district that she was living in Chicago. The OIG recommended that the Board immediately terminate her employment and place a DNH designation in her personnel file. She subsequently resigned, and the Board placed a DNH in her personnel file.

> o  *Teacher Resided in Lockport (17-02112)*

An investigation determined that a teacher violated the CPS residency policy by living in Lockport, Illinois, and by misrepresenting to the district that she was living in Chicago. The OIG recommended that the Board immediately terminate her employment and place a DNH designation in her personnel file.

After the Board initiated dismissal proceedings against her, she resigned, and the Board placed a DNH in her file.

Office of Inspector General
Chicago Board of Education
2018 Annual Report

- o  *Teacher Resided in Cicero (17-02145)*

An investigation determined that a teacher resided in Cicero, Illinois, in violation of the CPS residency policy, and that he misrepresented his residency to CPS in order to avoid the requirement that he live in Chicago. The OIG recommended that the Board immediately terminate his employment and place a DNH designation in his personnel file.

The Board advised that it initiated dismissal proceedings against him, which are still pending.

- o  *Teacher Resided in Highland Park (17-02267)*

An investigation determined that a teacher was violating the CPS residency policy by living in Highland Park, Illinois, and by misrepresenting to the district that he was living in Chicago.

The OIG also found that he had violated the CPS Code of Ethics because he worked as a real estate broker while he was a CPS employee, but never completed a secondary employment form or an intersession secondary employment form, as required.

While the OIG was investigating this matter, the teacher submitted notice of his resignation, effective at the end of the school year, under the district's early resignation incentive. Accordingly, the OIG recommended that, if he attempted to rescind his resignation, the Board should terminate his employment for his residency violation. The OIG also recommended that the Board place a DNH designation in his personnel file after his resignation was final.

On June 30, 2018, he did, in fact, resign, and the Board subsequently placed a DNH in his personnel file.

- o  *Assistant Principal Resided in Blue Island (17-02335)*

An investigation determined that an assistant principal was violating the residency policy by living in Blue Island, Illinois, and by misrepresenting to the district that she was living in Chicago. The OIG recommended that the Board immediately terminate her employment and place a DNH designation in her personnel file. After the OIG reported on this matter, the assistant principal resigned, and the Board subsequently placed a DNH in her personnel file.

- o  *Teacher Resided in Highland Park (18-00208)*

An investigation determined that another teacher was residing in Highland Park, Illinois, in violation of the CPS residency policy, and that she misrepresented to CPS

Office of Inspector General
Chicago Board of Education
2018 Annual Report

that she was living in Chicago in order to avoid the residency requirement. The OIG recommended that the Board immediately terminate her employment and place a DNH designation in her personnel file. The teacher subsequently resigned, and the Board placed a DNH in her personnel file.

> o *Teacher Resided in Sauk Village (18-00228)*

An investigation determined that a teacher was residing in Sauk Village, Illinois, in violation of the CPS residency policy, and that she misrepresented to CPS that she was living in Chicago to avoid the residency requirement. The OIG recommended that the Board immediately terminate her employment and place a DNH designation in her personnel file. She subsequently resigned, and the Board placed a DNH in her file.

> o *Warehouse Department Employee Resided in Glenview (18-00247)*

An investigation determined that an employee in CPS's Warehouse Department was violating the CPS residency policy by living in Glenview, Illinois, and by misrepresenting her residency to the district to avoid the residency requirement. The OIG recommended that the Board immediately terminate her employment and place a DNH designation in her personnel file, and, after the OIG reported on this matter, the Board terminated her employment and placed a DNH in her file.

> o *Two Teachers, Husband and Wife, Resided in Skokie (18-00325)*

An investigation determined that a husband and wife, who were both CPS teachers, were living in Skokie, Illinois, in violation of the CPS residency policy, and that they misrepresented their residency to the district to avoid the residency requirement. The OIG recommended that the Board immediately terminate their employment and place DNH designations in their personnel files.

After the OIG reported this matter to the Board, the husband resigned, and the Board subsequently placed a DNH designation in his personnel file. The Board advised that it has initiated dismissal proceedings against the wife, which are still pending.

> o *Teacher Resided in Northbrook (18-00363)*

An investigation determined that a teacher was violating the CPS residency policy by living in Northbrook, Illinois, and by misrepresenting to the district that he was living in Chicago.

Before the OIG concluded its investigation, the teacher submitted notice of his resignation, effective at the end of the school year, under the district's early resignation incentive. Accordingly, the OIG recommended that, if he attempted to

Office of Inspector General
Chicago Board of Education
2018 Annual Report

rescind his resignation, the Board should terminate his employment for his residency violation. The OIG also recommended that the Board place a DNH designation in his personnel file after his resignation was final.

On June 30, 2018, he did, in fact, resign, and the Board subsequently placed a DNH in his personnel file.

- *Teacher Resided in Evanston (18-00421)*

An investigation determined that a teacher was living in Evanston, Illinois, in violation of the CPS residency policy, and that she misrepresented her residency to the district by claiming she was living in Chicago. Because she violated the residency policy and lied about it, the OIG recommended that the Board immediately terminate her employment and place a DNH designation in her personnel file.

During its investigation, the OIG also found that she violated the CPS policy on paid time off by using as many as 11 sick days to travel to attend her children's sporting events. Given that the OIG already was recommending that her employment be terminated for the residency violation, the OIG did not make any specific recommendations for her improper use of sick days, but advised the Board to take this violation into account, as well.

After the OIG reported on this matter, she resigned, and the Board subsequently placed a DNH in her personnel file.

- *School Clerk Resided in Elk Grove Village (18-00070)*

As discussed in Section 3 above, a school clerk who was the subject of an OIG investigation regarding the improper use of school credit cards (OIG 18-00425) was also violating the CPS residency policy by living in Elk Grove Village, Illinois. She resigned in the wake of the OIG's reports to the Board on these matters, and the Board subsequently placed a DNH in her personnel file.

### Section 10 — Cases Involving Arrests or Criminal-Background Issues

The OIG has the responsibility of monitoring the outcome of cases wherein Board employees or vendors were arrested and charged with criminal offenses. The OIG reports on these matters so that the Board can make a determination regarding administrative discipline or other action, based on the resolution of the criminal cases.

Office of Inspector General
Chicago Board of Education
2018 Annual Report

o  *Teacher with History of Sexual Advances Towards a Minor (17-02121)*

An investigation determined that a teacher at an elementary school had a history of sexual overtures and improper fondling with at least one minor, and possibly more. The OIG initiated this case after one of the teacher's former students submitted a complaint to the OIG alleging that he was victimized by the teacher approximately 30 years ago, when the teacher worked for another school district. The former student reported to the OIG that, when he was 13 years old, the teacher improperly touched him in the groin area while they were in a classroom. He also informed the OIG that, years later, the teacher was prosecuted for criminal sexual abuse of a different minor.

The OIG subsequently found that in 2000, before the teacher worked for CPS, he was arrested for indecent solicitation of a child, who was not a CPS student. At that time, he worked for another school district. He was arrested after law enforcement discovered that he had an improper relationship with a 16-year-old boy whom he met in an internet chat room. According to police reports, the teacher and boy had discussed sexual subject matter over email and, on at least one occasion, had met at the mall and in the teacher's car, which, at the very least, involved the teacher rubbing the boy's arm, leg and ear. The teacher was arrested when he arrived for a subsequent planned meeting with the boy.

In 2000, the teacher was charged with two Class 3 felonies: (1) indecent solicitation of a child, 720 5/11-6(a)(2), and (2) aggravated criminal sexual abuse involving a victim between 13 and 16 years of age, 720 ILCS 5/12-16(d). However, he pleaded guilty to, and was only convicted of, Class A misdemeanor battery, 720 ILCS 5/12-3(a)(2). He was sentenced to 24 months of probation and 100 hours of public service work and was ordered to pay $2,027 in fines and costs. He was also ordered to have no contact with the victim and to complete counseling. He forfeited his computer that was seized by police, and he was ordered not to use the internet, unless such use related to his employment. He was not ordered to register as a sex offender.

The OIG further found that in 2003, shortly after his period of probation concluded, he was hired by CPS as an elementary school teacher. He disclosed his conviction for misdemeanor battery — which is not an enumerated offense — on his CPS application and underwent a criminal background check, but the background check did not reveal any criminal convictions, not even the conviction that he disclosed.

As part of this investigation, the OIG interviewed the teacher, who confirmed much of the information in the police reports about his arrest and his improper involvement with the boy. He acknowledged that, when he was arrested after

arriving for one of his planned meetings with the boy, he was anticipating the possibility that he and the boy might engage in a sex act.

During this investigation, the OIG informed the CPS Law Department of the nature of this case and the evidence obtained, and CPS immediately placed the teacher on a paid leave of absence. After the OIG concluded its investigation and reported this case to the Board, the Board notified ISBE of this matter, and the teacher resigned and voluntarily surrendered his teaching license. His license is now treated by ISBE as revoked. The Board also placed a Do Not Hire (DNH) designation in the teacher's personnel file.[5]

- o  *Teacher Arrested for Federal Firearm Crimes (17-00991)*

A teacher was arrested and indicted in U.S. District Court for the Northern District of Illinois for allegedly committing two federal firearms crimes: (1) conspiring with a juvenile to provide a firearm and ammunition to an individual who had previously been convicted of a felony, *see* 18 U.S.C. §§ 371 and 922(d)(1); and (2) providing a firearm and ammunition to an individual who had previously been convicted of a felony, *see id.* § 922(d)(1).

When the OIG interviewed the teacher, he repeatedly refused to answer questions about his arrest, even though he had been advised of his obligation to cooperate with the OIG. Accordingly, his refusal to answer the OIG's questions violated Board Rule 4-4(m), which states that all employees are obligated to cooperate with OIG investigations, as required by the Illinois School Code, 105 ILCS 5/34-13.1. Based on the Rule 4-4(m) violation, which is deemed to be irremediable conduct, the OIG recommended that the Board terminate his employment and place a DNH designation in his personnel file.

The teacher subsequently resigned, and the Board placed a DNH in his personnel file. His criminal case is still pending.

- o  *Security Officer Guilty of Misdemeanor Firearm Charge (16-00983)*

A school security officer was arrested and charged in the Circuit Court of Cook County with Class 4 felonies of unlawful possession of a controlled substance (cocaine), *see* 720 ILCS 570/402, and aggravated unlawful possession of a firearm, *see id.* 5/24-1.6(a). He subsequently pleaded guilty to a firearms charge that was

---

[5] This investigation predated the creation of the OIG's Sexual Allegations Unit, which now focuses on these types of cases. This matter was investigated and reported in Fiscal Year 2018, which ended on June 30, 2018. The OIG began assembling the Sexual Allegations Unit in July 2018, and that unit started investigating these types of cases in October 2018.

Office of Inspector General
Chicago Board of Education
2018 Annual Report

reduced to a Class A misdemeanor, and the drug-possession charge was dropped. The court sentenced him to an 18-month period of conditional discharge.

He resigned during the course of his court proceedings, and the Board placed a DNH in his personnel file.

> o *Teacher Charged with Felonies for Selling Valium (18-00034)*

A teacher at an elementary school was arrested by Chicago Police Officers after he was charged in the Circuit Court of Cook County with three felony counts of delivery of a controlled substance, specifically, having sold valium to an undercover officer on three previous occasions. *See* 720 ILCS 570.0/401-G. According to police reports, he allegedly sold the valium after his hours of employment and at locations away from Board property.

After his arrest, the Board immediately placed him on a paid leave of absence.

The OIG attempted to contact the teacher several times to schedule an interview, but the teacher never responded. His refusal to respond violated Board Rule 4-4(m), which states that all employees are obligated to cooperate with OIG investigations, as required by the Illinois School Code, 105 ILCS 5/34-13.1. Based on the Rule 4-4(m) violation, which is deemed to be irremediable conduct, the OIG recommended that the Board terminate his employment and place a DNH designation in his personnel file.

The Board subsequently terminated his employment and placed a DNH in his file. His criminal case is still pending.

> o *School Security Officer Guilty of Aggravated DUI (15-00970)*

A school security officer was arrested and charged in the Circuit Court of Cook County with three counts of the Class 4 felony of aggravated driving under the influence with a revoked or suspended license (625 ILCS 5/11-501) and six counts of the Class 4 felony of having driven with a revoked or suspended license and under the influence of alcohol multiple times (625 ILCS 5/6-303).

He subsequently pleaded guilty to one count of aggravated driving under the influence with a revoked or suspended license, a Class 4 felony, and the Cook County State's Attorney's Office dropped the other counts. The court sentenced him to serve one year in the Illinois Department of Corrections and credited him with already having served 252 days. The court also gave him one year of mandatory supervised release.

Office of Inspector General
Chicago Board of Education
2018 Annual Report

While the OIG was investigating this matter, the security officer was arrested again and charged with driving on a revoked license. He was found guilty of that charge and fined $394.

The Board terminated his employment and placed a DNH in his personnel file.

o   *Employee of CPS Vendor Guilty of Misdemeanor Domestic Battery (17-00612)*

An employee of a CPS vendor was arrested and charged in the Circuit Court of Cook County with the Class A misdemeanor of committing domestic battery with the intent to cause bodily harm, *see* 720 ILCS 5/12-3.2(a)(1), after her ex-boyfriend reported to the police that she had battered him in his home. She pleaded guilty to the charge and was sentenced to one year of court supervision. The court also imposed a $250 fine. The Board advised the OIG that it notified her employer of this matter.

o   *Employee of CPS Vendor Guilty of Misdemeanor Domestic Battery (17-00705)*

An employee of a CPS vendor was arrested and charged in the Circuit Court of Cook County with Class A misdemeanors of committing domestic battery with the intent to cause bodily harm, *see* 720 ILCS 5/12-3.2(a)(1), and resisting or obstructing a police officer, *see* 720 ILCS 5/31-1(a). Police reports show that the arrest followed an altercation that she had with her sister and that, after the police arrived, she attempted to flee but was stopped when an officer grabbed her arm. According to police reports, she then attempted to slap the officer and pull free, but failed.

She pleaded guilty to both charges and was sentenced to one year of court supervision and 40 hours of community service. The Board advised the OIG that it notified her employer of this matter.

o   *Cook Violated Sick-Day Policy Following Arrest (17-00481)*

A cook violated the CPS policy on paid time off by using a sick day while in police custody, following his arrest. The arrest was for alleged conduct that led to a misdemeanor charge, of which he was ultimately found not guilty. The Board advised that the cook was given a 15-day unpaid suspension.

### SECTION 11 — UPDATES TO CASES REPORTED IN PREVIOUS ANNUAL REPORTS

Below are updates to two matters discussed in the OIG's 2017 Annual Report.

Office of Inspector General
Chicago Board of Education
2018 Annual Report

- ○ *Subjects in Gift Card Case Indicted for Disability Benefits Fraud*

In its Annual Report for the 2017 Fiscal Year, the OIG reported that the owner of a vendor that regularly sold the district gift cards was responsible for false pricing and invoicing, as well as deficient inventory controls and records (15-01115). Based on the vendor's records, the OIG suspected that an employee of the vendor had been defrauding the district by failing to deliver all of the gift cards for which CPS had paid. However, because the vendor kept such poor records of its sales, the OIG could not determine whether the employee had stolen from CPS or stolen from the vendor itself. In any event, the OIG found that the employee used the vendor's relationship with CPS to steal gift cards, which she and her husband used to make $4,043.62 worth of personal purchases.

Since the OIG reported on this matter in the 2017 Annual Report, the U.S. Attorney's Office for the Northern District of Illinois indicted the employee and her husband on multiple counts of defrauding the Social Security Administration. In addition, the employee and her husband were each charged with lying to the SSA, and the vendor's owner and the employee's husband were each charged with falsifying documents to obstruct the government's investigation of this matter. All three were charged with conspiracy to falsify documents with the intent to obstruct the government's investigation.

The OIG assisted the U.S. Attorney's Office and the Office of Inspector General for the Social Security Administration with their investigation of this matter.

According to the allegations in the indictment, the employee and her husband fraudulently concealed the fact that she was working for the vendor in order to obtain more than $110,000 in Social Security Disability Insurance benefits, which she was not entitled to receive, given her employment. The employee and her husband included the vendor's owner in the scheme. Among other things, they arranged for the vendor's owner to falsely issue the employee's paychecks in the name of the employee's husband in an effort to represent that the husband, and not the wife, was working for the vendor.

This case is still pending in federal court.

Also, since the OIG reported on this matter in the 2017 Annual Report, the Board permanently debarred the vendor, the owner and the employee from doing any business with the Board, pursuant to the OIG's recommendations.

Office of Inspector General
Chicago Board of Education
2018 Annual Report

o *Guilty Plea and Sentencing in Case Against Bus Company Owner*

In the 2017 Annual Report, the OIG reported that it assisted the federal authorities in their investigation of Jewel Lockhart, the owner of Jewels Bus Company, a school bus vendor that transported CPS students from 2008 to 2013. As previously reported, the U.S. Attorney's Office for the Northern District of Illinois indicted Lockhart on one count of having impeded the Internal Revenue Service and six counts of willfully filing false tax returns.

On June 18, 2018, Lockhart pleaded guilty to two counts of filing false tax returns, and, on October 3, 2018, the U.S. District Court for the Northern District of Illinois sentenced her to one year and one day in prison. She also was ordered to pay $1,885,988 in restitution to the IRS and the Illinois Department of Revenue.

The Board has permanently debarred both Lockhart and her bus company from doing any business with the Board.

The names of the subjects are included here because their names were already identified in a press release from the U.S. Attorney's Office.

Office of Inspector General
Chicago Board of Education
2018 Annual Report

# APPENDICES

A.  Executive Memo to the Board Regarding Ethics Violation by
    General Counsel Ronald Marmer and Subsequent Cover-Up by
    CEO Forrest Claypool
    (Released Publicly on December 7, 2017)

B.  February 21, 2018, Significant Activity Report:
    Options for Knowledge 2016–17 SY Elementary Admissions

C.  May 23, 2018, Significant Activity Report:
    Montessori Pre-K Perk at Lincoln Park's Oscar Mayer

D.  May 29, 2018, Significant Activity Report:
    Contract Steering by Barbara Byrd-Bennett to a Vendor; and a
    Former Board Member's Conflicts of Interest Involving
    Investments in the Same Vendor and Other CPS Vendors

E.  July 31, 2018, Significant Activity Report:
    Improper Manipulation of CPS Procurement Process by
    Alternative-School Operator, Gary Solomon, Thomas Vranas and
    Barbara Byrd-Bennett

**Appendix A**

Office of
**Inspector General**
**Chicago Board of Education**
Nicholas Schuler, Inspector General

FINAL EXECUTIVE MEMO

**To:** The Chicago Board of Education:

Frank M. Clark, President
Jaime Guzman, Vice President
Mark F. Furlong
Dr. Mahalia Hines
Arnaldo Rivera
Gail D. Ward

**From:** Nick Schuler, Inspector General *NS*

**Date:** December 5, 2017

**Re:** 1. Violation of the Code of Ethics by Ronald Marmer;
2. Subsequent Acts to Cover Up Contrary Attorney Opinions; and
3. Lies to the OIG by Forrest Claypool

This is an executive summary of the final report by the OIG in its investigation into whether (1) General Counsel Ronald Marmer violated the Code of Ethics by improperly exercising "contract management authority" over legal work performed by Jenner & Block for the school funding litigation while Marmer had an existing "business relationship" with that firm; and (2) CEO Forrest Claypool and Marmer acted improperly with regard to the opinions of several in-house and outside attorneys who had concluded that Marmer either was already violating the Code of Ethics because he was exercising "contract management authority," or could not exercise such authority over work performed by Jenner & Block without violating the Code of Ethics.

