EXHIBIT 17

Office of
# Inspector General
## Chicago Board of Education
Nicholas Schuler, Inspector General



## Annual Report – Fiscal Year 2019



January 1, 2020

773-48-FRAUD      CPSOIG.ORG      833-TELL-CPS

Office of

# Inspector General

## Chicago Board of Education

Nicholas Schuler, Inspector General

January 1, 2020

To the citizens of Chicago and Illinois, the Chicago Board of Education, the Mayor of Chicago, the Illinois General Assembly and other elected officials:

The following Annual Report of the Office of Inspector General for the Chicago Board of Education includes a summary of investigations and other matters reported to the Board of Education by the Office of Inspector General in Fiscal Year 2019 (July 1, 2018, to June 30, 2019), and is filed pursuant to 105 ILCS 5/34-13.1(e).

The cases reported by the OIG in Fiscal Year 2019 include:

- o An investigation of a high school swim coach who misappropriated $30,000 from the school by renting out the school pool and pocketing the rental payments he collected;

- o An investigation of a nursing-services vendor whose franchise president used her vacation home to influence the CPS procurement process while her company was being considered for a $30 million contract;

- o A performance review that determined that CPS failed to collect up to $2 million in pre-kindergarten payments due to a variety of factors, including mismanagement, lax debt collection, poor oversight of the district's tuition collection arrangement with a vendor and pre-K application fraud;[1]

- o An investigation of an elementary school where several staff members received a free pre-K perk that was not available to the public and that the employees were not entitled to receive; and

- o Numerous investigations of CPS employees who underreported their income to obtain free pre-K for their children.

Also in Fiscal Year 2019, the OIG formed a new unit — the Sexual Allegations Unit — focused on investigating cases in which CPS students were the victims of sexual abuse by CPS employees or other CPS-affiliated adults. The OIG SAU opened nearly

---

[1] The OIG publicly reported on this matter via a Significant Activity Report released on March 13, 2019.

500 investigations in 2019. The SAU investigations that were completed and reported to the Board in 2019 are discussed in this Annual Report.

Other matters detailed in this report include:

- o Violations involving student information and data, such as the improper removal of students from the rolls and the improper disclosure of confidential student information;

- o Falsification of work hours, abuse of paid leaves of absence and abuse of benefit days;

- o Contract "stringing" schemes in which two sets of married couples used their companies to split contracting work at CPS schools to evade CPS's competitive procurement processes; and

- o Updates to prior OIG investigations, including several recent convictions for former CPS employees and vendors who participated in a major purchasing and reimbursement scam through which they stole nearly $900,000 from the district.

As always, it is a privilege to serve the students and families of CPS. Know that this office remains dedicated to independent investigation and analysis to further its mission of rooting out waste and corruption within our school district. Please feel free to contact us with any concerns.

Sincerely,

Nicholas Schuler
Inspector General

# Table of Contents

**Section 1 — Office Overview** ........................................................................**1**
   A.  Mission and Budget..........................................................................1
   B.  Training and Investigation Standards ...............................................1
   C.  Complaints Received in 2019...........................................................2

**Section 2 — Pre-K Cases: Fraud, Improper Perks and Mismanagement** .......................**6**
   A.  Staff Enjoyed Free Pre-K Perk Not Available to Public ................................6
   B.  Pre-K Billing Marred by Mismanagement.........................................8
   C.  Investigations of CPS Employees Who Falsified Pre-K Applications.................10

**Section 3 — Coach Misappropriated $30,000 in Pool Rental Payments** .....................**14**

**Section 4 — Violations Involving Student Information and Data** .............................**18**

**Section 5 — Vendor Misconduct, "Stringing" and Procurement Reform** .....................**22**
   A.  Use of Vendor's Vacation Home During RFP Process...........................22
   B.  "Stringing" in Construction and Trade Work........................................23
   C.  Procurement Reform Task Force Review ..........................................25

**Section 6 — Falsified Time, Abuse of Benefits and Secondary Employment**...............**27**

**Section 7 — Employee Residency Fraud**........................................................**30**

**Section 8 — Sexual Allegations Unit Investigations** ......................................**35**
   A.  Background ................................................................................35
   B.  Case Inventory, Allegations, Police Involvement and Personnel Action...........36
   C.  Investigations Concluded in Fiscal Year 2019.....................................37

**Section 9 — Cases Involving Arrests or Criminal-Background Issues** .........................**52**

**Section 10 — Updates to Cases Reported in Previous Annual Reports**.......................**56**
   A.  Convictions and Sentencing in Major Theft Scam ...............................56
   B.  Guilty Pleas and Sentencing in Disability Benefits Fraud Case.....................57
   C.  Changes to Pre-K Program at Oscar Mayer Magnet ............................58

**Appendix**

Office of
# Inspector General
Chicago Board of Education
Nicholas Schuler, Inspector General

# FY 2019 ANNUAL REPORT

## SECTION 1 — OFFICE OVERVIEW

### A. MISSION AND BUDGET

The mission of the Office of Inspector General is to ensure integrity in the operations of Chicago Public Schools by conducting meaningful, accurate and thorough investigations into allegations of waste, fraud, financial mismanagement and employee misconduct. The OIG also reviews CPS systems, practices and procedures to determine their effectiveness in preventing waste, fraud and financial mismanagement.

In Fiscal Year 2019, the OIG's budget grew to approximately $3.64 million as its employee positions grew from 19 to 49,[2] due to the creation of the OIG's Sexual Allegations Unit, which was tasked with investigating adult-on-student sex abuse cases at CPS.

### B. TRAINING AND INVESTIGATION STANDARDS

Many employees of the OIG are members of the Association of Inspectors General, a national organization of state, local and federal inspectors general and their staffs. The AIG offers training seminars and certification institutes for members as well as networking opportunities.

Many OIG employees hold the designation of Certified Inspector General or Certified Inspector General Investigator.

Participation in the AIG also offers employees continuing training in best practices related to the performance of the Inspector General mission. Locally, the OIG collaborates with IG offices from other state and local agencies to train all staff in a

---

[2] These 49 employee positions reflect the number of positions that were *approved* in Fiscal Year 2019. The OIG had not actually hired that many employees that year. The number of OIG employees was in flux throughout the year, as the Sexual Allegations Unit continued to grow, and the extent of that growth will be better reflected in the 2020 budget.

Office of Inspector General
Chicago Board of Education
2019 Annual Report

variety of areas related to investigations and audits. The Sexual Allegations Unit also receives training on child interviews and Title IX procedures.

The OIG conducts its investigations in accordance with the AIG's Principles and Standards for Offices of Inspector General, generally accepted principles, quality standards and best practices applicable to federal, state and local offices of inspectors general. In addition, the OIG, at all times, exercises due professional care and independent, impartial judgment in conducting its investigations and issuing its reports and recommendations.

### C. COMPLAINTS RECEIVED IN 2019

In Fiscal Year 2019, the OIG received 2,175 complaints alleging misconduct, waste, fraud and financial mismanagement at Chicago Public Schools, including allegations of misconduct by CPS employees and vendors and allegations of students residing outside the City of Chicago and attending CPS.

Of the 2,175 total complaints received, the OIG opened investigations into a total of 817 cases (37.6%). Several factors restrict the number of cases the OIG can open and investigate, including (1) a continuing focus on significant and often complex issues; (2) a particularly small staff size in relation to the OIG's total oversight responsibility (in Fiscal Year 2019 CPS had approximately 38,000 employees and a budget of $5.98 billion); and (3) time consumed by post-investigation activities (e.g., preparation and testimony for hearings, trials and labor arbitrations).

As previously reported by this office, the inability to investigate more complaints creates a substantial risk that instances of fraud and employee misconduct go undetected.

The OIG received 334 anonymous complaints, 15.4 percent of the total complaints received during the reporting year. Although the OIG responds to anonymous complaints, it is far more challenging to begin an investigation without the ability to speak with the complainant.

The table below reflects the types of complaints received by the OIG in Fiscal Year 2019.

[Table begins on next page.]

Office of Inspector General
Chicago Board of Education
2019 Annual Report

## Type of Complaint Received FY 2019

| | | |
|---|---|---|
| Sexual Allegations (Total)[3] | 458 | 21.06% |
| Grooming | 64 | 2.94% |
| Sexual Abuse | 46 | 2.11% |
| Touching: Less than Sexual Abuse | 45 | 2.07% |
| Sexual Act | 37 | 1.70% |
| Sexual Comments – in Person | 32 | 1.47% |
| Student-on-Staff Inappropriate Conduct | 11 | 0.51% |
| Old Allegations | 8 | 0.37% |
| Sexual Electronic Communication | 7 | 0.32% |
| Concerning: Other | 208 | 9.56% |
| Mismanagement | 199 | 9.15% |
| Residency | 140 | 6.44% |
| Discourteous Treatment | 105 | 4.83% |
| Bullying/Inadequate Response to Bullying | 101 | 4.64% |
| Corporal Punishment | 78 | 3.59% |
| Violation of Board Policy | 76 | 3.49% |
| Negligently Supervising Students | 72 | 3.31% |
| Tuition Fraud | 65 | 2.99% |
| Ethics | 61 | 2.80% |
| Discrimination | 56 | 2.57% |
| Retaliation | 52 | 2.39% |

[3] These complaints were handled by the OIG's Sexual Allegations Unit and do not include matters that were referred to other investigative bodies at intake, such as student-on-student sexual misconduct complaints that were referred to CPS's Office of Student Protections.

Office of Inspector General
Chicago Board of Education
2019 Annual Report

## Type of Complaint Received FY 2019

| | | |
|---|---|---|
| Conduct Unbecoming | 49 | 2.25% |
| Inattention to Duty | 45 | 2.07% |
| Falsification of School Records | 42 | 1.93% |
| Failure to follow IEP/504 Policies/Procedures | 42 | 1.93% |
| Criminal Background | 41 | 1.89% |
| Falsification of Employment Records | 34 | 1.56% |
| Falsifying Attendance Records | 34 | 1.56% |
| Misappropriation of Funds | 27 | 1.24% |
| Off-Duty Criminal Conduct | 24 | 1.10% |
| Test Cheating | 20 | 0.92% |
| Using Verbally Abusive/Aggressive Language | 20 | 0.92% |
| Violation of the Student Code of Conduct | 19 | 0.87% |
| Preferential Treatment | 17 | 0.78% |
| Residing Outside the School Boundary | 16 | 0.74% |
| School Safety/Security | 16 | 0.74% |
| Reporting to Work Under the Influence | 15 | 0.69% |
| Unfit for Duty | 15 | 0.69% |
| Wrongful Termination | 15 | 0.69% |
| Contractor Violations | 14 | 0.64% |
| Fraudulent Leave of Absence | 13 | 0.60% |
| On-Duty Criminal Conduct | 12 | 0.55% |
| LSC Member Misconduct | 12 | 0.55% |
| Improper Licensure | 9 | 0.41% |
| Grade Changing | 8 | 0.37% |

Office of Inspector General
Chicago Board of Education
2019 Annual Report

### Type of Complaint Received FY 2019

| | | |
|---|---|---|
| Theft of Board Property | 7 | 0.32% |
| Violation of Magnet and Selective-Enrollment Policy | 6 | 0.28% |
| Violation of Acceptable Use Policy | 3 | 0.14% |
| LSC Election Fraud | 3 | 0.14% |
| Unauthorized Use of Board Property | 1 | 0.05% |
| Other | 133 | 6.11% |
| | **2,175** | **100.00%** |

Office of Inspector General
Chicago Board of Education
2019 Annual Report

## SECTION 2 — PRE-K CASES: FRAUD, IMPROPER PERKS AND MISMANAGEMENT

In Fiscal Year 2019, the OIG reported on numerous matters involving CPS's pre-kindergarten programs. The first case was an investigation of an elementary school where staff members improperly received pre-K benefits that were not available to the public. That investigation prompted the OIG's Performance Analysis Unit to examine the manner in which pre-K was managed in the district and to conduct a performance review of pre-K billing and collections. That review was the subject of an OIG Significant Activity Report released on March 13, 2019, and included in this report as the **Appendix**. Following that review, the OIG investigated specific instances in which CPS employees underreported their income on pre-K applications for their children.

### A. STAFF ENJOYED FREE PRE-K PERK NOT AVAILABLE TO PUBLIC (16-01403)

An investigation determined that a principal of an elementary school afforded staff members a child-care perk at the school that was not available to the general public and was not sanctioned by the district. Like many CPS schools, this school offered the public a need-based half-day pre-K program that was overseen by CPS's Office of Early Childhood Education. However, six staff members at the school who enrolled their children in the half-day session were allowed to keep their children at the school for the entire day. Whereas other parents were only able to enroll their children in either the morning or afternoon session, staff members were given access to both sessions for their children. That is, the children of staff members were only officially enrolled in one of the sessions. Therefore, they were allowed to stay in the other session without applying through OECE and, because they were not on the books for the second session, it was completely free.

Because the staff members evaded the OECE enrollment process, the children's attendance at the additional pre-K sessions was not tracked by OECE or at the school. As a result, the OIG was not able to confirm the precise number of additional pre-K sessions attended by each child. However, based on the evidence uncovered in the investigation, the OIG determined that, at a minimum, four staff members had a total of five children regularly attending both pre-K sessions during the 2016–17 and 2017–18 school years, one staff member had a child intermittently attend both pre-K sessions during the 2016–17 and 2017–18 school years and one staff member had a child attend both sessions during the 2014–15 school year. Accordingly, they likely received the following benefits:

Office of Inspector General
Chicago Board of Education
2019 Annual Report

| Staff Member | Number of Children | Approx. Duration of Add'l Pre-K | Frequency | Approx. Value of Add'l Free Pre-K [4] |
|---|---|---|---|---|
| Staff Member A | 1 | 1.5 School Years | Consistent | $6,000 |
| Staff Member B | 2 | 1.5 School Years | Consistent | $12,000 |
| Staff Member C | 1 | 1 School Year | Consistent | $4,000 |
| Staff Member D | 1 | 1.5 School Years | Consistent | $6,000 |
| Staff Member E | 1 | 1.5 School Years | Intermittent | $3,000 |
| Staff Member F | 1 | 1.5 School Years | Consistent | $6,000 |

The OIG found that the principal gave the staff members either express or implied permission to use both pre-K sessions for their children. Moreover, the principal instructed pre-K teachers, a pre-K teacher's assistant and a school clerk to watch the staff members' children during the daily one-hour period between the two pre-K sessions. As such, she abused her authority and misused CPS resources by granting these benefits to staff members that were not available to the general public. The OIG did not find evidence that the principal personally benefitted from this improper practice. She appeared to be motivated primarily by a desire to accommodate her staff. However, she unquestionably understood that by allowing staff members to place their children in additional pre-K sessions, she was flouting CPS pre-K enrollment procedures and causing staff members to receive benefits to which they were not entitled.

The OIG also found that the six staff members who received these perks knew or should have known that they were accepting benefits to which they were not entitled. Although the evidence showed that the principal permitted this practice, the staff members should have known that accepting additional free pre-K was improper because, among other reasons, (1) they knew that their children were enrolled in only one half-day pre-K session, (2) they intentionally circumvented the normal OECE pre-K enrollment process by going directly to the principal or other staff members to gain access to additional pre-K, and (3) they knew this perk was not offered to the general public.

The OIG recommended strong discipline for the principal, up to and including the termination of her employment. In the wake of the OIG's investigation, the principal

---

[4] The approximate value of the additional pre-K received by each staff member was calculated based on the average cost of half-day daycare in the area around the school.

Office of Inspector General
Chicago Board of Education
2019 Annual Report

retired from CPS, and the Board is determining whether to place a Do Not Hire (DNH) designation in her personnel file.

As for the staff members who improperly received the additional free pre-K, the OIG recommended appropriate discipline, up to and including termination, for five of them. The sixth staff member also violated the CPS residency policy, as discussed in more detail in Section 7 below. Therefore, the OIG recommended that the Board immediately terminate his employment and place a DNH designation in his personnel file.

The Board has advised that it is still assessing this matter to determine the proper disciplinary action for all six of these staff members.

### B. Pre-K Billing Marred by Mismanagement (18-00133)

An OIG performance review determined that CPS left as much as $2 million in parent pre-K payments on the table over four school years, including money it was shorted by nearly 140 of its own employees.

The programs at issue were CPS's tuition-based pre-K, which currently charges $14,617 for a full-day seat, and a sliding-scale program which last operated in the 2017–18 school year and charged anywhere from $260 to $4,400 for a half-day seat, depending on family income.

The review by the OIG's Performance Analysis Unit attributed CPS's failure to collect up to $2 million in pre-K payments to a variety of factors, including pre-K application fraud by CPS employees with children in pre-K programs, lax debt collection, mismanagement, poor oversight of CPS's tuition-collection arrangement with a for-profit company and human or data errors.

On March 13, 2019, the OIG issued a Significant Activity Report detailing the findings and recommendations from this performance review. The OIG's full Significant Activity Report is included below as the **Appendix**.

Since reporting on this matter publicly, the Board has made progress in collecting its pre-K debts and also taken measures to address other problems identified in the OIG's report.

Some pre-K debts are lost forever due to one-time errors or other issues. However, the Board is attempting to recover what it can. According to the Board, as of December 2019, roughly $86,000 in pre-K debts had been collected and more than $730,000 is still owed, the vast majority of it by more than 600 non-CPS employee families. Debts of at least $25 are being sent to an outside firm for collection,

including the outstanding debts of a Chicago Police Department commander and a Chicago police officer.