**FINDINGS**

Based on an extensive investigation, the OIG has concluded that:

1. Marmer was improperly exercising "contract management authority" over work performed by Jenner & Block on the school funding litigation because he had an existing "business relationship" with Jenner & Block.

567 West Lake Street ◆ Suite 1120 ◆ Chicago, Illinois ◆ 60661-1405
Phone (773) 534-9400 ◆ Fax (773) 534-9401 ◆ inspectorgeneral@cpsoig.org

**Appendix A**

Final Executive Memo
OIG 16-00924
Subject: Ethics Violation by General Counsel and Subsequent Cover-Up

2.  Marmer and Claypool failed to take proper corrective or remedial action once they were informed that the three members of the CPS Ethics Committee — CPS Ethics Advisor Andra Gomberg, Deputy General Counsel Ruchi Verma and then-Senior Assistant General Counsel Andrew Slobodien — and a fourth high-level Law Department attorney, Joseph Moriarty, had determined that Marmer was violating the Code of Ethics. In light of the Ethics Advisor's clear standing in the Code of Ethics to advise on the matter, Claypool and Marmer should have taken her advice more seriously, and they should have worked with her on an acceptable solution.

3.  After Marmer and Claypool learned of those four in-house opinions, they sought the opinions of two outside attorneys: former Board of Education General Counsel Patrick Rocks and longtime outside labor law attorney James Franczek. Rocks concluded that Marmer could not exercise any supervisory authority over the work performed by Jenner & Block without violating the Code of Ethics — but he stopped short of concluding that Marmer was violating the Code of Ethics, as he did not know what Marmer's involvement actually was. Franczek concluded that Marmer was violating the Code of Ethics because he was, in fact, exercising "contract management authority" over Jenner & Block while having a "business relationship" with the firm.

4.  Franczek asked Claypool why Marmer could not simply be removed from supervising Jenner & Block. Franczek also stated that Claypool could ask the Board for an exemption for Marmer. Claypool told Franczek he was not going to do that because he did not want the matter to "go public."

5.  Claypool and Marmer finally consulted with a seventh attorney, J. Timothy Eaton, who issued a June 10, 2016, opinion letter, finding that Marmer's conduct did not violate the Code of Ethics. Significantly, Eaton has known Claypool for decades, since the time Eaton served as a teacher's assistant for an undergraduate course that Claypool was in when Eaton was a law student. According to campaign records, Eaton has contributed $5,000 to Claypool's campaigns for public office.

6.  Eaton's June 10, 2016, opinion letter is incorrect and materially deficient. Eaton reached the incorrect conclusion because he failed to address the central problem relating to the definition of a "business relationship."

7.  Claypool knew that Eaton's letter did not address the central question of the "business relationship," which the six previous attorneys had identified as dispositive. Claypool and Eaton both told the OIG that Eaton was never specifically asked to provide an opinion that was favorable to Marmer, and that Eaton was never specifically asked to steer clear of the "business relationship"

Final Executive Memo
OIG 16-00924
Subject: Ethics Violation by General Counsel and Subsequent Cover-Up

issue. Marmer told the OIG that he could not recall if specific terms of the Code of Ethics were discussed.

Even if what Claypool, Marmer and Eaton claim is true, Eaton's June 10, 2016, letter clearly took a generous approach by ignoring the "business relationship" question altogether. For his part, Eaton says that he decided the "business relationship" question was a non-issue, so he decided it did not need addressing.

Regardless, Claypool should never have accepted the opinion in the first place. Instead, he should have sent it back to squarely address the issue that the six previous attorneys thought was dispositive. In the end, the OIG cannot definitively conclude whether Eaton issued his opinion within narrowly tailored confines outlined by Claypool or Marmer, whether such strictures did not need to be spoken aloud because of the relationship between Claypool and Eaton, or whether Eaton somehow entirely missed the mark on his own.

In any case, Claypool's reliance on Eaton's June 10, 2016, opinion letter was manifestly deceptive and disingenuous.

8. Claypool failed to adequately inform the Board about the six attorney opinions that were in lock-step agreement that Marmer could not have supervisory authority over work performed by Jenner & Block. Also, around the time that the Jenner & Block contract was up for Board approval in July 2016, Claypool apparently misled President Clark into believing that Marmer was not highly or substantively involved in the work performed by Jenner & Block, which had been occurring since at least March 2016. Accordingly, Claypool violated his fiduciary duty under the Code of Ethics to act in good faith with the Board.

9. On July 28, 2016, the day after the Board approved of the retention of Jenner & Block for the school funding litigation, a *Chicago Sun-Times* article raised the question of whether Marmer was violating the CPS Code of Ethics. In the wake of the *Sun-Time*s article, the OIG opened an investigation into the matter. On August 8, 2016, the *Sun-Times* reported that the OIG had confirmed an investigation into the matter. On August 9, 2016, the *Chicago Tribune* quoted Claypool as saying, "Obviously the inspector general looks at a lot of things routinely. We're happy to walk him through the process." On August 14, 2016, the *Sun-Times* published a letter from Claypool, in which he defended his and Marmer's actions in the matter. In that letter, he said, "[W]e welcome the opportunity to answer questions from the inspector general or anyone else."

Final Executive Memo
OIG 16-00924
Subject: Ethics Violation by General Counsel and Subsequent Cover-Up

10. Claypool attempted to paper over the opinions of the six attorneys with Eaton's letter, which was released to the press in the wake of public questions about Marmer's involvement in the contract work.

11. After the OIG investigation was publicly known, Claypool took improper steps to alter relevant records with the intent of obscuring the work that Franczek had done on the matter. Specifically, Marmer had complained to Claypool about the size of Franczek's $2,124 bill, including the fact that references to "CPS's Code of Ethics" and "ethics issues" were listed on it. After Marmer complained about the bill, Claypool personally handed Franczek's bill back to Franczek and asked him to change the entries that described work on "CPS's Code of Ethics" and "ethics issues." Franczek promptly acted on that request, and changed his invoice to reflect work only on a generic "personnel matter." Franczek then sent the changes via courier back to Claypool's personal attention under a cover letter marked in bold letters: "Attorney-Client Privileged and Confidential" and "For Forrest Claypool's Eyes Only." Franczek's revised bill was subsequently found on CPS's billing system. Importantly, no record of the original bill was found on the CPS billing system or at the Law Department.

12. Claypool greatly compounded the severity of his misconduct when he repeatedly lied to the OIG through two separate interviews — and after being advised in writing each time that false statements could result in discipline up to and including termination of employment — by unequivocally, emphatically and repeatedly denying that he had asked Franczek to make changes to his bill. He even stated he would never have been involved in such lowly billing matters. At one point, he said that he runs a $5.6 billion operation, and "I'm not looking at freaking bills." The evidence clearly shows otherwise.

13. On November 17, 2017, just three days after his second interview, Claypool issued a written public statement that put a disingenuous spin on the lies he had made during his OIG interviews regarding Franczek's bill. He changed his categorical and emphatic statements that he never saw the bill and never asked for any changes to an abrupt I don't recall. He turned 180 degrees from claiming certain memory to no memory at all. His letter was designed to taint the Board's reception of the OIG's final report by falsely portraying lies on two separate occasions as a mere lapses of memory.

14. In addition, Claypool's public release of his letter to the IG represented a failure to cooperate with the OIG. At the end of his second interview, the OIG had specifically told Claypool and his attorneys that the OIG might need to speak with other witnesses about the billing records that the OIG had shown to, and

**Appendix A**

Final Executive Memo
OIG 16-00924
Subject: Ethics Violation by General Counsel and Subsequent Cover-Up

discussed with, Claypool. The OIG said that confidentiality was required to ensure witness integrity.

Despite that, Claypool sent Marmer a warning about what the OIG was asking. In an email to Marmer on the same afternoon that he released his letter to the press, Claypool told Marmer that, although he knew that he and Marmer should not be communicating about the OIG's investigation, he still wanted to give Marmer, as Claypool wrote, a "heads up" about the letter. Claypool conveniently concluded in his email that, since the letter was public, there was no problem if Marmer saw it. Thus, Claypool failed to cooperate with the OIG by refusing to honor the OIG's request to keep the OIG interviews confidential while the investigation was pending.

In any event, the OIG had already scheduled a second interview with Marmer when Claypool released his letter, so the actual effect was to improperly give Marmer a "heads up" that the OIG was asking about Franczek's bill — and, more importantly, that the OIG possessed hard-document proof of exactly what had happened — before the OIG was able to re-interview Marmer about it.

15. Claypool also lied to the OIG when he stated that he was not aware that Franczek had written an opinion on the matter when he and Franczek spoke about Franczek's opinion in June 2016. Claypool told the OIG that someone had informed him only much later that Franczek had written an opinion, which he described as "enraging." Claypool even said that the news that Franczek had written an opinion was a complete surprise to him.

The evidence, however, confirms Franczek's account that he had a copy of a written opinion with him on June 6, 2016, when he spoke to Claypool — and that Claypool deliberately refused to accept it. Among other supporting evidence is a statement from Law Department attorney Moriarty who told the OIG that Franczek talked to him right after Franczek's meeting with Claypool. Moriarty told the OIG that Franczek had said that Claypool was angry and refused to accept the memorandum.

In addition, an email shows that a draft of Franczek's memo was sent to Moriarty by Franczek at 8:57 a.m. on June 6, 2016. In that email, Franczek asked Moriarty to let him know if there was anything he "violently disagree[d]" with because he was meeting with Claypool at 11:30. That email, by itself, shows that Franczek was planning to give the opinion letter to Claypool at the meeting. And shortly after the meeting between Claypool and Marmer that day, Franczek sent Moriarty an email that reads, "I think I am off the xmas card list."

**Appendix A**

Final Executive Memo
OIG 16-00924
Subject: Ethics Violation by General Counsel and Subsequent Cover-Up

When the emails, Franczek's account, Moriarty's account, Franczek's opinion letter, Claypool's anger with Franczek, and Claypool's other proven lies are considered together, it is clear that Claypool deliberately refused to accept Franczek's written opinion — which he was not happy about — and lied about it to the OIG.

16. Claypool also improperly refused to pay the $7,080 bill that Rocks's firm, Jackson Lewis, had submitted for its work on the Marmer ethics question.

First Deputy General Counsel Douglas Henning told the OIG that he was at a meeting with Claypool and people from the press office, when Claypool learned of Rocks's bill. Claypool took the position at that meeting that he had never ordered the work, so CPS should not pay for it. Henning told the OIG that, based on those statements by Claypool, he made sure that the Jackson Lewis invoice was not paid. Claypool also said that he had a conversation with Jackson Lewis attorney James Daley during which Claypool advised that CPS would not be paying the bill because he had never asked for the work. For his part, Daley denied ever having that conversation with Claypool. In any event, it is clear that the refusal to pay the bill happened on Claypool's prompting and only after there were public questions about Marmer's involvement in the school funding litigation — and that it almost certainly happened once the OIG was looking into the situation.

Based on the totality of the evidence, it is more likely than not that Claypool's refusal to pay the Jackson Lewis bill represented a further attempt by Claypool to minimize the weight and importance of Rocks's opinion by making it seem like the opinion was never ordered and was, therefore, somehow informal — a proposition that is against the manifest weight of the evidence in this case.[1]

17. The OIG discovered that Chief Internal Auditor Andrell Holloway and Doug Henning — who both followed Claypool to CPS from the CTA — were added to the Ethics Committee and that Senior Assistant General Counsel Andrew Slobodien was removed from it in the middle of this investigation. Marmer told the OIG that he was responsible for the changes.

---

[1] Ironically, Jackson Lewis considers the bill to have been paid. As discussed more fully below, due to a subsequent and apparently mistaken overpayment from CPS in January 2017 for a separate invoice, Jackson Lewis wound up crediting the work as being paid when Claypool and Henning believe it was not paid.

**Appendix A**

The timing of those changes is problematic because they were made in the middle of the investigation into an issue that squarely involved Marmer's and Claypool's disagreement with the Ethics Committee.

Gomberg, the *de facto* chair of the committee, told the OIG that she was not involved in the changes, which were more or less presented to her as a *fait accompli*. Even more troubling, the changes apparently came right after the IG briefed the Board in closed session about the previous negative opinion of the Ethics Committee. Claypool and Henning were at that meeting. The IG had asked Claypool to leave that meeting so he could brief the Board in private. Claypool refused. Accordingly, because he heard what the IG told the Board, Claypool clearly knew that the opinion of the Ethics Committee was central to the investigation. Claypool denied having any part in the changes.

Nonetheless, in the face of the timing and overall circumstances, the OIG cannot eliminate the possibility that the real motive for the personnel changes, which Marmer has taken credit for, was to create an Ethics Committee more deferential to Claypool and Marmer. In short, the public perception is horrible. It looks like the changes were retaliatory and designed to lessen the independence of the committee. That alone should have warranted delaying any changes until after the OIG investigation was complete. Accordingly, at a minimum, the changes to the Ethics Committee represent a critical error in judgment. And Marmer has taken credit for them.

## RECOMMENDATIONS

Based on the extensive evidence in this case, the OIG is recommending the termination of Forrest Claypool's employment.

The OIG stops short of finding that this is necessarily a termination-level case for Marmer. As discussed further below, the OIG is recommending that the Board discipline Marmer in an appropriate manner, which might include, for example, a "first and final" warning, a lengthy suspension or even termination (if the Board decides that is warranted).

Please be aware that the OIG is not making these recommendations lightly.

As the OIG stated in its June 23, 2017, Interim Summary Report, the OIG does not believe that Marmer stood to benefit financially from the contract with Jenner & Block and, of course, the underlying Code of Ethics violation would have been much worse if that had been the case.

**Appendix A**

Marmer and Claypool told the OIG that they disagreed with what the internal CPS attorneys told them because they believed the internal lawyers were reading the Code of Ethics too literally. They believed that because Marmer was not going to gain financially from the contract, his supervision of Jenner & Block's work simply should not be prohibited. In short, they refused to believe that the Code of Ethics not only prohibited improper financial gain, but even the appearance of a less-than-arms-length arrangement (in other words, the appearance of impropriety). If Claypool and Marmer had simply come forth and told the Board and the public that they disagreed with the Ethics Committee, the Board could have weighed in with a proper remedy (e.g., voting for an exception, amending the Code of Ethics, removing Marmer from his supervisory role, etc.). If that had happened, this matter probably would not have involved discipline.

Instead, Claypool and Marmer searched for an exonerating opinion. Of course, Claypool took a series of actions to minimize the further negative attorney opinions he received along the way. It is that approach that was fundamentally deceptive — the idea that Claypool could present Eaton's opinion as the only one, when it failed to even address the dispositive issue of the "business relationship" in the first place. Although Claypool's actions in this regard were deceptive, the OIG is not certain that this would have been a termination case if the conduct had stopped there and Claypool had come clean about what had happened at that point.

The decision by Claypool to alter billing records while the OIG investigation was ongoing — and after Claypool told the public that he was happy to "walk the OIG through the process" — escalated this to a full-blown cover-up and, thus, a termination case for him. The fact that Claypool took steps designed to hide Franczek's opinion on the CPS billing system, which occurred at the opening stages of the OIG investigation and while under heavy press scrutiny, makes this misconduct very serious indeed. It goes without saying that if any line employee had done that much, he or she would be fired.

Inexplicably, Claypool pushed the matter beyond all bounds when he chose to lie through two separate OIG interviews about his dealings with Franczek. In particular, and as discussed in the Final Summary Report, Claypool's repeated and unequivocal denials that he had asked Franczek to make changes to the bill — even after being shown documents that put him at the epicenter of the changes — are not remotely credible. The matter was important enough for him to defend his actions in the open letter to the *Sun-Times* that he penned just 11 days before asking for the changes, but he would have the Board and everyone believe now that he cannot remember handing billing records to Franczek, or having them returned to him and labeled "For Forrest Claypool's Eyes Only." When all the evidence is considered together, it is

**Appendix A**

Final Executive Memo
OIG 16-00924
Subject: Ethics Violation by General Counsel and Subsequent Cover-Up

clear that Claypool lied to the OIG, even after being shown documents that proved his actions. On top of that, he failed to cooperate with the OIG when he handed his November 17, 2017, letter to the press, thereby giving Marmer an improper "heads up" to what the OIG was asking.

At every turn in this matter, Claypool kept making matters worse. And it appears that his decisions were driven by a clear desire to keep information harmful to his narrative from the Board, the OIG and the public.

What kind of signal would it send to CPS employees, parents and children if the CEO was allowed to change records as part of a cover up and keep his job? Why should CPS employees tell the truth in other investigations — as required under Board Rules — if repeated lies by the head of the administration are not decisively punished? Elaborate cover-ups are designed to hide improper behavior, not above-board actions, and that was clearly the case here, as evidenced by the pattern of attorney shopping, record changing and lies to investigators. Again, any other employee would be fired for such deliberate and protracted deception. Surely, the CEO must be held to the same — if not an even higher — standard. Of course, Claypool is a highly sophisticated government actor who surely should be expected to know the ethics rules. Even more critically, as the CEO, he sets the bar for how the entire organization acts and owns up to mistakes when they are inevitably made. The example Claypool has set here cannot be the standard of honesty and responsibility that the Board and citizens of Chicago accept. Sadly, the OIG is left with no recourse but to conclude that this is a termination case for Claypool.

The decision to remove Claypool is ultimately the Board's. Pursuant to Board Rule 4-1(C):

> The Board shall exercise all authority over the following employee matters, which authority is non-delegable under the Illinois School Code or which the Board has reserved to itself:
>
> ...
>
> (3) To dismiss the Board Secretary, the Assistant Board Secretary, the Chief Executive Officer, the General Counsel, deputies and assistants general counsel, executive officers and officers upon majority vote of the full membership of the Board[.]

Please be advised that the OIG expects that it will put forth a recommendation for Claypool's termination in an Inspector General Board Action Report in the near future.

**Appendix A**

Final Executive Memo
OIG 16-00924
Subject: Ethics Violation by General Counsel and Subsequent Cover-Up

For his part, Marmer has clearly displayed poor judgment. For starters, it is obvious that Marmer, as the one whose conduct was in question in the first instance, should not have been involved in the business of finding an outside opinion that cleared him. That fact alone suggests a biased search. And the sudden need to find the "gravitas" they found in Eaton appears to be nothing more than a decision to continue to search for an exonerating opinion. In addition, his admitted decision to make changes to the Ethics Committee in the middle of this investigation certainly raises the appearance of impropriety.

Of course, other acts by Marmer give rise to serious questions. For example, the OIG finds problematic his account of why he brought his concerns about Franczek's bill to Claypool's attention. He said that he objected to both the size of the bill and to the references to "CPS's Code of Ethics" and to "ethics issues," and even suggested that the bill was not up to his professional standards. When, however, his statement is compared to the bills of Rocks and Eaton — both of which contain almost identical entries and were for similar amounts — it seems that Franczek was not singularly out of step with the others. So, it is clear that Franczek did not do anything that the other attorneys had not done. Regardless, there is no proof that Marmer saw the bills of the other two attorneys, so the OIG cannot say for sure that Marmer would not have acted the same way if he saw them.

In the end, however, there is no proof that Marmer asked anyone to change any bills or records. The OIG also cannot conclude that Marmer (or Claypool) deliberately ordered Eaton to give an opinion that steered clear of the "business relationship" question. And there is no proof of any lies by Marmer to the OIG.

Nonetheless, Marmer violated the Code of Ethics by exercising "contract management authority" in the school funding litigation. Plus his involvement in the hunt for his own exonerating opinion was improper, and his changes to the Ethics Committee were misguided. Despite those actions, the evidence does not support a conclusion that Marmer's efforts rose to the same level of cover-up committed by Claypool.

Accordingly, the OIG stops short of finding that this is necessarily a termination-level case for Marmer. The OIG is recommending that the Board discipline Marmer in an appropriate fashion, which might include, for example, a "first and final" warning, a lengthy suspension or even termination (if the Board decides that is warranted).