The CPS Law Department directly sought repayment from 39 current or former CPS employees or their spouses with pre-K debts of at least $500, which amounted to, collectively, more than $90,000 in debt. Of them, 35 have resolved their debts. Four former employees with roughly $10,000 total in debt, as well as others with smaller debts, were referred to the outside firm for debt collection. Of those with at least $500 in debt, no current employees were disciplined as all had either paid their debts or voluntarily signed a payroll deduction form.

The OIG had also recommended that CPS consider finding a new vendor to collect pre-K tuition because the current vendor had not abided by its contract. The Board, however, decided not to find a new vendor. The Board advised that the vendor's services have been significantly reduced since the end of the sliding-scale pre-K program. The vendor will only be used to collect tuition for those few schools that offer tuition-based pre-K.

If CPS decided to stick with the same vendor, the OIG recommended that the contract be renegotiated and that the vendor use consistent fees across all schools, because, without CPS's permission, the vendor had charged a variety of late fees — ranging from $20 to $90 *per* monthly bill with outstanding debt — as well as processing fees ranging from $46 to $50 per student, depending on the school. The Board has since advised that a standard $40 late fee and $50 processing fee will be added to new agreements between the Board and the vendor going forward.

As recommended, certain payment records have been consolidated in one place and principals have been notified of what pre-K records they should be keeping in their files. According to the Board, the vendor is being asked to provide a monthly report on all student tuition and fees that CPS will be monitoring for delinquencies. Notably, during the 2018–19 school year, four new debtors, none of them CPS employees, were identified as still owing nearly $7,700 total in outstanding pre-K tuition. Their debts are being sent to an outside firm for debt collection, as well.

As recommended, CPS has ended its more than $70,000-a-year lease for a 3,200-square-foot office space that was being used by one employee who has been relocated. This employee's responsibilities will no longer be split between two duties, one of them pre-K bill collection. Instead, a different, single person will be in charge of monitoring pre-K billing, the OIG has been told.

As discussed in the OIG's report, currently, CPS employees can face discipline for not paying a city parking ticket but face no disciplinary consequences for not paying

Office of Inspector General
Chicago Board of Education
2019 Annual Report

their pre-K debts. As recommended, CPS is contemplating changes to address this issue.

The OIG also had made several recommendations on how to improve the pre-K application form which remain relevant because the system's move to free pre-K for four-year-olds will once again require income information that will be used by CPS to award free pre-K seats to the neediest families first. Following the OIG report, CPS changed its form to include an attestation-of-truthfulness box, as recommended. However, the form could still be improved by making more clear which parent checked the box and submitted the form — a problem presented in some of the investigations discussed below — and by warning parents that providing false or misleading information could result in criminal penalties under the state public benefits fraud law, 720 ILCS 5/17-6(a).

### C.  Investigations of CPS Employees Who Falsified Pre-K Applications

Following the performance review, the OIG conducted investigations of specific instances in which CPS employees underreported their income on Pre-K applications for their children. The OIG focused its investigations on 15 cases in which the income reported by CPS employees was understated by a large amount. After fully investigating those 15 cases, the OIG found that CPS employees did, in fact, owe outstanding tuition, either because they misrepresented their income on their applications or because their income was otherwise underreported (18-01001; 18-01006; 18-01008; 18-01233; 18-01234; 18-01237; 18-01238; 18-01241; 18-01242; 18-01243; 18-01247; 18-01249; 18-01250; 18-01288; 18-01442).

#### 1.  Amounts Owed and Other Details from the 15 Cases

The 15 investigations involved 16 CPS employees: four assistant principals, 11 teachers, and one student services advocate who was in a relationship with a teacher. Each employee had a child enrolled in a CPS pre-K program that charged tuition according to a sliding scale based on parental income. In each case, the employee's child's application did not list the employee's full CPS salary.

In five of these investigations, the CPS employees admitted to completing their applications and omitting their CPS income. In one of these cases, the CPS employee specifically admitted to understating her family income in order to ensure that her child secured a seat in the program and was not excluded due to her high income. In another case, the CPS employee acknowledged being told by an OECE employee that her child was unlikely to gain admission to the pre-K program of her choice due to her high family income. The CPS employee then claimed to have "zero income" on her child's application. The employee defended her decision to the OIG by stating

Office of Inspector General
Chicago Board of Education
2019 Annual Report

that since she was a 39-week employee and not receiving a paycheck at the time of the application, she was truthful in stating she had "zero income."

For these six employees, the table below shows their position, the amount they owed, the OIG's recommendation and the Board's response.

| Position | Amount Owed | Recommendation | Board's Response |
|---|---|---|---|
| Bilingual Teacher | $1,516.40 | Repayment and appropriate discipline | A letter has been sent to the employee demanding payment of these funds, and this matter is still pending. |
| Regular Teacher | $1,463.60 | Repayment and appropriate discipline | A letter has been sent to the employee demanding payment of these funds, and this matter is still pending. |
| Assistant Principal | $8,000.00 | Repayment and appropriate discipline | A letter has been sent to the employee demanding payment of these funds, and this matter is still pending. |
| Bilingual Teacher | $3,398.20 | Repayment and appropriate discipline | A letter has been sent to the employee demanding payment of these funds, and this matter is still pending. |
| Bilingual Teacher | $2,741.90 | Repayment and appropriate discipline | A letter has been sent to the employee demanding payment of these funds, and this matter is still pending. |
| Special Ed. Teacher | $3,780.80 | Repayment and appropriate discipline | A letter has been sent to the employee demanding payment of these funds, and this matter is still pending. |

In seven of the OIG's investigations, the CPS employees claimed that their spouse completed the application and was solely responsible for the omission. Four of those employees claimed to have been separated from their spouse at the time the application was submitted. In one case, the CPS employee denied understating her income on her child's application, and the documentary evidence indicated that an OECE employee may have been responsible for the understatement. In each of these cases, the OIG was unable to conclude that the CPS employees knew or should have known that their income was improperly omitted from the pre-K applications in question.

Office of Inspector General
Chicago Board of Education
2019 Annual Report

For these seven cases, the table below shows the positions of the employees, the amounts they owed, the OIG's recommendations and the Board's response.

| Position | Amount Owed | Recommendation | Board's Response |
|---|---|---|---|
| Special Ed. Teacher | $4,410.00 | Repayment only (no discipline) | A letter has been sent to the employee demanding payment of these funds, and this matter is still pending. |
| Program Option Teacher (Mother); and Student Special Services Advocate (Father) | $6,415.50 (collectively) | Repayment only (no discipline) | A letter has been sent to the employee demanding payment of these funds, and this matter is still pending. |
| Regular Teacher | $4,000.00 | Repayment only (no discipline) | A letter has been sent to the employee demanding payment of these funds, and this matter is still pending. |
| Regular Teacher | $8,554.00 | Repayment only (no discipline) | This employee left CPS after the OIG reported on this matter. A letter has been sent to the now-former employee demanding payment of these funds, and this matter is still pending. |
| Regular Teacher | $8,554.00 | Repayment only (no discipline) | A letter has been sent to the employee demanding payment of these funds, and this matter is still pending. |
| Assistant Principal | $3,219.30 | Repayment only (no discipline) | After a letter was sent to the employee demanding payment of these funds, the employee paid the entire amount owed. |
| Regular Teacher | $3,019.30 | Repayment only (no discipline) | After a letter was sent to the employee demanding payment of these funds, the employee agreed to a bi-weekly wage deduction until the debt is paid off. |

In these 13 cases shown in the two tables above, 14 CPS employees evaded a total of $59,073 in sliding-scale tuition due to the understatement of their CPS incomes.

In the remaining two cases, the CPS employees' income was clearly omitted from their children's pre-K applications, but the OIG was unable to determine whether the

Office of Inspector General
Chicago Board of Education
2019 Annual Report

applicable rules and procedures utilized by OECE required inclusion of their salary. However, if both employees were charged tuition based on their incomes at the time that their children began attending the pre-K program, they would have been billed the amounts listed below.

| Position | Amount Owed | Recommendation | Board's Response |
|---|---|---|---|
| Assistant Principal | $4,410.00 | Consider seeking repayment | After a letter was sent to the employee demanding payment of these funds, the employee agreed to a bi-weekly wage deduction until the debt is paid off. |
| Assistant Principal | $1,529.71 | Consider seeking repayment | Still assessing to determine proper action. |

In addition to causing the monetary losses discussed above, the pre-K applicants who understated their family incomes also subverted the sliding-scale program's goal of providing pre-K to the neediest families. The sliding-scale program was designed to give preference for program seats to applicants with lower family incomes. In these investigations, at least two CPS employees admitted to the OIG that their decision to understate their income was motivated by a desire to ensure that their children received seats in the program (as opposed to the seats going to students with lower family incomes).

### 2. Poor Controls and OIG Policy Recommendations

The OIG also identified a number of structural deficiencies in the sliding-scale program that allowed applicants to understate their incomes and cause CPS to lose tuition revenue. Some of these deficiencies made it difficult for the OIG to determine the culpability of the CPS employees investigated. For example, CPS used an online application system that allowed the application data to be changed by CPS staff, with no clear record of the changes. As a result, at times the OIG was unable to determine what applicant information was submitted to CPS, at what time, and by whom.

Additionally, OECE's income verification procedures were extremely lenient and did little to discourage fraud. In some cases where OECE accepted "no income" declarations from applicants, the OIG was unable to locate any evidence that OECE staff actually made any efforts to verify the lack of family income. In one case, a CPS employee who submitted a pre-K application claimed that OECE staff accepted her signed statement of no income after she told them that she was a salaried CPS teacher. As a result, she was able to avoid receiving a bill for her child's pre-K.

Office of Inspector General
Chicago Board of Education
2019 Annual Report

Notably, the 15 cases discussed here likely represent only a small fraction of the tuition fraud that occurred during the course of the sliding-scale program. The OIG's review for potential tuition fraud was limited to pre-K parents who were also CPS employees. CPS employees constituted less than five percent of all parents in the sliding-scale program during the review period.

In sum, the outcomes of these investigations reinforce several of the conclusions laid out in the performance review discussed above (18-00133), namely that CPS's pre-K programs operated with insufficient oversight and little to no emphasis on preventing fraud or ensuring the accurate collection of tuition.

CPS eliminated the sliding-scale program for the 2018–19 school year, but CPS continues to prioritize free pre-K based, in part, on parental incomes listed on pre-K applications. Therefore, as in the OIG's performance review, the OIG again recommended that CPS require employment disclosures from applicants and add an attestation box and warning to the application form to discourage parents from understating their incomes. As discussed above, the Board has made some of the OIG's recommended changes to the application form.

In addition, the OIG recommended that CPS conduct an audit of its pre-K income-verification procedures to determine (1) whether current procedures comply with federal Head Start Program policies and regulations, and (2) what practicable steps may be taken to increase the efficacy of the income-verification process. The Board has not yet informed the OIG whether it plans to conduct this recommended audit.


### SECTION 3 — COACH MISAPPROPRIATED $30,000 IN POOL RENTAL PAYMENTS

Two related investigations reported by the OIG involved a high school swimming coach who had previously been disciplined following an OIG investigation regarding his use of the school pool but, nevertheless, continued to violate CPS policy as he enriched himself through an improper pool-rental scheme.

By way of background, in May 2016, the OIG issued a report to the Board (15-00302) finding that the coach benefitted from an extremely low price to rent the pool for his private swim club and that he committed multiple ethical violations through his use of the pool. In addition, the OIG determined that the school's principal and assistant principal were responsible for giving the coach the steeply discounted pool rental rate — approximately $1.20 per hour. By giving the coach's swim club up to half a million dollars (or more) in free rent through an insider process, the principal and assistant principal abandoned their fiduciary duties to the school and Board, the OIG found.

Office of Inspector General
Chicago Board of Education
2019 Annual Report

In that 2016 report, the OIG recommended appropriate discipline for the coach, principal and assistant principal. The OIG also recommended that the Board debar the coach and the private swim club for an appropriate period of time. In response, the Board issued written warnings to the principal and assistant principal and initiated debarment proceedings against the coach and his swim club. The coach subsequently agreed to a voluntary exclusion for him and his club. The coach, who was also a security officer at the school, resigned his security officer position but continued to coach the school swim team. For additional details regarding the OIG's prior investigation of this coach, please see the OIG's 2016 Annual Report.

In the aftermath of the OIG's 2016 report, the OIG received new complaints that the coach was improperly subletting his club's pool lease and that he was still engaging in business with the school, even though he was undergoing debarment proceedings. The OIG also discovered that, despite resigning from his position as a school security officer in the wake of the OIG's prior investigation, he subsequently returned to CPS as an hourly employee.

The OIG investigated those matters and reported on them in Fiscal Year 2019. In one case, the OIG determined that the coach entered into multiple improper side deals to lease the school pool to outside groups and then pocketed the nearly $30,000 in rental payments he collected — essentially stealing money that should have gone to the school. In the second case, the OIG found that the coach improperly continued to engage in business activities involving the school after the Board began debarment proceedings against him. In both those cases the OIG found that the school's principal and assistant principal were also culpable. Those cases are discussed in more detail below.

        o   *Improper Rental of School Pool and Theft of Rental Fees (16-01270)*

An OIG investigation revealed that the swimming coach entered into side agreements to rent the school's pool to three different outside groups without the knowledge of CPS's Department of Real Estate. He entered into some of these agreements by improperly "subletting" a portion of time he already had leased for his private swim club, in violation of his club's license agreement with the Board. For other side agreements, his conduct was even more egregious, as he simply rented out pool time that he was not entitled to at all. Each of his rental agreements with the outside groups was off-the-books, violating CPS rules governing the rental of CPS property.

From April 2013 to September 2016, the coach collected at least $29,604 from the three outside groups under the coach's off-the-books agreements and deposited those funds into his bank account. The school's records showed that he never

Office of Inspector General
Chicago Board of Education
2019 Annual Report

transferred any of those funds to the school, which was confirmed by the school clerk. In fact, the school clerk did not even know that any outside groups had rented the pool, other than the coach's club team. Accordingly, the OIG found that the coach essentially stole the nearly $30,000 in rental fees (and possibly more) he collected by pocketing those funds for himself, rather than turning them over to the school as he should have done.

The OIG also found that the principal and assistant principal either knew or should have known about the coach's informal pool-rental agreements with the outside groups. Although they both claimed they did not know the coach was collecting money directly from outside groups using the pool, emails showed that a representative from one of the groups informed the principal and assistant principal that she rented pool time directly from the school's swimming coach, not the school. And the OIG's prior investigation into the coach's use of the pool had put the principal and assistant principal on notice of the coach's questionable practices.

As had become evident from this case and the OIG's prior investigation of the use of the school's pool, the principal, in particular, clearly maintained a very permissive approach towards the coach and his activities at the school. In this case, the OIG concluded that she was either complicit in the coach's scheme to profit from his use of the school pool or willfully turned a blind eye to his dealings with outside groups.

The OIG referred this matter to the Cook County State's Attorney's Office, and in August 2019, the State's Attorney's Office charged the coach with four counts of theft, a Class 1 felony, 720 ILCS 5/16-1(a)(1)(A), (a)(2)(A), (a)(1)(B) and (a)(2)(B), for his unauthorized use of the school pool to collect rent for himself, and one count of official misconduct, a Class 3 felony, 720 ILCS 5/33-3(a). As of December 2019, his criminal proceedings were still pending.

Based on the OIG's findings in this case, the OIG recommended that the coach be permanently debarred from doing any business with the Board, including any use of Board facilities. The Board subsequently advised that it is planning to initiate debarment proceedings against him.

The OIG was also going to recommend that the Board terminate the coach's employment with the district; however, before the OIG issued its report in this matter the Board determined that the coach should have received a Do Not Hire (DNH) designation in his personnel file following his resignation in the wake of the OIG's first investigation of him. Accordingly, the Board terminated his employment and placed a DNH in his file before the OIG issued a report in this case.

Office of Inspector General
Chicago Board of Education
2019 Annual Report

With respect to the principal, the OIG stopped short of specifying termination as the OIG's recommendation for her and left it to the Board to determine whether termination was appropriate in this instance. However, given her clear lack of supervision of the coach and her well-documented history of allowing private club teams to profit from the use of the school's facilities (*see, e.g.*, 14-00058, 15-00302 and 15-01073), at a minimum, the OIG recommended serious discipline — such as an appropriate suspension — up to and including termination. In response, the Board advised that she was given a five-day unpaid suspension.

The OIG recommended appropriate discipline for the assistant principal, and the Board subsequently advised that he was issued a written reprimand.

Lastly, the OIG recommended that the Board consider this case and the poor oversight by the school's administration as the Board continues to work on better guidelines and controls with respect to leasing Board facilities. The Board advised that the Department of Real Estate is considering this matter in those discussions.

- ○ *Continued Business Activities with the School Despite Debarment (17-00305)*

In this investigation, the OIG determined that the coach continued to engage in business activities with the school during and after debarment proceedings involving his use of the school pool.