The OIG is further recommending that the role and function of the Ethics Committee needs to be strengthened and defined. At a minimum, the Ethics Committee should be formed with the consent of the Board. The Board should approve what the membership make-up of the committee should be. And appointments to the Ethics

**Appendix A**

Final Executive Memo
OIG 16-00924
Subject: Ethics Violation by General Counsel and Subsequent Cover-Up

Committee should be publicly approved at Board meetings. Accordingly, the OIG is recommending that the Board appoint a group to research the best practices for operating an Ethics Committee, and the group should recommend new rules based on that research. For instance, the rules should specify what happens when there is a disagreement about the interpretation of the Code of Ethics between the Ethics Committee and a CPS employee, or even a Board member. Once the exploratory work is done, the OIG expects that the Board would be able to incorporate the appropriate changes into the Code of Ethics so as to avoid situations like the one that led to this investigation. The OIG respectfully requests to be included in the process of developing and implementing those changes.

Finally, the OIG is not making any recommendations regarding Eaton. As stated above, the OIG cannot definitively conclude whether Eaton issued his opinion within narrowly tailored confines outlined by Claypool and Marmer, or Eaton somehow missed the mark on his own. And for reasons discussed at length in the Final Summary Report, the OIG has taken the view that because Eaton's representation ceased and the OIG was eventually allowed all the access it needed to complete the investigation, the question of interference by Eaton has fallen away and is moot.

### FULL BOARD COOPERATION SINCE THE JUNE INTERIM REPORT

As is well known, the OIG publicly asserted at the December 7, 2016, Board meeting that this investigation was being obstructed by the improper assertion of the attorney-client and work-product privileges. The OIG followed up those assertions in its Interim Report to the Board on June 23, 2017. In that report, the OIG further asserted that Eaton, who then was representing the Board in the OIG's investigation, had a material self-interest stemming from the June 10, 2016, opinion that he had issued in this case. In June, the OIG recommended that the Board cease asserting the attorney privileges against the OIG and that Eaton's representation of the Board in the OIG investigation cease.

The OIG is pleased to report that the Board promptly acted on both of those recommendations. The Board removed Eaton's firm in July 2017. The Board members then hired McDermott Will & Emery to work out a limited waiver of the attorney-privilege issues. Once the limited waiver was executed on September 5, 2017, the OIG's investigation was able to be finished in a relatively timely and straightforward fashion.

The key information relating to the misconduct of the top executive and his chief legal officer were hidden behind the veil of attorney-client privilege and only saw sunlight once that veil was lifted. The critical information that makes this a

**Appendix A**

Final Executive Memo
OIG 16-00924
Subject: Ethics Violation by General Counsel and Subsequent Cover-Up

separation case for Claypool largely came after the Board ended its privilege assertions. It was only then that the OIG was able to talk to Rocks and Franczek and get their billing records — and then question Claypool and Marmer about them. Accordingly, this case should be understood by everyone as a textbook civics lesson on why OIG access to documents cannot be blocked on the grounds of attorney-privilege assertions.

Thus, the Board's decision to lift its objections to OIG access to attorney-client and work-product material represents a major step forward by the Board for the proposition that the OIG's oversight work is necessary and vital to the proper functioning of the school district. In fact, the OIG considers the successful resolution to the question of access to attorney-client and work-product privileged material in this case to be so significant that it should serve as a model of cooperation on this issue, not only for the Board and its OIG but also for other local governmental bodies and their OIGs. Of course, this OIG is also grateful for the limited waiver because it avoided the great expenditure of time and money that would have resulted if the OIG had to pursue the access-to-information question in court.

The sole points of caution are that the limited waiver worked out between the Board and the OIG is not binding on future investigations and, even if that tool is used again, it might prove to be inadequate in a future case.

There is some danger that such access will not always be granted in future investigations. Indeed, the OIG is somewhat concerned that the Board only entered into the limited waiver in this case because the OIG was able to advance it sufficiently — so as to illustrate the obvious public perception problems posed by the privilege assertions — before the obstruction stopped the case from advancing further. Thus, the OIG fears that similar access might not be granted if the case for OIG access to attorney-client-privileged material is not as straightforward (and convincing) at the start of a future investigation as it was at the opening stages of this one, which the OIG detailed to the Board in its June 2016 Interim Summary Report.

In addition, the OIG can envision a situation in the future in which potentially privileged material must be collected quietly or risk jeopardizing the entire investigation. That was not the case here, but it is something to keep in mind, with an eye toward hammering out an arrangement between the Board and the OIG that would ensure proper access to information when confidential collection of information is essential to investigations.

**Appendix A**

Final Executive Memo
OIG 16-00924
Subject: Ethics Violation by General Counsel and Subsequent Cover-Up

The OIG's concerns about future cases notwithstanding, the OIG is pleased with the cooperation it ultimately received from the Board and its current counsel in this case.

\* \* \*

In addition to the above material, the accompanying Final Summary Report details the evidence in this case and contains the OIG's analysis.

As always, if you have any questions, please feel free to contact me at (773) 534-REDACTED.

**Appendix B**

Office of
**Inspector General**
Chicago Board of Education
Nicholas Schuler, Inspector General

---

### SIGNIFICANT ACTIVITY REPORT

---

**WEDNESDAY, FEBRUARY 21, 2018**

### OPTIONS FOR KNOWLEDGE 2016–17 SY ELEMENTARY ADMISSIONS

**OVERVIEW**

At the OIG's request, the CPS Office of Access and Enrollment conducted the largest audit of CPS elementary school admissions in at least a decade, covering more than 18,200 enrollments at more than 420 schools last school year.

The audit examined the admissions of virtually every K–8 student who enrolled at a traditional[1] CPS school that did not constitute that student's neighborhood — or zoned — school. In other words, OAE audited all elementary-grade admissions that went through, or should have gone through, OAE's Options for Knowledge admissions process for the 2016–17 school year. This included admissions to selective-enrollment, magnet and open-enrollment seats.

Some background: In Chicago, every street address matches up to a corresponding CPS neighborhood elementary and high school. That means, in most cases, children are entitled to seats in their neighborhood schools without filling out applications.

But "for any other school in the Chicago Public Schools system, you . . . have to submit an application if you want your child to be considered for enrollment," parents are advised in the Options for Knowledge Guide. Such applications are supposed to go through OAE's Options for Knowledge admissions process.

CPS established uniform procedures for winning Options for Knowledge seats to ensure that all applicants would have a level playing field of access to them, or "equal access and equity," as the 2016–17 Options Guide phrases it.

---

[1] For purposes of this report, "traditional" CPS schools exclude charter and most contract schools but include those operated by the Academy for Urban School Leadership. The audit also excluded special education and homeless admissions, as well as students transferred for their own safety.

---

567 West Lake Street ✦ Suite 1120 ✦ Chicago, Illinois ✦ 60661-1405
Phone (773) 534-9400 ✦ Fax (773) 534-9401 ✦ inspectorgeneral@cpsoig.org

**Appendix B**

However, an OIG performance review of Options for Knowledge enrollments found that thousands of K–8 admissions[2] to non-zoned schools last school year were anything but uniform.

Of more than 18,200 elementary-grade admissions audited, nearly 6,900 failed the OAE audit, an analysis of audit data by the OIG's Performance Analysis Unit found. In other words, 38 percent of admissions did not pass the audit, or nearly two in five.

Generally, audit failures reflected students who were admitted to schools other than their neighborhood ones without going through OAE, as required. A handful of other audit failures reflected students who applied through OAE but were improperly leapfrogged over other applicants on OAE waitlists, OAE data indicated.

The OIG found that admissions audit failures permeated the elementary school system. Of 421 schools audited, 93 percent had at least one audit failure. Nearly half had at least 15.

The OIG divided audited schools into four general elementary-grade categories: neighborhood, citywide non-magnet, magnet and selective-enrollment.

Among those categories, selective-enrollment seats held only one 2016–17 SY admission that failed the audit — perhaps because such seats have been among the most heavily monitored.

At the other end of the spectrum, neighborhood schools produced the most audit failures. They also contained the most *admissions* audited, at more than 11,800 of the total roughly 18,200, as well as the most *schools* audited, at 359 of the total 421. Significantly, neighborhood schools had the highest audit admissions failure rate, of 52 percent.

So, more than half of the students who enrolled in neighborhood schools outside their own neighborhoods last school year improperly bypassed OAE to get there, OAE audit data showed. This is indicated in the **Illustration** on the next page.

Such students, in effect, circumvented OAE via a variety of side-door admissions practices.

These practices included intentional improper efforts to select certain students and bypass OAE, as well as unintentional improper admissions that skirted OAE due to a principal's or staff member's lack of knowledge or understanding of admissions

---

[2] The OAE audit included 207 admissions to the system's four magnet pre-kindergarten programs — at Drummond, Inter-American, Mayer and Suder. All 207 admissions passed the audit and were included in the OIG's "passing" count.

# Appendix B



Source: OIG analysis of OAE audit of 2016-17 SY elementary Options for Knowledge admissions.

rules and procedures. (Note that many principals interviewed by the OIG demonstrated little knowledge of CPS admissions rules.) In some cases, improper admissions amounted to clerical or documentation errors.

In total, 90 percent of all audit failures involved admissions to neighborhood schools.

Thus, any effort to address the pervasive admissions issues identified in this report must pay special attention to neighborhood schools.

The district is in the process of converting the Options for Knowledge application process into a new online system, called GoCPS, which is expected to make offers to online applicants in waitlist order. This should reduce waitlist queue-jumping.

However, the OAE audit only identified six of 6,870 audit failures as involving applicants on waitlists. The vast majority of audit failures were not on the OAE waitlists of students' chosen schools, according to OAE audit data provided to the OIG. Instead, most audit failures involved students who applied directly to schools, rather than filling out required OAE applications to those schools.

The new GoCPS system will not automatically block schools from improperly enrolling out-of-boundary students who show up at their doors without going through OAE, one OAE official said. So as of this writing, principals or school staff members who don't know better, or who actually want to circumvent the rules, probably will be able to sidestep OAE under GoCPS. As a result, without new

**Appendix B**

measures and stepped-up training, improper admissions under GoCPS probably will continue.

OAE's audit was the largest such audit in at least a decade, and perhaps in OAE's history. That's because it included admissions to the hundreds of neighborhood schools that one former OAE official said had probably never been audited en masse for Options for Knowledge compliance. This lack of past scrutiny may partially explain the disproportionate number of audit failures in neighborhood schools.

In addition to analyzing audit data, the OIG interviewed principals of 30 schools with more than 500 combined audit failures, and reviewed policies and other documents about the Options for Knowledge and GoCPS admissions processes.

The OIG found a widespread pattern of inconsistent and improper admissions practices that undermine the "equal access" goals of the Options program and OAE. These irregularities, combined with three policy loopholes identified by the OIG, leave the system vulnerable to fraud and undue influence.

During the OIG's review, OAE plugged one of these loopholes amid questions from the OIG about it, but as of this writing, two others still exist. One loophole involves the lack of policy specifics on the rules for admitting students after a school's OAE waitlist has expired — a period of time highly susceptible to misconduct that relies on schools sending OAE inefficient paper application forms by fax or email. The other loophole involves the absence of one category of schools — citywide non-magnets — from CPS Options for Knowledge policies, a situation that leaves such schools in an enforcement gray zone.

As a result of its performance review, the OIG is recommending, among other things: intensive admissions training, especially for principals of neighborhood schools; the closure of policy loopholes; clearer and more accessible rules for principals; the creation of additional auditable data, especially at the vulnerable period after OAE waitlists are exhausted; enhanced penalties for those that violate admissions rules and increased transparency to parents.

During the course of this review, one OAE official indicated that more admissions training is planned as part of the GoCPS rollout. This official also was supportive of folding admissions training into annual Principal Law Conferences, as several principals suggested to the OIG. This official suspected that most audit failures were due to "people who just didn't know" the rules because there have been "many misconceptions over the years" about admissions procedures.

The OIG's complete findings and recommendations are attached to this report as **Appendix A.**

**Appendix B**

This information should help officials design OAE training on the new GoCPS process, as well as guide CPS in the development of its GoCPS software and upcoming Aspen Student Information System. In addition, CEO Janice Jackson has told the OIG that a corrective action plan is being developed in response to this report.

### CHERRY-PICKING AND WEEDING PRACTICES

To spot-check the OAE audit, the OIG's Performance Analysis Unit interviewed the principals of 30 schools, including 27 with at least one audit failure each.

A cross section of schools with neighborhood, magnet, citywide non-magnet and selective-enrollment seats were interviewed. During these interviews, the OIG checked on more than 500 admissions that failed the audit. This sample reflects seven percent of both all schools audited and all audit failures.

More than half of the 30 principals (16 of 30) described using what amounted to their own systems for choosing students. Nearly half (14 of 30) functioned as if they had "principal discretion," something disallowed on the elementary level since 2010 (*See* Board Report 09-1216-PO3). Principals were reminded of this in a 2016 letter emailed to principals by Access and Enrollment Executive Director Tony Howard and provided in part below:

---

October 5, 2016

Dear Principal:

As you are aware, the 2017-2018 Options for Knowledge application season started on October 3rd and ends on December 9th. Please note the following important information regarding this year's application process:

1. In order for you to accept students from outside of your attendance area for the 2017-2018 school year, your school must be listed in the Options for Knowledge Guide as a school with space available. If you have opted out of the Options Guide by indicating to our office that your school is overcrowded, you cannot accept students who reside outside of your school's attendance boundary.

 There is no principal discretion at the elementary level. Any out-of-attendance-area student who is accepted to your school must be accepted through the process managed by the Office of Access and Enrollment (OAE).

---

Some schools were improperly "cherry-picking" favored prospective students, while others were weeding out less appealing students, the OIG found.

Some non-selective schools used test scores, grades and attendance to vet students — all improper practices, according to the Options for Knowledge Guide, which

**Appendix B**

specifically bars the use of "testing or other academic criteria, interviewing or screening of any kind."

Many schools bypassed OAE to give preference to the children of CPS employees, the siblings of existing students, multiple sibling applicants, or out-of-boundary pre-kindergarten students who were improperly promoted to kindergarten without going through OAE.

At one neighborhood school that had been dropped from the Options for Knowledge program by OAE due to potential overcrowding, the recently-elected principal admitted her four children, her niece and nephew (who were also the children of a staff member), a teacher's child and a custodian's two children — even though they all lived outside the school's attendance boundary. OAE had no record of any applications for these students, as required.

One principal of a neighborhood school checked out a potential out-of-boundary student who was not on the OAE waitlist by asking another parent if the prospective student was from a "Good family?" The principal even met with the family before offering the student a place at the school.

One principal of the handful of neighborhood schools with tuition-based pre-K[3] described an unwritten agreement with former CEO Barbara Byrd-Bennett that supposedly allowed the school to admit out-of-boundary tuition-paying pre-K students to kindergarten. Board authorization is required for such a variance from Board policy. (*See* 10-0623-PO1, in effect at the time.) Explained one former OAE official: "You don't want to let people buy their way into a good elementary school."

Other schools specifically weeded out kids with histories of poor attendance — an issue that could hurt their School Quality Rating Policy scores.

One principal will not take students with poor attendance once the school year begins because such a record reflects "a parent issue." Another asks for "credentials" such as test scores and report cards. Yet another will "investigate" non-zoned students because they can be "running from something."

Some principals defended their screening practices by saying that students who aren't automatically entitled to go to their schools should face closer scrutiny. One neighborhood principal requires that out-of-boundary students make a persuasive case for admission. "The burden of proof is on them,'' the principal explained.

---

[3] For the current 2017–18 school year, tuition-based pre-K costs $13,974 a year. The families of kindergarteners admitted in 2016–17 would have paid $12,220 and $12,767 in the two school years prior to that, respectively, for a two-year pre-K program.

**Appendix B**

**PERVASIVE PROBLEM**

Improper admissions were widespread, spanning many different kinds of schools.

That included magnet as well as neighborhood schools; overcrowded[4] as well as underutilized schools. As mentioned, only one 2016–17 selective-enrollment elementary admission failed the audit.[5]

Much attention has been paid to various schemes used to admit students to CPS's selective-enrollment high schools. However, competition for seats in the system's elementary schools also can be fierce. This is indicated in **Appendix B**, which lists the number of selective-enrollment, magnet and open-enrollment applicants per seat by elementary grade and school for the 2016–17 SY and is hosted on the OIG website.

The OIG's review found that some of the most sought-after elementary schools for open-enrollment seats held improperly admitted students. For example, 69 students improperly bypassed OAE to enter eight of the system's most competitive open-enrollment kindergartens last school year. Meanwhile, more than 1,700 other children who applied through the Options program were left sitting on waitlists.

Even schools headed by prized Independent School Principals held audit failures. So did every SQRP level of school — highly ranked as well as poorly ranked.

Schools in and out of the Options Guide had audit failures.

Some schools opted out of the Guide — a move that OAE officials said made them ineligible to take outsiders — and then appeared to run their own side-door admissions processes without informing OAE. Others stayed in the Guide, told OAE they had no spare seats and then admitted students who were not zoned to them. Yet other schools took OAE waitlist kids as well as others they improperly admitted without going through OAE.

The OIG calculated that 93 percent of schools audited contained at least one improperly enrolled student last school year, as indicated in **Table 1.**

Nearly two-thirds of audited schools held at least 10 improperly admitted students. Close to half had at least 15.

---

[4] "Overcrowded" refers to schools with fall 2015 adjusted utilization rates, including leased and modular classrooms, of more than 120%, which was the metric at the time of these admissions. "Underutilized" schools used less than 80% of their space. Only 4% of elementary schools audited were overcrowded, 53% were underutilized and 42% were efficient, according to the adjusted utilization rate in effect at the time.

[5] OAE also identified 34 other students who were sitting in selective enrollment K–8 seats in 2016-17 but had been improperly admitted to them years earlier.

**Appendix B**

**Table 1**

**Audit Failures\* by Frequency**

| Audit Status | Elementary Schools | Pct of All Schools Audited |
|---|---|---|
| No Audit Failures | 29 | 7% |
| Schools with at Least 1 Audit Failure | 392 | 93% |
| Schools with at Least 2 Audit Failures | 384 | 91% |
| Schools with at Least 3 Audit Failures | 366 | 87% |
| Schools with at Least 4 Audit Failures | 348 | 83% |
| Schools with at Least 5 Audit Failures | 330 | 78% |
| Schools with at Least 10 Audit Failures | 264 | 63% |
| Schools with at Least 15 Audit Failures | 201 | 48% |
| Schools with at Least 20 Audit Failures | 145 | 34% |
| Schools with at Least 25 Audit Failures | 105 | 25% |
| Schools with at Least 30 Audit Failures | 68 | 16% |
| **Total Schools Audited** | **421** | **100%** |

\*In the vast majority of cases, audit failures reflect non-zoned students who improperly bypassed OAE.

Source: OIG analysis of Office of Access and Enrollment elementary school audit of SY 2016–17 admissions.

This constitutes a pervasive problem.

During the OIG's spot check of more than 500 audit failures at 27 schools, the OIG discovered that some audit failures may have been appropriate admissions. The majority of these cases reflected clerical errors in updating out-of-boundary addresses to in-boundary locations. In total, 18 percent of admissions identified by OAE as improper in the 27 spot-check schools may have been appropriate but not documented correctly, the OIG estimated.

However, it also is likely that the OAE audit failed to detect some improperly admitted students. For example, a spreadsheet version of one school's waitlist contained several students whose admissions passed the audit even though a clerk's notes indicated they were accepted out of order. The OIG also questions how two kindergarten applicants with waitlist numbers of 232 and 437 passed the audit at two extremely competitive neighborhood schools, even though both schools only accepted a handful of kindergarten applicants from their OAE waitlists.