The Board first initiated debarment proceedings against the coach and his private swim club in 2016, following the OIG's first investigation of the coach, in which the OIG found that his use of the pool violated the CPS Code of Ethics and that he benefitted from an extremely low price to rent the pool. As part of those proceedings, the coach and his club were suspended from engaging in business with the Board. Although he stopped using the pool pursuant to his notice of debarment, he nevertheless attempted to merge his club with a competing club while simultaneously attempting to secure the school pool for that new club. Essentially, he sought to circumvent the debarment of his club by continuing to use the pool under a different name. His actions in that regard were improper and in violation of his suspension during his debarment proceedings.

The OIG also found that the principal assisted him during his debarment proceedings by pushing the CPS Real Estate Department to rent the pool to that new club and to accept a low rental rate of $25 per hour, which was very favorable to that club and was far less than the rate the coach had been charging outside groups to rent the pool, as discussed above. With the principal's assistance, the new club did, in fact, obtain an agreement to rent the pool for $25 per hour.

Office of Inspector General
Chicago Board of Education
2019 Annual Report

Shortly after that new club began renting the pool, the Board approved a settlement with the coach, by which the club would receive a permanent voluntary exclusion from doing any business with the Board and the coach would receive a temporary voluntary exclusion from doing any business with the Board. Nevertheless, the coach violated those voluntary exclusions by hosting a private and for-profit swim meet at the school on behalf of both his club and the new club that he had planned to merge with his club. The coach was paid $750 for working that event.

Apparently, the potential merger of the two clubs never actually occurred. Although some of the swimmers from the coach's club joined the new club that began using the school's pool, that new club never acquired the coach's club. Regardless, the coach should not have worked the for-profit event at the school.

In addition, the OIG found that the principal and assistant principal were aware that the coach was involved in the private swim club meet and, nevertheless, allowed it to continue. They claimed that the coach misled them about the event. However, the evidence showed that they knew the coach had been organizing the private event at the school, they discussed the matter prior to the event and they allowed him to proceed with the event. Furthermore, the principal allowed the coach to continue coaching the school's swim team, even after the OIG presented her with this information about his activities.

Based on the findings in this investigation, the OIG recommended that the coach and his club be permanently debarred from doing any business with the Board, including any use of Board facilities, and that they both be placed on the Board's list of debarred vendors. The Board advised that it plans to take those actions with respect to the coach and his club.

The OIG recommended appropriate discipline for the assistant principal because he permitted the coach and his club to be involved in the private and for-profit event at the school. The OIG recommended serious discipline for the principal because she not only allowed them to be involved in the event at the school, but also assisted the coach during his debarment proceedings by helping the new club obtain a favorable lease at the school. As stated above, the Board advised that the principal was given a five-day unpaid suspension and the assistant principal was issued a written reprimand.

## SECTION 4 — VIOLATIONS INVOLVING STUDENT INFORMATION AND DATA

In the first two cases discussed below, CPS employees improperly designated students in false categories, such as listing them as "lost" before removing them

Office of Inspector General
Chicago Board of Education
2019 Annual Report

from the rolls or listing them as homeless for purposes of college aid applications. The next two cases involved the improper disclosure of private and confidential student information.

o   *Improper Removal of Students from Rolls (18-01664)*

An OIG investigation determined that the director of culture and climate at a high school regularly misused the "lost child" transfer code to unenroll truant students. The Board's policy and guidelines on absenteeism and truancy provide that school administrators may not use that code until they complete a detailed set of procedures designed to ensure that the code is used only as an option of last resort for students who cannot be located after exhausting all possible measures. Those procedures include, among other things, completing a "Lost Child Report" documenting the attempts made to find the missing student. In this case, however, the OIG found that the director used the code to remove truant students from the rolls who were expected to return to school eventually and consistently ignored the Board's procedural requirements.

Specifically, the OIG found that, from the 2016–17 school year through the 2018–19 school year — while the director was responsible for attendance at the school — the school used the lost-child code to remove students from the rolls 257 times and, in 218 of those instances, the "lost" student returned to the school and reenrolled. The OIG also found that, during that period, the director never complied with the procedural requirements when using the lost-child code.

In addition, the OIG found that the principal failed to exercise sufficient oversight over the director's enrollment and attendance practices. The principal was aware that the director was frequently using the lost-child code to remove students from the rolls and failed to put a stop to that practice, even though the principal had been trained on those procedures.

The OIG found that the director's misuse of the lost-child code had the effect of artificially increasing the school's attendance rates. However, the OIG was unable to conclude that the director was intentionally falsifying the school's attendance numbers or that the principal permitted the director's practices in order to inflate the school's attendance rates.

The OIG recommended appropriate discipline for both the director and the principal. The Board advised that it is still assessing this matter to determine the proper disciplinary action.

Office of Inspector General
Chicago Board of Education
2019 Annual Report

The OIG also recommended further training for the school staff on the use of transfer codes, and the Board advised that the Network Chief is working with policy personnel on this matter and will provide the recommended training.

o *False Designation of Students as Homeless on FAFSA Applications (18-00692)*

An OIG investigation determined that a school counselor was improperly completing Free Application for Federal Student Aid (FAFSA) forms for students and listing them as homeless without their consent. Even though she had been trained that the FAFSA form needed to be completed directly by the students or their parents, she nevertheless entered the information for the students, often when they were not present and without their consent.

The OIG found that the counselor improperly designated students as "unaccompanied homeless" on their FAFSA forms and encouraged students to list themselves that way in order to skip questions regarding their parents' financial information. The counselor's practices likely led to the submission of inaccurate information on the FAFSA forms. For example, one of the students was surprised to learn after she graduated that she had been inaccurately listed as unaccompanied homeless on her FAFSA form, which had been filled out by the school counselor.

The principal had received complaints about the counselor's FAFSA practices, but he failed to take appropriate action to ensure that her methods complied with CPS standards. The OIG found that the principal's inaction constituted inattention to duty.

The OIG recommended appropriate discipline for the school counselor and the principal. The OIG also recommended that the counselor be given additional training to ensure she followed FAFSA procedures correctly in the future. The Board advised that it was still considering this matter to determine the appropriate course of action.

o *Teacher Posted Confidential Student Information on the Internet (18-00712)*

An OIG investigation determined that a special-education teacher at an elementary school posted confidential information about her students on her personal blog, which was accessible by the public over the internet. The information she posted included students' names, pictures and schoolwork, as well as sensitive details about their disabilities and troubled personal lives.

By disclosing this information to the public, the teacher violated CPS policy governing the confidentiality of student records. After the OIG interviewed the

Office of Inspector General
Chicago Board of Education
2019 Annual Report

teacher as part of this investigation, she removed her blog from the internet, stopping the public disclosure of her students' information.

The OIG recommended that the Board terminate her employment and place a Do Not Hire (DNH) designation in her personnel file. The Board subsequently initiated dismissal proceedings against the teacher, which are still pending.

Also, during the course of this investigation, the OIG discovered that in one of the teacher's blog posts she stated one of her students had been sexually assaulted by the student's uncle. The OIG assigned that aspect of the case to the OIG's Sexual Allegations Unit to be investigated separately. That matter is discussed below (19-00262).

- o *Charter Network Solicited, Received and Used CPS Student Data (16-01119)*

On at least three separate occasions over a three-year period, a charter network solicited confidential CPS student information and used it to recruit CPS students to its charter schools. Charter school administrators directed an executive assistant who worked at one of the charter schools to obtain the CPS student information from a CPS data analyst who was friends with the executive assistant. The CPS employee, in turn, provided the information requested at least three times — once in April 2014, once in March 2015 and once in July 2016.

All told, the charter network improperly obtained at least 113,935 lines of CPS student data, including students' names, home addresses, schools and grade levels. At least seven charter employees were involved in either seeking, obtaining or using the CPS student information, including the director of student matriculation, a recruitment officer, two principals and a dean.

In addition to the improper solicitation, receipt and use of CPS student information, the OIG also found that the charter network was not fully forthcoming with CPS about the extent of its employees' wrongdoing. After the charter schools sent recruitment mailings to CPS families using the student information it had obtained, CPS parents complained, prompting the charter network to conduct an internal investigation into the matter. Following the internal investigation, the then-president of the network sent a letter to CPS officials briefly explaining the findings of the investigation and the remedial measures being taken. Significantly, however, he (1) downplayed the extent of his employees' wrongdoing; (2) failed to disclose that his employees initiated the improper transmission of student information by soliciting that information from CPS; (3) failed to address his employees' indifference to using the information for recruitment, despite the obvious confidentiality concerns associated with it; and (4) failed to disclose the extent of

Office of Inspector General
Chicago Board of Education
2019 Annual Report

the student data obtained, including the fact that they had obtained such information from CPS in prior years.

In the aftermath of the improper disclosure and use of confidential student information, CPS responded by promptly terminating the employment of the one CPS employee involved and placing a DNH designation in her personnel file. The charter network's disciplinary response, by comparison, was much weaker. It merely issued written reprimands to the seven charter employees involved, even though it apparently concluded that they violated the Illinois School Student Records Act. Two of those employees were subsequently promoted.

Because the Board had already terminated the employment of the CPS employee who improperly disclosed the confidential student information, the OIG did not recommend that the Board take any further disciplinary action. However, the OIG recommended that the Board consider the OIG's findings when assessing its business relationship with the charter network, including when assessing any renewal proposal the charter network submits. In response, the Board advised that it shared the OIG's report with CPS's Office of Innovation and Incubation, which will consider it when assessing the district's relationship with the charter network.

## Section 5 — Vendor Misconduct, "Stringing" and Procurement Reform

### A. Use of Vendor's Vacation Home During RFP Process (17-01026)

An investigation determined that a vendor used her vacation home to influence the CPS procurement process while her company was being considered for a $30 million contract for nursing services, pursuant to a request-for-proposal process. While the RFP committee was evaluating proposals from various vendors seeking the contract, the local franchise president of one of those vendors offered a member on the committee the use of her vacation home. That CPS employee, who worked in the Office of Diverse Learner Support and Services, accepted the benefit and stayed at the vendor's vacation home. In doing so, she violated CPS's Code of Ethics, which prohibits employees from accepting gifts from vendors soliciting CPS work. She then further violated the Code of Ethics by failing to disclose the gift to CPS's Chief Financial Officer as required.

The franchise president not only improperly used her vacation home to influence a member of the committee deciding whether she would be awarded a multi-million dollar contract, she also lied to the OIG when she was asked about it. She told the OIG that she was unaware that the CPS employee was involved in the RFP process, that the CPS employee never stayed in her vacation home and that she never gave

Office of Inspector General
Chicago Board of Education
2019 Annual Report

the CPS employee the keys to her vacation home. The employee, however, admitted that she stayed in the vacation home and that she received the key from the president. Emails further showed that the president knew the CPS employee was using her vacation home and that she knew the CPS employee was involved with the RFP process.

Ultimately, this vendor was not awarded the contract at issue. However, a few years later, CPS awarded the vendor a different contract for the same services, which the franchise president and her franchise have been performing.

The OIG recommended that the Board debar both the president and the franchise because they violated CPS's ethical standards and undermined the procurement process. With respect to the parent company, the OIG recommended that the Board direct it to enhance its internal policies and training related to ethics and doing business with CPS and that the Board require the company to certify on an annual basis that it has complied with CPS's Code of Ethics and procurement policies. Furthermore, the OIG also recommended that the Board appoint an independent monitor that is paid for by the company to assess and report on the company's corporate ethics and compliance culture.

The Board advised that it is engaged in ongoing discussions with the parent company about implementing these recommendations, including obtaining an independent monitor for the parent company and debarring the franchise and franchise president.

The OIG also recommended that the Board amend Section XII of the Code of Ethics to explicitly state that vendors and prospective vendors seeking Board work are prohibited from giving gifts, payments or gratuities to Board officials or employees. The Board advised that CPS's Ethics Advisor is considering this recommendation.

As for the CPS employee who served on the RFP committee and stayed at the vendor's vacation home, she has since resigned from CPS. The OIG recommended that the Board place a Do Not Hire (DNH) designation in her personnel file, and the Board subsequently put a DNH in her file.

### B. "Stringing" in Construction and Trade Work (17-00950)

In Fiscal Year 2019, the OIG continued to investigate "stringing" violations. Board Rule 7 prohibits "stringing," which is defined as dividing or planning any procurement program, activity, transaction, invoice, purchase order or agreement involving the Board or any of its operational elements (including offices, departments, bureaus, programs, units and schools) to avoid: (a) the competitive

Office of Inspector General
Chicago Board of Education
2019 Annual Report

procurement processes set forth in Board Rule 7; or (b) the limitations on delegated authority set forth in Board Rule 7 or 105 ILCS 5/34-8.1.[5]

In 2019, the OIG reported on two separate stringing schemes by married couples who used their companies to split their trade work at CPS schools to avoid the district's $10,000 spending limit. For this type of work, Board Rules prohibited CPS schools and departments from purchasing more than $10,000 in services from a vendor in a single year without first submitting the purchases through the competitive bidding process.

In this case, an engineer at a high school admitted that he helped the two married couples structure their work at his school to circumvent the spending limit. In fact, he told the OIG that he preferred to do business with these companies because they have multiple vendor numbers that allow him to divide their work when it would otherwise exceed the spending limit.

During this investigation, the engineer retired from CPS. But for his retirement, the OIG would have recommended discipline for him for helping companies string CPS work. Because he had retired when the OIG issued its report, the OIG recommended that the Board place a DNH designation in his personnel file. The Board has not yet placed a DNH in his file, but is considering taking that action.

The two schemes by the married couples are discussed below.

       o   *First Scheme: Over $500,000 in CPS Business and Criminal History*

In the first scheme, a husband and wife used their two companies — which essentially operated as the same company — to split general contracting work at CPS schools as a means of circumventing the spending limit without going through the competitive procurement process. As such, the OIG found that they engaged in stringing in violation of Board Rules.

Their stringing was extensive over numerous years. From Fiscal Year 2008 to Fiscal Year 2017, the two companies both performed work at 29 different schools in which their combined work at each school exceeded $10,000 in a given fiscal year. Their total business in those instances was $579,423, and the amount over the limit was $219,423 — business that they would not have otherwise obtained had they abided by the district's spending limit.

---

[5] The Board has since amended the Board Rules raising the spending limit but maintaining the prohibition against stringing.

Office of Inspector General
Chicago Board of Education
2019 Annual Report

The OIG recommended that the Board permanently debar the couple and their companies for violating the prohibition on stringing.

In addition, the OIG found that the husband had been convicted of two felonies. In 2006, before his company began doing business with the district, he was convicted of attempted burglary, a Class 3 felony. Then in 2013, during the period in which he and his wife were stringing construction work at CPS schools, he was convicted of possession of a stolen motor vehicle, a Class 2 felony. The OIG advised the Board that, because the 2013 conviction was for a crime involving the receipt of stolen property, that conviction alone could warrant his debarment under CPS's Debarment Policy.

The Board advised that it has initiated debarment proceedings against the husband and wife, as well as their companies, and those proceedings are still pending.

> o  *Second Scheme: Plumbing Services Strung at a High School*

In the second scheme, a different married couple used their two companies to split plumbing work so they too could exceed CPS's $10,000 spending limit without going through the competitive procurement process. Unlike the first scheme, this couple's stringing was confined to a single high school. The couple strung their services in three separate years at the school, conducting a total of $55,662 in business. Of that, $25,662 was over the limit and, thus, business that they would not have otherwise obtained had they abided by the district's spending limit. As such, they also engaged in stringing in violation of Board Rules.

The OIG recommended that the couple and their companies be permanently debarred from doing business with the Board. The Board advised that it has initiated debarment proceedings against the husband and wife, as well as their companies, and those proceedings are still pending.

### C. PROCUREMENT REFORM TASK FORCE REVIEW (19-00163)

On November 2, 2018, the City of Chicago Inspector General asked the CPS OIG and other offices of inspector general to take part in a joint oversight project reviewing the implementation of 16 recommendations made by the Procurement Reform Task Force in November 2015. The PRTF consisted of representatives from City government and sister agencies who were tasked with improving their procurement and contract management. The IG for the City of Chicago asked other IG offices to "assess whether, and the extent to which, implemented recommendations are fully and effectively operational."

Office of Inspector General
Chicago Board of Education
2019 Annual Report

In response, the OIG's Performance Analysis Unit carried out a performance review of CPS's implementation of the 16 recommendations. The OIG subsequently reported its findings on each recommendation to the Board and to the City IG. The OIG's review, and those of the other Chicago IGs, contributed to a Progress Report issued on June 4, 2019.