Therefore, although numbers cited in this report are based on the OAE audit, such numbers should be considered estimates.

**Appendix B**

Please note that even if 18 percent of all "failed" admissions were adjusted to "passing" to reflect the OIG spot check, the overall admissions audit failure rate would be 31 percent instead of the 38 percent unadjusted rate. Even this lower, adjusted percent would mean that close to one in three elementary-grade admissions to non-zoned schools were improper last school year.

Even this lower, adjusted percentage reflects a pervasive problem.

**THE NEIGHBORHOOD PHENOMENON**

Neighborhood schools had by far the most audit failures among the four OIG-created categories. They held 90 percent of all audit failures, as shown in **Table 2.**

Neighborhood schools also contained the overwhelming majority of improper (6,169) as well as proper (5,650) non-neighborhood admissions.

Perhaps more importantly, neighborhood schools had the worst audit-failure rates among the various categories of schools examined.

More than half (52 percent) of students admitted to neighborhood schools outside their own neighborhoods improperly skirted Options admissions rules.

**Table 2**

**Audit Failures* by Program Category**

| Program Category | Schools | Admissions That Failed Audit | Admissions That Passed Audit | Total Admissions Audited | Pct of Admissions in Category That Failed Audit | Pct of All Failed Admissions |
|---|---|---|---|---|---|---|
| **All Programs** | 434 | 6,870 | 11,337 | 18,207 | 38% | 100% |
| Neighborhood | 359 | 6,169 | 5,650 | 11,819 | 52% | 90% |
| Citywide Non-Magnet | 10 | 374 | 404 | 778 | 48% | 5% |
| Magnet** | 38 | 326 | 3,555 | 3,881 | 8% | 5% |
| Selective Enrollment | 27 | 1 | 1,728 | 1,729 | 0% | 0% |

*In the vast majority of cases, audit failures reflect non-zoned students who improperly bypassed OAE.

**Includes eight magnet schools with attendance boundaries.

Note: 13 schools with two programs were counted twice.

Source: OIG analysis of Office of Access and Enrollment elementary school audit of SY 2016–17 admissions.

**Appendix B**

Virtually all (98.88%) neighborhood schools had at least one audit failure, the OIG also calculated.

In fact, if all students admitted to schools other than their zoned schools in the 2016–17 SY had gone through the OAE Options program properly, as required, nearly two-thirds of all Options admissions would have been to neighborhood schools.

Clearly, thousands of parents are choosing neighborhood elementary schools — just not their assigned ones. However, according to the OAE audit, in more than half of such cases, these admissions improperly bypassed OAE.

### SCATTERED RULES

During spot-check interviews, many principals said it's not unusual for them to be personally lobbied by parents to admit students, including after Options for Knowledge deadlines had passed. Such lobbying makes it critical that principals understand legitimate versus illegitimate admissions practices.

Yet many principals told the OIG that they did not know the admissions rules for out-of-boundary students and had never been formally trained on them. Some didn't even know where to find such rules. In some respects that is understandable because the rules are scattered across several locations.

In general, the basic admissions rules for traditional CPS schools that accept elementary-grade students who are not zoned to them are as follows:

1. An OAE application is required for students applying to schools other than their neighborhood schools. Selective-enrollment seats are awarded by OAE based on test scores and other factors. Magnet and open-enrollment seats are supposed to be filled in lottery waitlist order. Once OAE waitlists are exhausted, schools award any remaining seats by accepting applicants on a first-come, first-served basis. Such applicants fill out paper post-lottery forms, called "post-application process forms," that must be approved by OAE before schools can enroll these students.

2. Schools with open seats must be listed in the Options for Knowledge Guide; if they are not in the Guide, they cannot accept outside students.

3. Principals do not have discretion in the selection of elementary-grade students. At non-selective schools, the use of screening, interviewing, testing or academic criteria is prohibited.

4. Except in the four CPS schools with magnet pre-K programs, non-zoned pre-K students cannot automatically matriculate to kindergarten. If they

**Appendix B**

want to stay in a non-zoned school they must apply to its kindergarten through OAE.

The most detail on the above rules is contained in a CPS PowerPoint used during annual OAE Options for Knowledge admissions seminars. However, that training is largely attended by clerks; some principals had never heard of it.

Otherwise, the rules are spread across several locations, including two Board policies (the CPS enrollment policy, 17-0426-PO1, and the Options for Knowledge admissions policy, 17-0426-PO2) as well as the Options for Knowledge Guide. The two Board policies provide limited specifics and often refer readers to the Options Guide, which bills itself as an informational "tool" for parents rather than a procedural manual for schools. However, the Guide is so poorly organized and lengthy (61 pages in SY 2016–17 and 151 pages in the 2018–19 version) that a principal in search of an answer could easily miss it.

### THREE LOOPHOLES

The OIG's analysis of numerous relevant CPS policies, rules, guidelines and online reference materials detected at least three loopholes in current admissions policies:

1. Non-magnet elementary schools with citywide boundaries (11 total) are not covered in the two relevant CPS policies concerning CPS enrollment and Options for Knowledge admissions. They also are not specifically mentioned in either the 2016–17 Options Guide covering the year audited or the current GoCPS Elementary and High School Guide for 2018–19. Citywide non-magnet schools had the second-worst admissions audit failure rate, of 48 percent. They should be covered in CPS admissions policies so rules can be enforced against them.

2. Little explicit policy detail is offered on how schools should proceed after OAE-issued waitlists are exhausted. Exacerbating this problem is the inefficient paper post-lottery form that OAE requires schools to email or fax to OAE at this critical time period, when the OIG believes many audit failures occurred. CPS plans to continue using paper forms, which cannot be easily audited systemwide, even under GoCPS, one OAE official told the OIG. Admissions information during this vulnerable time period needs to be easily audited systemwide by the OIG and the CPS Audit Department.

3. No clear policy language seems to cover admissions rules at 70 analyzed schools that OAE said had opted out of the SY 2016–17 Options Guide, only to produce 1,032 audit failures.

OAE took steps to address this third loophole during the course of the OIG review. Amid OIG questions, one OAE official said OAE realized it was a "flaw on our part" not to have more closely monitored those schools that opted out of the Options

**Appendix B**

Guide. As a result, as part of the conversion of the Options application process into the new online GoCPS system, almost all CPS elementary schools that were omitted from the Options Guide are participating in GoCPS for 2018–19 SY admissions and should be subject to OAE rules.

This change is a positive step forward. However, 392 schools had at least one audit failure, so folding the 70 that opted out of the Guide into GoCPS does not address the audit failures at the 322 other schools.

In addition, the OIG believes the two other identified loopholes exist as of this writing. They leave CPS vulnerable to misconduct and undue influence, or at a minimum to the existence of a jumble of inconsistent practices. Plus, policies with loopholes are difficult to enforce.

Some deviations from CPS rules were portrayed by principals as actions taken in the best interest of their schools, in some cases amid pressure to perform well in SQRP ratings. However, inconsistent practices — including well-intended ones — can turn off parents and make them suspect that they are not being afforded the "equal access" that the Options Guide and GoCPS promise.

As CPS experiences its seventh straight year of declining enrollment, it is critical that prospective parents feel they are being treated fairly in the gateway elementary grades covered by the audit. Otherwise, they could give up on the system entirely.

**SPECIAL NOTE**

The OIG is grateful to OAE's data team for their diligence in performing such a large-scale audit and for their professionalism in answering the OIG's many questions.

**RECOMMENDATIONS**

As a result of its performance review, the OIG is recommending that CPS take the following ten actions which are explained in further detail in **Appendix A:**

1. Conduct thorough training of principals, assistant principals, enrollment clerks and network chiefs on elementary-grade Options for Knowledge admissions rules, paying particular attention to neighborhood school staff.

2. Ensure Options/GoCPS admissions rules are clear, consistent and accessible. The OIG recommends that key rules be reduced to a concise, one-page document and that principals, assistant principals and enrollment clerks be required to sign it at the beginning of their tenures in their school buildings.

3. To close a loophole, provide clear admissions rules on how to appropriately enroll students after OAE-issued waitlists are exhausted. The OIG is

**Appendix B**

especially concerned about vulnerabilities during this period that could well be exacerbated by the use of inefficient paper post-lottery forms that schools are required to email or fax to OAE.

4.  To close another loophole, include citywide non-magnet schools in admissions policies.

5.  Revisit the boundaries, admissions practices and online profiles of the system's 11 citywide non-magnet elementary schools to ensure they comply with the Board reports that established such schools.

6.  Wherever possible, admissions information in GoCPS and the upcoming Aspen Student Information System should be easily auditable systemwide, not just on a school-by-school basis, by OAE as well as the OIG and the CPS Audit Department. Systemwide auditable information for both online and paper applicants should include: when and how offers were made and accepted, when waitlists are exhausted, and when post-lottery application forms were sent to and approved by OAE.

7.  Perform regular audits, as often as annually, of out-of-boundary elementary admissions, including to neighborhood schools, and create new penalties for violators, including reducing a school's SQRP rating or stripping Independent School Principals with repeat violations of their ISP status.

8.  Consider expanding sibling preferences as much as possible without contributing to overcrowding.

9.  Use consistent language in Board policies and GoCPS materials, which currently have inconsistent references to the "Options for Knowledge" program and guide.

10. Provide parents more transparency about Options and GoCPS procedures, especially concerning the availability of seats by grade and the use of post-lottery application forms after OAE waitlists are exhausted.

**Appendix C**

Office of
**Inspector General**
Chicago Board of Education
Nicholas Schuler, Inspector General

---

### SIGNIFICANT ACTIVITY REPORT

---

OIG 17-00326                                    WEDNESDAY, MAY 23, 2018

#### CPS URGED TO END MONTESSORI PRE-K PERK AT LINCOLN PARK'S OSCAR MAYER

Children living in the most affluent attendance area in CPS are receiving special priority access to two years of free, full-day Montessori pre-kindergarten, worth $30,000 on average in the private market, a performance review by the Office of the CPS Inspector General has found.

CPS usually awards free pre-K based on an applicant's need. Only children residing within the boundary of Oscar Mayer Magnet, at 2250 N. Clifton in Lincoln Park, are given a unique preference in accessing free Montessori pre-K based solely on their attendance area, the OIG's Performance Analysis Unit has determined.

This is a result of CPS's 2008 decision to allow Mayer to keep its attendance boundary when Mayer converted to a magnet school with new Montessori and International Baccalaureate programming. Currently, siblings and attendance area three-year-olds get first dibs on Mayer's free pre-K. In the last five school years, they have left room for a total of only four non-neighborhood three-year-olds.

Mayer's attendance boundary contains the highest average median family income by census tract of any attendance area in CPS, an OIG analysis found. In addition, the entire attendance area is considered "Tier 4" — the most affluent of the four socioeconomic tiers used during most magnet entry-level selection processes to promote socioeconomic diversity.

The OIG found it unjustifiable that residents of the wealthiest attendance area in CPS should receive a unique priority access to free CPS pre-K, let alone to two years of free, full-day Montessori pre-K.

In a report issued to CPS officials and School Board members on April 17, the OIG recommended that CPS stop funding this perk as soon as possible and organize input from the Mayer community on other options for the school. The OIG's reasoning and detailed recommendations follow.

---

567 West Lake Street ◆ Suite 1120 ◆ Chicago, Illinois ◆ 60661-1405
Phone (773) 534-9400 ◆ Fax (773) 534-9401 ◆ inspectorgeneral@cpsoig.org

**Appendix C**

**AN EXCLUSIVE PERK FOR CPS'S MOST AFFLUENT ATTENDANCE AREA**

The Chicago School Board approved Oscar Mayer's conversion from a neighborhood school to a magnet school with an attendance boundary in 2008.

With help from a federal magnet grant, CPS stocked the school with a Montessori program in pre-K to 5th grade and a Middle Years International Baccalaureate Programme in grades 6 to 8 in an attempt to boost enrollment and attract greater white buy-in from the surrounding area, CPS's magnet grant application indicates.

However, Mayer's status as a magnet school with an attendance boundary[1] currently gives free Montessori pre-K admissions preference to an attendance area comprised entirely of the most affluent socioeconomic tier in CPS — Tier 4.

Significantly, as shown in **Table 1**, Mayer's boundary also contains the highest average median family income by census tract of any attendance area in CPS, the OIG's Performance Analysis Unit found.

**Table 1**

**Top 10 Attendance Areas by Income**

| Rank | School | Average Median Family Income* |
|------|--------|------------------------------|
| 1 | Mayer | $177,947.25 |
| 2 | Burr | $173,324.33 |
| 3 | Agassiz | $172,254.33 |
| 4 | Prescott | $169,824.00 |
| 5 | Burley | $160,113.75 |
| 6 | Lincoln | $156,671.29 |
| 7 | Hamilton | $147,532.50 |
| 8 | Kellogg | $145,604.00 |
| 9 | Ogden | $144,556.00 |
| 10 | Blaine | $138,322.00 |

*Reflects the average of the median family incomes of census tracts whose center lies within a school's attendance boundary.

Source: OIG analysis of CPS census tract income data used to create tier levels for 2017-18 admissions.

Montessori pre-K is a highly-coveted commodity to many parents. A decade ago, when some residents were told CPS was planning free Montessori pre-K at Mayer, their reaction was "Wow," one former CPS official said.

Although CPS's magnet grant application envisioned the school as a citywide magnet, vocal area residents fearful of losing a citywide magnet lottery convinced CPS officials to let Mayer keep its boundary, the OIG was told. CPS officials agreed, apparently believing at the time that Mayer had more than enough empty seats to accommodate both neighborhood students as well as non-attendance area ones via lottery.

The free, full-day Montessori pre-K that Mayer students now enjoy averages more

---

[1] Only eight of 38 CPS elementary magnet schools, including Mayer, have attendance boundaries.

# Appendix C

than $30,000 over two years in the private market, an OIG survey of nine Montessori pre-Ks within three miles of Mayer found. That's excluding additional fees that at one private school ran as high as $2,850 for a family's first enrollee.

This school year, the salaries and benefits alone of the teachers and teacher assistants in Mayer's pre-K program for three- and four-year-olds cost CPS just over $700,000, the OIG calculated.

Taxpayers are footing this bill for some children who later go on to leave CPS. Of the 68 three-year-olds who joined Mayer's pre-K in 2014-15, nearly a third had left CPS by this school year, when they should have been in first grade. Some went on to pricey private schools or some Catholic schools in the area. Others left for suburban Northfield, Washington, D.C., and even the United Kingdom, student records show.

According to Early Childhood officials, only three other CPS schools provide free pre-K that is not need-based: Drummond and Suder Magnets, which offer two years of free Montessori pre-K, and Inter-American Magnet, which features one year of dual-language pre-K. All three are citywide magnets that use four socioeconomic tiers to select entry-level pre-K students who are guaranteed seats through eighth grade. This process gives applicants across the city a level playing field of access to these free programs.

This is not the case at Oscar Mayer Magnet.

Instead, because Mayer's attendance-area three-year-olds enjoy an admissions preference, it has become increasingly rare for children who live outside Mayer's attendance area to win pre-K seats. This past fall, all of Mayer's seats for three-year-olds were filled by neighborhood children or siblings of existing students.

In fact, in the last five school years, only four three-year-olds living outside Mayer's boundary with no siblings at the school have been admitted to Mayer's pre-K from socioeconomic status (SES) tier waitlist, as indicated in **Appendix A.**

There clearly is outsider demand for Mayer's free Montessori pre-K. This school year alone, 686 three-year-olds from outside Mayer's attendance boundary were sitting on socioeconomic tier waitlists, unable to gain entry to Mayer, as indicated in **Appendix B**.

Thus, Tier 4 parents in the CPS attendance area with the system's highest average median family income are receiving a unique admissions priority to free pre-K, worth at least $30,000 over two years in the private market.

Meanwhile, hundreds of parents residing outside Mayer's boundary who would like their children to attend Mayer's free Montessori pre-K are battling an annual

**Appendix C**

admissions process that is stacked against them in a way not encountered by applicants to Suder's or Drummond's free citywide Montessori magnet pre-K.

**DEMOGRAPHIC CHANGES**

Mayer's conversion to a magnet school with an attendance boundary was intended to attract white students to a school that was underutilized and heavily attended by African American students from outside the neighborhood, according to CPS's successful 2007 federal magnet grant application and other records.

A top goal of CPS's grant application involving Mayer and four other proposed magnet schools was to "eliminate, reduce or prevent minority group isolation" and to "attract non-minority students into neighborhoods and schools that traditionally they have been reluctant to enter."

At the time, Mayer had a capacity of 948 but held only 525 students — 89.5 percent of whom were minority, the application stated.

By the end of the three-year grant, as predicted, Mayer was more evenly diverse, due largely to white student increases and black student decreases. However, CPS's grant application envisioned that Mayer's white student body would increase six percentage points over the life of the grant. Instead, as shown in **Appendix C**, it jumped 23 percentage points — nearly four times more than predicted.

Longer haul, over 10 years, Mayer's racial composition has changed even more dramatically — from 16 percent white to 71 percent white and from 52 percent black to 8 percent black. **Chart 1** shows this by the number of students per race.

### Chart 1



**Appendix C**

Also over the last decade, the number of in-boundary white students soared more than 1,700 percent, as shown in **Appendix D**. At the same time, Mayer's enrollment rose from 497 to 760 this school year. Its utilization status is now "efficient."

A few years after CPS filed its 2007 magnet grant application, a judge vacated CPS's desegregation consent decree and CPS switched from a race-based to a socioeconomic-based magnet admissions process. Diversity in socioeconomic status became a goal of the magnet admission policy, along with maintaining, "to the extent permitted by law," the diversity achieved under the consent decree.

Since then, Mayer's students have increasingly come from the most affluent of four socioeconomic tiers — Tier 4. The earliest tier data available indicates that since 2011, the percent of 3-year-olds attending Mayer from Tier 4 has risen from 74 percent to 98 percent this school year. This is detailed in **Table 2** below.

**Table 2**

**Mayer Three-Year-Old Students by Socioeconomic Tier to Date**

| SY | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Total | % Tier 4 |
|---|---|---|---|---|---|---|
| 2011-12 | 5 | 10 | 3 | **51** | 69 | *74%* |
| 2012-13 | 0 | 2 | 3 | **48** | 53 | *91%* |
| 2013-14 | 1 | 1 | 6 | **47** | 55 | *85%* |
| 2014-15 | 1 | 2 | 0 | **65** | 68 | *96%* |
| 2015-16 | 3 | 1 | 5 | **62** | 71 | *87%* |
| 2016-17 | 1 | 3 | 4 | **50** | 58 | *86%* |
| 2017-18 | 0 | 0 | 1 | **63** | 64 | *98%* |
| **# Change from 2011-12** | **-5** | **-10** | **-2** | **+12** | | **+24%** |
| **% Change from 2011-12** | ***-100%*** | ***-100%*** | ***-67%*** | ***+24%*** | | |

Source: CPS Department of Planning and Data Management

Mayer's current schoolwide composition of 85 percent Tier 4 students should rise even more after the current eighth graders — the sole pre-magnet class in the building — graduate. This year's eighth-grade class holds the smallest percent of Tier 4 students and the most African Americans of any grade in the building.

Thus, without any Board action, Mayer's socioeconomic and racial diversity will almost certainly continue to move in exactly the opposite direction from that promoted in CPS's magnet admissions policy, even though Mayer is a "magnet" school and receives funding for extra positions as such. This school year alone,

**Appendix C**

Mayer's Montessori and IB positions across all grades totaled $1.8 million, or $2,480 per pupil.

**A PROPHETIC CONCERN**

The March 2008 Board Report that changed Mayer's designation to a magnet school with a boundary contained a special caveat as "a compromise" to the fact that Mayer was not becoming a citywide magnet, a former CPS official told the OIG. This caveat required that an annual demographic assessment be done to determine if Mayer should stay a magnet school with a boundary or instead become a citywide magnet.