The OIG found that CPS had fully implemented the following six recommendations:

o   Comply with PRTF minimum standards for awarding sole-source procurements and publically disclosing applications for sole-source procurements

o   Comply with PRTF minimum standards for conducting due diligence of vendors before entering into a contract

o   Submit information on minority- and women-owned business enterprise (M/WBE) certifications to a procurement committee for evaluation

o   Adopt uniform terms for any protests of procurement decisions and post a description of the protest process and rules for the public

o   Train employees on procurement rules and regulations

o   Establish a process for information-sharing among agencies about poor performance, noncompliance or wrongdoing by vendors

Of the remaining 10 recommendations made by the PRTF, the OIG found that six had been partially implemented and that four had not been implemented at all. Those 10 recommendations are set forth in the table below.

| PRTF Recommendation | OIG Finding |
| --- | --- |
| Post all contractors, vendors and subcontractors on CPS's website in a user-friendly and searchable format | Partially Implemented |
| Include standard language in key documents requiring contractors to certify that they, their principals and subcontractors have not been disciplined by a government agency or otherwise violated any relevant law or regulation | Partially Implemented |
| Prohibit significant changes to contract length (increases of more than a year), value (cost increases over 50%) and scope ("cardinal" changes causing the contractor to perform very different work) | Not Implemented |

Office of Inspector General
Chicago Board of Education
2019 Annual Report

| PRTF Recommendation | OIG Finding |
|---|---|
| Use PRTF-developed process to evaluate vendors' claims that they have made a good faith effort to meet M/WBE goals | Not Implemented |
| Share certain information on personnel matters with sister agencies | Partially Implemented |
| Adopt PRTF-developed standards for approval of non-competitive procurements (small purchase, emergency, sole source) | Partially Implemented |
| Create and publish a comprehensive procurement manual | Not Implemented |
| Use a checklist developed by the PRTF when closing out contracts | Not Implemented |
| Use a PRTF-developed guide for conducting site visits to ensure vendor compliance | Partially Implemented |
| Adopt PRTF-developed policy language by which a vendor debarred by one government agency can be automatically debarred by CPS | Partially Implemented |

Since the OIG issued its findings, CPS's Procurement Department has taken steps to implement some of these PRTF recommendations that the OIG had found to be not fully implemented. For example, it has published a procurement manual and amended its debarment policy to meet the PRTF recommendation for automatic debarments. The OIG anticipates continuing to work with Procurement on these issues.

### SECTION 6 — FALSIFIED TIME, ABUSE OF BENEFITS AND SECONDARY EMPLOYMENT

The first case discussed below involves two employees who, for three years, helped each other falsify their time. The second case involves an employee who fraudulently took a paid leave of absence. Three of the cases discussed below involve secondary employment violations and two of the cases involve the misuse of sick days.

   o   *Two School Psychologists Falsified Their Time (18-01738)*

An investigation determined that two school psychologists falsely recorded their work hours numerous times over a three-year period. Their timekeeping records demonstrated a pattern of swiping in and out that was consistent with rampant falsification. Although their work assignments were never at the same school,

– 27 –

Office of Inspector General
Chicago Board of Education
2019 Annual Report

timekeeping records showed that they were swiped on or off the clock at the same location on hundreds of occasions — and often the two individuals were swiped in or out at the same time. After initial denials from the two psychologists, they both admitted to the OIG that they swiped for each other, calling or texting one another to coordinate their swipes.

In addition, the OIG found that they were improperly working secondary employment for charter schools without approval from CPS. At the charter schools, they performed psychological evaluations of those schools' students. Records showed that they documented performing those evaluations during their CPS work days, and given their falsified work hours, the OIG found that they likely worked on charter school evaluations while they were on CPS time. By swiping for one another, they would have been able to arrive to their assigned CPS schools late, leave early or even fail to come to work at all some days. However, because the charter schools did not keep records of when, specifically, they worked, the OIG could not determine the exact extent to which they worked their charter jobs on CPS time.

The OIG recommended that the Board terminate their employment and place Do Not Hire (DNH) designations in their personnel files. In the wake of the OIG's investigation, both psychologists resigned from CPS, and the Board subsequently placed DNH designations in their files.

○ *SECA Fraudulently Received Medical Leave and Disability Benefits (17-01062)*

An investigation determined that a special-education classroom assistant at an elementary school fraudulently received CPS medical leave, FMLA and short-term disability benefits while she was, in fact, able to work. Although the SECA went on paid leave, claiming that she was unable to work, she used her leave time to attend nursing school. During that period, CPS paid her over $12,000. After her leave ended, she failed to return to work, and her employment was terminated. The Board subsequently placed a DNH designation in her personnel file for an unrelated incident.

Because she had left CPS and already received a DNH, the OIG did not recommend any further discipline. However, the OIG recommended that the Board pursue recovery of the more than $12,000 she received from the Board during her fraudulent leave, if financially practicable. The Board advised that it plans to pursue recovery of those funds.

○ *Teacher Used Board Resources for His Side Job in Real Estate (18-00487)*

An investigation determined that a teacher at an elementary school was working a side job as a real estate broker without the approval of his principal and, from time

Office of Inspector General
Chicago Board of Education
2019 Annual Report

to time, he used CPS resources to perform his real estate work during his CPS scheduled work hours. The OIG found that, by using Board resources to perform his secondary employment during his CPS workday, he violated the CPS Code of Ethics. The OIG found that he also violated the Code of Ethics by failing to obtain approval from his principal to work his second job.

Additionally, the OIG found that the teacher improperly used sick days to attend a wedding in violation of the CPS paid time off policy.

As discussed below, the OIG also investigated the teacher's residency and found that he was violating the residency policy by living in Deerfield.

Given the residency violation, the OIG recommended that the Board immediately terminate his employment and place a DNH designation in his personnel file. The Board advised that it is in the process of making a disciplinary decision in this matter.

  o  *Teacher Failed to Obtain Approval to Work Second Job (18-00453)*

A teacher at an elementary school failed to notify her principal, and receive permission for, her secondary employment selling jewelry. The OIG found that the teacher violated CPS's Code of Ethics, which requires employees to obtain approval before working secondary employment. However, the OIG concluded that her violation was relatively minor, given that there was no evidence she worked her second job on CPS time or used Board resources to perform it.

The OIG recommended that she be given appropriate discipline, taking into account the relatively minor nature of the violation. The OIG also recommended that she be directed to complete CPS's secondary employment approval form as required. The Board subsequently issued her a non-disciplinary memo about the violation.

  o  *Teacher Used Sick Days for a Trip to Mexico (18-00471)*

An investigation determined that a teacher at an elementary school violated CPS's paid time off policy by using two and a half sick days for a trip to Mexico. In fact, she had a pattern of using sick days just before or after winter break, when she usually traveled to Mexico. Therefore, it is possible she misused sick days in conjunction with other trips to Mexico, as well. At the very least, however, the OIG found that she improperly used two and a half sick days on one of those trips.

As discussed below, the OIG also found that she violated the employee residency policy by living in Manteno (17-02197).

Office of Inspector General
Chicago Board of Education
2019 Annual Report

Had she only violated the CPS policy on paid time off, the OIG would have recommended appropriate discipline, but since she violated the residency policy the OIG recommended that the Board immediately terminate her employment and place a DNH designation in her personnel file. The Board has since initiated dismissal proceedings against her, which are still pending.

## Section 7 — Employee Residency Fraud

The cases in this section involve employee violations of the Board's residency policy (residency fraud). The OIG recommends "immediate termination" when employee residency violators also lie about their addresses. This is because, per the Board's residency policy, an employee who lies about his or her address in conjunction with a residency violation is subject to immediate dismissal. *See* Board Report 18-0627-PO4.

One of the cases discussed here also involved tuition fraud because two CPS employees living in the suburbs sent their son to a CPS school in violation of Board Rules, even though he was living with them in the suburbs.

> o *Central Office Employee Living in Skokie (16-01079)*

A community coordinator working in the Office of Faith-Based Initiatives was residing in Skokie in violation of the residency policy, despite representing to the district that he was living in Chicago. Shortly after he was interviewed by the OIG in this investigation, he resigned from CPS. At the recommendation of the OIG, the Board placed a Do Not Hire (DNH) designation in his personnel file.

> o *SECA Living in Romeoville Enrolled His Son in Free CPS Pre-K (16-01403)*

A SECA at an elementary school represented to the district that he was living in Chicago when he actually was living in Romeoville in violation of the residency policy.

This residency investigation was also part of a larger investigation involving improper pre-K perks for staff members at the SECA's school. That larger investigation (16-01403) is discussed in detail above. This SECA was one of the staff members who benefitted from that perk. Notably, he listed a false Chicago address on his son's pre-K enrollment file, and then brought his son from Romeoville to the CPS school where the SECA worked to attend the free all-day pre-K that was not available to the public and which the staff members should not have received.

Office of Inspector General
Chicago Board of Education
2019 Annual Report

The OIG recommended that the Board terminate the SECA's employment and place a DNH designation in his personnel file. The Board advised that it is still assessing this matter to determine the appropriate action to take.

> ○ *Teacher Resided in Cicero (17-00859)*

An investigation determined that an elementary school teacher was living in Cicero and had been living there since 2010 while working for CPS. In addition to violating the residency policy, she also lied to the district multiple times over the years by claiming she lived at Chicago addresses where she never actually lived.

The OIG recommended that the Board immediately terminate her employment and place a DNH designation in her personnel file. She subsequently resigned, and the Board placed a DNH in her file.

> ○ *Central Office Employee Living in River Forest (17-00934)*

The OIG found that a team leader in the CPS Accounting Department violated the residency policy by living in River Forest. She also misrepresented her residency to the district by claiming that she was living in Chicago. After she was interviewed by the OIG in this investigation, she resigned from CPS. The Board subsequently placed a DNH in her personnel file, pursuant to the OIG's recommendation.

> ○ *Teacher Living in Manteno (17-02197)*

A teacher at an elementary school was living in Manteno in violation of the residency policy since 2006. She not only failed to notify the district that she moved to Manteno, she also twice updated her address-of-record with CPS with false Chicago addresses. The OIG recommended that the Board immediately terminate her employment and place a DNH designation in her personnel file. The Board subsequently initiated dismissal proceedings against her, which are still pending.

In a related investigation discussed above, the OIG found that she also violated the CPS policy on paid time off (18-00471).

> ○ *School Clerk Resided in Calumet Park (18-00312)*

An investigation determined that a school clerk at a high school represented that he was living in Chicago when he was actually living in Calumet Park in violation of the residency policy. The OIG recommended that the Board immediately terminate his employment and place a DNH designation in his personnel file. The Board followed the OIG's recommendation and terminated the school clerk's employment; however, a hearing officer subsequently reversed the Board's decision, and the employee was reinstated.

Office of Inspector General
Chicago Board of Education
2019 Annual Report

      o   *Two Employees Living in Hazel Crest Enrolled Son in CPS (18-00321)*

An investigation determined that a special-education classroom assistant and a technology coordinator were living in Hazel Crest with their son, who was attending a CPS elementary school. The SECA and technology coordinator moved to the suburbs with their son during the 2013–14 school year. However, they continued to represent to CPS that they were living in Chicago while the parents maintained their CPS employment and their son continued to attend his CPS school.

The OIG found that the parents violated the employee residency policy by living in the suburbs and that they violated Board Rules by enrolling their son in CPS for the 2014–15, 2015–16, 2016–17, 2017–18 and 2018–19 school years, even though he was no longer a Chicago resident. The OIG also found that the parents owed nearly $53,000 in non-resident tuition for the first four years, when their son attended CPS for the full year.[6] Because the son had not yet completed the 2018–19 school year at the time the OIG issued its report to the Board, the OIG found that the parents owed a prorated proportion for that school year based on the amount of the year he attended CPS.

The OIG recommended that the Board immediately terminate the parents' employment and place DNH designations in their personnel files. Additionally, the OIG recommended that the son be disenrolled from his elementary school, unless he reestablishes residency in Chicago. Finally, the OIG recommended that the Board pursue recovery of the non-resident tuition owed by the family, if financially practicable.

In the wake of the OIG's investigation, the parents resigned from CPS and the Board placed DNH designations in their files. With respect to their son, the Board adopted a finding that he was a non-resident of Chicago, and the parents disenrolled him from CPS. The parents and the Board are currently discussing a payment plan for the outstanding non-resident tuition.

      o   *Teacher Living in Lansing (18-00371)*

An investigation determined that an elementary school teacher violated the residency policy by living in suburban Lansing. Despite living in Lansing, where her son attended public school, she represented to CPS that she was residing in Chicago. Shortly after she was interviewed by the OIG in this investigation, she resigned from

---

[6] Not only are suburban students subject to disenrollment, their families also owe CPS tuition for the years the students attended CPS schools as non-residents. The statutory non-resident tuition rate varies slightly from year to year. For the 2018–19 school year, the rate was $13,936 per student.

Office of Inspector General
Chicago Board of Education
2019 Annual Report

CPS. At the recommendation of the OIG, the Board placed a DNH designation in her personnel file.

      o   *Teacher Resided in Deerfield (18-00487)*

An elementary school teacher represented that he was residing in Chicago, even though he was actually residing in Deerfield. Accordingly, the OIG found that he violated the residency policy. The OIG recommended that the Board immediately terminate his employment and place a DNH designation in his personnel file. The Board advised that it is in the process of making a disciplinary decision in this matter.

As discussed above, the OIG also found that the teacher violated the CPS policy on paid time off and improperly used CPS resources to perform his secondary employment.

      o   *Teacher Living in Park Ridge (18-00717)*

A high school teacher represented that he was residing in Chicago, while violating the residency policy by living in Park Ridge. Shortly after the OIG interviewed him in this investigation, he resigned from CPS. The Board subsequently placed a DNH designation in his personnel file at the recommendation of the OIG.

      o   *Teacher Resided in Glenview (18-00903)*

An investigation determined that a high school science teacher was living in Glenview and had been living there during the entirety of her 14-year CPS career in violation of the residency policy. She also lied to the district throughout that period by representing that she was living in Chicago when she was actually living in Glenview. The OIG recommended that the Board terminate her employment and place a DNH designation in her personnel file.

The OIG recognized that, as a science teacher, she was in a special-needs position for the district and eligible to receive a residency waiver — though she never obtained one. Although the OIG recommended that her employment be terminated for violating the residency policy and lying to the Board, the OIG acknowledged that the Board may wish to treat her potential waiver eligibility as a mitigating factor.

In response to the OIG's recommendations, the Board initiated dismissal proceedings against the teacher, which are still pending.

Office of Inspector General
Chicago Board of Education
2019 Annual Report

       o  *School Culture Coordinator Living in Evanston (18-00997)*

A school culture coordinator represented that he was living in Chicago, even though he actually had been living in Evanston during the entirety of his five years with CPS in violation of the residency policy. The OIG recommended that the Board immediately terminate his employment and place a DNH designation in his personnel file. The Board subsequently terminated his employment and placed a DNH in his file.

       o  *Teacher Living in Arlington Heights (18-01171)*

A teacher at an elementary school was living in Arlington Heights since 2008 in violation of the residency policy. She also misrepresented her residency to the district by maintaining her old Chicago address as her address-of-record with CPS. The OIG recommended that the Board immediately terminate her employment and place a DNH designation in her personnel file.

She resigned from CPS in the wake of the OIG's investigation, and the Board placed a DNH in her file.

       o  *School Security Officer Resided in Maywood (18-01399)*

A security officer at an elementary school represented that he was living in Chicago, even though he actually had been living in Maywood for 15 years in violation of the residency policy. Accordingly, the OIG recommended that the Board immediately terminate his employment and place a DNH designation in his personnel file. The Board advised that it is in the process of making a disciplinary decision in this matter.

       o  *Lunchroom Attendant Resided in Forest Park (18-01827)*

A lunchroom attendant at a high school represented that she was living in Chicago, even though she actually had been living in Forest Park for at least the last seven years in violation of the residency policy. The OIG recommended that the Board immediately terminate her employment and place a DNH in her personnel file. She subsequently resigned from CPS in the wake of the OIG's investigation, and the Board placed a DNH in her file.

Office of Inspector General
Chicago Board of Education
2019 Annual Report

## SECTION 8 — SEXUAL ALLEGATIONS UNIT INVESTIGATIONS

### A. BACKGROUND

In Fiscal Year 2019, the OIG formed a new unit — the Sexual Allegations Unit — tasked with investigating sexual misconduct allegations in which the victim is a CPS student and the subject is a CPS employee or other CPS-affiliated adult. Previously, CPS's Law Department investigated those matters. However, in the aftermath of the *Chicago Tribune's* "Betrayed" series, documenting instances in which such matters were mishandled, the IG publicly recommended that the OIG take over responsibility for investigating those cases.

At that time, the IG concluded that inherent conflict-of-interest problems — as noted by the *Tribune's* reporting — made it impossible for the Law Department to conduct truly independent investigations. The Law Department had been simultaneously investigating sexual misconduct by CPS employees while defending the district against lawsuits by the victims of those same crimes. Those competing interests made it impossible to tell whether the Law Department was working for student victims or trying to limit the district's legal exposure.

The IG proposed that, by placing these cases under the investigative purview of the OIG, such allegations would be investigated impartially, by a factfinder with a record of independence and transparency. Simply put, the OIG would not be conflicted by other interests while investigating these matters, and the OIG would publicly report on them. As in all its cases, the OIG would conduct thorough investigations, while also coordinating with law enforcement and prosecutors to ensure that criminal investigations, where applicable, were not jeopardized.

The Board agreed with the IG's proposal, and on June 27, 2018, passed a resolution (18-0627-RS4) granting the OIG specific authority to investigate these matters. In that resolution, the Board committed to dedicating the resources necessary for the OIG to assemble a team devoted to investigating sexual misconduct.

In the following months, the OIG began forming the Sexual Allegations Unit, and that unit commenced operations on October 1, 2018, with a commitment to investigating every case involving allegations that could be construed as sexual or potentially sexual. Consequently, the OIG SAU has a very high volume of cases, opening nearly 500 investigations during Fiscal Year 2019. The SAU works its cases to conclusion, with written reports to the Board on both the substantiated and unsubstantiated cases.

As part of its work, the OIG SAU coordinates with the Illinois Department of Children and Family Services, law enforcement and prosecutors, when appropriate, and also

Office of Inspector General
Chicago Board of Education
2019 Annual Report

regularly coordinates with CPS's Office of Student Protections, Law Department and Talent Office, to ensure that victims are receiving necessary supports and to help determine whether CPS employees, vendors or volunteers need to be removed from schools as a precautionary measure pending the outcome of the OIG's investigation.