However, during that 2008 Board meeting, then-CPS Board President Rufus Williams raised repeated questions about CPS's plans for the school.

A Lincoln Park resident at the time, Williams knew that a large number of African-American students from outside Mayer's boundary attended Mayer. He predicted that "There may very well be a day when the neighborhood has adopted this school and everyone from the neighborhood is going to this school,'' according to **Attachment A**, which contains relevant portions of that meeting's transcript.

Williams worried that "after we've created this wonderful school,'' black students would no longer have access to it. He proposed setting aside a certain percentage of seats to ensure diversity "into posterity.''

CPS officials assured Williams that Mayer's heavy minority population would keep it diverse for a while. CPS could not predict how quickly the neighborhood would embrace the school, but would monitor it in the meantime, officials said.

Williams wanted attention to Mayer's diversity somehow "encapsulated" in the Board Report so that "eight, 10 years from now, the institutional memory isn't gone." Said Williams: "[W]e may not be here eight years from now. Some of us may change."

As a result, then-CEO Arne Duncan and then-General Counsel Patrick Rocks added specifics to the Board Report about who would be responsible for the demographic report, who would receive it and when it was due. Rocks also inserted a reference to the desegregation consent decree to address Williams' diversity concerns.

By the time the Board approved 08-0326-EX5, the highlighted portions below had been added to it:

**Attendance Boundaries:** Mayer's current attendance boundaries will be maintained. Each year thereafter, a demographic assessment will be conducted to determine whether Oscar Mayer will maintain its designation as a magnet school with attendance boundaries or will be categorized as a magnet school with no attendance boundaries. The Chief Executive Officer or his designee shall submit a written report of this assessment to the Secretary of the Board on or before September 1st of each school year. This report will include an analysis of the school's compliance with the goals in the Second Amended Consent Decree in United States v. Board of Education, 80 C 5124.

**Appendix C**

Despite public promises from the very top and the on-the-spot insertions to the Board Report, in 10 years, no demographic assessment has ever been filed.

The Mayer Board Report was updated in 2010 after the consent decree was vacated, but the special caveat requiring an annual demographic assessment was left intact at that time.

As Williams prophesized, Williams, Duncan and Rocks are no longer with CPS. None of the current and former CPS officials questioned by the OIG knew for sure, or could agree on, who was responsible for filing the annual demographic assessment. The vagueness of the language in the Board Report created an accountability vacuum.

Also as Williams predicted, in the past decade, white neighborhood students have embraced Mayer, with their numbers soaring by more than 1,700 percent, while the number of out-of-boundary as well as in-boundary black students has plummeted. This is indicated in **Appendix D.**

Williams has since told the OIG that he believes the Board Report's language was "purposefully obfuscatory." He said he would be "extremely annoyed" if he were Board President today and learned that an annual report promised by top CPS officials had not been conducted in 10 years.

**RECOMMENDATIONS**

As a result of the OIG's demographic assessment of Oscar Mayer Magnet and other findings, the OIG recommended the following to CPS in an April 17 report:

**Recommendation 1: CPS should stop funding a free, two-year pre-K program at Oscar Mayer that uses an admissions process skewed to favor the children in Mayer's attendance area — the most affluent in CPS.** The more than $700,000 a year in salaries and benefits CPS spends on a Montessori pre-K program that favors children from the wealthiest attendance area in CPS constitutes an unjustifiable expenditure of taxpayer funds given the massive number of needy children in the system and the limited nature of CPS's resources. As a result, the OIG recommends that CPS stop using attendance area preferences to assign free pre-K at Mayer *as soon as possible.* Ideally, if not too disruptive, that means by admissions for SY 2018-19. If the CEO decides to continue Mayer's current admissions practices, she should provide a written explanation of her reasoning to the OIG and the Board, as well as file annual demographic assessments about Mayer, starting this September 1.

**Recommendation 2: CPS, the School Board and the Mayer community should consider other options, including converting Mayer to a *citywide* pre-K to 8 magnet.** Mayer has undergone demographic changes dramatic enough to consider conversion to a citywide magnet, as the 2008 Board Report suggests. Other avenues could include the format at Clissold Elementary, a neighborhood "magnet cluster" school with a K–5 Montessori program and a Grade 6 to 8 IB Middle Years Programme. Additional

**Appendix C**

approaches may be possible but none should give CPS's most affluent attendance area the inside track to two years of free pre-K. For reference, **Appendix E** shows the utilization rates of nearby schools.

**Recommendation 3**: **The CEO should work with the Board Secretary to create a joint process for future Board reports that will record "designees" charged with producing information for the Board and will track the production of such information**. The answer might be as simple as recording "designees" and their required reports on a joint Google calendar. Such a system would help ensure that the CEO and other CPS officials follow through on promises they make to the Board and to the public.

**CPS RESPONSE**

On May 18, the OIG received a written response from CPS indicating the district will conduct a 10-year demographic assessment of Oscar Mayer by no later than August 1, and that such a demographic report will be filed annually, beginning September 1.

"Upon completion of the assessment, a determination will be made regarding the continued funding of the pre-K program," CPS told the OIG. Any changes would be implemented in the 2019-20 school year as it would be "too disruptive" to do so in 2018-19.

In addition, according to CPS, "should the 10-year demographic assessment show a need to consider changes to Oscar Mayer's current attendance boundaries," a community engagement process would be instituted "to consider all viable options." If needed, a "community engagement plan" would be developed by no later than September 1, 2018. It would be implemented from that September through January of 2019. According to CPS, "before dissolving Mayer's attendance boundaries and converting it into a citywide magnet school, all relevant stakeholders, including the Board and Mayer's community, must be provided an opportunity to provide input into the decision." Any proposed recommendations would be made at the February 2019 Board meeting.

Finally, CPS agreed to collaborate with the Board Secretary in creating a formalized process for recording future "designees" charged with producing information for the Board and for tracking their required reports to the Board.

**Appendix D**

Office of
**Inspector General**
Chicago Board of Education
Nicholas Schuler, Inspector General

---

**S I G N I F I C A N T   A C T I V I T Y   R E P O R T**

---

**T U E S D A Y ,  M A Y  2 9 ,  2 0 1 8**

**CONTRACT STEERING BY BARBARA BYRD-BENNETT TO A VENDOR
AND IMPROPER WINING AND DINING OF HER BY THAT VENDOR
AND
A FORMER BOARD MEMBER'S CONFLICTS OF INTEREST
INVOLVING INVESTMENTS IN THE SAME VENDOR AND OTHER CPS VENDORS**

**OVERVIEW**

This report discusses a significant investigation that involved: (1) now-convicted former CPS CEO Barbara Byrd-Bennett's improper dealings with an education-technology company ("Vendor A") — a CPS vendor and sponsor of the SUPES Academy — which involved the receipt of expensive dinners from Vendor A and a procurement process that was competitive in name only; and (2) a former Board of Education member's ("the Former Member") conflicts of interest, which also involved Vendor A, as well as other companies in which the Former Member was invested.

Although those two matters are separate to a significant degree, there was sufficient overlap for the OIG to investigate them together and address both of them in a single report, which the OIG issued to the Board of Education ("the Board") and CPS administration on March 8, 2018.

The investigation began as an examination of the Former Member's financial interests after public concerns were raised that, during the Former Member's tenure on the Board, CPS business increased with companies in which the Former Member held an interest. Shortly thereafter, the OIG learned that a sales executive employed by Vendor A (the "Sales Executive") solicited work from CPS by treating Byrd-Bennett and a top aide (the "Top Aide") to numerous lavish dinners. Amidst the ongoing wining and dining by Vendor A — which began in 2012 and continued until Byrd-Bennett's departure from CPS in 2015 — Byrd-Bennett initiated a

---

567 West Lake Street  ◆  Suite 1120  ◆  Chicago, Illinois  ◆  60661-1405
Phone (773) 534-9400  ◆  Fax (773) 534-9401  ◆  inspectorgeneral@cpsoig.org

**Appendix D**

procurement process designed to award a large district-wide contract to the company. As a result, in February 2014, the Board authorized a contract with Vendor A worth up to $6 million. Vendor A subsequently realized nearly $2 million in sales from CPS purchases made during the term of the contract.

The OIG also discovered that Vendor A also paid SUPES $50,000 over two years pursuant to sponsorship agreements that allowed Vendor A to attend SUPES Academies (SUPES events that were not CPS specific) and gain access to administrators from numerous districts, including CPS. Vendor A and SUPES entered into those agreements following an introduction by Byrd-Bennett and a recommendation by Byrd-Bennett that Vendor A's Sales Executive work with SUPES to gain access to "key decision makers." Furthermore, the timing of the interactions between Vendor A and SUPES were suspiciously close in proximity to the procurement process that led to Vendor A's contract with CPS.

Despite the suspicious circumstances involving SUPES in this matter, the evidence was not sufficient for the OIG to conclude that Vendor A paid SUPES to obtain the CPS work or that SUPES otherwise impacted the dealings between CPS and Vendor A. Nevertheless, the OIG could not completely exclude the possibility that Vendor A paid SUPES in the hopes of getting in Byrd-Bennett's good graces.

Critically, the OIG did not find that the Former Member had any involvement in or knowledge of (1) the wining and dining of Byrd-Bennett and the Top Aide, (2) Byrd-Bennett's steering of the contract to Vendor A, or (3) Vendor A's dealings with SUPES.

However, the OIG found that during the procurement process for Vendor A's contract, the Former Member failed to fully recuse herself from discussions on the matter as required by the CPS Code of Ethics. (CPS Code of Ethics, § VII(A).) The Former Member also violated the Code of Ethics by encouraging CPS to do business with Vendor A and several other companies in which the Former Member was invested. (CPS Code of Ethics § XI(A).)

The OIG's findings are set forth below, followed by a summary of the issues and events and the OIG's recommendations. The report is separated into two main parts with Byrd-Bennett's dealings with Vendor A discussed first, and the Former Member's conflicts of interest discussed second.

**Appendix D**

### FINDINGS WITH RESPECT TO BYRD-BENNETT, THE TOP AIDE AND VENDOR A

1. Vendor A's Sales Executive engaged in an ongoing pattern of treating Barbara Byrd-Bennett, the Top Aide and other CPS staff to expensive dinners while soliciting work. From May 2012 to March 2015, while Vendor A was soliciting and receiving work from CPS, Vendor A paid for 23 dining events involving CPS officials for a total of $8,108. The Sales Executive and Byrd-Bennett coordinated most of those events.

2. The Sales Executive and Vendor A violated CPS's ethical standards and undermined CPS's procurement processes by using expensive dinners to influence Byrd-Bennett and obtain CPS business.

3. Byrd-Bennett and the Top Aide violated the Code of Ethics by accepting numerous expensive dinners from Vendor A while Vendor A was soliciting work from CPS. (*See* CPS Code of Ethics, Board Report 11-0525-PO2, §§ XII(A) and XII(I).) Byrd-Bennett and the Top Aide also failed to disclose those dinners on their Statements of Business and Financial Interests even though such disclosures were required. Vendor A's records and emails did not identify the CPS attendees for 7 of the 23 dining events involving CPS. However, of the 16 meals in which the CPS attendees were identified, Byrd-Bennett attended 14, and the Top Aide attended 10. Many of the meals included several CPS attendees. The pro rata benefit received by Byrd-Bennett at the dinners exceeded $50 in at least 12 instances, and exceeded $100 in at least 6 instances. The pro rata benefit received by the Top Aide at the dinners exceeded $50 in at least 9 instances, and exceeded $100 in at least 5 instances.

4. In October 2013, Byrd-Bennett and the Top Aide subverted the Board's established procurement process by designing an RFP to steer CPS work to Vendor A. (*See* Board Rules § 7-2.) Although Byrd-Bennett initiated an RFP process that purported to satisfy the Board's procurement rules, in fact, the process was competitive in name only because the Top Aide tailored the scope of services in the RFP to ensure that Vendor A would receive the contract.

5. In February 2014, the Board ultimately approved a Board Report authorizing a two-year contract with Vendor A for up to $6 million. Vendor A subsequently realized nearly $2 million in sales from CPS purchase orders issued during the term of the contract.

**Appendix D**

**RECOMMENDATIONS AND BOARD RESPONSE**

Although the OIG normally would recommend that the Board debar Vendor A, it has since been acquired by another education-technology company, and the contract at issue in this investigation has expired. Nevertheless, Vendor A's successor in interest continues to do business with CPS and has benefitted from the access to CPS schools that Vendor A obtained improperly. Accordingly, the OIG recommended that CPS conduct a review to determine whether it should continue to use the successor company as a vendor. As part of that review, CPS should examine the effectiveness of the product, which Vendor A sold to CPS under the contract steered by Byrd-Bennett, and which the successor company continues to sell to CPS.

In the meantime, the OIG recommended that CPS, and all its units, suspend all purchase orders for the product that was initially sold by Vendor A and now is sold by the successor company.

If CPS's review of the successor company reveals that the company's ongoing business with CPS is a legacy of an improper contracting process, and the successor company is not adding value for CPS students, the company should be debarred. If, however, the Board decides to continue doing business with the successor company, the Board should appoint an independent monitor to review the company's sales activities for unethical conduct, and the Board should require that the company annually certify that it has complied with CPS's ethics policies. The independent monitor should be chosen by the Board, but paid for by the company.

In response to the OIG's report on this matter, the Board advised that the Chief Education Officer and the Chief of Teaching and Learning will be temporarily suspending any purchase requests for the product for the 2018–19 school year and will be working with curriculum specialists to assess the efficacy of the program. The Board further stated: "Immediate suspension of any contracts with the organization is impractical as it would pull the rug out from schools using the program this year and during the summer without adequate time to determine a replacement. It is also unnecessary as [the Sales Executive], who created the ethical issue, is no longer involved with this product and the product is owned by a different company, [the successor company]."

In addition, the OIG recommended that the Board debar the Sales Executive as a vendor. The Sales Executive now works for another company that is also a CPS vendor. The Board advised the OIG that it notified the Sales Executive's new company that the Sales Executive cannot be associated with CPS accounts in any way going forward. The Board is considering whether she should be debarred individually.

**Appendix D**

The OIG also recommended that section XII of the Code of Ethics be amended to explicitly state that vendors or prospective vendors seeking Board work are prohibited from giving gifts, payments or gratuities to Board officials or employees.

As for Byrd-Bennett and the Top Aide, Byrd-Bennett is serving a prison sentence, and the Top Aide no longer works for the district. Following the OIG's report on this matter, the Board placed Do Not Hire designations in the personnel files of both Byrd-Bennett and the Top Aide.

#### FINDINGS RELATED TO THE FORMER MEMBER'S CONFLICTS OF INTEREST

1. While the Former Member served on the Board, she violated the prohibition on conflicts of interest in the Code of Ethics by using her position to advocate for CPS to purchase products of at least four companies in which she was invested, including Vendor A. (*See* CPS Code of Ethics, Board Report 11-0525-PO2, § XI(A).)

2. In addition, the Former Member violated the Code of Ethics by failing to fully recuse herself with respect to the Board-level contract awarded to Vendor A because, although she abstained from voting on the matter, she participated in some discussions about it with Byrd-Bennett and a high-level executive at Vendor A (the "High-Level Executive"). (*See* CPS Code of Ethics, § VII(A).)

3. The Former Member also failed to fully disclose her interests on her CPS Statements of Business and Financial Interest and her Cook County Statement of Economic Interests by failing to state all the companies in which she had an economic interest that conducted business with CPS. Significantly, however, the Mayor's Office and the Board were aware of her interest in all those companies because she disclosed those interests on the questionnaire she completed during the vetting process for her position on the Board. Thus, she did not hide those interests from the Board or City Hall.

4. CPS's Code of Ethics is out of step with more restrictive Illinois law because it does not prohibit Board members from having — at most — a financial interest of more than $25,000 in cumulative Board contracts with a single vendor, even though such interests are prohibited under 105 ILCS 5/10-9.

#### RECOMMENDATIONS AND BOARD RESPONSE
Given that the Former Member is no longer serving on the Board, the OIG advised that the appropriate remedy for the violations discussed above is to make CPS's Code of Ethics more robust and to provide better training to Board members so that similar violations do not occur in the future.

**Appendix D**

As discussed in more detail below, CPS's Code of Ethics appears to conflict with Illinois law (*see* 105 ILCS 5/10-9 and 50 ILCS 105/3) because the Code of Ethics does not prohibit Board members from having a significant economic interest in companies that do business with the Board. Notably, the Code of Ethics already prohibits Local School Council Members from having an economic interest in any contract with the school where they serve (*see* CPS Code of Ethics, § IX), but it does not extend that rule to Board members (*see id.*, § VII), even though Board members have much greater responsibility and more opportunity for improper influence. Moreover, CPS employees are prohibited by the Code of Ethics from having an economic interest in Board work or business. (*See id.*, § VIII.) And, more importantly, the Code of Ethics should not permit conduct that is prohibited by law. Therefore, the OIG recommended that the Board should amend section VII of the Code of Ethics so that it comports with Illinois law and protects the integrity of the Board by making it clear that Board members have no significant personal financial stake in the business of CPS at any level. Furthermore, because Board members vote to renew charter schools, the OIG recommended that they also should be prohibited from having an interest in companies doing business with CPS charters.

The Board should also place an affirmative duty on Board members to inquire whether any entities in which they have an economic interest are doing business or seeking to do business with CPS — either at the Board level or with individual departments or schools — or CPS charter schools. To ensure that Board members conduct this inquiry, the OIG recommended that Board members should be required to certify annually that (1) they conducted an inquiry with respect to the entities in which they held an economic interest and (2) none of those companies did business with CPS or CPS charters. If Board members find that those companies were, in fact, conducting such business, they should disclose that information and either (1) sell or otherwise discharge their interest in those companies or (2) step down from their position on the Board.

In response to the OIG's recommendations on this matter, the Board has informed the OIG that, among other things, it is working on a plan to amend the Code of Ethics. The Board planned to make those changes as early as the May 2018 Board Meeting. The OIG, however, advised the Board that, in the near future, the OIG will be submitting findings and recommendations in a forthcoming report on a different matter that involves ethical concerns and may warrant further changes to the Code of Ethics. Therefore, the OIG respectfully asked the Board to refrain from amending the Code of Ethics until those other recommendations are submitted so that the Board can make appropriate changes after considering all the recommendations together.

**Appendix D**

**FINDINGS, RECOMMENDATIONS AND BOARD RESPONSE WITH RESPECT TO VENDOR B**

One of the education-technology companies that the Former Member was invested in and advocated for at CPS ("Vendor B") failed to cooperate in the OIG's investigation. Vendor B and its then-CEO refused to provide information requested by the OIG during this investigation. Their failure to cooperate violated the terms of Vendor B's contracts with CPS. Accordingly, the OIG recommended that Vendor B and its then-CEO be debarred as CPS vendors. (Board Report 08-1217-PO1, § 2(f).)

The Board advised that it has begun debarment proceedings against Vendor B and its former CEO.

### PART ONE: BYRD-BENNETT AND THE DISTRICT-WIDE CONTRACT WITH VENDOR A

A. VENDOR A'S WINING AND DINING OF BYRD-BENNETT AND HER TOP AIDE

Vendor A's Sales Executive told the OIG that she and Byrd-Bennett were friends and that they knew each other from doing business together when Byrd-Bennett worked for Detroit Public Schools. The Sales Executive's expense reports and emails show that, after CPS hired Byrd-Bennett, the Sales Executive began treating Byrd-Bennett to expensive dinners while simultaneously soliciting work for Vendor A. The Sales Executive told the OIG that she reached out to Byrd-Bennett because they were friends and that, during those dinners, she pitched Vendor A's services and suggested ways that Vendor A could help CPS. This wining and dining continued until the time of Byrd-Bennett's resignation three years later. In total, Vendor A spent more than $8,000 on 23 instances of wining and dining Byrd-Bennett and her staff. These dinners were at high-end restaurants like Chicago Cut Steakhouse, Joe's Seafood and Mastro's Steakhouse.