In addition, the OIG provides the Board with monthly updates on the status of the SAU cases and makes public presentations about the SAU's work at Board Meetings on a quarterly basis. In Fiscal Year 2019, the OIG made its first two of these public presentations — on January 23, 2019, and on April 24, 2019.

### B. Case Inventory, Allegations, Police Involvement and Personnel Action

During Fiscal Year 2019, the OIG opened 458 SAU cases, including four cases that had been opened by the CPS Law Department before October 2018, when the SAU began investigating cases. The rate of reports received by the OIG fluctuated at around three cases per school day.

|  | Oct. | Nov. | Dec. | Jan. | Feb. | Mar. | Apr. | May | June |
|---|---|---|---|---|---|---|---|---|---|
| New Cases (cumulative) | 51 | 45<br>96 | 35<br>131 | 44<br>175 | 62<br>237 | 72<br>309 | 42<br>351 | 65<br>416 | 42<br>458 |
| Avg. # Cases per School Day | 2.32 | 2.81 | 2.33 | 2.75 | 3.88 | 3.43 | 2.80 | 2.95 | 3.00 |

When these cases were opened the OIG categorized them based on the allegations in the complaint. The table below shows the OIG's breakdown of the cases by category.

| Category | Definition | FY 2019 |
|---|---|---|
| Sexual Act | Penetration | 37 |
| Sexual Abuse | Physical conduct for sexual gratification, e.g. groping, fondling | 46 |
| Sexual Comments — in person | Unambiguously sexual comment to a student | 32 |
| Grooming | Actions to break down inhibitions for the purpose of sexual conduct | 64 |
| Sexual Electronic Communication | Sexual text messages, emails or other communications | 7 |
| Touching: Less than Sexual Abuse | Touching of a possible (not obvious) sexual nature | 45 |
| Concerning: Other | Leering, "creepy" behavior or other potentially concerning behavior | 208 |

Office of Inspector General
Chicago Board of Education
2019 Annual Report

| Category | Definition | FY 2019 |
|---|---|---|
| Old Allegations | Recent outcry concerning behavior towards a staff member | 8 |
| Student-on-Staff Inappropriate Conduct | Students initiating concerning behavior towards a staff member | 11 |

As shown in the next table, many of these cases were also investigated by the police, and 15 cases resulted in criminal charges.

| Police-Involved Cases | FY 2019 |
|---|---|
| Total CPD-involved cases | 75 |
| Active (including two non-criminal investigations) | 24 |
| Suspended or Unfounded | 36 |
| Charged/Indicted | 15 |

The OIG's SAU investigations resulted in 155 temporary or permanent CPS personnel actions during Fiscal Year 2019. Most of these actions were decisions to remove employees from schools while they were under investigation to ensure that children were being protected. For 36 employees, the investigations led to the end of their employment with the district, either through termination, resignation or retirement.

| Personnel Action | FY 2019 |
|---|---|
| Staff pulled or blocked from schools | 109 |
| Staff reinstated on OIG's recommendation | 10 |
| Staff terminated, resigned or retired | 36 |
| **Total** | 155 |

### C. Investigations Concluded in Fiscal Year 2019

In Fiscal Year 2019, the OIG completed 136 SAU investigations and issued reports to the Board in each of those matters. In 34 of those cases, the OIG reported substantiated findings. The OIG found that the other 102 cases were unsubstantiated.

Office of Inspector General
Chicago Board of Education
2019 Annual Report



Each substantiated case is discussed below in more detail. These cases are separated into the categories presented in the following chart, beginning with the two cases reported by the OIG that resulted in criminal charges. Notably, as stated above, in Fiscal Year 2019 there were a total of 15 SAU cases involving criminal charges. However, only two of them are discussed in this Annual Report because they were the only ones of those 15 cases that were completed and reported to the Board in Fiscal Year 2019.



As can be seen, many of the SAU cases reported in Fiscal Year 2019 were substantiated for lesser policy and guideline violations, often for inappropriate or unprofessional acts or comments that improperly crossed boundaries with students. Some cases involved text messages or other electronic communications from teachers to students that were not sexual, but nevertheless violated CPS policy for being sent via unauthorized channels. Although the violations in some of these cases might appear relatively minor, the district has emphasized the importance of these policies for protecting children and thwarting grooming.

As the IG has stated publicly, the OIG began this unit accepting complaints with a very wide breadth of allegations, and — with the determination to vigilantly scrutinize anything that could potentially be predatory — opened any case that could be construed as possibly sexual or leading to sexual activity, even when the

Office of Inspector General
Chicago Board of Education
2019 Annual Report

complaint was not sexual on its face. Consequently, in many SAU cases the OIG found, after a thorough investigation, the conduct at issue was, in fact, non-sexual. Of course, for some of the SAU cases reported in Fiscal Year 2019 the OIG found very serious sexual misconduct.

   1. *Substantiated Cases Resulting in Criminal Charges*

In the two cases below, the OIG found that adults committed sexual misconduct with students. Both cases resulted in criminal charges following police investigations.

   o *Vendor Employee Exposed Himself and Touched Student Sexually (18-01595)*

An investigation determined that an employee of a vendor who worked with students at an elementary school engaged in sexual misconduct with a preteen student multiple times over several weeks. Among other things, he exposed himself to her, showed her naked photos of himself and inappropriately touched her.

He was removed from the school, fired by the vendor that employed him and arrested by the Chicago Police Department following concurrent investigations by the CPD and DCFS. He was later indicted in the Circuit Court of Cook County for aggravated criminal sexual abuse (five counts) and predatory criminal sexual assault of a child (three counts). His criminal case remains pending.

Needless to say, given the severity of his conduct, the OIG found that he clearly violated CPS policy, which strictly prohibits sexual conduct between school personnel (including vendors) and students. His conduct also constituted sexual harassment and violated several other provisions of CPS's policies and guidelines.

The OIG recommended that he be permanently debarred as a CPS vendor and that he be banned from any CPS property. The Board subsequently advised it is in the process of initiating debarment proceedings against him.

   o *School Bus Aide Made Sexual Advance Towards Student (18-01273)*

An investigation determined that, as a school bus aide approached a high school student from behind, he touched her inappropriately and made a sexual comment about her body. The OIG found that the school bus aide engaged in sexual misconduct in violation of CPS's sexual harassment policy. The OIG further found that his conduct constituted an improper sexual advance towards a student and that he improperly targeted a student for personal attention in violation of CPS's guidelines.

Office of Inspector General
Chicago Board of Education
2019 Annual Report

As a result of this incident, the Cook County State's Attorney's Office charged the school bus aide with misdemeanor battery, 720 ILCS 5/12-3(a)(2). His criminal case remains pending.

The OIG recommended that the Board terminate his employment and place a Do Not Hire (DNH) designation in his personnel file. The Board subsequently terminated his employment and put a DNH in his file.

### 2. Sexual Misconduct Between a Principal and Teacher[7] (19-00032)

The OIG found that a principal committed sexual misconduct by having non-consensual sex with a teacher. The teacher reported the incident to the Chicago Police Department, and that investigation is still pending.

The OIG also found that the unwelcomed sexual conduct, which created a hostile work environment at the school, clearly constituted sexual harassment under CPS policy. The principal also violated CPS's non-fraternization policy because the principal supervised the teacher with whom he had sex, and he did not report his involvement with her as required.

Significantly, the principal did not cooperate in the OIG's investigation. Although he appeared for an interview, he refused to answer any questions about the incident in question. Accordingly, the OIG found that he violated Board Rule 4-4(m), which requires all CPS employees to cooperate with OIG investigations.

Following the OIG's interview of the principal, he immediately resigned from CPS. The OIG recommended that the Board place a DNH designation in his personnel file and also recommended that the Board consider referring this matter to ISBE for the possible revocation of his certificates.

The Board subsequently placed a DNH in his file and referred the matter to ISBE, which then opened its own investigation into the principal.

### 3. Failure to Report Suspected Sex Abuse (19-00262)

An investigation determined that a special-education teacher at an elementary school posted on her personal blog that she heard one of her students state that she was sexually assaulted by a relative. The OIG found that the teacher failed to notify DCFS about the alleged sexual abuse as she was required to do under CPS's

---

[7] Although the OIG SAU mostly investigates adult-on-student sexual misconduct, this investigation of adult-on-adult sexual misconduct was a high priority case referred to the OIG, and the SAU was the OIG unit best equipped to handle it. It was the only such matter the OIG reported to the Board in Fiscal Year 2019.

Office of Inspector General
Chicago Board of Education
2019 Annual Report

mandated reporter policy, which provides that mandated reporters, such as her, must immediately call DCFS when they have reasonable cause to believe that a child known to them in their official capacity may have been abused. In this case, the teacher believed that she probably would have told her principal about the sexual abuse reported by her student, but she said she did not realize she was supposed to call DCFS. The teacher clearly lacked a sufficient understanding of the policy, which she failed to follow.

The OIG recommended that the teacher's employment be terminated and that a DNH designation be placed in her personnel file. The OIG also notified DCFS about the matter and referred it to CPS's Office of Student Protections to ensure that the student at issue was receiving appropriate support.

The Board subsequently initiated dismissal proceedings against the teacher, which are still pending.

Notably, this case arose from a related OIG investigation discussed above, in which the OIG found that this teacher was improperly posting confidential student information on the internet (18-00712).

### 4. Other Sexual Harassment and Discrimination Cases

In the following three investigations, the OIG found that teachers' conduct violated CPS's non-discrimination and sexual harassment policy.

#### o  Teacher Required Students to Write about Sexual Fantasies (18-01538)

An investigation determined that a teacher at a high school made several inappropriate and offensive comments to students, many of which were sexual and directed to female students. He also required students to write journal entries about their sexual turn-ons and fantasies for a grade. The OIG found that his actions constituted sex discrimination and sexual harassment in violation of CPS policy. In addition, his conduct was strictly prohibited by CPS's guidelines regarding maintaining professional boundaries with students.

The OIG recommended that the Board terminate his employment and place a DNH designation in his personnel file. He subsequently retired, after the Board initiated dismissal proceedings against him. The Board then placed a DNH in his file.

#### o  Inappropriate Comments and Physical Contact by Gym Teacher (18-01355)

An investigation determined that a gym teacher at a high school had inappropriate physical contact with female students, including putting his arms around their shoulders and touching their backs. The OIG also found that it was more likely than

Office of Inspector General
Chicago Board of Education
2019 Annual Report

not that the gym teacher made an inappropriate sexual comment about a female student. Although his physical contact with students was not overtly sexual, the OIG concluded that he violated CPS's sexual harassment policy, as well as CPS's guidelines on maintaining professional boundaries with students. The OIG found that the repeated physical contact with students combined with the sexual comment created a hostile learning environment for one of his students by interfering with her ability to participate in or benefit from gym class.

The OIG recommended appropriate discipline for the gym teacher, and the Board initiated dismissal proceedings against him, which are still pending.

o  *Teacher Sent Overly Friendly Emails to Female Students (18-01292)*

A high school teacher sent several emails to two female students about non-academic matters, some of which were overly friendly and familiar and sent late in the evening. The OIG did not conclude that this conduct constituted grooming under CPS policy because there was insufficient evidence that he was emailing students for the purpose of sexual abuse. However, the OIG found that the teacher violated CPS's guidelines on maintaining professional boundaries with students because his emails were well outside the bounds of an appropriate relationship between staff and students. The OIG also found that the emails violated CPS's policy regarding the use of the CPS network and computer resources. In addition, the OIG found that, because the teacher appeared to have directed his individualized attention and communications to female students only, he acted towards them in a sexually discriminatory manner in violation of CPS's non-discrimination and sexual harassment policy.

The OIG recommended appropriate discipline for the teacher. In the wake of the OIG's investigation, the teacher resigned from CPS, and the Board placed a DNH designation in his personnel file.

5.  *Other Policy and Guidelines Violations*

In the following cases, the OIG did not find that sexual misconduct occurred, but found that the conduct at issue violated CPS policy or guidelines.

o  *Coach Sent Text Messages to His Team in Violation of Guidelines (18-01302)*

A high school athletic coach sent group text messages regarding team matters to his team at all hours of the day, including during school and late in the evening. He also connected with several of his players on social media and occasionally shared posts and messages with them. After these communications by the coach were first

Office of Inspector General
Chicago Board of Education
2019 Annual Report

reported, the Board terminated his employment and placed a DNH designation in his personnel file.

The OIG subsequently investigated the matter and found no evidence that the coach ever shared sexual or overly personal content with any student or otherwise engaged in sexual misconduct. Nonetheless, the OIG found that the coach violated CPS guidelines by communicating with his team via text message and by connecting with players on social media. Given that the coach was no longer a CPS employee when the OIG issued its report to the Board on this matter, the OIG did not recommend any further action.

> o *Lunchroom Attendant Connected with Students on Social Media (18-01309)*

A lunchroom attendant at a high school inappropriately added friends on Snapchat without first verifying if they were students and allowed at least one student to remain on her friends list after determining that she was a student. She also admitted that she had other students as friends on Snapchat in the past. The OIG found that this conduct violated CPS policy, which prohibits CPS employees from connecting with students on social media.

The OIG recommended that she be given appropriate discipline. She subsequently resigned from CPS.

> o *Improper Boundary Crossing Between Porter and Students (18-01324)*

An investigation determined that a porter at an elementary school acted in an unprofessional and overly friendly manner with students through his playful banter and antics during the lunch period. The evidence did not warrant a finding of grooming, but the OIG found that his conduct violated CPS policy on maintaining professional boundaries with students. The OIG recommended appropriate discipline for the porter, and the Board advised that it took no action against him.

> o *School Security Officer Made Inappropriate Sexual Comments (18-01360)*

An investigation determined that a security officer at an elementary school made inappropriate and lewd comments about women to students and adults, and otherwise behaved inappropriately in the workplace. Among other things, he told students that their mothers were "sexy." Notably, the OIG found no evidence that he made sexual comments about children. However, the OIG found that his comments about adult women were inappropriate and unprofessional.

At the recommendation of the OIG, the Board terminated his employment and placed a DNH designation in his personnel file.

Office of Inspector General
Chicago Board of Education
2019 Annual Report

○ *School Social Worker Bought Gifts for Fifth Grader (18-01362)*

A social worker at an elementary school bought gifts for a fifth-grade student, including a scooter and a tablet, and took her on 10 or more non-educational excursions over a 16-month period. The OIG, however, concluded that this activity did not rise to the level of sexual misconduct. There was no evidence that the social worker ever crossed physical boundaries with the student, and the social worker always brought his nephew (a third grader) along with the student on the excursions, which were all in public places and appropriate for children. Thus, the social worker was not creating isolated, one-on-one interactions with the student. Ultimately, the OIG found no evidence that the social worker was developing a personal relationship with the student for the purpose of sexual abuse. Accordingly, his conduct did not constitute grooming under CPS policy.

While the OIG did not conclude that the social worker committed sexual misconduct, the OIG found that he violated CPS's guidelines on maintaining professional boundaries with students and that he violated the student travel policy by driving the student to their excursions in his private vehicle.

The OIG recommended appropriate discipline for the social worker. The Board subsequently initiated dismissal proceedings against him, which are still pending.

○ *Security Officer's Sexual Comments to a Student (18-01478)*

A security officer at a high school asked a male student if he had engaged in a sexual act with his girlfriend. Although the security officer discussed sexual subject matter with the student, there was no additional evidence to support a finding of sexual misconduct. The OIG, however, found that his comment was inappropriate and violated CPS's guidelines on maintaining professional boundaries with students, which specifically prohibit the type of statement made by the security officer in this case.

The Board had already terminated the security officer's employment and placed a DNH designation in his personnel file when the OIG issued its report in this matter. As such, the OIG did not make any further recommendations.

○ *Teacher's Non-Sexual But Improper Touching of Students (18-01521)*

An investigation determined that a special-education teacher at an elementary school routinely made physical contact with students in class, including what students described as him "hitting" or "slapping" them in a manner that made them feel uncomfortable. The OIG found that the physical contact was not discernably sexual in nature, but that it violated Board rules regarding teachers' physical contact

Office of Inspector General
Chicago Board of Education
2019 Annual Report

with students, as well as CPS's guidelines on maintaining professional boundaries with students.

The OIG recommended appropriate discipline for the teacher, and the Board initiated dismissal proceedings against him, which are still pending.

> o *Photos of Scantily Clad Women in View of Students (18-01535)*

A security officer at an elementary school used a CPS computer at a school security station to browse a dating website containing photos of women in underwear or bikinis, while students were in the vicinity. Students reported that the security officer continued to browse the website in their presence, even though they could see the offensive photos on the computer screen.

After this incident was first reported, the Board terminated the employment of the security officer and placed a DNH designation in his personnel file. The OIG subsequently investigated the matter, finding that the security officer's conduct was offensive to students based on their gender and violated CPS policy regarding the use of the CPS network and computer resources. Given that the security officer was no longer a CPS employee at the time the OIG issued its report, the OIG did not recommend any further action.