Vendor A's expense reports and emails identified Byrd-Bennett as having attended at least 14 of those meals. For seven of the 23 meals documented by Vendor A, the CPS attendees were not identified. Given that Byrd-Bennett was the Sales Executive's primary CPS contact and they frequently dined together, it is likely that Byrd-Bennett also attended some of the dinners in which CPS attendees were not identified. Nevertheless, at a minimum, Vendor A spent more than $6,000 on the 14 meals that Byrd-Bennett definitely attended.

The Sales Executive's other main contact at CPS was the Top Aide, whom the Sales Executive knew from the Top Aide's time working with Byrd-Bennett in Detroit. Vendor A's expense reports and emails show that the Top Aide attended at least 10 of the dinners hosted by Vendor A. Those dinners had a total cost of more than $4,500.

# Appendix D

The table below details the timeline for the dinners Vendor A hosted for CPS personnel, and also highlights a few key dates with respect to CPS's contracting with Vendor A.

| Date | Expense | Restaurant | Attendees |
|------|---------|------------|-----------|
| May 23, 2012 | $124.77 | Unknown | The Sales Executive and BBB |
| July 12, 2012 | $102.18 | The Grill | The Sales Executive and unidentified CPS attendee(s) |
| August 20, 2012 | $249.33 | Devon Seafood Grill | The Sales Executive and two unidentified CPS attendees |
| November 13, 2012 | $519.15 | III Forks | A Vendor A sales manager (the "Sales Manager") and unidentified CPS attendee(s) |
| February 26, 2013 | $680.14 | Morton's Steakhouse | The Sales Executive, BBB and "9 chiefs" |
| July 10, 2013 | $630.59 | Joe's Seafood | The Sales Executive, BBB, the Top Aide, a second aide of BBB's ("BBB Aide 2") and possibly one other attendee |
| August 5, 2013 | $524.55 | Morton's Steakhouse | The Sales Executive, the Sales Manager, BBB, the Top Aide and a third aide of BBB's ("BBB Aide 3") |
| October 1, 2013 | $88.48 | Catch 35 | The Sales Executive, the Sales Manager, BBB (who stopped by for a drink) and one other person |
| **October 25, 2013** | **CPS released the relevant RFP** | | |
| October 25, 2013 | $145.61 | IPO | A Vendor A marketing employee (the "Marketing Employee") and unidentified CPS attendee(s) |
| February 5, 2014 | $222.10 | III Forks | The Sales Executive, the Marketing Employee and the Top Aide |
| **February 26, 2014** | **The Board voted to approve contract to Vendor A for up to $6 million** | | |
| March 5, 2014 | $650.02 | Gibson's Steakhouse | The Sales Executive, BBB and other unidentified attendees |

# Appendix D

| Date | Expense | Restaurant | Attendees |
|------|---------|------------|-----------|
| March 24, 2014 | $135.00 | Sunda | The Sales Manager and unidentified CPS attendee(s) |
| **March 31, 2014** | **CPS and Vendor A finalized the education-services contract** | | |
| March 31, 2014 | $170.98 | Catch 35 | The Sales Executive and BBB (and possibly the Top Aide) |
| April 1, 2014 | $80.30 | Elephant and Castle | The Sales Executive, the Sales Manager, the Marketing Employee, a fourth Vendor A employee, and two CPS employees |
| **April 7, 2014** | **CPS purchase order to Vendor A for more than $100,000** | | |
| April 30, 2014 | $226.52 | The Palm | The Sales Executive, the Sales Manager, a third Vendor A employee, BBB and the Top Aide |
| **June 5, 2014** | **CPS purchase order to Vendor A for more than $100,000** | | |
| June 17, 2014 | $656.59 | Chicago Firehouse | The Sales Executive, the Sales Manager, the Marketing Employee, BBB, the Top Aide, BBB Aide 3, two other CPS employees and two employees of another vendor |
| **August 4, 2014** | **CPS purchase order to Vendor A for more than $1 million** | | |
| August 20, 2014 | $444.73 | III Forks | The Sales Manager, the Marketing Employee, another Vendor A employee, BBB, the Top Aide, BBB Aide 3 and another CPS employee |
| September 16, 2014 | $358.23 | Morton's Steakhouse | The Sales Executive, BBB and the Top Aide |
| September 17, 2014 | $358.21 | Grand Lux | The Sales Manager and seven unidentified CPS attendees |
| October 20, 2014 | $627.15 | Chicago Cut | The Sales Executive, the Sales Manager, BBB, the Top Aide and another CPS employee |

**Appendix D**

| Date | Expense | Restaurant | Attendees |
|---|---|---|---|
| December 2, 2014 | $536.54 | Devon Seafood Grill | The Sales Executive, the Sales Manager, the Marketing Employee, three other Vendor A employees, BBB, the Top Aide, and another CPS employee |
| March 26, 2015 | $420.30 | Mastro's Steakhouse | The Sales Executive, BBB and the Top Aide |
| March 31, 2015 | $157.00 | Roka Akor | The Sales Manager and unidentified CPS attendee(s) |
| **Total** | $8,108.47 | | |

As can be seen in the table above, the cost of the majority of the dinners was more than $300, with several costing more than $600. The pro rata benefit received by Byrd-Bennett at the Vendor A dinners exceeded $50 in at least 12 instances, and exceeded $100 in at least six instances. The pro rata benefit received by the Top Aide at the dinners exceeded $50 in at least nine instances, and exceeded $100 in at least five instances. Notably, under the Code of Ethics, only "gifts" (which includes meals and drink tabs) of under $50 bear a presumption of propriety. And, in any event, CPS employees are prohibited from receiving gifts from a single vendor with a cumulative value of more than $100 a year. (*See* CPS Code of Ethics, Board Report 11-0525-PO2, §§ XII(A) and (B).) Of course, when all the meals are considered together, Byrd-Bennett and the Top Aide received far more than the allowed yearly amount.

B. Byrd-Bennett and the Top Aide Steered the Contract to Vendor A

While accepting extravagant dinners from Vendor A, Byrd-Bennett and the Top Aide steered a Board-level contract to the company with a potential value of $6 million over two years. The contract was awarded via a February 2014 Board Report that followed a Request for Proposal CPS released in October 2013. Vendor A ultimately realized nearly $2 million in sales to CPS during the term of the contract.

Emails and expense reports show that, in the months leading up to the RFP, the Sales Executive was meeting with Byrd-Bennett and her staff to discuss the implementation of Vendor A's product in CPS. In July 2013, the Sales Executive treated Byrd-Bennett, the Top Aide and another member of Byrd-Bennett's staff (BBB Aide 2) to a $630 dinner at Joe's Seafood. The next day the Sales Executive met with BBB Aide 2 to discuss bringing Vendor A into CPS. Later that month, after Vendor A received an unrelated low-level purchase order from a single CPS high

**Appendix D**

school, the High-Level Executive at Vendor A emailed a Vendor A accountant: "[C]an't wait for the big one from CPS!" The expensive dining continued in August 2013 when the Sales Executive treated Byrd-Bennett, the Top Aide and another CPS employee connected with Byrd-Bennett (BBB Aide 3) to a $525 dinner at Morton's Steakhouse. In September 2013, the Sales Executive told the Sales Manager that he should not give any CPS school a pilot or discount "until we are done with the other piece."

A CPS C-Suite Officer at the time (the "CPS Officer") informed the OIG that Byrd-Bennett approached him and told him that she wanted Vendor A to get CPS's business. The CPS Officer recalled that he told Byrd-Bennett that a contract like that needed to go through the normal procurement process and that, following his prompting, CPS began the RFP process that resulted in the contract award to Vendor A. That process began in October 2013 when the Sales Executive was still meeting with Byrd-Bennett and the Top Aide. On October 1, 2013, the Sales Executive and Byrd-Bennett met at Catch 35. The next day the Sales Executive, the Top Aide and Byrd-Bennett agreed by email to meet on October 9, 2013, to discuss the type of education service offered by Vendor A and, ultimately, requested in the RFP CPS released later that month. On October 9, the Sales Executive and the Top Aide met as scheduled. One week after meeting with the Sales Executive, the Top Aide circulated within CPS a draft scope of services for an upcoming RFP. Significantly, the scope was tailored for the services Vendor A offered. On October 20, 2013 — five days before CPS released the RFP — the Sales Executive and Byrd-Bennett communicated again when Byrd-Bennett asked the Sales Executive to provide a Byrd-Bennett family member with a username and password to gain access to Vendor A's product.

When CPS officially released the RFP on October 25, 2013, the Sales Executive forwarded the RFP to several Vendor A executives, referred them to the scope of services in the RFP and said: "This is what we have been waiting for[.]" After reading the scope, the High-Level Executive responded: "[T]he smile on my face is as wide as the Ohio River!! Great work everyone!" Another Vendor A executive responded: "Incredible job, [Sales Executive]. You kick ass. Hands down." Normally, one would expect such a celebratory exchange of emails to follow the formal award of a contract at the end of the bidding process rather than the receipt of an RFP at the start of it.

Byrd-Bennett's influence continued after CPS released the RFP. The evaluation committee, which was charged with reviewing Vendor A's and other companies' responses to the RFP, was staffed, in part, with individuals close to Byrd-Bennett. The CPS Officer even said that Byrd-Bennett went around him by putting her "minions" on the evaluation selection committee. Ultimately, the committee recommended Vendor A for the CPS contract. Additionally, emails show that the Sales Executive and Byrd-Bennett continued to communicate during the "quiet

**Appendix D**

period" while the proposals were being reviewed, even though such communications were prohibited given the confidential nature of the competitive-bidding process.

On February 3, 2014, the Top Aide emailed the Sales Executive: "I am so excited we are finally moving on this." Two days later the Sales Executive bought the Top Aide another expensive dinner. On February 26, 2014, the Board voted, with the Former Member abstaining, to approve a contract to Vendor A for up to $6 million over two years. One week later Vendor A treated Byrd-Bennett and others to a $650 dinner at Gibson's.

In the months that followed, CPS made two purchases from Vendor A that were each more than $100,000, and a third purchase that was more than $1 million. Each of those purchases were followed within weeks by expensive dinners for Byrd-Bennett and the Top Aide. In May 2015, CPS made a fourth large purchase from Vendor A. The OIG did not find that any expensive dinners took place in close proximity to that purchase. By that time, however, Byrd-Bennett was in the process of resigning while under investigation for her involvement in the SUPES kickback scheme.

Taken together, the persistent wining and dining, Vendor A's emails and coordinated meetings with Byrd-Bennett and her staff, and the RFP draft from the Top Aide show that Byrd-Bennett and the Top Aide steered the Board contract to Vendor A. This conclusion is further supported by the statements of a top CPS education official (the "Education Official") at the time, who worked on the RFP. The Education Official told the OIG that Byrd-Bennett made the decision to release the RFP and that the Education Official was instructed to help with the process after it was already set in motion. She said she had the impression that Byrd-Bennett wanted Vendor A to receive the work and that Vendor A was the only company the Education Official knew of that provided the services specified in the scope she received from the Top Aide.

Although the Sales Executive denied any coordination with Byrd-Bennett or the Top Aide regarding the RFP, the evidence shows otherwise. Notably, the Sales Executive admitted that she met with the Top Aide a few weeks before CPS released the RFP, and she admitted that the scope of services in the RFP was favorable for Vendor A. Indeed, the day the RFP was released, the Sales Executive sent an email, stating that the RFP was "align[ed] perfectly with [Vendor A]." Furthermore, Vendor A's Marketing Employee told the OIG that the scope of services in the RFP was uniquely aligned with Vendor A's services. He also said that the Sales Executive may have known that CPS was releasing an RFP before it became public. He said it was not uncommon for the Sales Executive to hear a rumor about a planned RFP, and it would not surprise him if a pending RFP was the topic of discussion at dinners the Sales Executive had with Byrd-Bennett or other CPS personnel.

**Appendix D**

Byrd-Bennett claimed that the CPS contract with Vendor A went through the normal procurement process. She recalled that the Sales Executive presented Vendor A's services to her and others over dinner, and she recalled recommending Vendor A for the contract, but she denied steering it to Vendor A.

Despite Byrd-Bennett's denial, the OIG concluded that, based on the totality of the evidence, it is more likely than not that Byrd-Bennett and the Top Aide steered the CPS contract to Vendor A and that the procurement process employed in this instance was not truly competitive.

### C.  VENDOR A'S DEALINGS WITH SUPES

This case raised additional suspicion from the OIG because Vendor A's dealings with CPS coincided with its dealings with SUPES. Given SUPES's proven history of corruption in CPS contracting, the OIG examined whether SUPES had any involvement with the work CPS awarded Vendor A. Although the OIG did not make any findings with respect to SUPES in this case, the relevant details involving SUPES are set forth below to explain SUPES's role, convey the OIG's concerns and provide an account of the evidence that the OIG considered in that regard.

Vendor A paid SUPES a total of $50,000 to be a SUPES sponsor for the 2012–13 and 2013–14 school years. As a SUPES sponsor, Vendor A received the benefit of gaining access to educators through SUPES events and promotions. Vendor A began considering the SUPES sponsorship after Byrd-Bennett introduced the Sales Executive to a SUPES officer (the "SUPES Officer") in June 2012. The Sales Executive and Byrd-Bennett had met over dinner a few weeks earlier, and Byrd-Bennett recommended that the Sales Executive work with SUPES to gain access to "key decision makers." Over the next couple weeks the Sales Executive and the SUPES Officer discussed a potential sponsorship. On July 12, 2012, the Sales Executive paid for dinner with someone from CPS who was not identified in the expense report. On July 16, 2012, the SUPES Officer told the Sales Executive the following via email:

> Gary [Solomon] indicated you had a chance to meet each other at ERDI last week and talk more about a sponsorship. I can have an agreement to you as soon as you confirm the amount. Accordingly, Gary suggested you contact Barbara about [extended day education programs].

The next day the Sales Executive and the SUPES Officer agreed that Vendor A would pay SUPES $25,000 to serve as a sponsor for the 2012–13 school year.

The following year, in July or August of 2013 — during the period before the RFP when the Sales Executive was wining and dining CPS and soliciting Board work — the Sales Executive and the SUPES Officer decided to renew the sponsorship for the 2013–14 school year. On July 8, 2013, the Sales Executive sent the SUPES Officer an email telling him that she wanted to discuss Vendor A's options for the SUPES

**Appendix D**

sponsorship in the upcoming year. Two days later, the Sales Executive met with Byrd-Bennett, the Top Aide and BBB Aide 2 over dinner at Joe's Seafood, and the day after that the Sales Executive met with BBB Aide 2 again to discuss bringing Vendor A into CPS.

The Marketing Employee was the regular point of contact at Vendor A with respect to the SUPES sponsorship. Under the terms of the 2013–14 sponsorship, the Marketing Employee was allowed to participate in SUPES's four Chicago "Academies," which took place in September, October, November and January, and he also was allowed to participate in SUPES's Nashville conference in February. The Marketing Employee attended all of those events and used them as a means to market Vendor A's products and gain access to educators from districts across the country. He said he saw Byrd-Bennett and the Top Aide at one of the SUPES events, but he did not discuss CPS work with them.

Significantly, the Marketing Employee was in Chicago at the Union League Club attending a SUPES Academy on October 25, 2013, the same day CPS released the RFP that led to the Vendor A contract. Person 5's expense report shows that he had dinner that evening with unspecified CPS personnel at IPO, a restaurant in the W Hotel. The Marketing Employee told the OIG that he did not recall anyone from CPS being at the dinner, but he said he may have met a CPS principal at the SUPES event and then brought that person to dinner. According to the Marketing Employee, he was in Chicago that day to attend one of many SUPES Academies he attended pursuant to the sponsorship, and the fact that the RFP was released the same day was coincidental.

The Marketing Employee and the SUPES Officer communicated several times via email during the period from August 2013 to February 2014, but CPS work was not discussed in those emails. In some of the emails, they made general references to "business development" and scheduled telephone conferences to continue the discussion, but the Marketing Employee told the OIG that those calls did not involve CPS.

After the 2013–14 school year, Vendor A decided not to renew the sponsorship agreement with SUPES. The Marketing Employee and the Sales Executive told the OIG that Vendor A decided not to renew the sponsorship because it was not worth the large expense. In November 2014, Gary Solomon, SUPES's CEO, offered the Sales Executive a position at SUPES. Emails show that the Sales Executive expressed some interest, but declined the offer.

When questioned about Vendor A, Solomon and Tom Vranas said that Vendor A was a SUPES sponsor. Absent, however, was any mention from them of a scheme or quid pro quo involving Vendor A. The Sales Executive and the Marketing Employee told the OIG that Vendor A simply served as a SUPES sponsor because the sponsorship

**Appendix D**

provided a platform for them to introduce and promote Vendor A to various school districts. The Marketing Employee said he never had the impression that sponsoring SUPES would "grease the wheels" at CPS.

Ultimately, the OIG did not discover evidence sufficient to conclude that SUPES influenced or benefitted from Vendor A's dealings with CPS or otherwise participated in improper acts related to those transactions. Vendor A paid SUPES $50,000 to serve as a SUPES sponsor and gain access to educators, but the OIG cannot conclude that those payments spurred the contract steering discussed above. The Sales Executive had a pre-existing relationship with Byrd-Bennett and was soliciting CPS work from her before the Sales Executive became involved with SUPES. Although the communications between SUPES, Vendor A and Byrd-Bennett in the summer of 2012 hint at an arrangement improperly impacting Vendor A's business with CPS, in the end there was not enough evidence to substantiate such an arrangement. Accordingly, the OIG has not made any findings in this matter with respect to SUPES. That said, the OIG cannot entirely exclude the possibility that Vendor A paid SUPES in the hopes of getting in Byrd-Bennett's good graces.

**PART TWO: THE FORMER BOARD MEMBER'S CONFLICTS OF INTEREST**

    A.  CONDUCT DURING THE PROCUREMENT PROCESS FOR THE VENDOR A CONTRACT

At the outset, the OIG has concluded that the Former Member was not involved in the improper steering of the Board-level contract to Vendor A through the RFP process. The OIG did not find any evidence showing that the Former Member was involved in the meetings and coordination between the Sales Executive and Byrd-Bennett. The meetings between the Sales Executive and Byrd-Bennett began before the Former Member joined the Board, and none of the evidence shows that the Former Member was aware of the coordination between Byrd-Bennett, the Top Aide and the Sales Executive after she joined the Board.

The Former Member, however, had a conflict of interest as an investor in Vendor A, and she engaged in some prohibited communications during the procurement process for the Vendor A contract. When Board members have an economic interest in a contract authorized by action of the Board, the Code of Ethics requires that they disclose their interest, abstain from voting on the matter *and* recuse themselves from any participation or discussion of the matter. (CPS Code of Ethics, § VII(A).) That provision clearly applied to the Former Member because, at the time of the procurement process that led to the Vendor A contract, she had just doubled her investment in Vendor A to $500,000. While the Former Member disclosed her interest in Vendor A and abstained from voting on the contract, she did not fully recuse herself from discussions about the matter, as discussed below.

**Appendix D**

During the RFP process that led to the Vendor A contract, the Former Member had several conversations with the High-Level Executive at Vendor A, whom she knew professionally as an investor and investment banker. In November 2013, shortly after the RFP was released, the Former Member emailed the High-Level Executive, telling him that she wanted to help him "get more traction in CPS." He subsequently sent her an email informing her that CPS had released an RFP and that they could not discuss the matter because they were in the "quiet period" — the time during the RFP process when the prospective vendors are generally restricted from discussing their proposed work with CPS personnel. The Former Member, nevertheless, introduced him to an executive of a nonprofit organization who was close with Byrd-Bennett and was influential in CPS. The Former Member said she did not believe that introduction would interfere with the RFP process, and the OIG did not find that it impacted that process or contributed to the Board awarding the district-wide contract to Vendor A. However, the introduction to the nonprofit executive did contribute to the implementation of Vendor A's product in select CPS schools.