> o *Non-Sexual Conduct Involving Teacher at Charter High School (18-01554)*

An investigation determined that a teacher at a charter high school had hugged students and touched their upper backs and shoulders. The teacher had also been alone with a student in an office on two occasions and had texted various students on a field trip. The OIG found that the teacher's interactions with students were not sexual in nature, but that they would have violated policy and guidelines for CPS staff. The teacher's physical contact with students, while non-sexual, appeared to be beyond a professional and appropriate boundary with students, and being alone with students in the office was sufficient to give the appearance of impropriety. As for the text messages, although they would have normally been permitted, given that they were necessitated by educational activities, the teacher had not obtained consent from the principal and parents to send the texts.

The OIG recommended that the Board share the OIG's report with the charter school and that the charter consider appropriate discipline for the teacher. The charter has not yet responded with its determination on the matter.

Office of Inspector General
Chicago Board of Education
2019 Annual Report

o *Security Officer Gave His Phone Number to a Student (18-01555)*

A security officer at an elementary school gave his personal phone number to a seventh-grade student and told her that she could call him anytime if she needed to talk. He also hugged the student on at least one occasion. After this incident was first reported, the Board terminated the employment of the security officer and placed a DNH designation in his personnel file.

The OIG investigated the matter and concluded that, while this case did not rise to the level of sexual misconduct, the security officer violated CPS's guidelines for maintaining professional boundaries with students and also violated CPS policy governing the proper channels of communications with students. Although he apparently never actually spoke with the student over his phone, he intended for the student to contact him outside the authorized CPS network to discuss matters unrelated to school, which was improper. Given that the security officer was no longer a CPS employee at the time the OIG issued its report, the OIG did not recommend any further action.

o *Vendor Employee Asked to Connect with Student on Social Media (18-01557)*

A vendor employee gave a high school student a candy bar, asked her if she had social media accounts and then asked her to add him to her accounts. Given that this was only a single instance of giving a student candy and asking to connect on social media, without evidence that he had the intent of breaking down her inhibitions for the purpose of sexual abuse, the OIG could not conclude that this rose to the level of grooming. The OIG, however, found that his conduct violated the guidelines on maintaining professional boundaries with students, as well as the CPS policy prohibiting communicating with students on personal social media accounts.

At the time the OIG issued its report to the Board, he was no longer employed by the CPS vendor. Accordingly, the OIG reported its findings but did not recommend any further action. The Board has advised that, in the event this individual ever applies to work for CPS, the Board will consider his conduct in this case when reviewing his application for employment.

o *Students Viewed Pornographic Images on Teacher's Tablet (18-01613)*

While a seventh-grade student was using his teacher's personal tablet, the student found pornographic images on it and showed them to other students. Based on the evidence, the OIG concluded that the teacher actually did not know that the pornographic pictures were on his tablet and that he had taken some protective measures to prevent students from accessing private information on his tablet. Nevertheless, the OIG found that the teacher violated CPS's guidelines on

Office of Inspector General
Chicago Board of Education
2019 Annual Report

maintaining professional boundaries with students because he failed to provide adequate supervision to ensure that the students did not view pornographic content on his tablet.

The OIG recommended appropriate discipline for the teacher, and the Board placed him on a Level Two Performance-Improvement Plan.

> o *Substitute Teacher's Inappropriate Comments to Students (18-01681)*

A substitute teacher made racially- or ethnically-focused sexually inappropriate comments to eighth-grade girls that made them uncomfortable. Specifically, he told one girl that she had "grown into a beautiful woman" and should "uplift" the men of her race. He told another girl that the people of her ethnicity are good lovers. The OIG found that these comments violated CPS's guidelines on maintaining professional boundaries with students.

The OIG recommended appropriate discipline for the substitute teacher. The Board advised that a disciplinary review of this matter is still pending.

> o *Inappropriate Language in Verbal Spar with Student (18-01736)*

A vendor employee who mentored and tutored CPS students used inappropriate sexual language with a high school student while they were sitting in the bleachers watching a basketball game. The mentor and student were lightly teasing each other, until the interaction escalated when both parties made comments about the other's genitalia. The OIG found that the mentor's comments were unprofessional and violated CPS's guidelines regarding maintaining professional boundaries with students. There was no evidence that any other misconduct occurred between the two individuals.

After the incident, the mentor was reassigned to a different school. The OIG recommended that the Board consider whether any further action against the mentor or vendor was necessary and that, if the Board determined that further action was warranted, the Board should communicate that to the vendor for appropriate follow up. The Board subsequently informed the vendor that the mentor is no longer permitted to work with CPS.

> o *Teacher's Inappropriate Conduct with Students (18-01800)*

A temporarily assigned teacher at an elementary school improperly interacted with seventh- and eighth-grade students, including speaking with students about a song that references strippers and offering a student a tampon when she asked for a

Office of Inspector General
Chicago Board of Education
2019 Annual Report

Band-Aid. The OIG found that this did not constitute sexual misconduct but that it violated CPS's guidelines on maintaining professional boundaries with students.

Because the teacher was in a temporary position and had been removed from the school during the OIG's investigation, his position ended and he was no longer working for CPS when the OIG issued its report. Therefore, the OIG recommended that the Board place a DNH designation in his personnel file, which the Board subsequently did.

> o *Security Officer Sent Student Flirtatious Text Messages (18-01824)*

An investigation determined that a security officer at an elementary school sent flirtatious text messages to a student who was a senior at a CPS high school. Although the student did not attend the security officer's school, he met her while she was participating in an event at his school, and the OIG concluded he likely knew or should have known that she was a student. The evidence showed that he gave her his personal phone number and that she later texted him, at which time he asked how old she was and she told him she was 18. He followed with flirtatious texts. The OIG, however, found no evidence that they ever met again in person.

The OIG found that, while the evidence in this case did not rise to the level of sexual misconduct, the security officer violated CPS's guidelines on maintaining professional boundaries with students and also violated the CPS policy generally prohibiting staff from texting students on their personal phones.

The OIG recommended appropriate discipline for the security officer. The Board subsequently terminated his employment and placed a DNH designation in his personnel file.

> o *Security Officer Improperly Referenced Sex (19-00037)*

While a security officer at a high school was patrolling the lunchroom he saw two juniors hugging and, in an effort to get them to separate, sarcastically asked them if they were trying to have sex. The OIG found that, while his comment did not constitute sexual misconduct, it violated CPS's guidelines on maintaining professional boundaries with students.

The OIG recommended appropriate discipline for the security officer, and the Board subsequently suspended him for 15 days without pay. He has since returned to work.

Office of Inspector General
Chicago Board of Education
2019 Annual Report

   o  *Male SECA Walked into Entryway of Girls' Bathroom (19-00039)*

A male special-education classroom assistant at an elementary school walked into the entryway of the girls' bathroom while several sixth-grade students were inside to tell them to hurry up. The OIG did not find that this incident rose to the level of sexual misconduct. It was a one-time event, he did not walk fully into the bathroom and he only walked into the entryway to tell the students to hurry. Nevertheless, the OIG found that this conduct violated CPS's guidelines for maintaining professional boundaries with students.

The OIG recommended appropriate discipline for the SECA. Following the investigation, however, the SECA resigned from CPS.

   o  *SECA's Non-Sexual Touching of Pre-K Student (19-00054)*

An investigation determined that a special-education classroom assistant at an elementary school touched pre-kindergarten students on the shoulder in a playful manner and potentially poked them in the ribs. One student complained about being touched in this manner and asked the SECA to stop, but he did not stop. The student then became increasingly nervous about coming to school and interacting with the SECA. Although the SECA's touching of the pre-K student was not sexual in nature, the OIG found that it violated CPS's guidelines on maintaining professional boundaries with students.

The OIG recommended appropriate discipline for the SECA. The Board subsequently terminated his employment and placed a DNH designation in his personnel file.

   o  *Substitute Teacher's Sexual Gesture to a Student (19-00085)*

While a substitute teacher was working at a computer with a senior, he typed a sexual innuendo on the screen and made a sexual gesture to the student. There was no evidence of any further improper interaction between him and her. The OIG found that this conduct did not rise to the level of sexual misconduct but that he clearly violated CPS's guidelines on maintaining professional boundaries with students.

The OIG recommended appropriate discipline for the substitute teacher. The Board subsequently terminated his employment and placed a DNH designation in his personnel file.

   o  *Teacher Gave Money and Special Attention to Students (19-00086)*

A teacher at a high school communicated with students on social media and via text message about matters unrelated to school. He also gave certain students additional

Office of Inspector General
Chicago Board of Education
2019 Annual Report

attention and monetary gifts. The OIG did not find that these interactions with students were sexual. However, the OIG found that his conduct violated CPS policy and guidelines because he communicated with students over unauthorized channels and crossed professional boundaries with students by developing overly familiar relationships with them.

The OIG recommended appropriate discipline for the teacher. The Board subsequently terminated his employment and placed a DNH designation in his personnel file.

- o *Teacher's Failure to Prevent Students' Access to Sexual Material (19-00095)*

An investigation determined that when a high school teacher walked out of the classroom, one of her students accessed the teacher's cell phone, viewed sexual content on the phone and showed that sexual content to other students in the class. The teacher had allowed students to use her phone, and she knew that the sexual material was on her phone, but she told the OIG she trusted that the students would not use her phone to access that material. Based on the evidence, the OIG concluded that the teacher did not intend to share the sexual material with the students and that, in fact, her students demonstrated a lack of respect for her privacy. However, the OIG found that the teacher, nevertheless, violated CPS's guidelines on maintaining professional boundaries with students by failing to take adequate precautions to ensure that students did not access sexually explicit material.

The OIG recommended appropriate discipline for the teacher. The Board subsequently placed the teacher on a Level Two Performance-Improvement Plan.

- o *Interaction Between Student and Family-Friend SECA (19-00213)*

An investigation determined that a SECA had a close relationship with a special-needs senior and her family. The SECA did not engage in any sexual misconduct, but she did violate CPS policy and guidelines. The OIG found that, at times, the SECA and student had texted each other and had telephone conversations using their personal cell phones, which violated CPS policy governing the proper channels for communications between staff and students.

Also, on one occasion when the student was walking to school in the cold and snow, her aunt asked the SECA if she could pick her up and drive her to school. The SECA drove the student to school that day with the aunt's permission, as well as the permission of the student's lead teacher, but she technically violated the CPS student travel policy because she failed to obtain the written consent from the student's family or the principal.

Office of Inspector General
Chicago Board of Education
2019 Annual Report

The SECA also admitted that she occasionally hugs her students and blows kisses to them, which she said she did in an attempt to create a safe and family-like atmosphere in her class, which is comprised of special-needs students between 19 and 22 years old. The OIG found that this conduct violated CPS's guidelines on maintaining professional boundaries with students.

The OIG recommended appropriate discipline for the SECA, and she was subsequently given school-based discipline.

> o *Teacher's Inappropriate Comment to Eighth Grader (19-00250)*

An elementary school teacher admitted that he told one of his eighth-grade students that she "should be kissing [his] ass." The teacher acknowledged that the comment was inappropriate, but explained that he meant it as a joke. The student said the teacher was probably joking, but that the comment made her uncomfortable. The OIG found that the statement violated CPS's guidelines on maintaining professional boundaries with students. However, the OIG did not find sufficient evidence to support a finding of sexual misconduct.

The OIG recommended appropriate discipline for the teacher, and the Board is still considering what action to take in this matter.

> o *Security Officer Encouraged Students to Date Each Other (19-00277)*

A security officer at a high school used a loudspeaker during a Valentine's Day–themed fundraiser at the school to encourage specific students to purchase gifts for specific other students and also to encourage students who used to date each other to get back together. Although these comments by the security officer did not rise to the level of sexual misconduct, the OIG found that they were inappropriate and in violation of CPS's guidelines on maintaining professional boundaries with students.

The OIG recommended appropriate discipline for the security officer, and he was issued a written reprimand.

> o *Substitute Teacher's Comments About His Own Love Life (19-00282)*

A substitute teacher told a group of high school students during class that he needed to find a desperate woman for Valentine's Day. He also made a gratuitous comment about a musician being a "sugar daddy." Although these comments did not rise to the level of sexual misconduct, the OIG found that they violated CPS's guidelines on maintaining professional boundaries with students.

The OIG recommended appropriate discipline for the substitute teacher, and the Board advised that it is still considering what action to take in this matter.

Office of Inspector General
Chicago Board of Education
2019 Annual Report

   ○ *Security Officer Engaged in Sexual Banter with Students (19-00498)*

A security officer at a high school used explicit language while engaging in sexual banter with a group of male students. Although he discussed sexual subject matter, his comments did not rise to the level of sexual misconduct because, among other things, he did not make any sexual advances toward any student, and there was no evidence he engaged in any sexual conduct with a student. The OIG, however, found that his comments violated CPS's guidelines on maintaining professional boundaries with students, which specifically prohibit the type of comments made by the security officer in this case.

The OIG recommended appropriate discipline for him, and the Board subsequently terminated his employment and placed a DNH designation in his personnel file.


### Section 9 — Cases Involving Arrests or Criminal-Background Issues

The OIG has the responsibility of monitoring the outcome of cases wherein Board employees or vendors were arrested and charged with criminal offenses. The OIG reports on these matters so that the Board can make a determination regarding administrative discipline or other action, based on the resolution of the criminal cases.

   ○ *Teacher Convicted of Misdemeanor Battery for Striking her Son (14-01334)*

A teacher at an elementary school was arrested for striking her teenage son and for child endangerment with respect to her younger daughter, who was beaten by the teacher's boyfriend. For striking her son, the teacher was charged in the Circuit Court of Cook County with two counts of aggravated domestic battery, a Class 2 felony, 720 ILCS 5/12-3.3(a), and one count of aggravated battery with the use of a deadly weapon, a Class 3 felony, 720 ILCS 5/12-3.05(f)(1). The teacher was initially charged with child endangerment with respect to her daughter, but that charge was dropped.

The case proceeded to trial on the three counts pertaining to the incident with her son. At trial, the court found her not guilty of aggravated battery with the use of a deadly weapon. With regard to the two aggravated domestic battery counts, the court found her guilty of two lesser-included offenses — two counts of misdemeanor battery. The court sentenced her to two years of probation and eight days of community service. She also paid $502 in court fines and fees.

Office of Inspector General
Chicago Board of Education
2019 Annual Report

In addition, DCFS conducted a concurrent investigation of this matter and made an indicated finding against the teacher for "substantial risk of physical injury/environment injurious to health and welfare by neglect."

The Board subsequently placed her on a Level Two Performance-Improvement Plan.

> o *Vendor Pre-K Teacher Convicted of Criminal Sexual Assault (15-00099)*

A preschool teacher employed by a vendor was arrested and charged in the Circuit Court of Cook County in two separate cases for criminal sexual assault of three-year-old students. In one case he was charged with eight counts of predatory criminal sexual assault of a child under 13 years of age, a Class X felony, 720 ILCS 5/11-1.40(a)(1). He pleaded guilty to one of those counts, and the court sentenced him to serve 13 years in prison. He was also sentenced to three years of mandatory supervised release.

In the other case he was charged with one count of the same crime — predatory criminal sexual assault of a child under 13 years of age. However, in that case he pleaded guilty to the lesser charge of aggravated criminal sexual abuse, a Class 2 felony, 720 ILCS 5/11-1.60(c)(1). The court sentenced him to three years in prison and two years of mandatory supervised release.

The OIG recommended that the Board personally debar him from ever doing business with CPS or otherwise working on CPS property. The Board subsequently permanently debarred him.

> o *Substitute Teacher Convicted of Indecent Solicitation of a Child (15-00192)*

A substitute teacher at an elementary school was arrested and charged in the Circuit Court of Cook County with two counts of indecent solicitation of a child with the intent of committing criminal sexual assault, a Class 2 felony, 720 ILCS 5/11-6(a); one count of indecent solicitation of a child with the intent of committing aggravated sexual abuse, a Class 3 felony, 720 ILCS 5/11-6(a); one count of grooming (using an electronic device to solicit a child to commit a sex offense), a Class 4 felony, 720 ILCS 5/11-25; and one count of solicitation to meet a child whom he believed was more than five years younger than him, a Class 4 felony, 720 ILCS 5/11-6.6.

He was arrested after a teacher and administrator at the school reported to the police his improper actions toward an eighth-grade student. The Board terminated his employment and placed a Do Not Hire (DNH) designation in his personnel file.

Office of Inspector General
Chicago Board of Education
2019 Annual Report

He was later found guilty of all counts and was sentenced to serve four months in the Cook County Department of Corrections. He was also sentenced to 30 months of sex-offender probation.

    o  *Teacher Arrested for DUI (16-00667)*

A teacher was arrested for driving under the influence and was subsequently charged in the Circuit Court of Cook County with the Class A misdemeanor of DUI with a blood or breath alcohol content of 0.08 or greater, 625 ILCS 5/11-501(a)(1). The court fined him and gave him supervision, with community service.

The OIG advised the Board of this matter, and the Board subsequently determined that no discipline was warranted in this case.

    o  *Hourly Employee Convicted of Unlawful Use of a Weapon (18-00108)*

An hourly employee at a high school was arrested and charged in the Circuit Court of Cook County with felony aggravated unlawful use of a weapon, 720 ILCS 5/24-1.6(a)(2), and criminal trespass to vehicles, 720 ILCS 5/21-2(a). He pleaded guilty to a lesser weapons charge — misdemeanor unlawful use of a weapon, 720 ILCS 5/24-1(a)(10) — and the trespass to vehicles charge was dropped. The court sentenced him to one year of conditional discharge, with 80 hours of community service. The court also ordered him to pay $314 in fines, costs and fees.