Moreover, during the quiet period for the contract, the Former Member continued to exchange emails about the RFP with the High-Level Executive. While those emails were relatively minor, and the Former Member was not disclosing confidential information or influencing the outcome of the RFP, the conversations show that she did not abstain from engaging in such discussions.

Significantly, the Former Member initially told the OIG that she had no communications with the High-Level Executive during the RFP process. She stated that she was not aware of the RFP until the Board briefing prior to the Board meeting in February 2014. She said it was a credit to the High-Level Executive that he had not told her about the RFP earlier and that she was "totally surprised" by the contract award to Vendor A. Their emails in November and December 2013, however, show that her statements to the OIG were not true. After the OIG discovered those emails and confronted the Former Member with them during a second interview, she said she had not realized those conversations predated the Board briefing in February 2014.

Emails also show that the Former Member discussed the Vendor A contract with Byrd-Bennett over dinner in the Former Member's home on February 11, 2014 — two weeks before the Board approved the contract to Vendor A. After the dinner concluded, the Former Member immediately emailed the High-Level Executive telling him that she had just had dinner with Byrd-Bennett and that Byrd-Bennett was thrilled with Vendor A coming into the district. When the OIG showed the Former Member that email and asked what she and Byrd-Bennett discussed that night, she said she remembered having Byrd-Bennett over for dinner, but did not remember anything they discussed.

**Appendix D**

Although the Former Member did not influence the RFP process, her discussions about Vendor A with the High-Level Executive and Byrd-Bennett demonstrate that she did not fully recuse herself from the matter. The Former Member's attorneys assert that her recusal was sufficient because she fully recused herself from the *Board's* discussion regarding Vendor A. However, based on a plain reading of the Code of Ethics, the required recusal is not limited to discussions with other Board members. Pursuant to section VII(A)(2), the Former Member needed to recuse herself "from *any* participation or discussion of the matter." (CPS Code of Ethics, § VII(A)(2) (emphasis added).) Thus, the OIG concluded that the Former Member's discussions with Byrd-Bennett and the High-Level Executive about Vendor A's business with CPS were prohibited. The OIG's conclusion is not only supported by a plain reading of the Code of Ethics, but also by the spirit of the rule. The recusal requirement would be meaningless if it prohibited a conflicted Board member from discussing a potential contract with other Board members, but allowed the conflicted member to discuss it with the CEO, who had a central role in the contracting process and could simply relay the discussion to other Board members. Similarly, the recusal requirement would be ineffective if it permitted a conflicted Board member to communicate about the work at issue with the very company seeking Board business.

The Former Member also told the OIG that, by the time she discussed Vendor A with Byrd-Bennett over dinner on February 11, 2014, the contract between Vendor A and the Board was on the Board agenda and, therefore, was "a fait accompli." The Former Member suggested that her discussion with Byrd-Bennett at that point was understandable because the contract was already "baked." Her view, however, cannot be correct because it implies that the Board is simply serving as a rubber stamp on all deals presented by CPS personnel. Viewed that way, the Former Member would not have needed to abstain from voting on the Vendor A contract because the deal was moving forward regardless of what the Board members thought of it.

The Vendor A contract required a Board vote, and the Former Member was required to abstain from that vote. Likewise, she was required to recuse herself from any discussions of the matter. Of course, this case — which involved improper benefits received by Byrd-Bennett and the Top Aide and contract steering to Vendor A — demonstrates the importance of the Board's oversight and the importance of recusals for Board members with conflicts of interest.

### B. THE FORMER MEMBER'S PATTERN OF ADVOCATING FOR HER COMPANIES IN CPS

The Former Member's conversations regarding Vendor A discussed above were not her only improper communications during her tenure on the Board regarding companies in which she was invested. She encouraged CPS to use the products of

**Appendix D**

several companies in which she held an interest, promoting that business through conversations she had with CPS personnel and conversations she had with executives at the companies. Any one of those communications might be considered a minor violation when considered in isolation. In the aggregate, however, her conduct in that regard amounted to a square ethical violation, and one that was more serious than her violation with respect to Vendor A's Board-level contract discussed above.

1. *Violation of Section XI of the Code of Ethics*

Pursuant to the Code of Ethics (CPS Code of Ethics § XI(A)), the Former Member was prohibited from attempting to influence any CPS decision or action involving the companies in which she was invested. Despite this clear and common-sense prohibition on conflicts of interest, the Former Member engaged in a pattern of actively pitching and advocating for CPS to implement the products of several education-technology companies in which she was invested. Although she did not have a controlling interest in any of the companies, her investments were substantial, including approximately half a million dollars she had invested in each of three companies doing business with CPS. She also provided investment banking services for education-technology companies, through which she could earn large commissions.

When the OIG first interviewed the Former Member, she stated that it would be unconscionable for her to push for CPS to purchase the products of the companies in which she was invested. After investigating further, however, the OIG discovered that she had done just that. For example, emails show that she introduced one CPS elementary school principal to the Vendor A High-Level Executive so that they could discuss the potential purchase of Vendor A's product. Notably, the Former Member had $250,000 invested in Vendor A at the time she joined the Board, and then invested another $250,000 in the company the following month. Mere weeks after doubling her investment in the company, she introduced the principal to the High-Level Executive. And, as mentioned above, the Former Member subsequently told the High-Level Executive that she wanted to help him "get more traction in CPS."

The Former Member had similar interactions with other company executives and principals. The Former Member met with a high school principal and discussed the product of another education-technology company in which she was invested. The principal's school had begun using that product shortly before the Former Member joined the Board. After the Former Member met with the principal, she had several discussions with him about the product, as well as the products of other companies in which she was invested. In one email she told him that she was "trying to get more people using [the company], the results are so good." Purchase orders show that the high school spent more and more money on that company's product after its

**Appendix D**

principal met with the Former Member. In another email, the Former Member told the principal that they "needed to help [that company's CEO] 'sell' the high school's results to other schools." The Former Member, the principal and the CEO subsequently emailed each other discussing future collaboration.

The Former Member also spoke about that principal and his school with a different CEO, the CEO of Vendor B. Vendor B's business development director subsequently asked the principal to help sell Vendor B's products. The principal then attended a sales meeting with a large charter network to help sell Vendor B to the charter.

One week later, the Former Member encouraged the principal of another school to consider using Vendor B and introduced her to the CEO.

When the OIG interviewed the Former Member a second time and asked her about these interactions with principals and CEOs, she admitted that she promoted those companies' products in CPS. The OIG found that she mostly exerted this influence directly on principals, but, in at least some instances, she discussed those companies with Byrd-Bennett.

2. *Context of the Conflict*

To be clear, the OIG did not find evidence that the Former Member promoted these companies' products in CPS with the purpose of advancing her own finances to the detriment of CPS. The Former Member told the OIG that when she expressed her opinions about education-technology products to CPS principals, it often had the effect of recommending companies and products in which she had an investment, simply because her investments were aligned with her opinions. She was adamant that she fully believed in the efficacy of her companies' products and that she advocated for those products because she thought they would improve CPS outcomes. In fact, she suggested that she was selected as a Board member, in part, to provide her expertise with respect to the education-technology industry.

The OIG does not dispute that the Former Member believed the products she promoted would benefit CPS. However, as the Former Member admitted in one email she sent to a principal, she was "biased" with respect to her investments. She clearly stood to benefit financially from the implementation of those companies' products in any school district, and particularly in a large district like CPS. Thus, with respect to those companies, she could not be a neutral and objective arbiter of what contracts were in CPS's best interest.

Notably, the rules set forth in the Code of Ethics are not merely hypothetical precautions. This case illustrates their importance. As discussed above, Byrd-Bennett and the Top Aide improperly steered a contract to Vendor A, after receiving improper benefits from the company. Thus, while the Former Member — a large Vendor A investor who had just doubled her investment in the company — was

**Appendix D**

trying to help Vendor A get more traction in CPS, Vendor A was actually engaged in improper dealings with the CEO. Vendor A should not have been awarded the district-wide contract, and the Former Member should not have been pushing that company. The combination of the two is even worse.

### 3. Impact of the Former Member's Conduct

As stated above, the Former Member violated the Code of Ethics simply by *attempting* to influence any CPS decision involving these companies. The OIG further found that the Former Member's influence actually contributed to CPS purchases of these companies' products. As stated above, one principal purchased more of the Former Member's companies' products after the Former Member encouraged its principal to use them. The full extent of the Former Member's impact, however, is difficult to measure and, thus, the OIG does not attribute to her a precise amount of CPS funds that were paid to her companies. Purchase orders reflect that total CPS spending on her companies increased from $886,000 the year before her appointment to the Board, to $1.8 million her first year on the Board. Her second year on the Board spending on her companies increased to $3 million, and in the first two years that passed since her departure from the Board, CPS spent $1.9 million and $1.7 million, respectively. Those figures show a significant rise in CPS spending on her companies after her appointment to the Board, with CPS spending the most during her second year. The OIG cautions against attributing those increases to the Former Member. Many factors contribute to the fluctuations in CPS spending and the changing education-technology products that CPS employs. Notably, the peak year for spending during the Former Member's second year on the Board is skewed by the $1.4 million in purchase orders that were issued to Vendor A pursuant to a large district-wide contract. As discussed above, that contract was steered to Vendor A by Byrd-Bennett, not the Former Member. Much of the business CPS did with the Former Member's companies was completely independent of any influence from her. However, given her stature and her persistent promotion of her companies' products in CPS, the OIG found that she likely contributed to CPS purchases of her companies' products in some cases. Notably, when the OIG asked the Former Member about the extent of her influence on CPS decisions with respect to these companies, she downplayed her influence and was reluctant to discuss any of her involvement in these matters without being shown specific emails documenting her communications.

### 4. Defenses Raised by the Former Member

In her own defense, the Former Member claimed that she never "initiate[d] a discussion of a commercial contract with a CPS principal." That claim is at best misleading. The Former Member may not have presented principals with contracts to sign, but she clearly pitched her companies' products to principals and referred

**Appendix D**

the principals to executives at the companies who engaged in sales discussions. As stated already, the Former Member introduced a principal to the Vendor A High-Level Executive so that they could discuss the product. The High-Level Executive then continued the conversation with the principal and looped in the Sales Manager to try to close the deal. Thus, the Former Member's actions were tantamount to initiating the discussion of a commercial contract.

The Former Member also claimed that she only received minimal benefit from her investments that did business with CPS. She argued that, during her two-year tenure on the Board, plus the year following her resignation from the Board, her total earnings from these investments was in the low tens of thousands. This argument is also misleading. First, her violation of the Code of Ethics was not contingent on her receiving any income from her investments while she was on the Board or realizing any gain after selling her stocks. While she was on the Board, she had investments well exceeding $1.5 million in companies that were doing business with the Board. She had the potential to make huge financial gains from those investments. That clearly qualified as an economic interest giving rise to conflicts for purposes of the Code of Ethics, regardless of whether any gains were realized.

Second, some of her gains were substantial — for example, the value of her $500,000 investment in Vendor A ultimately doubled when Vendor A was acquired. The Former Member informed the OIG that, before Vendor A was acquired, she chose to contribute that investment to a fund with restrictions that she imposed and that, as a result, she will obtain, at most, a return on her investment of approximately $75,000, a much smaller benefit than the $500,000 gain she could have received. Notably, she took those steps after she was already under investigation in this matter.

Third, the Former Member also could benefit from these education companies by providing them with investment banking services. For example, she tried to provide that work for Vendor A during its acquisition, which could have entitled her to potentially receive approximately $1 million in commission had she gotten that work. She was not awarded the Vendor A work, however, in part because she was under investigation in this case.

The Former Member also raised her history of charitable giving and role as a benefactor in the education community. The OIG does not dispute the extent of her generosity in that regard. The OIG's investigation focused on her conflicts stemming from her investments.

**Appendix D**

### C. THE FORMER MEMBER'S APPARENT VIOLATION OF THE ILLINOIS SCHOOL CODE

The Former Member appears to have at least facially violated the Illinois School Code's prohibition on school board members having an interest in board contracts. The School Code provides in pertinent part:

> No school board member shall be interested, directly or indirectly, in his own name or in the name of any other person, association, trust or corporation, in any contract, work or business of the district or in the sale of any article, whenever the expense, price or consideration of the contract, work, business or sale is paid either from the treasury or by any assessment levied by any statute or ordinance. (105 ILCS 5/10-9.)[1]

This statute provides for various exceptions, including for certain contracts with a cumulative value of $25,000 and under so long as the board member abstains from voting on the matter. However, those exceptions apparently do not apply to the Former Member, particularly with respect to the Board-level contract, which awarded up to $6 million to Vendor A and ultimately resulted in nearly $2 million in CPS purchases. That contract was awarded in February 2014, while the Former Member was on the Board and fully aware of the contract. Although the Former Member abstained from voting on that contract, abstention is not a cure under a plain reading of the statute.

Significantly, the apparent facial violation in this case was mitigated by multiple factors. First, the procedure set forth in the CPS Code of Ethics appears to be in conflict with the School Code's prohibition on board members having such interests. Whereas the School Code appears to flatly prohibit school board members from having an economic interest in board contracts valued over $25,000, the CPS Code of Ethics allows members of the Board to have such interests so long as they (1) disclose the interest, (2) recuse themselves from any discussion of the matter, and (3) abstain from voting on the matter. Thus, from reading the Code of Ethics, the Former Member would have had no way of knowing that she was violating the School Code, and she might have presumed that she was not violating any law so long as she complied with CPS policy. Second, when the Former Member was vetted for her position on the Board, this potential violation apparently never was considered or discussed even though CPS officials clearly knew from the Former Member's disclosures that she held significant investments in several companies that did business with the Board. In fact, emails show that the Former Member disclosed her investments to Board officials during the onboarding process and while she was serving on the Board.

---

[1] The Public Officer Prohibited Activities Act includes a similar prohibition on interests in contracts. *See* 50 ILCS 105/3. The OIG focused on the provision in the Illinois School Code, however, because it deals directly with school board members.

**Appendix D**

Additionally, the Former Member's attorneys submitted a memorandum to the OIG in which they stated that, during her vetting for participation on the Board and during her tenure on the Board, the Former Member was advised by Board officials and personnel in the Mayor's Office that her education-related investments did not preclude membership on the Board. The memorandum further states that the Former Member was informed that she could serve as a Board member so long as she disclosed her interests, recused herself from Board discussions of matters involving those interests and abstained from voting on any contract involving those interests.

This case demonstrates that the rules in the Code of Ethics governing the economic interests of Board members in Board contracts are deficient when compared with state law, which makes such violations a Class 4 felony. As discussed above, the OIG recommended that the Board amend the Code of Ethics to strengthen it and bring it in line with Illinois law.

### D. THE FORMER MEMBER'S FAILURE TO PROPERLY DISCLOSE HER INTERESTS

Although the Former Member disclosed her financial interests on her vetting questionnaire in the lead up to her selection for a position on the Board, she failed to properly disclose her interests on her CPS Statements of Business and Financial Interest, as well as her statement she filed with the Cook County Clerk.

On the 2013 SBFI, which pertained to activity in 2012, she stated that the Board did not award work to any company in which she had an economic interest. In fact, she had financial interests in four companies that did Board work in 2012. On the 2014 SBFI, which pertained to 2013, she disclosed two companies, but failed to disclose four additional companies she was invested in that did Board work that year. She also failed to disclose that one of the companies owed her money pursuant to multiple promissory notes.

The Former Member told the OIG that she thought she only needed to disclose the companies that had Board-level contracts with CPS. The SBFI form asks if "the Chicago Board of Education award[ed] any work, business or contracts to any person or entity in which you or a relative have an economic interest?" However, the form clearly alerts the reader that the *Chicago Board of Education* is a defined term that is explained on the definitions page attached to the form. On the definitions page it is defined to include the Board "and all entities operated by the Board ..., including all schools, area offices, departments, and other business units." Thus, the SBFI disclosures are not limited to companies with Board-level contracts. As such, the Former Member needed to include companies that transacted with any and all CPS units, and she failed to do so.

**Appendix D**

The OIG acknowledges that the Former Member's omissions on her SBFIs were partially mitigated by the fact that she ran her disclosures by Board officials and disclosed all of those companies on the questionnaire used to vet her before she joined the Board. Additionally, a list of the companies the Former Member was invested in was accessible by the public on her company's website.

The OIG also found that she failed to disclose her interests on the Cook County Statement of Economic Interests she filed in 2014. On that form, she stated that the Board was not doing business with any company in which she had an ownership interest in excess of $5,000. On the same day she filed that statement disclosing no companies, she also filed her SBFI with CPS in which she disclosed two companies. The following year, after the Former Member was under investigation in this matter, she disclosed 22 companies on her Cook County statement.

**Appendix E**

Office of
# Inspector General
## Chicago Board of Education
Nicholas Schuler, Inspector General

---

### SIGNIFICANT ACTIVITY REPORT

---

OIG 13-00930                                    TUESDAY, JULY 31, 2018

#### IMPROPER MANIPULATION OF CPS PROCUREMENT PROCESS BY ALTERNATIVE-SCHOOL OPERATOR, GARY SOLOMON, THOMAS VRANAS AND BARBARA BYRD-BENNETT

**OVERVIEW**

An OIG investigation has found that an alternative-school operator used Gary Solomon and Thomas Vranas as undisclosed lobbyists to help the company gain improper access to then-CPS CEO Barbara Byrd-Bennett, manipulate CPS procurement processes and win contracts to operate four CPS schools. Byrd-Bennett, Solomon and Vranas are currently serving prison sentences for a separate CPS matter investigated by the OIG, the FBI and the U.S. Attorney's Office for the Northern District of Illinois.

Solomon's and Vranas's work for the alternative-school operator — much of it highly unethical — was critical in establishing and growing the company's presence in CPS. The company presently operates six CPS schools and has received more than $67 million in CPS business.

Specifically, the OIG found that the alternative-school operator: (1) leveraged Solomon's and Vranas's relationship with Byrd-Bennett to obtain confidential inside information regarding forthcoming Requests for Proposals and to gain behind-the-scenes access to her and her staff; (2) sought to ensure that a direct competitor would not obtain CPS business; (3) used Solomon and Vranas to ensure that it would bypass the district's normal procedures for establishing contract schools and instead work directly with Byrd-Bennett and her staff; (4) hired a former CPS Network Chief (the "Former CPS Chief"), whom Byrd-Bennett had mentored at the SUPES Academy, as part of a "wink-wink" agreement with Byrd-Bennett to continue the company's business dealings with the district; and (5) improperly failed to disclose that the company had retained Solomon and Vranas to represent its interests to CPS officials. Additionally, the OIG learned that, while the company was doing business with CPS, it considered offering Byrd-Bennett post-CPS employment.

---

567 West Lake Street ◆ Suite 1120 ◆ Chicago, Illinois ◆ 60661-1405
Phone (773) 534-9400 ◆ Fax (773) 534-9401 ◆ inspectorgeneral@cpsoig.com

**Appendix E**

The OIG's investigation of the company began during the OIG's investigation of Byrd-Bennett and the companies owned by Solomon and Vranas — the SUPES Academy, Synesi Associates and PROACT Search. At that time, the OIG learned that the school operator had retained Solomon and Vranas to represent its interests before "key district administrators" in seeking to open contract schools at CPS. Under the company's consulting agreement with Solomon and Vranas, the company paid them a monthly base fee, as well as a $25,000 "success fee" for each CPS school it opened.