The Board terminated his employment and placed a DNH designation in his personnel file.

    o  *Lunchroom Manager Pleaded Guilty to Simple Battery (18-00436)*

A lunchroom manager was arrested and charged in the Circuit Court of Cook County with one count of misdemeanor domestic battery, 720 ILCS 5/12-3.2(a)(1). He subsequently pleaded guilty to the lesser charge of simple misdemeanor battery. He was sentenced to 18 months of court supervision and fined $250.

He subsequently resigned from CPS, and the Board placed a DNH designation in his personnel file.

    o  *Security Guard Convicted of Unlawful Use of a Weapon (18-01156)*

A high school security guard was arrested and charged in the Circuit Court of Cook County with felony aggravated unlawful use of a weapon, 720 ILCS 5/24-1.6(a)(1) and (2). He subsequently pleaded guilty to the lesser charge of unlawful use of a weapon/possession of a firearm, a Class A misdemeanor, 720 ILCS 5/24-1(a)(4). He was sentenced to community service and one year of supervision.

Office of Inspector General
Chicago Board of Education
2019 Annual Report

The Board subsequently terminated his employment and placed a DNH designation in his personnel file.

o   *SECA Convicted of Theft (18-01202)*

A special-education classroom assistant was arrested for her involvement in a fraud scam in which she opened lines of credit under false pretenses, made fraudulent purchases and exchanged those items for cash. She was charged in the Superior Court of Lake County, in Indiana, with three Level 6 felonies — forgery, identity deception and theft. She subsequently pleaded guilty to the theft count. The court sentenced her to 18 months in jail, but suspended that sentence and placed her on probation for 18 months, with the condition that she perform 100 hours of community service.

The Board subsequently terminated her employment and placed a DNH designation in her personnel file.

o   *Teacher Convicted of Violating Order of Protection (18-01473)*

A teacher was arrested after placing a tracking device on the car of his ex-girlfriend, a fellow CPS teacher, and violating an order of protection that she had against him. He was charged in the Circuit Court of Cook County with two counts of violating an order of protection, a Class A misdemeanor, 720 ILCS 5.0/12-3.4(a)(1), and one count of unlawful use of an electronic tracking device, also a Class A misdemeanor, 720 ILCS 5.0/21-2.5(b). He pleaded guilty to both counts of violating an order of protection and was sentenced to two years of supervision, including community service and electronic monitoring. The court also fined him $250 and ordered him to take a mental health examination.

The OIG advised the Board of this matter, and the Board subsequently initiated dismissal proceedings against him, which are still pending.

o   *Porter Convicted for Possession of Heroin (18-01691)*

A porter at an elementary school was arrested and charged in the Circuit Court of Cook County with one count of possession of a controlled substance (an amount less than 15 grams of heroin), a Class 4 felony, 720 ILCS 570/402(c). He pleaded guilty to that count and was sentenced to two years of probation. He was also ordered to pay $1,229 in fines and fees.

After the OIG advised the Board of this matter, the porter resigned from CPS. The Board subsequently placed a DNH designation in his personnel file.

Office of Inspector General
Chicago Board of Education
2019 Annual Report

## SECTION 10 — UPDATES TO CASES REPORTED IN PREVIOUS ANNUAL REPORTS

### A. CONVICTIONS AND SENTENCING IN MAJOR THEFT SCAM

In its 2014 Annual Report, the OIG reported its findings in four investigations that concerned major purchasing and reimbursement schemes that a school operations employee (Employee A) coordinated across two high schools. The schemes included CPS employees and vendors and resulted in the theft of nearly $900,000.

The OIG referred this matter to the Cook County State's Attorney's Office, which brought criminal charges against a number of individuals involved in the schemes. Specifically, the May 2015 Grand Jury of the Circuit Court of Cook County returned a 35-count indictment against five individuals involved in the schemes. Subsequent charges against two additional individuals brought the total number of criminal defendants to seven. All of those defendants have now reached plea agreements and have been sentenced by the court. The table below shows the crimes they pleaded guilty to, as well as their sentences.[8]

| Subject | Guilty Plea and Sentence |
|---|---|
| **Employee A**<br><br>OIG Cases<br>13-01153<br>14-00525<br>14-00595<br>14-00596 | o   Pleaded guilty in 2019 to organizing a financial criminal enterprise, a Class X felony.<br><br>o   Sentenced to six years in prison.<br><br>o   Court entered a $750,000 judgment against him for money stolen from CPS as part of the criminal enterprise he organized. |
| **Employee C**<br><br>OIG Case<br>14-00595 | o   Pleaded guilty in 2015 to one Class A misdemeanor count of theft.<br><br>o   Sentenced to conditional discharge, fined court costs and ordered to pay $10,000 in restitution. |
| **Employee D**<br><br>OIG Case<br>14-00525 | o   Pleaded guilty in 2019 to a lesser charge of misdemeanor theft.<br><br>o   Sentenced to probation for two years, with the condition of paying CPS $3,500 in restitution and completing 240 hours of community service. He was also ordered to pay $444 in court fines, fees and costs.<br><br>o   To date, he has paid CPS $1,140 of the restitution owed. |

---

[8] The names for the individuals given in the table, such as "Employee A," reflect the designations they were given in the OIG's 2014 Annual Report, where their conduct is discussed in more detail along with the conduct of other parties involved. This table only provides the information for the parties who were criminally charged, which is why individuals like "Employee B" are omitted.

Office of Inspector General
Chicago Board of Education
2019 Annual Report

| Subject | | Guilty Plea and Sentence |
|---|---|---|
| **Employee E**<br>OIG Case<br>14-00596 | o | Pleaded guilty in 2015 to one Class A misdemeanor count of theft. |
| | o | Sentenced to conditional discharge, fined court costs and ordered to pay $5,000 in restitution. |
| | o | He has already paid CPS the full $5,000 in restitution. |
| **Business Owner 2**<br>OIG Case<br>13-01153 | o | Pleaded guilty in 2019 to conspiracy to commit a financial crime, a Class 1 felony. |
| | o | Sentenced to probation for three years, with the condition of paying CPS $100,000 in restitution and serving 400 hours in the Sheriff's Work Alternative Program. He was also ordered to pay $864 in court fines, costs and fees. |
| | o | To date, he has paid CPS $15,000 of the restitution owed. |
| **Business Owner 3**<br>OIG Case<br>13-00153 | o | Pleaded guilty in 2019 to conspiracy to commit a financial crime, a Class 1 felony. |
| | o | Sentenced to three years of probation, with the condition of paying CPS $75,000 in restitution and serving one year of home confinement with electronic monitoring. He was also ordered to pay $619 in court fines, costs and fees. |
| | o | To date, he has paid CPS $15,000 of the restitution owed. |
| **Business Owner 4**<br>OIG Case<br>13-00153 | o | Pleaded guilty in 2018 to Class 1 felony theft. |
| | o | Sentenced to two years of second-chance probation — which includes community service — with the condition of paying CPS $20,000 in restitution. He was also ordered to pay $624 in court fines, costs and fees. |

### B. GUILTY PLEAS AND SENTENCING IN DISABILITY BENEFITS FRAUD CASE

In its Annual Report for the 2017 Fiscal Year, the OIG reported that the owner of a vendor company that regularly sold the district gift cards was responsible for false pricing and invoicing, as well as deficient inventory controls and records (15-01115). The OIG also found that an employee of the vendor used the vendor's relationship with CPS to steal gift cards, which she and her husband used to make $4,043.62 worth of personal purchases.

In the 2018 Annual Report, the OIG reported that the U.S. Attorney's Office for the Northern District of Illinois indicted the employee and her husband on multiple counts of defrauding the Social Security Administration. In addition, the employee and her husband were each charged with lying to the SSA, and the vendor's owner and the employee's husband were each charged with falsifying documents to

Office of Inspector General
Chicago Board of Education
2019 Annual Report

obstruct the government's investigation of this matter. All three were charged with conspiracy to falsify documents with the intent to obstruct the government's investigation.

The OIG assisted the U.S. Attorney's Office and the Office of Inspector General for the Social Security Administration with their investigation of this matter.

According to the allegations in the indictment, the employee and her husband fraudulently concealed the fact that she was working for the vendor in order to obtain more than $110,000 in Social Security Disability Insurance benefits, which she was not entitled to receive, given her employment. The employee and her husband included the vendor's owner in the scheme. Among other things, they arranged for the vendor's owner to falsely issue the employee's paychecks in the name of the employee's husband in an effort to represent that the husband, and not the wife, was working for the vendor.

In 2019, all three entered guilty pleas and were sentenced by the U.S. District Court. The employee and her husband each pleaded guilty to one count of wire fraud, in violation of 18 U.S.C. § 1343, and one count of conspiracy to obstruct justice, in violation of 18 U.S.C. § 371. The owner of the company pleaded guilty to obstruction of justice, in violation of 18 U.S.C. § 1519.

The employee was sentenced to 10 months in prison, followed by two years of supervised release. Her husband was sentenced to nine months in prison, followed by two years of supervised release. The two of them were ordered to pay restitution to the Social Security Administration in the amount of $111,763 and each ordered to pay a $200 special assessment to the court.

The owner was sentenced to two years of supervised release, with the first three months in home confinement. She also was ordered to pay a $5,000 fine and a $100 special assessment to the court.

### C. Changes to Pre-K Program at Oscar Mayer Magnet

In a May 23, 2018, Significant Activity Report the OIG detailed a pre-K admissions process at Oscar Mayer Magnet that, for 10 years, gave parents living in Mayer's Lincoln Park attendance area the inside track to the school's free two-year Montessori pre-K magnet program (17-00326).

This attendance area preference was due to Mayer's designation, via a 2008 Board Report, as a magnet school with an attendance boundary. According to that Board Report, CPS was supposed to provide the Board with an annual Mayer demographic analysis to monitor whether Mayer should "maintain its designation as a magnet

school with attendance boundaries or will be categorized as a magnet school with no attendance boundaries." At the time of the OIG's report, no such demographic analysis had been done in 10 years. During that time period, Mayer became increasingly less diverse, both racially and socioeconomically. The school shifted from 49 percent African American in 2007 to 73.2 percent white in 2019. Its attendance area is currently the most affluent in all of CPS and is composed solely of the most affluent of four CPS socioeconomic tiers. Despite a huge demand for Mayer's free pre-K, in recent years the school rarely has had room for applicants from outside the neighborhood.

The OIG found it unjustifiable that residents of CPS's wealthiest attendance area should receive priority access to two years of free Montessori pre-K worth approximately $30,000 in the private market and recommended that such special access be halted.

Following the OIG's report, CPS held a series of community meetings about the future of Mayer's pre-K program. The community and CPS decided that it would become a tuition-based pre-K Montessori program at the reduced tuition rate of $10,232, as it offered fewer than the 10 hours per day of classes provided at CPS's other tuition-based pre-K programs. Existing Mayer three-year-olds would be allowed to continue for free as four-year-olds, but new three-year-olds were supposed to be charged tuition. As of December 2019, CPS listed 40 students in Mayer's tuition-based pre-K program: six four-year-olds and 34 three-year-olds. Mayer is expected to offer tuition-based pre-K again in the 2020–21 school year, although the age groups and application deadline have yet to be determined, according to CPS.

The switch to a tuition-based pre-K program meant that, for the first time, kindergarten was Mayer's entry-level magnet grade in the fall of 2019. However, the Office of Access and Enrollment advised that, because the Board did not approve the pre-K decision until May of 2019, OAE was unable to run traditional lotteries with economic tiers for fall 2019 admission to Mayer's kindergarten. Across all grades, ultimately Mayer received 1,357 out-of-boundary magnet applications for what turned out to be only 11 K–8 openings, CPS data indicated. With 22 of a total 23 offers for 11 seats occurring two weeks after school started, only one student accepted. OAE advised that Mayer is expected to run a kindergarten lottery with economic tiers for fall 2020 admission.

The OIG had also recommended that CPS and the Board develop a tracking system so that information requested by the Board, such as the Mayer demographic analyses, would not continue to fall through the cracks. Since the OIG issued its

Office of Inspector General
Chicago Board of Education
2019 Annual Report

report on this matter, the Board has advised that it has implemented a "new and more robust project management system" to track information required to be sent to the Board. A Mayer demographic report was filed in 2019 showing that Mayer's white population had increased for the 12th consecutive year and comprised 564 students out of a total enrollment of 770.

Mayer currently receives magnet funding despite its decreasing racial and socioeconomic diversity. Pursuant to Board Policy, magnet schools are supposed to try to maintain racial diversity as well as promote socioeconomic diversity. Mayer's diversity received little help in the 2019–20 school year, when CPS data indicated that only one student from outside the attendance boundary was accepted via the magnet lottery. As the OIG recommended, CPS should hold community meetings to decide whether Mayer should remain a magnet school with a boundary, or be converted to a traditional neighborhood school, a traditional magnet school with citywide admissions or a neighborhood school with a magnet cluster program.

Office of Inspector General
Chicago Board of Education
2019 Annual Report

# APPENDIX

March 13, 2019, Significant Activity Report:
Performance Review of Pre-K Billing and Collections

**Appendix**

Office of
**Inspector General**
Chicago Board of Education

Nicholas Schuler, Inspector General

---

## SIGNIFICANT ACTIVITY REPORT

---

OIG 18-00133                                     WEDNESDAY, MARCH 13, 2019

### PERFORMANCE REVIEW: PRE-K BILLING AND COLLECTIONS

**KEY FINDINGS**

CPS left as much as $2 million in parent payments involving two pre-K programs on the table over the last four school years, including money it was shorted by nearly 140 of its own employees, a performance review by the Office of Inspector General for the Chicago Board of Education has found.

The programs at issue are CPS's tuition-based pre-K, which this school year cost parents nearly $14,000 per full-day seat, and the less expensive sliding-scale pre-K program, which has charged parents copayments ranging from $260 a year to just over $4,400 a year for half-day seats, depending on family size and income.

Over the last four school years and across these two pre-K programs, CPS could have collected an additional nearly $1.6 million to $2 million but failed to do so due to pre-K application fraud by its own employees, lax debt collection, mismanagement, poor oversight of its tuition-collection arrangement with a for-profit company, and human or data errors, according to an OIG performance review of CPS pre-K billing and collections.

The OIG identified six ways in which CPS failed to collect all the money it was owed from the two programs in question — including from its own employees.

Overall, 138 CPS employees shorted CPS nearly $215,000 by either ignoring their tuition-based or sliding-scale pre-K bills or understating their incomes on applications for sliding-scale seats, an analysis of data provided by the CPS Office of Early Childhood Education, the for-profit tuition-collection vendor and other sources showed.

---

567 West Lake Street  ◆  Suite 1120  ◆  Chicago, Illinois  ◆  60661-1405
Phone (773) 534-9400  ◆  Fax (773) 534-9401  ◆  inspectorgeneral@cpsoig.org

**Appendix**

Specifically, 78 CPS employees shorted the district more than $114,000 by understating their CPS incomes on sliding-scale pre-K applications, thereby reducing or eliminating their copays, the OIG's Performance Analysis Unit found.

**Table 1: Employees per SY Who Shorted CPS by Understating Their Incomes by $1,000 or More**

| SY | Employees | Money Shorted CPS | Free Seats From Understated Incomes |
|---|---|---|---|
| 2014-15 | 23 | $46,444 | 13 |
| 2015-16 | 35 | $35,849 | 22 |
| 2016-17 | 19 | $14,111 | 12 |
| 2017-18 | 23 | $17,984 | 17 |
| **Total** | **78*** | **$114,387** | **64**** |

*Employees who understated income in multiple years or for multiple children are counted only once in the Total row.

**The 64 free pre-K seats benefited 55 children of 51 employees.

Source: OIG analysis of OECE and tuition-collection vendor data.

As indicated in **Table 1**, of these 78 employees, 51 won 64 free pre-K seats for their children (some attended for free two years in a row) by portraying themselves on applications as earning less than indicated by their CPS W-2s.

In addition, as shown in **Table 2**, 64 CPS employees neglected to pay more than $100,000 in bills for tuition-based pre-K or the sliding-scale program, despite repeated automated past-due warnings from the tuition-collection vendor.

The vast majority of these CPS-employee debtors — 61 of the 64 — owe money to the sliding-scale program, where CPS was especially lax about taking action against debtors, even if they listed six-figure incomes on pre-K application forms. Current OECE officials told the OIG that they could not remember ever removing the child of a single sliding-scale debtor from the program.

**Table 2: Pre-K Debt Owed by CPS Employees in Last Four SYs**

| SY | Employees with Sliding-Scale Debt | Sliding-Scale Debt | Employees With Tuition-Based Debt | Tuition-Based Debt |
|---|---|---|---|---|
| 2014-15 | 17 | $20,461 | 1 | $5,207 |
| 2015-16 | 20 | $15,483 | 0 | $0 |
| 2016-17 | 7 | $14,404 | 1 | $2,986 |
| 2017-18 | 25 | $39,567 | 1 | $2,207 |
| **Total** | **61*** | **$89,915** | **3** | **$10,400** |

*Some employees incurred debts in multiple years. In the Total row, such employees are only counted once.

Source: OIG analysis of CPS and tuition-collection vendor tuition-based data as of Oct. 23, 2018, and sliding-scale data as of Oct. 2, 2018, with debt reflecting only tuition or copays owed, not late fees.