The company paid Solomon and Vranas a total of $294,000 in consulting fees for their work in Chicago. Those payments included $194,000 in base consulting fees and $100,000 in "success fee" payments for their work in establishing four of the company's schools in CPS ("School A," "School B," "School C" and "School D") from 2012 to 2014.

Furthermore, in October 2012 the company paid SUPES $60,000 to be named a sponsor of the SUPES Academy on Byrd-Bennett's suggestion.

The company also paid the Former CPS Chief it hired to obtain additional CPS business just over $340,000 while it employed him from March 2013 to October 2015.

When considering the salary the company paid the Former CPS Chief on top of the payments it made to Solomon and Vranas, the school operator spent a total of nearly $700,000 to obtain confidential information and Byrd-Bennett's ear and favor.

The financial investment in influence peddlers was well worth it for the school operator, which received tens of millions of dollars in CPS funding. Through Solomon's and Vranas's coordination with Byrd-Bennett and manipulation of CPS's procurement process, the company opened its first four schools in CPS. It subsequently opened more CPS schools, and to date, CPS has paid it more than $67 million.

Because the school operator's actions constituted significant violations of CPS's procurement processes, the OIG recommended that the company be debarred as a Board vendor and that the company executives who oversaw its violations ("Executive A" and "Executive B") be debarred as well.[1] The OIG, however, also recognized that the Board may decide that the company's debarment may be too disruptive for CPS given that it currently operates several schools. In the event the Board reaches that determination, the OIG recommended that the Board fine the

---

[1] Because the company operates contract schools, and not charter schools, the Board does not need to establish the limited circumstances outlined in the Illinois Charter Schools Law to justify the revocation of a school's charter.

**Appendix E**

company at least $6.7 million and appoint an independent monitor to review and assess the company's conduct over a three-year period.

The OIG also made policy recommendations, including that the CPS Code of Ethics be amended to place a duty on lobbyists to register with the Board and disclose their interests in Board contracts. The OIG recommended that the lobbyist registry be accessible by the public on CPS's website.

The OIG reported its findings and recommendations to the Board of Education on June 29, 2018. The school operator's misconduct is discussed below, followed by the OIG's disciplinary and policy recommendations.

MANIPULATION OF CPS'S PROCUREMENT PROCESSES AND OTHER MISCONDUCT

    A.  USING SOLOMON TO IMPROPERLY OBTAIN ACCESS AND INSIDE INFORMATION

The alternative-school operator improperly used Solomon's and Vranas's relationship with then-CPS CEO Barbara Byrd-Bennett to obtain confidential inside information regarding forthcoming Requests for Proposals and to gain behind-the-scenes access to her and her staff.

The OIG's investigation showed that Solomon brokered a meeting between Executive B, Byrd-Bennett and her top aide at a conference in Nashville, Tennessee, in November 2012, at which time they discussed the company opening several schools in CPS. An email produced to the OIG by Solomon and Vranas's companies showed that, one week after the meeting in Nashville, the top aide emailed several high-ranking CPS employees to emphasize that Byrd-Bennett wanted to open more of the company's schools simply by amending a contract for a campus that the company was already opening: "Let me reiterate — the CEO would like the contract with [the school operator] signed this week. The CEO wants the option of 4 more [of the company's] schools."

On December 5, 2012, Byrd-Bennett emailed Solomon: "Friends at [the company] need to connect with me again. . . . trying to figure it out without breaking laws[.] So far they are on the Board agenda for 12/19[.]" Solomon responded, "Sure. Whenever is good for you."[2]

---

[2] At the same time Byrd-Bennett and Solomon were discussing how they could give the alternative-school operator CPS business without breaking the law, they also were negotiating the terms of their illegal kickback scheme and how Byrd-Bennett would receive money for her relatives. One day after Byrd-Bennett's December 5 email to Solomon concerning the school operator, she emailed both Solomon and Vranas asking whether there had been "any progress with [my relatives]?" Solomon immediately responded:

**Appendix E**

One week later, Solomon emailed Executive A and Executive B to relay inside information from CPS about how the district would be moving forward with their company. Among other things, Solomon said that he and CPS had discussed that: (1) CPS would approve an additional school and contract for the company at the upcoming December Board meeting; (2) "[d]uring the first week in January, an RFP will go out and [you] will respond to all parts of the RFP that you feel you can deliver upon"; (3) much of the RFP would be consistent with what Executive B, Byrd-Bennett and her top aide had discussed in Nashville; and (4) "CPS will give you all you can handle and then some." Solomon also said in the email that on the night of the December Board meeting, in which the Board was going to approve an additional school for the company, he, Vranas and two of the executives from the company were going to go out "to celebrate."

When the OIG spoke to the CPS official who was responsible for working on the contract issues with the company (the "CPS Official"), she confirmed that Byrd-Bennett's top aide had pressured her in November 2012 to open more schools for the company as quickly as possible. Specifically, the CPS Official recounted, Byrd-Bennett wanted the company to grow quickly to five more campuses, and for the company's contract with CPS for School A to be amended so as to allow for that expansion. CPS's Law Department and Department of Procurement informed the CPS Official that CPS could not award additional contracts to the company through the amendment of one contract, and that CPS would have to issue an RFP for any new school that the district would like to open.

B. SOLOMON HELPED THE COMPANY SIDESTEP THE CPS OFFICIAL

The school operator also undermined CPS's procurement process by taking advantage of Solomon's and Vranas's ability to circumvent normal procurement channels for contract schools.

Although the Board had approved a contract award for School A the week before Byrd-Bennett began working at CPS, that contract was not finalized until the following year, after Solomon and Vranas used their secret access to Byrd-Bennett to bypass CPS's normal procurement channels. In fact, the OIG found that company executives considered Solomon and Vranas instrumental in working with Byrd-

---

Like we have discussed, we have created accounts that, upon withdrawal, we will pay down the taxes and distribute. You can distribute to [your relatives] as you deem appropriate. It is our assumption, that the distribution will serve as a signing bonus upon your return to SUPES/Synesi. If you only join for the day, you will be the highest paid person on the planet for that day. Regardless, it will be paid out on day one.

Make sense?

**Appendix E**

Bennett to sidestep the CPS Official, who was responsible for working with the school operator to address contract issues related to the location of School A.

In an August 25, 2012, email, Solomon informed Executive A and Executive B that Byrd-Bennett had essentially threatened the CPS Official over delays in securing School A's location by telling her "to make it happen or suffer a miserable fate." Solomon further stated that Byrd-Bennett's threats were "the driving force behind the [B]oard action" on August 22, 2012, in which the Board approved the location of School A. The contract for School A was eventually executed in March 2013, after the company again sought Solomon's assistance. Earlier that month, Executive A emailed Solomon: "Gary can you call BBB and have her lean on someone to get our contract signed in the next couple of days?"

The CPS Official corroborated that Byrd-Bennett and her top aide had pressured her with regard to using School A as a foothold for the company's expansion throughout Chicago. And the CPS Official also said that the company eventually bypassed her altogether to meet with other CPS officials.

### C. The Company Attempted to Blackball a Direct Competitor

In August 2012, Executive B asked Solomon by email to take steps to ensure that a direct competitor would not obtain CPS business. When the alternative-school operator learned that the competitor had submitted proposals in response to a CPS RFP, Executive B emailed Solomon to tell him that the company was "bad news" and "we don't want them to get started in Chicago." According to CPS payment records, the district never paid the competitor for work.

The OIG cannot say for sure that CPS did not award the competitor work specifically because of Executive B's request. But whether CPS blackballed that other company because of Executive B's request is beside the point. The request, by itself, was highly improper. He explicitly instructed the individual whom the school operator had specifically hired to exert influence over Byrd-Bennett to rig CPS's procurement process and shield the company from a direct competitor. That is, Executive B took advantage of Solomon's relationship with Byrd-Bennett to again game CPS's procurement processes to the advantage of the company and to the disadvantage of a competitor.

### D. The Company's "Wink-Wink" Agreement

As part of a "wink-wink" agreement that Solomon brokered on Byrd-Bennett's behalf, the school operator hired the Former CPS Chief — who had recently resigned while under CPS investigation — with the understanding that his hiring was necessary for the company to continue doing business with CPS.

**Appendix E**

The Former CPS Chief had come under investigation by CPS's Law Department in November 2012 for having engaged in several types of misconduct, including carrying on an affair with a subordinate and residing outside of the City of Chicago. In a memorandum dated November 29, 2012, Law detailed its investigation of the then-CPS Network Chief and its conclusions. The Chief resigned from CPS on December 4, 2012, and for unknown reasons the Board chose not to place a DNH designation in his personnel file at that time, as would be expected in such instances.

The Former CPS Chief's mentor, Byrd-Bennett, came to his aid by instructing Solomon to help him find a new job, and Solomon did just that. On December 12, 2012, Solomon told Executive A and Executive B in an email that he had discussed with CPS that: "[Executive A and Executive B] are going to meet with [the Former CPS Chief] about a local Chicago position to assist in growing the number of [the company's] schools to 10, over the next three years. Hopefully, [the Former CPS Chief] came come [sic] on board by January." The Former CPS Chief officially began working for the company in March 2013.

Vranas told the OIG that the company hired the Former CPS Chief as part of a "wink-wink" arrangement that would lead to more CPS business for the company. Solomon told the OIG that hiring the Former CPS Chief was a critical piece of the company getting and maintaining work with CPS because his hiring was directly tied to the company obtaining CPS business. Solomon said he did not believe Byrd-Bennett was making a decision to use the company based on any quality considerations. Solomon further stated that the company continued to employ the Former CPS Chief despite his poor work performance solely to keep its business with CPS. When the OIG interviewed the Former CPS Chief, he acknowledged that the school operator hired him to take advantage of his connection to Byrd-Bennett.

For a while, the Former CPS Chief delivered for the company by becoming another conduit to Byrd-Bennett and using his relationship with her to the company's benefit. Even before he formally began working at the company, he coordinated strategic meetings between company personnel and Byrd-Bennett. In the months after officially joining the company, he secured a former CPS elementary school, which would eventually house the company's School B, and he worked with Byrd-Bennett to arrange for the building to be cleaned. He subsequently worked with CPS to secure another school site. Notably, the company promoted the Former CPS Chief only three months after he had officially joined the company.

The OIG believes the Former CPS Chief effectively rendered important parts of Solomon's job redundant — access to Byrd-Bennett and the ability to clear logjams. In fact, the Former CPS Chief told the OIG that, once the school operator hired him, the company no longer needed Solomon because the Former CPS Chief provided the company's connection to Byrd-Bennett. According to the Former CPS Chief, an

**Appendix E**

officer at the company said, "We no longer need Gary." Within a year and a half of hiring the Former CPS Chief, the company appears to have made its final payment to Solomon and Vranas.

Despite some apparent misgivings about the Former CPS Chief's performance, the company continued to employ him until shortly after Byrd-Bennett, Solomon, Vranas and their companies — including the SUPES Academy, where the Former CPS Chief also had worked — were indicted in federal court and the details of their kickback and bribery scheme were made public. Those parties were indicted on October 8, 2015, and Byrd-Bennett pleaded guilty on October 13. The next day the company dismissed the Former CPS Chief. He told the OIG he was convinced that the company ultimately let him go because of the Byrd-Bennett investigation.

Taken together, the circumstances surrounding the Former CPS Chief's employment with the company — particularly those that relate to his hiring and termination of employment — show that, at a minimum, a tacit "wink-wink" agreement did exist in which his employment was tied to the company continuing its business dealings with CPS.

E.    FAILURE TO DISCLOSE SOLOMON AND VRANAS AS LOBBYISTS OR CONSULTANTS

The school operator never disclosed to CPS that it had retained Solomon, Vranas or their companies to represent its interests to CPS officials, even though CPS's Code of Ethics required the company to do so. Pursuant to the Code:

> All contracts and leases valued at $25,000 or more to which the Board is a party shall be accompanied by a disclosure of the name and address of:
>
> 1.    Each attorney who was retained by the Board Vendor in connection with the contract or lease;
>
> 2.    Each lobbyist who was retained by the Board Vendor in connection with the contract or lease;
>
> 3.    Each consultant who was retained by the Board Vendor in connection with the contract or lease; and
>
> 4.    Any other Person who will be paid any fee for communicating with Officials or Employees when such communications are intended to influence the issuance of the contract or lease. *See* CPS Policy Manual § 503.1(XVI).

The CPS contracts that the company executed regarding the company's schools stated that the company was required to follow all Board policies and rules. In addition, each purchase order the company received for its services stated that, as a condition of payment, the company was required to follow the CPS Code of Ethics — which includes the lobbyist disclosure requirement.

**Appendix E**

Based on Solomon's and Vranas's actions, as well as the consulting agreements they entered into with the school operator, the company clearly retained them as lobbyists and, thus, needed to disclose them under the Code. And, for good measure, they also constituted disclosable consultants and "other Person[s] … paid … for communicating with Officials or Employees … to influence the issuance of [a] contract."

Nevertheless, the company never disclosed to CPS that it retained Solomon and Vranas to influence the procurement process by which it opened contract schools in CPS. Notably, the CPS Official — who was responsible for coordinating with the company with respect to the procurement process — had no idea that Solomon was manipulating the process through discussions with Byrd-Bennett.

**RECOMMENDATIONS**

    A. DISCIPLINARY RECOMMENDATIONS

Based on the evidence in this case, the OIG made the following disciplinary recommendations against the alternative-school operator and its executives:

1. The OIG recommended that the Board debar the company for its manipulation and circumvention of CPS's procurement process. *See* CPS Policy Manual §§ 401.6(2)(i)(6), (2)(i)(9), (2)(i)(18) & (2)(k) (Bd. Rpt. 08-1217-PO1); CPS Policy §§ 503.1(I), (XVI) & (XXI)(C) (Bd. Rpt. 11-0525-PO2).

2. The OIG also recommended that the Board debar Executive A and Executive B for their respective roles in the company's procurement violations. *See* CPS Policy Manual §§ 401.6(1.4)(s), (7.2).

3. The OIG recognized, however, that the Board may decide that the company's debarment may be too disruptive for CPS given that it currently operates several schools. Should the Board decide that it is not feasible to debar the company, the OIG recommended that the company should still be held to account through a number of significant sanctions:

    a. First, the OIG recommended that the Board sanction the company in an amount no less than $6.7 million, which is ten percent of the amount that CPS had paid the company as of the OIG's report to the Board on this matter.

    b. The OIG also recommended that the Board not renew the contracts that it currently has in place with the company. Instead, the Board should allow the contracts to lapse and place them back out to bid. The Board should decide whether to allow the company to bid on the

**Appendix E**

contracts, taking into account the company's actions detailed in this report.

c. Further, and as a condition of continuing to do business with CPS, the OIG recommended that the Board direct the company to enhance its internal policies and training related to doing business with CPS. The Board should further require the company to certify on an annual basis that it has complied with the CPS Code of Ethics and procurement policies.

d. As an additional condition for continuing to do business with CPS, the OIG recommended that the Board appoint an independent monitor that is selected by the Board and the OIG, but that is paid for by the company. The OIG must be involved in determining the terms of the independent monitor's engagement, and the OIG recommended that those terms include the following:

>The independent monitor shall provide services for a three-year period. Throughout that entire three-year period, the independent monitor shall have access to all of the company's books, records, personnel and facilities.

>Among other services, the independent monitor shall: (1) conduct a baseline assessment of the company's corporate ethics and compliance culture; (2) issue recommendations for improvement after that baseline assessment; and (3) conduct subsequent quarterly reviews to follow up on the monitor's recommendations so as to ensure the company's compliance with them.

>Six months before the end of the three-year review, the independent monitor shall provide an evaluation to the Board and the OIG of the company's progress and improvement regarding its recommendations. At the end of the three-year period, the independent monitor shall provide a final report to the Board and the OIG that assesses: (1) the company's corporate ethics and compliance culture; and (2) the company's overall improvement and progress.

This matter is complicated by the fact that Executive A and Executive B should be debarred from CPS business for their misconduct. But if the company is permitted to continue to do business with CPS, Executive A and Executive B cannot be debarred effectively, given their high-ranking positions with the company. To address this problem, as part of the independent monitor's final review at the end of the three-year monitoring period, the monitor should assess Executive A's and Executive B's individual contributions to the company's progress and improvements with regard

to the monitor's recommendations. Based on the monitor's final, three-year assessment, the Board should determine whether additional measures should be taken as to Executive A, Executive B or the company, individually, or if they each should be permanently debarred.

With regard to the former CPS employees implicated in this investigation, the OIG noted and recommended the following:

1. Former CPS CEO Barbara Byrd-Bennett is no longer employed with CPS. She resigned her position on May 29, 2015, while under OIG investigation and is currently serving a four-and-a-half-year prison sentence for a kickback scheme involving a CPS contract with the SUPES Academy where she once worked. The Board had already placed a DNH designation in her personnel file in response to the OIG's report in another matter (OIG 15-00005), and the OIG had no further disciplinary recommendations for her.

2. Byrd-Bennett's top aide declined to speak to the OIG. She no longer is employed with CPS, having resigned her position on August 1, 2015. The Board had already placed a DNH designation in her personnel file in response to the OIG's report in another matter (OIG 15-00005), and the OIG had no further disciplinary recommendations for her.

3. As discussed above, the Former CPS Chief resigned under investigation on December 4, 2012. It certainly is not clear to the OIG why a DNH designation was not placed in his personnel file at the time of his resignation. In any event, because he should have been classified as a DNH at that time, the OIG recommended that the Board do so now.

B. Necessary Enhanced Procurement Procedures and Lobbyist Registry

During this investigation, the OIG determined that CPS lacked sufficient processes to ensure that it receives all Contractor's Disclosure Forms from prospective vendors and that those forms are readily available to the public. Therefore, consistent with the Code of Ethics' disclosure requirements for contracts valued at $25,000 or more, the OIG recommended that the Department of Procurement must take steps to ensure that: (1) it receives Board vendors' disclosures of lobbyists, attorneys, consultants and/or any other third party retained to influence the award of such contracts; and (2) the disclosures are "kept in a form which allows inspection by the public" that is easier for the public to access than their current form. *See* CPS Policy Manual § 503.1(XVI)(A)-(B). Because Procurement told the OIG that the Office of Innovation and Incubation is responsible for RFP submissions and contracts related to contract schools, Procurement should coordinate with Innovation and Incubation to ensure that CPS receives the disclosures pertaining to contract schools.

**Appendix E**

As to the public's ability to access the Contractor Disclosure Forms, the OIG understands that, currently, the Department of Procurement maintains the forms, and that the only way that the public may access them is through a request made under the Illinois Freedom of Information Act. Accordingly, the OIG recommended that the Department of Procurement also allow the public to access the forms by placing electronic copies of them on a publicly accessible website on the cps.edu domain.

The OIG further recommended that the Code of Ethics be amended to place an explicit affirmative burden on lobbyists to register with the Board and disclose their involvement in Board contracts. The lobbyists should state whether they have a financial interest in any vendor successfully obtaining a Board contract, and, if so, they should state with specificity the nature of that financial interest. To facilitate this process, the OIG recommended that the Board create and maintain a lobbyist registry, which should be modeled on the City of Chicago's electronic lobbyist filing system that is accessible on the City's website and, among other things, should be kept in an electronic format that is maintained on the cps.edu domain. And the OIG should be involved in the development of the registry.

The OIG advised that the Board should consider which CPS department is best suited to manage the lobbyist registry, including, perhaps, the Ethics Advisor, Procurement or some other unit. Critically, the Board must provide sufficient funding and additional staff to whichever unit becomes responsible for the registry so that it has the capacity to establish the registry, ensure that it is kept up to date, and communicate with other departments, such as Procurement and the Ethics Advisor, as the need arises. In addition, the unit managing the registry should refer any inconsistencies or improprieties involving registered parties to the OIG as appropriate.