**Appendix**

Such sliding-scale debtors include 2 principals, 2 assistant principals, 25 teachers and a Chicago police commander with a six-figure salary who has yet to pay nearly $8,900 in sliding-scale copays for the pre-K classes his two children enjoyed in 2015–16 and 2016–17.

The commander was among dozens of parents — including seven CPS employees — whose 63 children were allowed to attend a second year of pre-K even though they still owed money for the first year of pre-K. The commander and other such debtor parents then failed to pay additional bills for the second year of pre-K, racking up nearly $138,000 in total debt over both pre-K years. **Table 3** shows that these parents averaged even more debt in their child's second year than in the first.

Table 3: Pre-K Students with Two Years of Sliding-Scale Debt, SY 2014–15 to SY 2017–18

|  | **Students** | **Total First Year Debt** | **Average First Year Debt** | **Total Second Year Debt** | **Average Second Year Debt** |
|---|---|---|---|---|---|
| **Total** | 63 | $63,344 | $1,005 | $74,395 | $1,180 |
| **With Employee Parents** | 7 | $12,590 | $1,799 | $14,831 | $2,119 |

Note: First-year debts do not carry over. Siblings who each had two years of debt were counted separately; siblings with one year of debt each are not reflected. Each employee-parent has one child with two years of debt.

Source: OIG analysis of CPS and tuition-collection vendor data.

This was the pattern of some of CPS's biggest debtors, including one family that owes CPS close to $15,500 over two years for two children; a CPS clerk who owes CPS more than $8,100 for her child's two years of pre-K in the school where she worked, and another Chicago police officer who owes CPS nearly $7,600.

Under Section 4-4(g) of the Board of Education Rules, CPS employees can be disciplined or fired for not paying city parking tickets but face no such penalties for not paying CPS pre-K bills. Thus, the OIG's 21 recommendations in its December 2018 report to the Board included updating Board Rules and Policies to impose consequences for pre-K debt by CPS employees.

Although CPS stopped charging sliding-scale copays this school year, it continues to provide free pre-K based on need by using an online application form the OIG views as flawed because it lacks an attestation of truthfulness, has no place for a signature and provides no clear indication of who filled out the form. The OIG recommended an improved form that includes these elements to discourage gaming of the system, especially by CPS employees as well as City of Chicago or sister agency employees.

The OIG does not take lightly a CPS employee who, in effect, lies to his or her employer for personal gain — and in a way that stiffs CPS. Income

**Appendix**

misrepresentation on a CPS pre-K application could amount to a criminal violation of the Illinois public benefits fraud law (*See* 720 ILCS 5/17-6(a)). The OIG recommended including a warning about this law on all pre-K applications.

In a February 22 response, CPS officials said they are planning improvements to the application form as well as to CPS's debt policy. In addition, they will seek recovery of pre-K debts from CPS employees, as well as possible discipline. Collection actions will be sought against non-employee debtors, according to a CPS Corrective Action Plan.

### A MISMANAGED CONTRACT

Since 2001, CPS has provided a limited amount of full-day, tuition-based preschool for the city's 3- and 4-year-olds. The program represents an option for those parents whose children do not qualify for free pre-K based on low income or special need. This school year, tuition is $13,974 per child for 10 months of 10-hour classes.

Initially, schools collected this tuition, but one former official from the CPS Office of Early Childhood Education indicated schools were poor bill collectors. In one school, OECE could not even find the tuition checks, this former official said. So OECE looked for vendors to take over this task and settled on one particular for-profit vendor because it was the only one of four finalists to propose not charging CPS directly for its services, according to the former OECE official. Instead, the for-profit vendor planned to make money by withholding a portion of tuition payments as "processing fees" before tendering tuition to CPS and by charging parents late-payment fees.

In SY 2007–08, the vendor began collecting tuition-based payments from CPS parents. Apparently because CPS was not paying the vendor directly, the Procurement Department was not involved. No Board report was issued about the deal. CPS was given access to the vendor's online billing and collection interface, allowing it to monitor the process and make adjustments as needed.

However, evidence indicated that for eight years, there was no written agreement between CPS and the tuition-collection vendor outlining how the vendor would collect and remit what would turn out to be millions of dollars in tuition annually on CPS's behalf. The vendor at some point required parents to sign an enrollment form listing a tuition amount, a late fee and a processing fee, but neither the vendor nor CPS could produce any evidence the parties had any written agreement for the first eight years of their relationship.

The OIG views this as a dangerous business practice, as it left CPS with tenuous recourse should it discover any vendor errors or have any disputes with the tuition-collection vendor.

**Appendix**

By SY 2013–14, CPS decided to expand its pre-K offerings by launching a "sliding-scale" pre-K program that offered parents a half-day of pre-K for a fee — but for less than the tuition required in the district's full-day tuition-based program.

Copays were tied to family size and overall income as listed on pre-K applications. Copays kicked in for families making more than 200 percent of the federal poverty level. For example, last school year a family of four making less than $49,200 would qualify for free seats. Families of four making more than that amount (or more than 200 percent of the FPL for that family size) would pay anywhere from $270 a year to as much as $4,410 a year. The top copay of $4,410 kicked in for families of four making more than $100,873 — all the way through the millionaire level.

Once again, the same for-profit vendor was recruited to bill and collect payments from sliding-scale parents without going through a formal procurement process.

Finally, under different Early Childhood leadership, another OECE official realized CPS had no contract with the for-profit vendor. A services agreement was executed, starting on July 1, 2015, covering both the tuition-based and sliding-scale programs.

However, from the first year of the 2015 agreement, the vendor charged higher fees than those in the contract. It did so without the written approval of CPS, as required by the contract. CPS parents picked up the extra tab, which went to the vendor.

At the end of June 2016, the contract expired. CPS then let the tuition-collection vendor operate on an expired contract — an unsound business practice in the OIG's view. Meanwhile, the vendor continued to raise fees without written approval from CPS. Again, parents shouldered the increases; the vendor reaped the benefit.

Plus, for years, parents at different tuition-based schools have been paying different fee amounts, ranging last school year from $46 to $50 for processing fees and from $20 to $90 *per* late payment. Most of these fees were above the contracted amounts. Several top current and former OECE officials were unaware of this practice and said the fee should have been the same across schools. Concerning late payments, one representative of the tuition-collection vendor speculated that tuition-based schools must have requested different late-payment amounts.

In the last four years alone, the vendor collected nearly $20 million from CPS parents and withheld more than $240,000 of that amount in processing fees as well as another $148,000 in late fees, an analysis of the vendor's records indicated.

Despite the millions the vendor collected annually on CPS's behalf, the OIG could find no evidence that CPS had ever audited the tuition-collection vendor over the last four school years. It may well have never done so.

**Appendix**

As of this writing, the vendor continues to collect tuition-based payments from CPS parents on CPS's behalf.

**OTHER CONCERNS**

In addition to OECE mismanagement of the tuition-collection contract, the OIG made several other findings concerning CPS pre-K billing and collection practices.

The OIG found that OECE employees in the best position to be riding herd over the tuition-collection vendor did not know key specifics of the contract, such as the contracted amount of the vendor's processing and late fees or when the contract expired. Thus, they were unable to detect when fees were above the contracted amount or to recommend exercising an option to renew the contract.

Current OECE officials could not remember any sliding-scale debtor ever being removed from the program for lack of payment, including those who listed six-figure incomes on their applications. OECE never referred pre-K debtors to a bill collector during the four years examined, even though a bill collector was under contract with CPS for part of this time period.

In recent years, CPS never systematically checked whether any debtors were CPS employees, although one key OECE official noted that he did not have the ability to do so.

One CPS employee who dealt with the tuition-collection vendor has been working alone in a 3,200-square-foot office space, located in a shopping mall, this school year as well as last school year. Such a large space for one person is "a waste of money," a former OECE official told the OIG. This year's rent is costing CPS more than $70,000.

At least two CPS departments that work with or monitor the vendor's billing and collection functions displayed poor recording-keeping in that they were missing vital records in their official files or kept incomplete or unauditable records.

At the time of the OIG's performance review, CPS employees were sharing passwords and user names to vendor billing accounts that had been used by employees who had left CPS years ago. This theoretically gave ex-CPS employees who remembered their old user names and passwords the ability to alter tuition or billing information and to see personal information about students and parents. It also left behind inaccurate audit trails.

In recent years, on-site supervision of one CPS employee with the power to waive fees or tuition was non-existent.

CPS used three different databases to collect pre-K application information for its sliding-scale program over the four years surveyed. This created the opportunity for

**Appendix**

numerous data errors and billing mistakes. The OIG also found what appeared to be numerous human errors in Early Childhood and pre-K data and files.

**SIX SHORTING METHODS**

Using data provided by OECE or contained in databases maintained by CPS or the tuition-collection vendor, the OIG's Performance Analysis Unit identified six ways in which CPS failed to collect all the money it was due from its tuition-based or sliding-scale pre-K programs between SY 2014–15 and SY 2017–18:



Source: OIG Analysis of CPS and tuition-collection vendor data 2014–15 through 2017–18.

1. **Sliding-Scale Debtors:** Nearly $751,000 in copays was never collected from the parents of 677 students in the sliding-scale program, including nearly $90,000 in debt accumulated by 61 CPS employees. Those employees include 2 principals, 2 assistant principals and 25 CPS teachers with debts over $500. The biggest CPS sliding-scale debtor is a school clerk who owes more than $8,100 from her child's two years of pre-K in the school where she worked. Among non-CPS employees, the biggest debtor has an unpaid tab of nearly $15,500. The second-largest non-CPS debtor is a Chicago police commander with a six-figure salary who owes CPS nearly $8,900 for the two years his two children attended sliding-scale pre-K. Another Chicago police officer, with an annual salary of more than $85,000, owes CPS nearly $7,600. All four of these debtors displayed

**Appendix**

a pattern exhibited in the cases of 63 sliding-scale students: their parents owed money at the end of their first year of pre-K, but the children were allowed to return for a second year, when their parents rang up even more debt, on average, than the first year.

2. **Tuition-Based Debtors:** Nearly $60,000 in tuition was never collected from the parents of 28 students in the tuition-based pre-K program. Of that amount, $10,400 in debt was racked up by three CPS teachers. The biggest CPS-employed tuition-based debtor was a teacher who failed to pay more than $5,200 for her child's tuition-based pre-K in the school where she worked.

3. **Tuition-Based Mystery Kids:** CPS could not produce any proof that nearly $37,000 in tuition was ever paid on behalf of four students who were not billed by the tuition-collection vendor, meaning those students may well have slipped into tuition-based seats without ever paying CPS. The OIG recommended a way of catching such non-billed students in the future.

4. **CPS Employees with Understated Incomes:** More than $114,000 in additional sliding-scale copays should have been collected from 78 CPS employees who understated their incomes on applications for sliding-scale seats, resulting in shortages to CPS. The bulk of these employees — 51 of 78 — obtained free pre-K seats for their children under this scheme, some for two consecutive years.

5. **Billable Incomes Not Billed:** Nearly $757,000 in sliding-scale copays was never collected from the parents of 379 students who were listed in data provided by OECE with family sizes and incomes that normally should have triggered sliding-scale copays — yet, inexplicably, they were never billed. This tally includes 242 students from one anomalous year, SY 2015–16, who were listed as "copay exempt" in CPS records without any supporting information to indicate why they should be exempt from paying what should have been more than $462,000 in copays. Key CPS officials could not adequately explain the basis of these waivers. Some of these families had six-figure incomes and possibly were granted copay exemptions based on standards that were not applied in the three other years examined by the OIG. If the $462,000 in questionable copay exemptions from 2015-16 is presumed to be accurate, CPS would have left nearly $1.6 million on the table across all six schemes identified by the OIG. But if the OIG applies the same copay exemption standards to SY 2015–16 as CPS allowed in other years, CPS would have left just over $2 million on the table from all six schemes over the four years analyzed.

6. **Three-Month Billing Error:** Nearly $324,000 in sliding-scale copays was never collected in SY 2017–18 due to a billing error involving 690 students whose parents mistakenly were not billed for the first three months of the program. CPS Early Childhood officials waived these three months of copays after finding

**Appendix**

CPS erred in not initially notifying or billing these parents. Early Childhood officials did not try to determine why the error occurred.

**TOP RECOMMENDATIONS AND CPS RESPONSES**

As a result of its performance review, the OIG's Performance Analysis Unit referred some cases to other OIG investigative units. The OIG also issued 21 recommendations to the Board on December 14, 2018, concerning pre-K billing and collection procedures. The first 10 recommendations were considered time-sensitive, so the OIG asked CPS for a corrective action plan addressing them within two months. A CPS corrective action plan was provided on February 22. The OIG expects responses to the 11 remaining recommendations by mid-June.

The IG's 10 time-sensitive recommendations, and CPS's responses, are as follows:

1. **Consider an RFP.** CPS should consider an RFP for SY 2019–2020 tuition-based collections because the tuition-collection vendor has not abided by its contract and handles millions of dollars in CPS tuition annually. If CPS decides to continue to use the same vendor, it should renegotiate its now-expired contract and monitor it carefully.

   *CPS Response: CPS will be working on a new contract with the same vendor, targeted to start April 30, 2019.*

2. **Standardize fees.** Any new contract should establish and enforce consistent *late* fees, which last school year ranged from $20 to $90 across all tuition-based schools, as well as consistent *processing* fees, which last school year ranged from $46 to $50 per tuition-based student, depending on the school. References to these fees in vendor or CPS material should use consistent and correct figures. (Note that the sliding-scale program was halted this school year so its fees are moot.)

   *CPS Response: The new contract with the same vendor will have the same processing fee and late fee across all tuition-based schools. These rates will be used consistently across all communications with parents and in the contract.*

3. **Demand payment.** CPS should demand payment, preferably with interest, from CPS employees with tuition-based or sliding-scale debt and carefully weigh all options against non-employee debtors with pre-K debt, particularly those with tuition-based debt or large debt amounts. In addition, CPS should send up-to-date bills to parents of the four tuition-based mystery kids.

   *CPS Response: The Law Department will be contacting high-level employees, and then rank-and-file employees, to seek repayment and/or possible disciplinary*

**Appendix**

*action. The Law Department also will seek collection actions against debtors who are not employed by the Board.*

4. **Update indebtedness policies and rules.** The current Board Policy on Indebtedness requires CPS job applicants to pay outstanding parking tickets as a condition of employment. In addition, under Board Rules, existing CPS employees can be disciplined or dismissed for any City of Chicago debt. Board Rules and Policies should be amended to address CPS pre-K debt by CPS employees and job applicants.

   *CPS Response: The Law Department will be updating Board Rule 4-4(g) to expand its coverage to all public debt above and beyond just debt to the City of Chicago. The proposed changes may require negotiations with labor organizations.*

5. **Check annually for CPS debtors**. CPS should conduct an annual check for employees with pre-K tuition debt. Action should then be pursued against CPS-employed pre-K debtors under the updated Board Rules and Policies recommended above.

   *CPS Response: The Office of Early Childhood will provide the appropriate CPS departments with a report on CPS employees who owe pre-K tuition debt.*

6. **Add attestation box and warning**. Current applications for free pre-K should contain an attestation-of-truthfulness box and require a clear indication of who filled out the form so CPS employees, in particular, can be held accountable if they provide false information. To discourage application fraud, such forms should include a warning that providing false or misleading information could result in criminal penalties under the Illinois public benefits fraud law, 720 ILCS 5/17-6(a).

   *CPS Response: The Office of Early Childhood will ask the City Department of Family Support Services to work with its software vendor to add the attestation box and warning. This attestation box and warning will apply to all public entities, not limited to CPS and the City of Chicago.*

7. **Employment disclosure needed.** The OIG recommends that CPS's free pre-K application require disclosure of whether any parent or guardian of a child applicant works for CPS — and possibly for the City of Chicago or its sister agencies. This will provide valuable information in the event CPS wants to seek back-tuition from its employees or sister-agency employees, all of whom should be held to the highest standards when debts to public agencies are involved.

   *CPS Response: The Office of Early Childhood will request that the DFSS work with their software vendor to add a section requiring that any guardian of a child*

**Appendix**

*applicant disclose his or her current employment status with CPS, the City of Chicago or any other public entity.*

8. **Audit trail and audits needed.** CPS needs to establish an auditable way of maintaining tuition-based application and payment information. The audit trail on data in the current electronic application database is not readily available to CPS officials. Audits of the billing and collection vendor should be conducted on a regular basis to ensure the vendor is withholding the correct amount of fees and tendering the correct tuition.

   *CPS Response: The tuition-collection vendor will be asked to provide a monthly report on all students' tuition payments and fees, which CPS will monitor for delinquencies and discrepancies in payments made.*

9. **End the lease.** When CPS's lease on the 3,200-square-foot office space now being used by only one CPS employee — a person who monitors tuition billing — expires on June 30, 2019, CPS should consider ending the more than $70,000-a-year lease.

   *CPS Response: This lease will not be renewed and the employee will be housed at Central Office.*

10. **Update usernames and passwords.** During the time period examined, CPS employees used the usernames and passwords of former CPS employees to access the vendor's database of CPS tuition-based and sliding-scale accounts. This prevented accurate audit trails and theoretically allowed ex-employees to tamper with tuition bills and access student information. In the future, all vendor database usernames and passwords should be used in a way that is consistent with CPS password guidelines.

   *CPS Response: CPS says it has corrected this issue.*